UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

FLUXCO-CANE OVERSEAS LTD. AND
MANOEL FERNANDO GARCIA,

      Plaintiffs,            :    08 Civ. 2432

          v.

NEWEDGE USA, LLC (f/k/a FIMAT USA
LLC)

      Defendants.

———————————————————————— x

      **VERIFIED COMPLAINT**

      Plaintiffs Fluxo-Cane Overseas Ltd. and Manoel Fernando Garcia (collectively "Plaintiffs"), by its attorneys, submits the following, for its complaint against Defendant NewEdge USA, LLC ("Defendant"):

## NATURE OF THE ACTION

    1.    This is a dispute between Plaintiffs, a trading company and its principal, and Defendant, their clearing broker.

    2.    Plaintiffs seek declaratory and injunctive relief from Defendant's attempt to force Plaintiffs to arbitrate disputes arising under various contracts between Defendant and Plaintiffs. Those disputes are not arbitrable because neither the contracts at issue nor any other agreement between the parties provides for arbitration of such claims. To the contrary, two of the three

agreements at issue contain broad forum selection clauses designating New York state or federal court as the exclusive jurisdiction for resolving disputes between them. Plaintiffs therefore seek a declaratory judgment that the disputed claims are not arbitrable and a preliminary and permanent injunction prohibiting Defendant from proceeding with arbitration on these claims against Plaintiffs.

**JURISDICTION AND VENUE**

3.     This Court has jurisdiction over this action and the claims asserted herein pursuant to 28 U.S.C. § 1331 as it raises a federal question pursuant to the Federal Arbitration Act, (9 U.S.C. § 1, et seq.) and 28 U.S.C. § 1332, as the parties are diverse and Plaintiffs seek damages in excess of $75,000.

4.     The Court has personal jurisdiction over Defendant because, upon information and belief, Defendant committed the acts discussed herein within the judicial district of the Southern District of New York and is doing business within the State of New York.

5.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391.

**PARTIES**

6.     Plaintiff Fluxo-Cane Overseas Ltd. ("Fluxo-Cane") is a corporation organized under the laws of the British Virgin Islands, having its principal place of business in Tortola, British Virgin Islands. Fluxo-Cane was formed on December 21, 2006 upon the merger of two British Virgin Islands companies, Fluxo Overseas Ltd. and its wholly-owned subsidiary, Cane International Corporation Ltd.

7.     Plaintiff Manoel Fernando Garcia is a citizen and resident of Brazil. Mr. Garcia is the sole shareholder and president of Fluxo-Cane.

8.      Upon information and belief, Defendant Newedge USA, LLC (f/k/a Fimat USA, LLC) ("Defendant") is an LLC organized under the laws of the state of Delaware, having its principal place of business at 630 Fifth Avenue, New York, New York 10111. Upon information and belief, Newedge USA, LLC is a broker offering clearing and settlement services to investors in a wide range of investment instruments, including exchange-traded listed derivatives and equities, as well as regular and exotic commodities listed on over-the-counter markets.

9.      Upon information and belief, Newedge USA, LLC is a subsidiary of non-party Newedge Group S.A. (UK Branch) (f/k/a Fimat International Banque S.A. (UK Branch) ("Newedge Group (UK Branch)")). Upon information and belief, Newedge Group (UK Branch) is a United Kingdom qualified branch of a French banking institution that provides a variety of financing services, including margin financing facilities, to its customers.

## THE FACTS

### The Notice of Arbitration

10.      On or about February 13, 2008, Newedge USA, LLC filed a Notice of Arbitration with ICE[1], naming Fluxo-Cane and Mr. Garcia as respondents (the "Notice"). (Ex. 1.) In it, Newedge USA, LLC claims that it and Newedge Group (UK Branch) are entitled to recover US $5,106,889,59 from the respondents. See Notice at 5.

11.      *Newedge USA, LLC was Fluxo-Cane's Broker To Assist Fluxo-Cane In Its Own Trading.* The Notice states that Fluxo-Cane was Newedge USA, LLC's customer, maintaining an account with Newedge USA, LLC. See Notice at 1-2. In essence, Fluxo-Cane used Newedge

---

[1]      Upon information and belief, non-party ICE Futures US, Inc. ("ICE") (f/k/a Board of Trade of the City of New York) is a designated contract market pursuant to the Commodity Exchange Act, with its headquarters located in New York. Upon information and belief, ICE operates a global futures and options exchange for trading in a broad array of "soft" agricultural commodities, including cocoa, coffee, cotton, frozen concentrated orange juice, and sugar.

USA, LLC as a broker to assist Fluxo-Cane in purchasing and selling commodity futures and option contracts. See Notice at 1. Indeed, the Notice explains that the legal relationship between the two entities was formed as a result of a "Customer Agreement" signed by both parties. See Notice at 2.

12.     Thus, the Notice states, Newedge USA, LLC was Fluxo-Cane's broker in conducting trades for Fluxo-Cane's own account as to other counterparties in the marketplace. There is no allegation that Fluxo-Cane conducted transactions directly with Newedge USA, LLC as a counterparty.

13.     *Newedge USA, LLC's Claim Against Fluxo-Cane Arises From Margin Calls To Which Newedge USA, LLC Is Purportedly Entitled Under The Customer Agreement.* The Notice does not allege that Fluxo-Cane caused any losses *to Newedge USA, LLC* as a result of Fluxo-Cane's orders or transactions.

14.     Rather, the Notice alleges that in January 2008, Fluxo-Cane's trading caused losses *to Fluxo-Cane itself* and in turn, Newedge USA, LLC had the legal right to demand further capital to satisfy margin requirements[2] pursuant to the Customer Agreement. See Notice at 3 ("[A]s a result of losses *incurred by Fluxo-Cane* on [certain sugar futures and options transactions], Newedge [USA, LLC] issued a margin notice in the amount of $5,000,000"). According to the Notice of Arbitration, Fluxo-Cane failed to meet these margin calls and, as a consequence, Fluxo-Cane allegedly owes Newedge USA, LLC, $2,285,355.59 pursuant to the terms of its Customer Agreement executed on March 8, 2007. See Notice at 3-4, 5.

15.     *Newedge Group (UK Branch) Lent Money To Fluxo-Cane, Which Mr. Garcia Guaranteed.* The Notice also purports to press claims on behalf of Newedge Group (UK

---

[2] A "margin requirement" is the minimum amount of capital a customer must maintain with a broker to conduct trading in certain levels of commodity futures.

Branch), although that entity is not a claimant. Again, the Notice invokes the claimant's rights under the Customer Agreement; under such agreement, Newedge USA, LLC has the contractual right to pursue claims on behalf of Newedge Group (UK Branch). See Notice at 2.

16.     Newedge Group (UK Branch) claims rights under a so-called "Financing Agreement" signed by Fluxo-Cane, Newedge USA, LLC, and Newedge Group (UK Branch). Under the Financing Agreement, Fluxo-Cane obtained loans from Newedge Group (UK Branch) to use as a margin in its account maintained at Newedge USA, LLC. See Notice at 2. This loan was guaranteed by Mr. Garcia through a "Letter of Individual Guarantee." See Notice at 2.

17.     *Newedge Group (UK Branch)'s Claim Against Fluxo-Cane And Mr. Garcia Allegedly Arises From Newedge Group (UK Branch)'s Rights Under The So-Called "Financing Agreement" And "Letter of Individual Guarantee."* The Notice purports to bring a claim by Newedge USA, LLC against Fluxo-Cane "as agent of" Newedge Group (UK Branch) for an additional US $2,821,534.00. See Notice at 2, 5. This is simply an action to collect on a loan; there is no allegation that Fluxo-Cane caused any losses to Newedge Group (UK Branch) directly through any commodity or futures transactions or orders; indeed, the Notice alleges that Newedge Group (UK Branch) was a "bank" that lends money. See Notice at 1.

18.     According to the Notice, when Fluxo-Cane failed to meet the margin demand of Newedge USA, LLC in its trading account, Fluxo-Cane had allegedly borrowed US $2,821,534.00 from Newedge Group (UK Branch) pursuant to the Financing Agreement. As stated above, Mr. Garcia allegedly guaranteed such amounts pursuant to a Letter of Individual Guarantee.

19.    Newedge USA, LLC does not address in its Notice the fact that the Customer Agreement and Financing Agreement expressly contemplate that litigation in New York, not arbitration in ICE or in any other arbitral forum, is the method of resolving disputes.

20.    Rather, Newedge USA, LLC conclusorily asserts, without explanation, that its dispute is among ICE members, and claims that the dispute is an "Allowable Claim" subject to arbitration pursuant to ICE Rule 20.02(b).  See Notice at 1.

**Plaintiffs' Agreements With Newedge USA, LLC and Newedge Group (UK Branch) Provide For Judicial Resolution of Disputes**

21.    Fluxo-Cane is engaged in the business of trading sugar and alcohol for import/export shipment, including shipment to the United States.

22.    As part of its business, Fluxo-Cane traded in Sugar No. 11 futures and option contracts through a number of clearing brokers on a contract market operated by ICE Futures US, Inc.

23.    As stated above, one of the clearing brokers that Fluxo-Cane traded through is Defendant Newedge USA, LLC (f/k/a Fimat USA, LLC).

24.    Whereas Fluxo-Cane's trading activities on ICE were governed by the rules promulgated by ICE (the "ICE Rules"), its contractual relationship with the clearing brokers through which it traded was governed by individual customer agreements and other ancillary contracts between Fluxo-Cane and each of its brokers.

25.    Thus, in the case of Newedge USA, LLC, the respective rights and obligations of Fluxo-Cane as customer and Fimat USA (as Newedge USA, LLC was then known) as clearing broker were set forth in a customer agreement dated March 8, 2007 (the "Customer Agreement" referenced above in the Notice) (Ex. 2).

26.    As set forth below, the Customer Agreement has no arbitration provision and contemplates that disputes arising under it are to be brought in a judicial forum in New York.

27.    The Customer Agreement was contained on pages 7-17 of a packet of new account materials provided by Fimat USA to Fluxo-Cane (the "New Account Materials").  In addition to the Customer Agreement, the New Account Materials contained instructions, risk disclosures, as well as other agreements, including, on page 22, a form of contract captioned "Arbitration Agreement." (Ex. 2)

28.    The bottom of the arbitration form contains the legend, in bold type, "YOU NEED NOT SIGN THIS AGREEMENT TO OPEN AN ACCOUNT WITH FIMAT USA, LLC." (Ex. 2)

29.    Fluxo-Cane executed the Customer Agreement on March 8, 2007, but did not execute the form of arbitration agreement.

30.    Thus, the only operative provision in the New Account Materials relating to dispute resolution was the previously mentioned clause mentioning a judicial forum in New York.

31.    To accommodate the margin call requirements in the master trading facility established pursuant to the Customer Agreement, FIMAT UK (as Newedge Group (UK Branch) was then known) offered Fluxo-Cane a demand loan margin financing facility (the "Financing Agreement" referenced above in the Notice).

32.    The Financing Agreement provides that all disputes there under are to be brought in a court sitting in New York.  See infra at 9.  The Financing Agreement was executed by Fluxo-Cane on April 9, 2007 and Fimat UK on June 1, 2007.  (Ex. 3.)

33.    A letter agreement amending and renewing the Financing Agreement date July 30, 2007 was executed by Fluxo-Cane on August 28, 2007 and Fimat UK on September 18, 2007. (Ex. 4.)

34.    Both the Customer Agreement and the Financing Agreement were supported by a personal guarantee, dated December 21, 2006, executed by Mr. Garcia in favor of Fimat USA and Fimat UK (the "Letter of Individual Guarantee" referenced above in the Notice). (Ex. 5.)

35.    The Letter of Individual Guarantee did not contain an arbitration provision or any other agreement to arbitrate disputes arising there under.

**Nevertheless, Newedge USA, LLC Filed A Notice of Arbitration Against Plaintiffs**

36.    On or around February 13, 2008, Newedge USA, LLC filed a Notice of Arbitration with ICE, naming Fluxo-Cane and Mr. Garcia as respondents. In it, Newedge USA, LLC attempts to combine three claims: one for itself against Fluxo-Cane, one for Newedge Group (UK Branch), which is not alleged to be a Member of ICE, against Fluxo-Cane and a claim for both Newedge USA, LLC and Newedge Group (UK Branch) for the sum total of the two claims referred to above against Mr. Garcia personally, calculated as follows:

37.    US $2,285,355.59 allegedly owed by Fluxo-Cane to Newedge USA, LLC under the Customer Agreement as a futures account margin deficit in its clearing account (See Notice at 5);

38.    US $2,821,534.00 allegedly owed by Fluxo-Cane to Newedge Group (UK Branch) under the Financing Agreement as amounts outstanding on Fluxo-Cane's demand loan facility (See Notice at 3); and

39.    US $5,106,889.59 (i.e., the total amount allegedly owed under the Customer Agreement and Financing Agreement) allegedly owed by Mr. Garcia to Newedge USA, LLC under the Letter of Individual Guarantee (See Notice at 5).

40.    Newedge USA, LLC does not address in its Notice the fact that the Customer Agreement and Financing Agreement expressly contemplate that litigation in New York, not arbitration in ICE or in any other arbitral forum, is to be the method of resolving disputes.

Rather, Newedge USA, LLC conclusorily asserts, without explanation, that the dispute is among ICE members, and that its claim is an "Allowable Claim" subject to arbitration pursuant to ICE Rule 20.02(b). See Notice at 1.

41.    Nowhere in the Notice does Newedge USA, LLC allege even the most basic prerequisites of Rule 20.02 – that it engaged in a specific type of commodities/futures transaction with Fluxo-Cane and that such a transaction directly caused a loss to Newedge USA, LLC. (Ex. 6.)

42.    In addition to declining to explain how its claims on their face fall under the definition of "Allowable Claims", Newedge USA, LLC also does not explain how or why a claim of an entity that is not an ICE member (Newedge Group (UK Branch)) should be arbitrable under ICE arbitration rules. (Indeed, Newedge USA, LLC's only power to press claims on behalf of Newedge Group (UK Branch) arises out of the Customer Agreement, which contemplates dispute resolution in New York courts and which contains an *unsigned* optional arbitration clause).

43.    On February 21, 2008, ICE forwarded a copy of the Notice to Fluxo-Cane and Mr. Garcia, informing them that they had twenty days from the date of receipt of the Notice – i.e., until Wednesday, March 12, 2008 – to submit an answer and to assert any counterclaims. (Ex. 6.)

### FIRST CAUSE OF ACTION
#### (Declaratory Judgment)

44.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth in paragraphs of this Complaint enumerated "1" through "43", inclusive with the same force and affect as if hereinafter set forth in full.

45.    On February 13, 2008, Newedge USA, LLC filed a notice of arbitration with ICE asserting against Plaintiffs claims for monies allegedly owed it under the Customer Agreement, the Financing Agreement, and the Guarantee.  None of these claims is arbitrable.

46.    Plaintiffs have not agreed to arbitrate disputes with Newedge USA, LLC or Newedge Group (UK Branch) under the Customer Agreement, the Financing Agreement, or the Letter of Guarantee.

47.    There exists an actual justiciable case or controversy between the parties with respect to the arbitrability of the claims Newedge USA, LLC has asserted against Plaintiffs in arbitration under the ICE Rules.

48.    Plaintiffs therefore seek a judgment declaring and finding that Defendant's claims asserted against Plaintiffs in the Arbitration Notice filed by Defendant with ICE on or about February 13, 2008 that are referenced in this Verified Complaint or any other claims arising under or in connection with the Customer Agreement, Financing Agreement, or Letter of Guarantee are not subject to arbitration.

49.    This Complaint is verified upon the accompanying signature of Manoel Fernando Garcia.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court award the following relief:

A.    a declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 against Defendant declaring and finding that Defendant's claims asserted against Plaintiffs in the Arbitration Notice are not subject to arbitration;

B.    a temporary restraining order and a preliminary and permanent injunction prohibiting Defendant from bringing or pursuing any arbitration proceeding against Plaintiffs with respect to the claims asserted in the Arbitration Notice filed by Defendant with ICE on or about February 13, 2008 that are referenced in this Verified Complaint or any other claims arising under or in connection with the Customer Agreement, Financing Agreement, and Letter of Guarantee;

C.     any further necessary or proper relief based on the declaratory judgment pursuant to 28 U.S.C. § 2202;

D.     such other and further relief as this Court deems just and proper.

Dated: March 10, 2008
     New York, New York

Respectfully submitted,

KOBRE & KIM LLP

By: _____

Michael S. Kim (MK-0308)
Francisco J. Navarro (FN-1874)
800 Third Avenue
New York, New York 10022
Telephone:    212.488.1200
Facsimile:    212.488.1220

Andrew C. Lourie (AL-0630)
1919 M Street, N.W.
Washington, D.C. 20036
Telephone:    202.664.1900
Facsimile:    202.664.1920

*Attorneys for Plaintiffs*

*Fluxo-Cane Overseas Ltd. and
Manoel Fernando Garcia*

## VERIFICATION

**STATE OF NEW YORK**
**COUNTY OF NEW YORK**

I, Manoel Fernando Garcia, of full age, being duly sworn according to law, upon my oath do depose and say:

1. I am the President and sole owner of Fluxo-Cane Overseas, Ltd., a Plaintiff in this matter.

2. I have read the foregoing Verified Complaint and hereby certify that all of the factual allegations contained herein are true and correct, except for those made upon information and belief, which I have reason to believe are true.

Sworn before me this

Tenth day of March, 2008

_____
Notary Public

DATED: March 10, 2008

_____
Manoel Fernando Garcia
President, Fluxo-Cane Overseas, Ltd.

MICH
Notary Publi
No
York
MICHAEL S KIM
Notary Public - State of New York
No. 02KI5070726
Qualified in New York County
My Commission Expires 12/23/2010

P
L
E
A
S
E

D
E
T
A
C
H

R
I
S
K

D
I
S
C
L
O
S
U
R
E

S
T
A
T
E
M
E
N
T

F
O
R

F
U
T
U
R
E
S

A
N
D

O
P
T
I
O
N
S

P
L
E
A
S
E

D
E
T
A
C
H

# RISK DISCLOSURE STATEMENT FOR FUTURES AND OPTIONS

THIS BRIEF STATEMENT DOES NOT DISCLOSE ALL OF THE RISKS AND OTHER SIGNIFICANT ASPECTS OF TRADING IN FUTURES AND OPTIONS. IN LIGHT OF THE RISKS, YOU SHOULD UNDERTAKE SUCH TRANSACTIONS ONLY IF YOU UNDERSTAND THE NATURE OF THE CONTRACTS (AND CONTRACTUAL RELATIONSHIPS) INTO WHICH YOU ARE ENTERING AND THE EXTENT OF YOUR EXPOSURE TO RISK. TRADING IN FUTURES AND OPTIONS IS NOT SUITABLE FOR MANY MEMBERS OF THE PUBLIC. YOU SHOULD CAREFULLY CONSIDER WHETHER TRADING IS APPROPRIATE FOR YOU IN LIGHT OF YOUR EXPERIENCE, OBJECTIVES, FINANCIAL RESOURCES AND OTHER RELEVANT CIRCUMSTANCES.

## Futures

### 1. Effect of 'Leverage' or 'Gearing'

Transactions in futures carry a high degree of risk. The amount of initial margin is small relative to the value of the futures contract so that transactions are 'leveraged' or 'geared'. A relatively small market movement will have a proportionately larger impact on the funds you have deposited or will have to deposit: this may work against you as well as for you. You may sustain a total loss of initial margin funds and any additional funds deposited with the firm to maintain your position. If the market moves against your position or margin levels are increased, you may be called upon to pay substantial additional funds on short notice to maintain your position. If you fail to comply with a request for additional funds within the time prescribed, your position may be liquidated at a loss and you will be liable for any resulting deficit.

### 2. Risk-reducing orders or strategies

The placing of certain orders (e.g. 'stop-loss' orders, where permitted under local law, or 'stop-limit' orders) which are intended to limit losses to certain amounts may not be effective because market conditions may make it impossible to execute such orders. Strategies using combinations of positions, such as 'spread' and 'straddle' positions may be as risky as taking simple 'long' or 'short' positions.

## Options

### 3. Variable degree of risk

Transactions in options carry a high degree of risk. Purchasers and sellers of options should familiarize themselves with the type of option (i.e. put or call) which they contemplate trading and the associated risks. You should calculate the extent to which the value of the options must increase for your position to become profitable, taking into account the premium and all transaction costs.

The purchaser of options may offset or exercise the options or allow the options to expire. The exercise of an option results either in a cash settlement or in the purchaser acquiring or delivering the underlying interest. If the option is on a future, the purchaser will acquire a futures position with associated liabilities for margin (see the section on Futures above). If the purchased options expire worthless, you will suffer a total loss of your investment which will consist of the option premium plus transaction costs. If you are contemplating purchasing deep-out-of-the-money options, you should be aware that the chance of such options becoming profitable ordinarily is remote.

Selling ('writing' or 'granting') an option generally entails considerably greater risk than purchasing options. Although the premium received by the seller is fixed, the seller may sustain a loss well in excess of that amount. The seller will be liable for additional margin to maintain the position if the market moves unfavorably. The seller will also be exposed to the risk of the purchaser exercising the option and the seller will be obligated to either settle the option in cash or to acquire or deliver the underlying interest. If the option is on a future, the seller will acquire a position in a future with associated liabilities for margin (see the section on Futures above). If the option is 'covered' by the seller holding a corresponding position in the underlying interest or a future or another option, the risk may be reduced. If the option is not covered, the risk of loss can be unlimited.

Certain exchanges in some jurisdictions permit deferred payment of the option premium, exposing the purchaser to liability for margin payments not exceeding the amount of the premium. The purchaser is still subject to the risk of losing the premium and transaction costs. When the option is exercised or expires, the purchaser is responsible for any unpaid premium outstanding at that time.

### Additional risks common to futures and options

### 4. Terms and conditions of contracts

You should ask the firm with which you deal about the terms and conditions of the specific futures or options which you are trading and associated obligations (e.g. the circumstances under which you may become obligated to make or take delivery of the underlying interest of a futures contract and, in respect of options, expiration dates and restrictions on the time for exercise). Under certain circumstances the specifications of outstanding contracts (including the exercise price of an option) may be modified by the exchange or clearing house to reflect changes in the underlying interest.

5.  Suspension or restriction of trading and pricing relationships

Market conditions (e.g. illiquidity) and/or the operation of the rules of certain markets (e.g. the suspension of trading in any contract or contract month because of price limits or 'circuit breakers') may increase the risk of loss by making it difficult or impossible to effect transactions or liquidate/offset positions. If you have sold options, this may increase the risk of loss.

Further, normal pricing relationships between the underlying interest and the future, and the underlying interest and the option may not exist. This can occur when, for example, the futures contract underlying the option is subject to price limits while the option is not. The absence of an underlying reference price may make it difficult to judge 'fair' value.

6.  Deposited cash and property

You should familiarize yourself with the protections accorded money or other property you deposit for domestic and foreign transactions, particularly in the event of a firm insolvency or bankruptcy. The extent to which you may recover your money or property may be governed by specific legislation or local rules. In some jurisdictions, property which had been specifically identifiable as your own will be pro-rated in the same manner as cash for purposes of distribution in the event of a shortfall.

7.  Commission and other charges

Before you begin to trade, you should obtain a clear explanation of all commission, fees and other charges for which you will be liable. These charges will affect your net profit (if any) or increase your loss.

8.  Transactions in other jurisdictions

Transactions on markets in other jurisdictions, including markets formally linked to a domestic market, may expose you to additional risk. Such markets may be subject to regulation which may offer different or diminished investor protection. Before you trade you should inquire about any rules relevant to your particular transactions. Your local regulatory authority will be unable to compel the enforcement of the rules of regulatory authorities or markets in other jurisdictions where your transactions have been effected. You should ask the firm with which you deal for details about the types of redress available in both your home jurisdiction and other relevant jurisdictions before you start to trade.

9.  Currency risks

The profit or loss in transactions in foreign currency-denominated contracts (whether they are traded in your own or another jurisdiction) will be affected by fluctuations in currency rates where there is a need to convert from the currency denomination of the contract to another currency.

10.  Trading facilities

Most open-outcry and electronic trading facilities are supported by computer-based component systems for the order-routing, execution, matching, registration or clearing of trades. As with all facilities and systems, they are vulnerable to temporary disruption or failure. Your ability to recover certain losses may be subject to limits on liability imposed by the system provider, the market, the clearing house and/or member firms. Such limits may vary:  you should ask the firm with which you deal for details in this respect.

11.  Electronic trading

Trading on an electronic trading system may differ not only from trading in an open-outcry market but also from trading on other electronic trading systems. If you undertake transactions on an electronic trading system, you will be exposed to risks associated with the system including the failure of hardware and software. The result of any system failure may be that your order is either not executed according to your instructions or is not executed at all.

12.  Off-exchange transactions

In some jurisdictions, and only then in restricted cir-cumstances, firms are permitted to effect off-exchange transactions. The firm with which you deal may be acting as your counterparty to the  transaction. It may be difficult or impossible to liquidate an existing position, to assess the value, to determine a fair price or to assess the exposure to risk. For these reasons, these transactions may involve increased risks. Off-exchange transactions may be less regulated or subject to a separate regulatory regime. Before you undertake such transactions, you should familiarize yourself with applicable rules and attendant risks.

**PLEASE ACKNOWLEDGE YOUR RECEIPT AND UNDERSTANDING OF THIS SEPARATE RISK DISCLOSURE STATEMENT BY INITIALLING WHERE APPLICABLE ON PAGE 17.**

Thank you for considering Fimat USA, LLC

Please read all documents carefully before signing.

Remember, futures and options trading entails risks, and
you should never invest, or place at risk, more
than you can afford to lose.

INSTRUCTIONS

**THE INFORMATION CONTAINED IN THIS BOOKLET IS VERY IMPORTANT.  PLEASE READ EACH SECTION VERY CAREFULLY.  IF THERE IS ANYTHING IN THE BOOKLET THAT YOU DO NOT UNDERSTAND, PLEASE CONTACT YOUR ACCOUNT REPRESENTATIVE FOR CLARIFICATION.**

The forms in this booklet must be properly completed and signed BEFORE you can open an account carried by Fimat USA, LLC ("FIMAT").   ALL CUSTOMERS MUST SIGN AND DATE AT LEAST THE APPROPRIATE FORMS FOR THE TYPE OF ACCOUNT WHICH THEY ARE PLANNING TO OPEN ON THE SPACES PROVIDED ON THE PAGES LISTED BELOW.

| TYPE OF ACCOUNT | PAGE(S) |
|---|---|

**INDIVIDUAL OR SOLE PROPRIETORSHIP:**

Please complete all applicable items in the Customer Application and provide requested Documents......................... 5-6

Sign and date the Customer Agreement and initial box acknowledging receipt of Disclosure
Statement .................................................................................................................................................... 17

Sign and date either the W-8 BEN or W-9 Forms
*See important statement below regarding tax forms for non-U.S. customers.*

**JOINT OR PARTNERSHIP ACCOUNT:**

Please complete all applicable items in the Customer Application and provide requested Documents......................... 5-6

Sign and date the Customer Agreement and initial box acknowledging receipt of Disclosure
Statement .................................................................................................................................................... 17

Complete Joint Tenants Agreement or Partnership Authorization, as applicable ......................................... 23-24

Sign and date either the W-8 BEN or W-9 Forms
*See important statement below regarding tax forms for non-U.S. customers.*

**CORPORATE ACCOUNT:**

Please complete all applicable items in the Customer Application and provide requested Documents......................... 5-6

Sign and date the Customer Agreement and initial box acknowledging receipt of Disclosure
Statement .................................................................................................................................................... 17

Complete Certificate of Corporate Resolution .......................................................................................... 25

Sign and date either the W-8 BEN or W-9 Forms
*See important statement below regarding tax forms for non-U.S. customers*

*Non-U.S. customers of Fimat USA, LLC ("FIMAT") are required to complete and provide to FIMAT an IRS Form W-8BEN if they will receive interest or other taxable income and they will be the beneficial owner of such income. (Certain non-U.S. customers may complete and provide to FIMAT an IRS Form W-8ECI or Form W-EXP in lieu of a W-8BEN.) Non-U.S. Intermediaries, i.e., persons acting on behalf of beneficial owners, are required to complete an IRS Form W-8IMY and if not a so-called "Qualified Intermediary" or "foreign withholding partnership" may also be required to provide to FIMAT an IRS Form W-8BEN for each ultimate beneficial owner. Failure to provide the proper form(s) to FIMAT may require FIMAT to withhold a percentage of income paid to a non-U.S. customer and/or will make the non-U.S. customer liable to FIMAT for taxes and penalties FIMAT may be required to pay as a result of such customer. FIMAT will presume that any IRS form you provide it is the proper form in light of your circumstances.* **CONSULT WITH YOUR TAX ADVISOR REGARDING THE PROPER FORM YOU ARE REQUIRED TO COMPLETE AND PROVIDE TO FIMAT.**

**TYPE OF ACCOUNT** (cont'd)                                                                                                                    **PAGE(S)**

<u>**TRUST ACCOUNT**</u> (including IRA, Keogh and Pension Plan Accounts):

    Please complete all items in the Customer Application and provide requested documents ......................................... 5-6

    Sign and date the Customer Agreement and initial box acknowledging receipt of Disclosure
    Statement ................................................................................................................................................... 17

    Complete Trust Authorization ................................................................................................................... 26

    Sign and date either the W-8 BEN or W-9 Forms
    *See important statement on page 3 regarding tax forms for non-U.S. customers*

<u>SPECIAL ACCOUNTS</u>:

<u>**DISCRETIONARY ACCOUNTS**</u> (in addition to standard account documents):

    Please complete all items in, and sign and date, the Trading and Fee Payment Authorization ....................................... 31

    Complete, sign and date and have your Discretionary Agent complete, sign and date if applicable
    the Exemption from Disclosure Document Requirement ........................................................................... 32

    Have your Discretionary Agent complete, sign and date the Certificate of Authorization of
    Trading Advisor or Account Manager ...................................................................................................... 33

<u>**HEDGE ACCOUNTS**</u> (in addition to standard account documents):

    Complete the Hedge Accounts section of the Customer Agreement............................................................... 17

<u>**FOREIGN ACCOUNTS**</u> (in addition to standard account documents):

    Note, but do not execute, the Foreign Customer Agent Designation and Foreign Customer
    Special Calls Notice................................................................................................................................. 29-30

<u>**OPTIONAL ACCOUNT DOCUMENTS**</u>:

    Subordination Agreement (mandatory, if you will deposit foreign currency with FIMAT) ............................................ 18

    Transfer of Funds Agreement.......................................................................................................................... 19

    Permission to Cross......................................................................................................................................... 20

    Authorization to Financial Institution to Release Information ........................................................................... 21

    Arbitration Agreement ..................................................................................................................................... 22

    Guaranty........................................................................................................................................................... 27

    Certificate of Corporate Resolution of Guarantor............................................................................................. 28

    Account Transfer Form .................................................................................................................................... 37

FOR SPECIAL ACCOUNTS NOT DESCRIBED ABOVE, FIMAT MAY REQUIRE ADDITIONAL DOCUMENTS, SUCH AS A GUARANTY, ORGANIZATIONAL CERTIFICATE, DISCLOSURE DOCUMENTS OR PROOF OF REGULATORY FILINGS AND APPROVALS.

**FIMAT USA, LLC**
## CUSTOMER APPLICATION

Please complete each of the following applicable sections.                                         Account No _____

<table>
<tr><td rowspan="12">A C C O U N T<br><br>I N F O R M A T I O N</td><td>Account Title</td><td>Social Security or Fed. Tax ID #</td></tr>
<tr><td>Account Mailing Address</td><td>Telephone            Fax Number for Statements</td></tr>
<tr><td>City             State      Zip Code</td><td>Country            Internet Address for Statements</td></tr>
<tr><td>Name (indicate beneficial owner or principal if different from Account Title)</td><td>Date of Birth      Marital       ☐Married    ☐Single<br>Status</td></tr>
<tr><td>Home Address (If different from Mailing Address)</td><td>If married, spouse's full name      Number of Dependents</td></tr>
<tr><td>City             State      Zip Code</td><td>Home Telephone Number</td></tr>
<tr><td>Current Employer (if retired please indicate so, and list last employer)</td><td>Years Employed</td></tr>
<tr><td>Address</td><td>Business Telephone No.</td></tr>
<tr><td>City             State      Zip Code</td><td>Job Title</td></tr>
<tr><td>Previous Employer</td><td>Dates Employed</td></tr>
<tr><td>Address</td><td>Business Telephone No.</td></tr>
<tr><td>City             State      Zip Code</td><td>Job Title</td></tr>
</table>

**I N V E S T M E N T    A C C O U N T**  **E X P E R I E N C E    D E S C R I P T I O N**

If introduced account, name of Introducing Broker _____
Customer acknowledges that, except for companies which are members of the FIMAT Group, Fimat USA, LLC and Introducing Broker are unaffiliated entities.

Years of Commodity Futures or Options Trading Experience_____   Years of Securities or Securities Options Trading Experience_____

Please List Brokerage Firms at Which Customer or Beneficial Owners Currently Maintain or Have Previously Maintained Investments (include other Fimat USA, LLC or affiliated company Accounts); Circle "C" for Commodities,  "S" for Securities, or "B" for Both; Circle "A" for Active, "I" for Inactive.

| (Brokerage Firm) | (City, State) | (Account Type) | (Active/Inactive) | (Avg. $ Amt. of Equity) | (Account Number) |
|---|---|---|---|---|---|
| 1._____ | _____ | C  S  B | A  I | $_____ | _____ |
| 2._____ | _____ | C  S  B | A  I | $_____ | _____ |

### INDICATE TYPE OF ACCOUNT

☐Individual   ☐Sole Proprietorship        ☐Joint Tenants        ☐ERISA        ☐General Partnership (Attach Partnership Agreement)

☐Trust (Attach Trust Agreement)   ☐Corporation   ☐Limited Partnership, Commodity Fund or Pool (Attach Offering Document)        ☐Other

Note: If this is a joint or a general partnership account, all principals are required to complete a copy of this customer application.

Please complete the following information for General Partners (if applicable):

Name _____            Address _____

Name _____            Address _____

Name _____            Address _____

Nature of Trading:                                          If Discretionary, who maintains the Power of Attorney?
                                                            Name:_____

      ☐Non-Discretionary          ☐Discretionary

                                                            Address:_____

Note:     If this is a discretionary account, please complete
            discretionary forms.                             City:_____ State:_____ Zip:_____

Trading Objectives: ☐Speculating ☐Hedging                   If Non-Discretionary, what will be the primary basis of your trading
If Hedging, what is the nature of your business?_____   decisions?
                                                              ☐Own Research     ☐Advice of Broker     ☐Other

If Hedge Account, indicate the type(s) of commodities to be hedged:

☐Petroleum products (specify)_____   ☐Financial Instruments/Currencies (specify)_____

☐Metals (specify)_____   ☐Agricultural products (specify)_____

☐Stock Indices (specify)_____   ☐Other (specify)_____

Fimat USA, LLC requires financial statements from all of its customers to open a commodity trading account.
The enclosed financial statements are:      ☐Audited      ☐Unaudited       As of (Month/Day/Year): (____/____/____)
Customer's Fiscal Year Ends (Month/Day/Year): (____/____/____)

**F I N A N C I A L   I N F O R M A T I O N**

Customers with no financial statements complete the following:         Current Balance Sheet as of (\_\_\_\_\_/\_\_\_\_\_/\_\_\_\_\_)

(To Be Kept in the Strictest of Confidence)

| **Liquid Assets:** | | **Short Term Liabilities:** | |
|---|---|---|---|
| Cash | $_____ | Accounts Payable | $_____ |
| Marketable Securities | $_____ | Loans/Notes Payable | $_____ |
| Other(s) (Explain) | $_____ | Other(s) (Explain) | $_____ |
| Total Liquid Assets | $_____ | **Long-Term Liabilities:** | |
| **Other Assets:** | | Mortgage(s) on Home | $_____ |
| Home(s) (Market Value) | $_____ | Other Mortgages | $_____ |
| Life Insurance (Cash Value) | $_____ | Note Payable (1 year) | $_____ |
| Business | $_____ | Other(s) (Explain) | $_____ |
| Real Estate (Excl. Home) | $_____ | | $_____ |
| Other(s) (Explain) | $_____ | **Total Liabilities:** | $_____ |
| | $_____ | | |
| **Total Assets:** | $_____ | **Net Worth** | $_____ |
| | | (Total Assets less Total Liabilities): | |

Current Annual Income (from all sources):
☐$1,000,000 or over  ☐$750,000-999,999 ☐$500,000-749,999  ☐$250,000-499,999 ☐under $250,000 (Specify exactly):$ \_

Speculative Capital:         (The amount of Customer's total liquid assets listed above which Customer could lose in speculative
$ _____         investments with Fimat USA, LLC without materially affecting Customer's lifestyle or business.)

Bank Accounts and Money Market Funds:

**R E F E R E N C E S**

| Financial Institution | Address | Contact | Telephone No. | Account No. |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |

Wire Instructions: _____

**M I S C**

| Does anyone else have a financial interest of 10% or more in or guarantee this account?  ☐ Yes  ☐ No | If Yes, then who, and describe relationship:  Name _____ Address _____ City _____  State _____  Zip _____  Relationship _____ |
|---|---|

Is the Customer, an immediate family member or any principal or affiliate:
    1) A member of the NFA or any exchange?                                                                            ☐Yes    ☐No
    2) Registered with the CFTC, NFA, SEC or NASD?                                                                ☐Yes    ☐No
    3) A director or employee of or related to any employee of any brokerage firm, the CFTC, NFA or any exchange?    ☐Yes    ☐No
If Yes, please explain: _____

Has Customer or any principal currently, or within the last five years, been involved in any investigations or court proceedings (including bankruptcy) involving any governmental or regulatory agency or private party?  ☐Yes  ☐No  If Yes, please explain: _____
(Attach separate sheet if necessary)

**S I G N A T U R E**

**Education:**  ☐Graduate/Professional Degree  ☐Undergraduate Degree ☐High School Diploma  ☐Other (Specify)_____

THE UNDERSIGNED HAS REVIEWED THE INFORMATION CONTAINED IN THIS APPLICATION AND WARRANTS AND REPRESENTS TO FIMAT USA, LLC  THAT IT IS TRUE AND CORRECT, AND FURTHER AGREES TO PROMPTLY NOTIFY FIMAT USA, LLC IN WRITING OF ANY MATERIAL CHANGES TO THE INFORMATION PROVIDED IN THIS APPLICATION.

Name of Account _____         Customer Signature _____

Date _____         Customer Signature _____

**FOR INTERNAL USE ONLY**
NAME OF AE: _____         AE/IB APPROVAL:_____
NAME OF IB:_____         FIMAT OFFICER APPROVAL:_____IB
INITIAL MARGIN RECOMMENDATION:_____         LOSS LIMIT:_____

# CUSTOMER AGREEMENT

In consideration of the acceptance by Fimat USA, LLC ("FIMAT") of one or more accounts (the "Account(s)") of the undersigned ("Customer"), and of FIMAT acting as broker for Customer, the Customer agrees as follows:

## I.    RISKS AND AUTHORITY

**A.    Risks of Commodity Trading.**  In addition to the Commodity Futures Trading Commission ("CFTC") mandated Risk Disclosure Statement attached hereto, Customer understands that (i) Customer may be trading in commodity futures contracts, options on commodity futures contracts, foreign futures contracts and options on foreign futures contracts (collectively, "Commodity Futures Contracts"), securities and securities options (collectively, "Securities"), derivative instruments, spot and forward contracts, physical commodities, cash and other properties and options thereon (collectively, "Other Account Instruments") and/or currencies and foreign exchange contracts and options thereon ("Forex," and together with Commodity Futures Contracts, Securities, Other Account Instruments and Forex being herein collectively defined as "Commodities"), and such trading is highly speculative, (ii) prices are subject to sharp upward and downward movements, (iii) price fluctuations may result in losses which substantially exceed the capital in Customer's Account(s), (iv) on trading days on which the subject of Customer's trading reaches its permissible exchange price limit, trading may cease, as a result of which Customer may be locked into substantial losses, and (v) in transactions on exchanges on which foreign currency is used, any profit or loss may be affected by exchange rate fluctuations.  Customer is willing and able, financially and otherwise, to assume the risks of such trading.  Customer recognizes that assurance of profit or freedom from loss is impossible to guaranty.  Customer has received no assurance and will place no orders in reliance on any such assurance or similar representations.  Customer understands that FIMAT may without notice to Customer exercise any of the remedies listed in Sections III.O and IV hereof if Customer fails to maintain adequate margin or if any other event of default occurs.  Customer agrees to review carefully each confirmation statement FIMAT sends Customer and notify FIMAT immediately in accordance with Section III.F hereof.

**B.    FIMAT's Authority and Responsibility.**  Customer authorizes FIMAT to purchase and sell Commodities, as agent for Customer's Account(s) in accordance with the oral or written instructions of Customer or persons authorized in writing to act, or persons reasonably believed by FIMAT to be acting, on Customer's behalf.  Unless Customer specifies to the contrary, FIMAT is authorized to execute all orders on any exchange or other market where such business is conducted which may be deemed by FIMAT, in its sole discretion, to be appropriate.  Customer hereby waives any defense that any such instruction was not in writing, as may be required by any law, rule or regulation. FIMAT agrees to provide the services contemplated hereunder in any commercially reasonable manner.

Customer authorizes FIMAT or its agents to investigate Customer's credit standing and in connection therewith to contact such banks (including, without limitation, any of FIMAT's Affiliates, such as Societe Generale), financial institutions and credit agencies, as FIMAT shall deem appropriate to verify information regarding Customer.  Customer authorizes FIMAT, in its sole discretion, to provide and/or exchange any financial information with respect to Customer with any of FIMAT's Affiliates.

**C.    Introduced Accounts (Only if applicable).**  Customer understands that Customer's Account(s) with FIMAT was introduced to FIMAT by an Intermediary (as defined in Section II.F below), and that, except for companies which are members of the FIMAT Group, the Intermediary is an independent business entity which is not in any way affiliated with or an agent of FIMAT.  Customer hereby authorizes FIMAT to accept all orders and instructions from its Intermediary and hereby ratifies all orders and instructions which FIMAT believes in good faith to have been transmitted by its Intermediary on Customer's behalf, which FIMAT is authorized to act upon.  If Customer is dealing with an Intermediary, make all checks payable to, and wire all funds directly to "Fimat USA, LLC".  FIMAT INTERMEDIARIES DO NOT HANDLE CUSTOMER FUNDS, EXCEPT TO FORWARD TO FIMAT CHECKS MADE OUT TO FIMAT.

**D.    Customer Representations and Warranties.**  Except as disclosed in writing to FIMAT prior to execution and delivery of this Agreement or in a subsequent written notice from Customer to FIMAT, Customer represents and warrants as follows:  (1) Customer is not (a) a general partner, officer, director, more than ten percent owner, correspondent, agent (or person associated with an agent), associated person, or employee of a futures commission merchant, commodity trading advisor, commodity pool operator, or an introducing broker, (b) a relative, spouse, or relative of a spouse of any of the foregoing persons who shares the same home with any such person, (c) a member of an exchange or a director or employee of an exchange, bank, trust company, insurance company, or regulatory or self-regulatory organization, or (d) engaged individually or as an employee in the business of dealing, as broker or principal, in Commodities other items, documents of title relating to

Commodities, bills of exchange, acceptances, or other forms of commercial paper, and if Customer becomes so employed or engaged Customer will promptly notify FIMAT in writing; (2) Customer, if applicable, (a) is duly organized and in good standing under the laws of the jurisdiction in which it was organized and in all jurisdictions where it is qualified to do business; (b) has the requisite capacity, power and authority to execute, deliver and perform its obligations under this Agreement and such Other Agreement, including without limitation, the granting of any security interests in the Collateral as contemplated hereby and thereby; (c) none of the execution, delivery or performance by Customer of its obligations under this Agreement or such Other Agreement conflict with the provisions of any material contract, agreement or instrument binding upon you or your properties, or the provisions of any law, statute, rule, regulation or decree, order or determination of any court of law applicable to Customer; and (d) no consent, authorization, permit or filing is required in connection with the execution, delivery and performance by Customer of this Agreement or such Other Agreement, except those that have been obtained or made and filings necessary to create, perfect and retain any security interest in, or lien upon, any Collateral for any of Customer's obligations to FIMAT; (3) Customer, if an individual, is of sound mind, legal age and legal competence; (4) no person other than Customer has or will have an interest in Customer's Account(s) except as otherwise disclosed in writing to FIMAT; and (5) all the information provided in the Customer Application is true, correct and complete as of the date hereof and that Customer will promptly notify FIMAT of any material changes in such information.

E.    **Customer is Principal.**  Unless Customer has advised FIMAT in writing otherwise prior to execution and delivery of this Agreement, Customer is acting for Customer's Account(s) as principal and not as agent in transactions under this Agreement.  Customer will give written notice to FIMAT before granting any person or entity any interest in Customer's Account(s) or undertaking to act as agent for any party with respect to Customer's Account(s).

## II.    DEFINITIONS  (As used in the singular or plural)

A.    **Affiliate.**  "Affiliate" includes Societe Generale, Fimat International Banque, SA, Fimat Americas SAS and SG Tandem, Inc. and any of their affiliates or subsidiaries.

B.    **Agreed by FIMAT.**  "Agreed by FIMAT" means an agreement in writing under the hand of a person whose name and signature at the material time appear on a list of authorized signatories maintained by FIMAT at its offices.  A copy of the list is available for inspection upon reasonable notice at FIMAT's offices during usual business hours.

C.    **Applicable Law.**  "Applicable Law" shall have the meaning set forth in Section III.A.3 below.

D.    **Collateral.**  "Collateral" means all of Customer's right, title and interest in and to all goods and other property, including without limitation, Commodities, the Account(s), inventory, documents, accounts, general intangibles, chattel paper and all proceeds of such property including but not limited to interest on or profits from the Account(s).  Any property en route to or allocated by any third party to FIMAT and/or any Affiliate shall be deemed "Collateral" for purposes of this Agreement.

E.    **Commodity Exchange.**  "Commodity Exchange" means any exchange, association, contract market or clearing association, whether incorporated or unincorporated, or persons who are engaged in the business of buying or selling any commodity or receiving the same for sale on consignment.

F.    **Intermediary.**  "Intermediary" includes an introducing broker, fully disclosed futures commission merchant, foreign broker, or any other person or entity acting in a similar capacity.

G.    **Liability.**  "Liability" means all Customer's obligations direct or indirect to FIMAT or its Affiliates of whatever form and however arising, including any indebtedness now or hereafter existing under this Agreement or any Other Agreement or any debit balances in the Account(s).

H.    **Other Agreement.**  "Other Agreement" means any and all agreements, documents and instruments (including, without limitation, promissory note(s), security agreement(s), pledge agreement(s) and guaranty(s)) executed by or on behalf of Customer in favor of FIMAT and/or an Affiliate, as such agreements, documents and instruments may be amended, supplemented or otherwise modified from time to time in accordance with their respective terms.

III.     **TERMS OF TRANSACTIONS**

    A.    **Applicable Rules and Terms.**  The Account(s) and all transactions and agreements in respect of the Account(s) shall be subject to:

        1.    the terms of this Agreement and any other terms Agreed by FIMAT and Customer;

        2.    FIMAT's terms from time to time in effect with respect to the specific type of transaction and the terms of FIMAT's confirmation of the transaction, except to the extent specifically inconsistent with Subsection III.A.1 above;

        3.    the regulations of all applicable Federal, state and self-regulatory agencies or authorities, including but not limited to:  (i) the provisions of the Commodity Exchange Act, as amended, and any rules, regulations, orders and interpretations promulgated thereunder by the CFTC; and (ii) the constitution, by-laws, rules, regulations, orders and interpretations of the Commodity Exchange (and its clearing house, if any) on which such transactions are executed and cleared, and any relevant registered futures association, including, without limitation, the National Futures Association ("NFA"), except to the extent Subsections III.A.1 or III.A.2 above provide more specific restrictions.  All such provisions, rules, regulations, orders, interpretations, constitution, by-laws, custom and usage are hereinafter collectively referred to as "Applicable Law;" and

        4.    customary practice in the trade, except to the extent specifically inconsistent with Subsections III.A.1, III.A.2, or III.A.3 above.

    B.    **Margin.**  Customer will pay to FIMAT (and only to FIMAT) all amounts FIMAT requires as margin or to satisfy any other of Customer's obligations under this Agreement in U.S. Dollars in immediately available funds, unless otherwise agreed, as FIMAT requires.  FIMAT at any time may change the margin requirements with respect to Customer's Account(s) for existing positions as well as for new positions.  The required margin may exceed the margin required by the Commodity Exchange (and its clearing house, if any) on which trades are cleared on behalf of Customer.

        **FIMAT has no obligation to notify Customer of any insufficiency of margin in Customer's Account(s) prior to exercising rights and remedies under Section IV of this Agreement.**

    C.    **Fees and Commissions.**  Customer will pay the fees and commissions FIMAT charges from time to time.  FIMAT may share its fees, commissions and amounts accruing on Customer's Account(s) with persons that introduce Customer to FIMAT or provide other services to FIMAT.

    D.    **Interest.**  If Customer fails to pay FIMAT in immediately available funds any sum when due, then unless otherwise provided in any Other Agreement, Customer will pay interest to FIMAT on the unpaid sum, while outstanding, at the lesser of (i) the maximum legal rate or (ii) 150% of the publicly announced prime lending rate of Societe Generale New York Branch as in effect from time to time while the unpaid sum is outstanding, compounded monthly.  Customer acknowledges that FIMAT may receive and retain as its own any increment or interest accruing from any of the funds FIMAT receives from Customer.

    E.    **No Standard Requirement.**  FIMAT has no obligation to impose uniform margin requirements, to publish details of fees or commissions, or to charge uniform fees, commissions or interest rates.

    F.    **Confirmations and Statements.**  FIMAT will promptly confirm in writing all transactions undertaken for Customer's Account(s).  Customer shall timely review all confirmations received from FIMAT to check that the description of the transactions is accurate and that no transaction is omitted.  Customer is conclusively bound by FIMAT's confirmations and statements of Customer's Account(s) if Customer does not object in writing before the earlier of ten days following transmission to Customer or by market opening on the day following Customer's actual receipt of such confirmation statements.  With respect to transactions which Customer authorizes but for which no confirmation is received, Customer shall be deemed to have waived all objections unless FIMAT has

received Customer's written request for a copy of the confirmation within five days of the transaction date. Customer understands that Customer should direct inquiries to FIMAT at 630 Fifth Avenue, Suite 500, New York, New York 10111, Attention: Compliance Department, or such other address as FIMAT may hereafter provide Customer. For the reporting of any alleged unauthorized trades or other trade improprieties, FIMAT authorizes and will accept "collect" telephone calls to the Compliance Department at (212) 504-7446. FIMAT is not bound by prices or transactions reported in error on confirmations and statements of Customer's Account(s).

Customer hereby authorizes FIMAT to transmit to it all confirmation and other statements of account activity, funds and positions by facsimile transmission or through the Internet to such address as Customer designates on the Customer Application, or as Customer designates from time in a writing addressed to the Compliance Department, as set forth in this paragraph. FIMAT reserves the right to assess its standard charge from time to time in effect for confirmation and other statements of account activity, funds and positions provided to customer through any other medium, as well as for duplicate statements of any kind. This authorization shall be perpetual, unless revoked in writing by Customer in a writing addressed to the Compliance Department, as set forth in this paragraph.

G.    **Capacity of FIMAT; Floor Brokers and Others; Indemnification.**    FIMAT will execute Customer's transactions solely as agent of Customer. In executing transactions on a Commodity Exchange, FIMAT may utilize floor brokers (who may be employees or other agents of FIMAT), and will be responsible for reasonable care in the selection of such brokers, but will not be responsible to Customer for negligence or misconduct of an independent floor broker if, at the time the floor broker was selected, the floor broker was authorized to act as such under the rules of the relevant Commodity Exchange and the appropriate regulatory agency. FIMAT will not be responsible to Customer in the event of error, failure, negligence, or misconduct on the part of any Intermediary, commodity trading advisor, or other person acting on Customer's behalf and, without limiting the foregoing, FIMAT has no obligation to investigate the facts surrounding any transaction in Customer's Account(s) which is introduced by such Intermediary, commodity trading advisor, or other person. Customer will indemnify FIMAT and hold it harmless from and against any and all liabilities, penalties, losses, and expenses, including legal expenses, incurred by FIMAT as a result of any error, failure, negligence, or misconduct on the part of any such Intermediary, commodity trading advisor, or other person acting on Customer's behalf. FIMAT shall not be responsible for any loss or damage caused, directly or indirectly, from any delays or inaccuracies in the transmission of orders, including but not limited to our automated order routing systems, or other information due to a breakdown in or failure of any transmission or communication facilities for any reason including those reasons described in Section V.D. hereof. FIMAT shall only be liable for actions or inactions by FIMAT which amount to gross negligence or fraud. Customer also agrees that FIMAT shall not be liable to Customer for any losses, costs, expenses, or other damages sustained by Customer in the event of any failure or delay by any exchange, market, clearing house, bank or other depository institution where any of Customer's funds or other assets are maintained, or a failure or delay by any member, bank or agent of any of the foregoing, or a failure or delay by any of the foregoing to enforce its rules, to fulfill its obligations, or to make any payment, for any reason whatsoever. Customer waives any claim, cause of action or right as against FIMAT, its employees or agents which may arise or occur as a result thereof.

H.    **Transaction Limits; Acceptance of Orders.**    FIMAT, solely for its own benefit and the benefit of other customers, may limit the number of transactions FIMAT executes, and the open positions FIMAT maintains or acquires, for Customer. Customer, acting alone or in concert with others, will not make any trade through FIMAT which would have the effect of exceeding the lower of limits imposed by FIMAT, the Commodity Exchange on which the transactions are executed, or any regulatory agency. If Customer exceeds its limit, FIMAT may require the transfer of Customer's positions to another firm, or FIMAT may liquidate some or all of the Customer's positions as FIMAT elects in its sole discretion. Customer agrees to promptly advise FIMAT if Customer is required to file reports of its positions to the CFTC or any Commodity Exchange.

I.    **Liquidation of Offsetting Positions.**    FIMAT shall liquidate any contract for which an offsetting order is entered by Customer on a first in, first out ("FIFO") basis, unless Customer instructs FIMAT not to liquidate such contract and to maintain the offsetting contracts as open positions; *provided*, that FIMAT shall not be obligated to comply with any such instructions given by Customer if Customer fails to provide FIMAT with any representations, documentation or information reasonably requested by FIMAT or if in FIMAT's reasonable judgment, any failure to liquidate such offsetting contracts against each other on a FIFO basis would result in a violation of Applicable Law.

J.    **Separate Accounts.**    Pursuant to CFTC Rule 1.46(e)(1), if FIMAT maintains or directs the trading for more than one account for Customer then, if held open, offsetting long and short positions in the separate accounts may result in the charging of additional fees and commissions and the payment of additional margin, although offsetting positions will result in no additional market gain or loss.

K.     **Failure of Delivery.**  At least five business days prior to the earlier of first notice or last trading day of the delivery month, Customer must advise FIMAT whether Customer intends to take or make delivery, as the case may be, of items purchased and sold by FIMAT at Customer's direction, and, if delivery is intended, Customer must demonstrate to FIMAT's satisfaction Customer's ability to perform Customer's delivery obligations, in any manner required by FIMAT including, without limitation, by depositing with FIMAT the funds or documents necessary for delivery.  If Customer fails to so advise FIMAT or to demonstrate satisfactorily Customer's ability to perform, then without notice or demand to Customer, FIMAT may, but shall have no duty to, liquidate such positions on terms FIMAT deems reasonable, or take any other action FIMAT deems reasonable, including taking or making delivery as the case may be.  If Customer fails to supply FIMAT, in a timely manner, with any item FIMAT has sold at Customer's direction, FIMAT may borrow or purchase the item from any party, including an Affiliate, to make the delivery.  FIMAT has no duty to borrow or purchase the item.  Customer shall comply fully with Applicable Law relating to taking or making any delivery, and shall, if taking delivery, take all steps as provided thereunder to ensure that all items to be delivered are in compliance with Applicable Law.  Customer will hold harmless and indemnify FIMAT for all liabilities, penalties, losses, and expenses, including any legal expenses and any penalties imposed by any Commodity Exchange, FIMAT incurs or reasonably anticipates incurring if Customer fails timely (1) to take good delivery of any item FIMAT has purchased at Customer's direction, (2) to supply FIMAT with or otherwise make good delivery of any item FIMAT has sold at Customer's direction, or otherwise, in connection with a delivery, or (3) to comply with Applicable Law, and FIMAT may in the event of any such failure, apparent failure, or otherwise withhold from Customer's Account(s) with FIMAT or any Affiliates the amount (however denominated) estimated by FIMAT as sufficient to satisfy the above indemnity, for application as FIMAT deems appropriate.

L.     **Forwarding and Storage of Material.**  If FIMAT on Customer's behalf arranges for packaging, shipping, storage, or insurance, FIMAT's only liability will be for gross negligence or willful misconduct in the making of the arrangements.

M.     **Reimbursement for Taxes, Etc.**  Customer will indemnify FIMAT for all taxes, levies, imposts, duties, charges, and fees (including legal expenses) incurred in connection with any sale, purchase, forwarding or storage.

N.     **Payment.**  Customer's payments must be in freely transferable and immediately available funds to FIMAT's account at a bank designated by FIMAT and without deduction for any taxes, imposts, duties, charges, or fees and free and clear of any withholding, restrictions, or conditions of any nature when received by FIMAT.  Payments may not be effected by the delivery of bank notes or other legal tender unless Agreed by FIMAT.  FIMAT may withhold any delivery until it receives payment in the foregoing manner.

O.     **Closeout.**  Whenever FIMAT, in its sole discretion, considers it necessary for Customer's protection or for FIMAT's protection, FIMAT may, but is not obligated to, refuse to accept new positions and/or close out or otherwise liquidate Customer's positions, and Customer will be liable for any deficiency in Customer's Account(s) that may result therefrom.

P.     **Options Exercise.**  Customer agrees that if Customer has a commodity option position with FIMAT and does not provide timely instructions regarding the exercise of a commodity option on the last day of trading in that option, FIMAT, in its sole discretion and without prior notice to Customer, is authorized to exercise or abandon (*i.e.*, let expire) the option.  Customer further agrees that any exercise or abandonment of an option by FIMAT pursuant to this Agreement shall be for Customer's sole account and risk and FIMAT shall have no liability with respect thereto, and FIMAT shall have no duty to exercise such authority.  Customer further agrees that, without FIMAT's written consent, Customer may not, on any day, exercise more than 20 options contracts with FIMAT unless Customer has margin with FIMAT in excess of the amount of margin FIMAT requires for the futures contracts Customer would be assigned as a result of such exercise.

Customer acknowledges that FIMAT's confirmation of purchase and sale statements will reflect option expiration dates that FIMAT obtains from sources generally believed to be reliable, and FIMAT will be responsible only for gross negligence, willful misconduct or fraud in connection therewith.  If Customer holds options with a Friday expiration date, it is possible that, if a grantor, Customer could be assigned a futures position after the expiration of the option on Friday, and on some exchanges, as late as Saturday morning.

Q.     **Adjustments.**  On rare occasion FIMAT may, in error, not fill Customer's order or fill Customer's order at a price which is less favorable than the price which could have been obtained if the error had not occurred.  In these circumstances, FIMAT will give Customer the filled order and cash adjust Customer's Account(s) so as to reflect the price at which the order could have been executed had the error not occurred.  Customer agrees however that,

if when correcting its error, FIMAT obtains a position at a better price than Customer's order could have been filled at, Customer will only receive the fill Customer could have obtained if Customer's orders had been executed without error (and FIMAT will receive any difference).

**R.** **Exchange of Physical for Futures Transaction.** Customer agrees to create, retain, and produce, upon request of a Commodity Exchange, the CFTC, or the United States Department of Justice, documentation of cash transactions underlying exchanges of futures for cash commodities or exchanges of futures in connection with cash commodity transactions in accordance with Applicable Law. Documentation means those documents customarily generated in accordance with cash market practices and/or required by the relevant Commodity Exchange or regulatory authority which demonstrate the existence and nature of the underlying cash transactions, including, but not limited to, contracts, confirmation statements, telex printouts, invoices, and warehouse receipts or other documents of title.

**S.** **Direct Order Transmittal Client Disclosure.** On occasion, when FIMAT's offices are closed, Customer may request that FIMAT grant it authority to place orders directly with one or more of FIMAT's non-U.S. Affiliates for execution on non-U.S. exchanges, or for transactions on U.S. exchanges to be executed on GLOBEX, NYMEX ACCESS or other electronic trading systems. If FIMAT grants Customer such authority, the following conditions shall apply: (1) the order(s) Customer places with FIMAT's non-U.S. Affiliate will be for FIMAT's omnibus account maintained directly or indirectly with FIMAT's non-U.S. Affiliate; (2) Customer will be a client of FIMAT and not of the non-U.S. Affiliate; (3) all monies, securities and property of Customer will be maintained by FIMAT; and (4) unless Customer objects within five days after receipt of this Agreement, FIMAT may assume Customer consents to these conditions.

## IV.   SECURITY AGREEMENT AND DEFAULT PROVISIONS

**A.** **Security Interest.** Customer hereby grants FIMAT a security interest in the Collateral and proceeds thereof, as security for the prompt payment and performance of any and all Liabilities.

**B.** **FIMAT's Rights Respecting Collateral.** Customer will sign and deliver all agreements, instruments, certificates and documents FIMAT requests to create, perfect, preserve and protect the security interest in any of the Collateral, accompanied by such instruments of assignment and transfer and in such form as FIMAT shall reasonably request. Customer appoints FIMAT as Customer's agent to sign, deliver, complete and file any such agreements, instruments, certificates and documents on Customer's behalf. FIMAT has no obligation to return an identical item of Collateral, but only to replace the item with property of like kind and substantially similar quantity, subject to adjustment for quantity variations at then prevailing market prices. FIMAT may, at any time and without limitations except those imposed by law, pledge, re-pledge, hypothecate, loan or invest any Collateral without notice to Customer or the obligation to account to Customer for any interest, income, or other benefit from any of the Collateral. Customer agrees to permit FIMAT and/or its agents and representatives at any time to inspect any of the Collateral and make abstracts or copies from any of Customer's books and records pertaining to the Collateral. The right is expressly granted to FIMAT, in its sole discretion, to notify warehousemen, consignees, bailees or any other persons in possession of Collateral of FIMAT's security interest therein. Unless Agreed by FIMAT, the undersigned will not file or authorize or permit to be filed in any jurisdiction any such financing or like statement in which FIMAT is not named as the sole secured party. Upon the request of FIMAT, Customer shall, at Customer's expense, keep insured all Collateral which is tangible property for full value, with such coverage as FIMAT may approve, and the policies shall be duly endorsed in FIMAT's favor and delivered to FIMAT.

**C.** **Events of Default.** In addition to any "Event of Default" which may be defined in any Other Agreement, and not by way of limitation of any right FIMAT otherwise has to demand payment at any time of any of the Liabilities, the following events shall constitute an "Event of Default": (1) Customer breaches, repudiates, or defaults in any way on any agreement with FIMAT or any Affiliate (including Customer's agreement to provide margin) or with any third party; or (2) FIMAT, in its sole discretion, determines that it has sufficient grounds for insecurity with respect to Customer's performance of any obligation to any person and Customer fails to provide assurance of performance of the obligation satisfactory to FIMAT; or (3) any proceeding is commenced by or against Customer under any bankruptcy, insolvency, relief of debtor, or similar law, or Customer makes an assignment for the benefit of creditors, a receiver, trustee, conservator, liquidator or similar officer is appointed for Customer or any of Customer's property; or (4) Customer's Account(s) are attached or levied against; or (5) any of Customer's representations to FIMAT or any Affiliate, whenever or wherever made, were misleading when made or deemed made or later becomes untrue; or (6) Customer dies, is disabled or becomes legally incompetent; or (7) Customer or any organization of which Customer is a member suspends or threatens to suspend the transaction of

its usual business, or any proceeding is commenced with respect to any of Customer's property or any such organization; or (8) Customer is a party to any merger, consolidation or sale of all or substantially all of its assets unless Agreed by FIMAT prior thereto; or (9) FIMAT has reason to believe that any of the foregoing is likely to occur imminently.

**D.    FIMAT's Remedies Upon Default.**

1.    Customer absolutely and unconditionally agrees that upon the occurrence of an Event of Default, FIMAT, on behalf of itself and as agent for any Affiliate, may exercise any one or more of the following remedies (except that, upon the occurrence of any Event of Default set forth in Section IV.C.(3) above, the remedies specified in subparagraphs a, b, c, and g below shall thereupon be deemed for all purposes to have been exercised, immediately and without action by FIMAT), with only such notice as is required by Applicable Law and cannot be waived, without prejudice to any other remedies:

   a.    FIMAT, on its own behalf and/or on behalf of any of its Affiliates, may terminate any or all of FIMAT's and/or any Affiliates obligations to Customer for future performance;

   b.    FIMAT, on its own behalf and/or on behalf of any of its Affiliates, may treat any or all of Customer's Liabilities and/or Customer's obligations to any Affiliates, including credit or debit balances, as immediately due, and may treat all limits, margin facilities and call tolerance facilities in place as revoked;

   c.    FIMAT, on its own behalf and/or on behalf of any of its Affiliates, may consolidate Customer's Account(s) or any of them at FIMAT and/or any Affiliates;

   d.    FIMAT, on its own behalf and/or on behalf of any of its Affiliates, may sell any or all non-cash Collateral held long by FIMAT and/or any Affiliates;

   e.    FIMAT, on its own behalf and/or on behalf of any of its Affiliates, may close out or hedge for Customer's Account(s) any or all open positions in Customer's Account(s) at FIMAT and/or any Affiliates pursuant to Section III.O above or otherwise, in any manner it deems reasonable under the circumstances;

   f.    FIMAT, on its own behalf and/or on behalf of any of its Affiliates, may borrow, lend, sell or buy from any party, including itself and/or any Affiliates, any property necessary to cover or hedge any or all positions in Customer's Account(s) at FIMAT and/or any Affiliates; and

   g.    FIMAT, on its own behalf and/or on behalf of any of its Affiliates, may offset the proceeds of the sale of non-cash Collateral, cash Collateral, and sums owing Customer by FIMAT and/or Affiliates (including any sums arising from the operation of this Section D), against Customer's Liabilities and Customer's obligations to any Affiliates, without prejudice to FIMAT's right to recover the balance of Customer's Liabilities and any Affiliates' right to recover the balance of Customer's obligations to them.

Customer appoints FIMAT as Customer's agent to sign, complete, and deliver any and all documents necessary or desirable to carry out the foregoing.  None of FIMAT nor any of its Affiliates, nor any of its agents or representatives will be responsible for losses or lost profits, accrued or anticipated, resulting from any position or transaction entered to enforce the foregoing remedies. Customer waives the right of set off in any action brought by FIMAT to collect amounts owned by Customer to FIMAT.

Customer will indemnify and hold harmless FIMAT and its Affiliates, and their respective agents and representatives from any liabilities, penalties, losses, costs and expenses, including but not limited to reasonable attorney fees (whether the reasonable fees and charges of external legal counsel and/or the costs and charges, if any, allocated by internal legal department), which FIMAT and/or any Affiliates incur in connection with (i) the exercise of any remedy hereunder or under any Other Agreement, (ii) the care or custody of the Collateral and defending or asserting the rights and claims of FIMAT and/or any Affiliates in respect thereof, and (iii) meeting any obligation of FIMAT and/or any Affiliates which would otherwise fail to be performed by reason of an Event of Default.

**V.    MISCELLANEOUS**

    **A.**    **Governing Law and Submission to Jurisdiction.**

All disputes between FIMAT and Customer including, but not limited to, disputes arising directly or indirectly as a result of, or the relationship established as a result of, this Agreement, shall be governed by the substantive laws of the State of New York, without regard to principles of choice of law. Notwithstanding any provision of Applicable Law, Customer agrees to commence all actions of any kind against FIMAT within one year of the event giving rise to any dispute. Customer irrevocably submits to the jurisdiction of the courts of New York and of the Federal Courts of the Southern District of New York with respect to litigation relating to all such disputes, including, but not limited to, disputes arising directly or indirectly as a result of or the relationship established as a result of this Agreement and transactions subject to this Agreement, agrees to commence actions and proceedings and assert claims for relief involving them only in such courts (unless Customer has otherwise agreed to arbitrate all disputes against FIMAT, in which case such arbitration shall be held only in New York City), and consents to service of process by the mailing of copies to Customer by certified mail to Customer's address as it appears on the books of FIMAT. Such service shall be effective ten days after mailing.

    **B.**    **Waiver of Jury Trial. CUSTOMER HEREBY WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO, BUT NOT LIMITED TO, DISPUTES ARISING DIRECTLY OR INDIRECTLY AS A RESULT OF, OR THE RELATIONSHIP ESTABLISHED AS A RESULT OF, THIS AGREEMENT OR ANY TRANSACTION IN CONNECTION THEREWITH. CUSTOMER'S WAIVER OF TRIAL BY JURY IS A PREREQUISITE TO, AND INDUCEMENT OF FIMAT TO OFFER, THE OPENING OF CUSTOMER'S ACCOUNT(S).**

    **C.**    **Applicable Law and Notes for German Clients.** Contrary to German Law, the substantive law of New York does not distinguish between binding and non-binding terminal (futures) transactions (see paragraph 53 of the German Börsengesetz). All trades under this Agreement are therefore binding market transactions. Customer acknowledges that under German Law futures trading gives rise to an imperfect obligation (as provided in paragraphs 762 and 764 of the Burgerliches Gesetzbuch ("BGB") and paragraph 58 of the German Börsengesetz). Customer also acknowledges that under paragraph 814 of the BGB disclosure of this fact removes any and all rights Customer might otherwise have as a result of the "Differenzeinwand" (paragraph 812 of the BGB). Customer credit balance held by FIMAT will be applied to fulfill, discharge and perform the transaction(s) and as an advance performance or down payment to cover any transaction(s) trading costs.

    **D.**    **Force Majeure; Warranty and Disclaimer of Warranties.** FIMAT shall not be liable for any delay in performance or for non-performance of its obligations caused by any event beyond the reasonable control of FIMAT. FIMAT may, without liability, cancel this Agreement or any particular transaction contemplated hereunder if its performance is delayed or rendered impossible due to any such event. FIMAT's sole warranty is that any commodity delivered by it will conform to the description on any confirmation prepared and delivered by FIMAT with respect thereto. FIMAT EXPRESSLY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED.

    **E.**    **Non-Waiver; Non-Assignment; Time of the Essence.** This Agreement and the Other Agreements, if any, constitute the entire Agreement between FIMAT and Customer with respect to the subject matter hereof and supersede all other understandings, agreements, or communications concerning such subject matter. Any oral representations, warranties, inducements, or agreements made by any representative of FIMAT inconsistent with the provisions of this Agreement are excluded and will not bind FIMAT. FIMAT will be bound by waivers and modifications of any of the terms of this Agreement, any other written agreement, or any transaction, or any attempted assignment by Customer of any right or interest in this Agreement, any other agreement, or any transaction, only if Agreed by FIMAT (as defined). Such agreement will bind FIMAT only in relation to the waiver, modification, or assignment, to which FIMAT has consented in writing. Customer hereby waives the right to claim estoppel or forbearance unless Agreed by FIMAT. Any agreement by FIMAT to forbear liquidation, pursuant to any of its rights and remedies hereunder, may be revoked by FIMAT upon 24 hours notice to Customer (unless a shorter time is commercially reasonable under the circumstances), which notice Customer hereby deems reasonable. FIMAT's failure to exercise any right or remedy is not a waiver of the right or remedy not exercised or any other right or remedy. Time is of the essence in the performance of Customer's obligations.

F.    **Binding Effect.**  This Agreement covers all of Customer's Account(s) with FIMAT, is binding on Customer and Customer's estate, legal representatives, successors and assigns and inures to the benefit of FIMAT and its successors and assigns.

G.    **Communications.**  Communications may be sent to Customer by mail, telex, telegraph, facsimile transmission, messenger, or other reasonable means at its current address shown on FIMAT's records, and are deemed received when Customer actually receives them or 24 hours after they are sent, whichever first occurs.  FIMAT, in its sole discretion, may record, on tape or otherwise, any telephone conversation between FIMAT and Customer involving their respective officers, agents and employees.  Customer hereby agrees and consents to such recording, with or without the use of an automatic tone warning device, and waives any right Customer may have to object to the use or admissibility into evidence of such recording in any legal proceeding between Customer and FIMAT or in any other proceeding to which FIMAT is a party or in which FIMAT's records are subpoenaed.  Customer acknowledges that FIMAT may erase such recordings after a reasonable period of time.  FIMAT shall be entitled to rely on any instructions, notices and communications, whether oral or in writing, that it believes to be that of an individual authorized to act on behalf of Customer as authorized to act on its behalf, and Customer shall be bound thereby.  Customer hereby waives any defense that any such instruction was not in writing as may be required by the Statute of Frauds or any other similar law, rule or regulation.  Customer will indemnify FIMAT and hold FIMAT harmless from and against all liabilities, penalties, losses, and expenses, including legal expenses, incurred by FIMAT as a result of FIMAT's acting upon such instructions.

H.    **Non-Execution.**  Any failure by Customer to duly sign this Agreement is not a waiver by FIMAT of any rights it otherwise has against Customer.

I.    **FIMAT Has No Responsibility for Advice.**  FIMAT is not acting as fiduciary, foundation manager, commodity pool operator, commodity trading advisor or investment adviser in respect of any Account(s) opened by Customer and FIMAT shall have no responsibility hereunder for compliance with any law or regulation governing the conduct of fiduciaries, foundation managers, commodity pool operators, commodity trading advisors or investment advisers.  Customer will not enter into any transaction with FIMAT, and will not hold FIMAT responsible for losses, as a result of any prediction, recommendation, or representation made by any representative of FIMAT.  Any information or advice communicated by FIMAT, although based upon information from sources FIMAT believes to be reliable, may be incomplete or inaccurate, may not be verified, and may be changed without notice to Customer.  FIMAT makes no representation as to the accuracy, completeness, reliability or prudence of any such information or advice or as to the tax consequences of Customer's futures or options trading.

J.    **Appointment of Agent.**  Customer's appointment of an agent on the "Trading and Fee Payment Authorization Limited to Purchases and Sales of Commodities" form ("Trading Authorization"), if applicable, is notice to FIMAT that the person so designated (the "Agent") is Customer's agent in respect of Customer's Account(s) with FIMAT, with complete authority on Customer's behalf to place orders for purchases and sales, including short sales, for cash or on margin, of Commodities other items in respect of which Customer may from time to time enter into transactions in one or more of Customer's Account(s) with FIMAT, for immediate or future delivery, to effect delivery and performance of the orders and of the obligations undertaken in connection with the orders, to borrow funds from FIMAT to finance any of the transactions, to lend or pledge Customer's properties with FIMAT and otherwise to secure Customer's Liabilities, withdraw or direct the payment of monies, securities, commodities, or other property from Customer's Account(s) with FIMAT, including to compensate Agent for its services, to settle Customer disputes with FIMAT or between Customer or any other party with whom FIMAT deals for Customer or with whom Customer deals through FIMAT as broker for the third party, and to sign and deliver on Customer's behalf notices and other documents and to take all other actions necessary or desirable to carry out the terms of this Agreement.  Customer agrees to notify FIMAT promptly in writing of the revocation or modification of the Agent's authority.  Customer will indemnify FIMAT and hold FIMAT harmless from and against all liabilities, penalties, losses, and expenses, including legal expenses, incurred by FIMAT in acting as instructed by the Agent and in continuing to act in reliance on the Trading Authorization after revocation or modification but prior to FIMAT's receipt of written notice thereof.

K.    **Termination.**  Customer may terminate this Agreement, at any time when Customer has no Liabilities and no open positions which could give rise to subsequent Liabilities, upon the actual receipt by FIMAT of written notice of termination.  FIMAT may terminate this Agreement at any time upon mailing or delivery of written notice of termination to Customer, provided that any such termination will not affect any transactions theretofore entered into and will not relieve either party of any obligations in connection with any debt or credit balance or other liability or obligation incurred prior to the termination.

**L.**    **Multiple Parties.**  If any Account(s) established pursuant to this Agreement is on behalf of more than one person:

    1.    each signing person is jointly and severally liable for the full and timely performance of all the obligations of all signing persons in connection with this Agreement and any account established and any transaction effected under this Agreement; and the terms hereof shall survive the legal incompetence or death of any or all signing persons;

    2.    in connection with any Account(s) established under this Agreement, FIMAT may act upon any order, request or instruction from any one signing person without the necessity of confirmation from any other;

    3.    the delivery of any report, statement, notice or other communication to any one signing person is deemed to have been to all of the signing persons;

    4.    FIMAT may deliver any Collateral of any of the signing persons to any one or more of the signing persons, and make payments from any Account(s) established pursuant to this Agreement to or upon the order or direction of any one of them, and FIMAT is under no obligation to inquire into the purpose of any request for the delivery of any such Collateral or the making of any such payment, or to see to the disposition or application thereof; and

    5.    unless FIMAT is advised otherwise in writing, the interest of the signing persons in any Account(s) established under this Agreement shall be deemed to be a joint tenancy with rights of survivorship and not a tenancy in common.

**M.**    **Severability.**  If any provision of this Agreement, or the application of such provision to any person or circumstances, is held invalid, the remainder of this Agreement, and the application of such provision to persons or circumstances other than those as to which it is held invalid, shall not be affected thereby.

**N.**    **Captions.**  Captions used in this Agreement are used for convenience and neither form an integral part of this Agreement nor limit the applicability or affect the meaning of any of the Agreement's provisions.

## VI.    ELECTRONIC TRADING SYSTEMS

FIMAT may make available to Customer the ability to trade, directly or indirectly (in whole or in part), through electronic trading systems (ETS) such as GLOBEX or ACCESS or other electronic systems.  The sponsoring organizations or such systems may make certain information available and in some cases require special disclosures for these systems.  To the extent these disclosures are required and other information is available, it has been set forth in the accompanying booklet entitled "Exchange Disclosures and Notices," which Customer acknowledges receiving by signing below.

## VII.    ACCEPTANCE OF AGREEMENT

This Agreement shall not be deemed to be accepted by FIMAT or become a binding contract between Customer and FIMAT until approved by a duly authorized officer of FIMAT in writing in accordance with its internal procedures.  Customer represents, unless Customer has executed the Joint Tenants Agreement; the Partnership Authorization; the Certificate of Corporate Resolution; or the Trust Authorization, that this is an individual account and no one else has an interest in this account and Customer has authority and capacity to enter into this Agreement.

## VIII.    OTHER AGREEMENTS AMONG THE PARTIES; CONFLICTS

Customer acknowledges that in addition to this Agreement, FIMAT may request that Customer and/or any Affiliate of Customer to execute and deliver such agreement(s), instrument(s) and document(s) as FIMAT may prescribe, which agreement(s), instrument(s) and documents upon their execution, shall become an Other Agreement.  In the event of a conflict between the provisions of this Agreement and the provisions of any Other Agreement, the provisions of this Agreement shall govern to the extent the underlying transactions relate to futures contracts or options thereon.

**IX.     FOR HEDGE CUSTOMERS ONLY**

CUSTOMER WARRANTS, BY <u>INITIALLING</u> IN A BOX BELOW, THAT IT WILL ENGAGE IN BONA FIDE HEDGING TRANSACTIONS PURSUANT TO CFTC REGULATION 1.3(z).  IN THE EVENT OF BANKRUPTCY, CUSTOMER PREFERS THAT THE TRUSTEE (PLEASE <u>INITIAL</u> CHOICE)

☐         LIQUIDATE                    ☐         NOT LIQUIDATE

OPEN COMMODITY CONTRACTS IN CUSTOMER'S HEDGE ACCOUNT WITHOUT SEEKING ITS INSTRUCTIONS.

**PLEASE ACKNOWLEDGE YOUR AGREEMENT AND CONSENT TO THIS CUSTOMER AGREEMENT BY SIGNING BELOW.**

BY SIGNING BELOW, CUSTOMER ALSO ACKNOWLEDGES THAT CUSTOMER HAS RECEIVED AND UNDERSTANDS THE FOLLOWING ATTACHED DISCLOSURE STATEMENT PRESCRIBED BY THE CFTC:

Please <u>initial</u> if received and understood:

☐         Risk Disclosure Statement
          for Futures and Options
          Attached at pg. 1

ACCOUNT NAME: _____

BY: _____    _____    _____
       Authorized Signature                        Date                       Name (Please Print)


BY: _____    _____    _____
       Authorized Signature                        Date                       Name (Please Print)

**SUBORDINATION AGREEMENT**

**THIS AGREEMENT IS FURNISHED TO AND MUST BE EXECUTED BY ANY CUSTOMER WHO INTENDS TO MAINTAIN FUNDS IN AN ACCOUNT DENOMINATED IN A FOREIGN CURRENCY WITH DEPOSITORIES LOCATED INSIDE OR OUTSIDE THE UNITED STATES BECAUSE YOU ARE DOMICILED IN A FOREIGN COUNTRY OR BECAUSE THE FUNDS ARE HELD IN CONNECTION WITH CONTRACTS PRICED AND SETTLED IN A FOREIGN CURRENCY.**

Funds of customers trading on United States contract markets may be held in accounts denominated in a foreign currency with depositories located outside the United States or its territories if the customer is domiciled in a foreign country or if the funds are held in connection with contracts priced and settled in a foreign currency. Such accounts are subject to the risk that events could occur which would hinder or prevent the availability of these funds for distribution to customers. Such accounts also may be subject to foreign currency exchange rate risks.

By signing this Subordination Agreement the customer authorizes the deposit of funds into such foreign depositories. For customers domiciled in the United States, this authorization permits the holding of funds in regulated accounts offshore only if such funds are used to margin, guarantee, or secure positions in such contracts or accrue as a result of such positions.

In order to avoid the possible dilution of other customer funds, a customer who has funds held outside the United States must further agree that his claims based on such funds will be subordinated as described below in the unlikely event *both* of the following conditions are met: (1) the customer's futures commission merchant is placed in receivership or bankruptcy, and (2) there are insufficient funds available for distribution denominated in the foreign currency as to which the customer has a claim to satisfy all claims against those funds.

By signing this Subordination Agreement the customer agrees that if both of the conditions listed above occur, the customer's claim against the futures commission merchant's assets attributable to funds held overseas in a particular foreign currency may be satisfied out of segregated customer funds held in accounts denominated in dollars or other foreign currencies only after each customer whose funds are held in dollars or in such other foreign currencies receives its pro-rata portion of such funds. It is further agreed that in no event may a customer whose funds are held overseas receive more than his pro-rata share of the aggregate pool consisting of funds held in dollars, funds held in the particular foreign currency, and non-segregated assets of the futures commission merchant.

**PLEASE ACKNOWLEDGE YOUR AGREEMENT AND CONSENT TO THIS SUBORDINATION AGREEMENT BY SIGNING BELOW:**

ACCOUNT NAME: _____

BY: _____    _____

    **Authorized Signature**           **Date**            **Name (Please Print)**

BY: _____    _____

    **Authorized Signature**           **Date**            **Name (Please Print)**

### TRANSFER OF FUNDS AGREEMENT

Fimat USA, LLC ("FIMAT"), on its own behalf and/or on behalf of any of its Affiliates, may, until it receives a written notice of revocation with respect thereto, in its sole and absolute discretion and without prior notice to Customer, transfer any funds, securities, commodities, contracts or other property from any account maintained by Customer to any other account of Customer maintained by FIMAT or any of its Affiliates for margin, to reduce or pay in full any debit balance in either such account, to reduce or satisfy deficits in either such account, or for any other reason. FIMAT will immediately confirm in writing each transfer of funds, securities, commodities, contracts or other property pursuant hereto and FIMAT shall not be liable for making or failing to make any transfer authorized hereby.

**PLEASE ACKNOWLEDGE YOUR AGREEMENT AND CONSENT TO THIS TRANSFER OF FUNDS AGREEMENT BY SIGNING BELOW:**

ACCOUNT NAME: _____

BY: _____         _____

       **Authorized Signature**        **Date**           **Name (Please Print)**

BY: _____         _____

       **Authorized Signature**        **Date**           **Name (Please Print)**

**PERMISSION TO CROSS**

Customer has no objection if floor brokers on any commodity futures exchange cross trade orders for Customer's Account(s) with orders for (i) other Fimat USA, LLC ("FIMAT") customers, (ii) FIMAT or FIMAT's affiliates' account, or accounts of their officers or directors, or (iii) the servicing floor broker's personal, proprietary or customer's account.

This is also to confirm that Customer has no objection to FIMAT, or Affiliates, or officers or directors of FIMAT or of affiliated companies, acting as buyers with respect to orders given by Customer to FIMAT to sell for Customer's Account(s), or acting as sellers with respect to orders given by Customer to FIMAT to buy for Customer's Account(s) on any commodity futures exchange.

This consent is subject to any applicable provisions of the Commodity Exchange Act, as amended, the regulations thereunder, and the by-laws and rules of the exchanges on which such transactions occur, and may be revoked at any time on written notice to FIMAT.

**PLEASE ACKNOWLEDGE YOUR AGREEMENT AND CONSENT TO THIS PERMISSION TO CROSS AGREEMENT BY SIGNING BELOW:**

ACCOUNT NAME: _____

BY: _____      _____

      **Authorized Signature**          **Date**          **Name (Please Print)**

BY: _____      _____

      **Authorized Signature**          **Date**          **Name (Please Print)**

**AUTHORIZATION TO FINANCIAL INSTITUTION TO RELEASE INFORMATION**

Customer, _____, hereby authorizes you,_____ (Name of Financial Institution), to release information regarding Customer's account(s) number(ed)_____ _____ with you to Fimat USA, LLC so that they may open a commodity futures account on Customer's behalf. This authorization shall remain in effect until expressly revoked in writing by Customer.

_____
(Customer's Signature)

_____

_____
(Address)

_____
(Date)

**ARBITRATION AGREEMENT**

Any controversy or claim between Fimat USA, LLC ("FIMAT") and the undersigned ("Customer") arising out of or relating to Customer's Account(s) with FIMAT, to transactions between FIMAT and Customer, to the Customer Agreement with FIMAT or any other agreement between FIMAT and Customer, or to the breach of any such transaction or agreement shall, except as provided below, be resolved by arbitration before a forum chosen in accordance with the procedure set out below. If, by reason of any applicable statute, regulation, exchange rule or otherwise, Customer's advance agreement to submit a controversy to arbitration would not be enforceable by FIMAT, this provision shall not permit Customer to enforce FIMAT's advance agreement to submit to arbitration. Any award rendered in any arbitration conducted pursuant to this agreement shall be final, binding and enforceable in accordance with the laws of the State of New York and judgment may be entered on any such award by any court having jurisdiction thereof.

At such time as Customer notifies FIMAT that Customer intends to submit a controversy to arbitration, or at such time as FIMAT notifies Customer that FIMAT intends to submit a controversy to arbitration, Customer will have the opportunity to choose a forum from a list of three or more qualified forums provided by FIMAT. A "qualified forum" is an organization whose procedures for conducting arbitrations comply with the requirements of the Commodity Futures Trading Commission ("CFTC") Rule 180.2.

As required by CFTC Rule 180.3, FIMAT will pay any incremental fees which may be assessed by a qualified forum for provision of a mixed arbitration panel, unless the arbitrator(s) hearing the controversy determine that Customer has acted in bad faith in initiating or conducting the arbitration. A "mixed arbitration panel" is an arbitration panel composed of one or more persons, a majority of whom are not members or associated with a member of a contract market or employee thereof, and who are not otherwise associated with a contract market.

In connection with this Arbitration Agreement, FIMAT is required to furnish to Customer the following statement, pursuant to Rule 180.3 of the CFTC (for the purposes of the following "you" or "your" means FIMAT's Customer):

**THREE FORUMS EXIST FOR THE RESOLUTION OF COMMODITY DISPUTES: CIVIL COURT LITIGATION, REPARATIONS AT THE COMMODITY FUTURES TRADING COMMISSION ("CFTC"), AND ARBITRATION CONDUCTED BY A SELF-REGULATORY OR OTHER PRIVATE ORGANIZATION.**

**THE CFTC RECOGNIZES THAT THE OPPORTUNITY TO SETTLE DISPUTES BY ARBITRATION MAY IN SOME CASES PROVIDE MANY BENEFITS TO CUSTOMERS, INCLUDING THE ABILITY TO OBTAIN AN EXPEDITIOUS AND FINAL RESOLUTION OF DISPUTES WITHOUT INCURRING SUBSTANTIAL COSTS. THE CFTC REQUIRES, HOWEVER, THAT EACH CUSTOMER INDIVIDUALLY EXAMINE THE RELATIVE MERITS OF ARBITRATION AND THAT YOUR CONSENT TO THIS ARBITRATION AGREEMENT BE VOLUNTARY.**

**BY SIGNING THIS AGREEMENT, YOU: (1) MAY BE WAIVING YOUR RIGHT TO SUE IN A COURT OF LAW; AND (2) ARE AGREEING TO BE BOUND BY ARBITRATION OF ANY CLAIMS OR COUNTERCLAIMS WHICH YOU OR FIMAT MAY SUBMIT TO ARBITRATION UNDER THIS AGREEMENT. YOU ARE NOT, HOWEVER, WAIVING YOUR RIGHT TO ELECT INSTEAD TO PETITION THE CFTC TO INSTITUTE REPARATIONS PROCEEDINGS UNDER SECTION 14 OF THE COMMODITY EXCHANGE ACT WITH RESPECT TO ANY DISPUTE WHICH MAY BE ARBITRATED PURSUANT TO THIS AGREEMENT. IN THE EVENT A DISPUTE ARISES, YOU WILL BE NOTIFIED IF FIMAT INTENDS TO SUBMIT THE DISPUTE TO ARBITRATION. IF YOU BELIEVE A VIOLATION OF THE COMMODITY EXCHANGE ACT IS INVOLVED AND IF YOU PREFER TO REQUEST A SECTION 14 "REPARATIONS" PROCEEDING BEFORE THE CFTC, YOU WILL HAVE 45 DAYS FROM THE DATE OF SUCH NOTICE IN WHICH TO MAKE THAT ELECTION.**

**YOU NEED NOT SIGN THIS AGREEMENT TO OPEN AN ACCOUNT WITH FIMAT USA, LLC SEE 17 CFR 180.1-180.5.**

**Acknowledged and Agreed:**

Account Name: _____

Customer Signature: _____    Date: _____

Joint Party Signature: _____    Date: _____

# FIMAT

April 4, 2007

Fluxo-Cane Overseas Ltd.
Rua Dr. Renato Paes De Barros
778-2 Andar
Sao Paulo – SP Brazil 04530-001

Re:  **Demand Loan Margin Financing Facility**

Ladies and Gentlemen:

Thank you for allowing us the opportunity to handle your account.  To accommodate your margin call funding requirements, we are pleased to have arranged for Fimat International Banque S.A. acting through its UK Branch ("Fimat UK"), to provide you a demand loan facility of up to $7,000,000 to meet your original margin requirements of which up to $4,000,000 can be used to meet your variation margin call requirements, in connection with your futures account, master account REL-31843 and any related accounts thereto, (collectively the "Accounts").  To implement this demand loan facility Fimat UK and we require your agreement to the following:

1.      The amount of any loan to you will be reflected on a confirmation statement which Fimat UK will send to you, or which we will send to you on their behalf. Fimat UK's and our records, as the case may be, shall be prima facie evidence of the outstanding principal balance of loans to you and any accrued and unpaid interest thereon.

You will repay the amount of any outstanding loan on Fimat UK's demand.  You also agree to pay interest on any outstanding loan at the earlier of Fimat UK's demand or on the last business day of each month at a per annum rate of interest equal to the sum of LIBOR of Fimat UK as in effect from time to time during the time while the amount of any loan is outstanding, plus 50 basis points, calculated daily. Notwithstanding anything herein to the contrary, all loans extended in connection with specific positions plus accrued and unpaid interest thereon must be repaid by no later than the date when such positions are closed out or expire.

2.      Although Fimat UK agrees to provide you a demand loan facility, its decision to extend you a loan at any particular time in response to a margin call by us will be entirely in its absolute discretion.  If Fimat UK does not provide you a loan, you are still required to meet your margin call with us promptly. The granting of a loan in connection with one circumstance shall not be binding on Fimat UK in connection with another circumstance.

3.      In order to secure all your obligations and liabilities to Fimat UK under the demand loan facility described herein, you hereby grant to Fimat UK a senior security interest in all your rights and interest in all your accounts with us, including all positions, financial assets, investment property and funds therein or credited thereto, and all, income, distributions, reinvestments and other proceeds of the foregoing, which security interest is and shall be second only to our security interest in the Accounts.  In connection therewith, you hereby give control over the Accounts to Fimat UK and us, as Fimat UK's agent, for purposes of perfecting Fimat UK's security interest under the laws of the State of New York and authorize us to serve, and we agree to serve Fimat UK, as Fimat UK's agent and custodian in connection directly or indirectly, with all matters related to Fimat UK's security interest in the Accounts, with full authority to distribute funds in accordance with the terms of this agreement and to comply with all

**A SOCIETE GENERALE BUSINESS**

2

entitlement orders and directions received by us from Fimat UK with respect to the Accounts without further consent by you and otherwise to follow Fimat UK's instructions related to the Accounts, and to refuse to follow instructions of any other person.

You further authorize Fimat UK or us as Fimat UK's agent, to take all steps which Fimat UK deems desirable to perfect Fimat UK's security interest in the Accounts, including making any filings; you agree to execute and deliver any and all financing statements and other documents to that end; you authorize Fimat UK or us as Fimat UK's agent, to file any and all financing statements and other documents without your signature; and expressly authorize Fimat UK or us as Fimat UK's agent, to act as your attorney-in-fact to sign such statements and other documents.

4.      You hereby authorize and instruct us to pay to Fimat UK all funds in your Account(s) with us in excess of your margin requirements with us up to the amount of any outstanding loan. All such payments made by us to Fimat UK in such circumstances shall be deemed to be payments directly to you for purposes of our obligation to pay such amounts to you. You hereby authorize and instruct us not to pay to you or any third party other than Fimat UK any funds in your Account(s) with us in excess of your margin requirements while you have any obligations outstanding hereunder to Fimat UK.

5.      Fimat UK is authorized for its own account and benefit and with notice to you to assign, lend, pledge or otherwise hypothecate this agreement and all its interests and your obligations thereunder to another party, and your obligations shall remain the same to such party notwithstanding such assignment, pledge or hypothecation. If Fimat UK assigns this agreement, all references herein to Fimat UK shall be deemed to be references to the assignee. Such assignment, loan, pledge or hypothecation shall not give rise to or form the basis of any actual or contingent claim of any kind whatsoever by you against such assignee.

6.      You authorize us at your expense to send to Fimat UK copies of your confirmation and monthly statements for your Account(s) with us, as well as any and all other documents and information that Fimat UK may from time to time request.

7.      You will indemnify and hold harmless Fimat UK and us for all liabilities, penalties, losses and expenses, including but not limited to reasonable attorney fees, Fimat UK or we may incur in connection directly or indirectly with this agreement or the administration, effectuation or enforcement thereof.

8.      If an event of default (or an equivalent event) occurs under any agreement with Fimat UK or us, or any of our respective parents, subsidiaries or affiliates, including if you fail to perform any of your obligations hereunder, Fimat UK reserves the right (but is not obligated) to terminate this agreement, instruct us in its absolute discretion to liquidate any or all positions in your Account(s) with us, and instruct us to remit to it all proceeds thereof (subject to the prior payment to us of any of your payment obligations to us), and you shall be liable to Fimat UK for any deficiency between the proceeds it obtains and any amount you otherwise owe Fimat UK and all costs Fimat UK incurs to exercise this remedy. If there is any surplus, we shall send it to you.

9.      All disputes under this agreement shall be resolved by federal or state courts located exclusively in New York, New York, and New York substantive law shall apply. For the avoidance of doubt, you and we agree that Fimat USA, LLC's "jurisdiction" for purposes of the New York Uniform Commercial Code shall be New York. You hereby consent to the exclusive jurisdiction of all such courts of tribunals and acknowledge that your consent is a material condition to Fimat UK granting you a demand margin loan facility. All parties hereto hereby waive any right to trial by jury. You consent to our service of process on you by mailing such process to you by first class, registered (or equivalent) mail, return receipt requested, or by a overnight express delivery service that receipts all deliveries. We will act as agent for

3

the purpose of accepting service of process on Fimat UK behalf in New York in any legal action or proceedings with respect to this agreement.

10.     No other agreement exists among the parties related to the demand margin loan facility described herein. The printed language of this agreement will govern unless a change is initialed by all the signatories to this agreement. Any subsequent amendment to this agreement must be in writing signed by all signatories to this agreement. You are authorized to enter into this agreement, and the person signing below is authorized to enter into this agreement on your behalf.

11.     None of these terms and conditions shall be construed as affecting any of your obligations or our rights under, or the terms of your customer agreement with us. This agreement shall automatically terminate on July 30, 2007 unless Fimat UK and we renew it in writing; provided however that either party may terminate the agreement immediately upon notice. The termination of this agreement shall not affect any of your obligations incurred or accrued prior to such termination and not then satisfied.

12.     To implement these arrangements, please note your agreement to the terms of this agreement by signing the three enclosed copies of this letter and returning all signed copies to us, together with a copy of a resolution or resolutions adopted by your Board of Directors, certified by your Secretary or an Assistant Secretary as being in full force and effect on the date thereof, authorizing the loans provided for in this agreement and a certificate, signed by your Secretary or an Assistant Secretary, as to the incumbency of the person or persons authorized on your behalf to execute and deliver this agreement and to give any notice of any loans requested hereunder. After gaining Fimat UK's signature, we will return to you a copy signed by Fimat UK and us. Feel free to contact your account executive or myself, at (646) 557-8560, if you have any questions.

Very truly yours,
Fimat USA, LLC

Amy Byrne
Senior Vice President
Head of Credit & Deputy Head of Risk Management

Acknowledged and Agreed:
Fluxo-Cane Overseas Ltd.

By: _____

Name: MANUEL FERNANDO GARCIA

Title: PRESIDENT

Date: APRIL 9th, 2007

Consented to:
Fimat International Banque S.A. (UK Branch)

By: _____

Name: Christophe Bourges
       Fimat International Banque SA (UK Branch)
Title: _____

Date: 6/11/7



July 30, 2007

**Fluxo-Cane Overseas Ltd.**
Rua Dr. Renato Paes De Barros
778-2 Andar
Sao Paulo – SP Brazil 04530-001

**Re: Amendment and Renewal**

Ladies and Gentlemen:

We refer to the <u>Demand Loan Margin Financing Facility</u> (herein "Agreement") dated April 4, 2007 between Fimat International Banque S.A. (UK Branch) (herein "Fimat UK") and **Fluxo-Cane Overseas Ltd.**

Effective as of July 1, 2007, Fimat UK proposes to renew your Agreement on the following conditions: Fimat UK agrees to provide you a demand loan facility of $7,000,000.00 to meet your original margin call requirements, of which up to $4,000,000.00 can be used for variation margin requirements, that is granted in connection with your futures account, master account **#REL-31843** and any related accounts thereto. Your facility is subject to an interest rate determined by Fimat UK based on the monthly average of the overnight LIBOR rate compounded daily as in effect from time to time during the time while the amount of any loan is outstanding, plus 50 bps.

Notwithstanding anything contained therein, you agree that the Agreement shall continue to exist without requiring further renewal and may be terminated at any time by either party upon notice. Except as specifically amended hereby, all of the terms and conditions of the Agreement shall continue to be in full force and effect and shall be binding upon the parties in accordance with their respective terms.

Please note your approval of this amendment to the Agreement by signing in the space indicated below and returning the three executed copies to us so that Fimat UK might implement these amendments immediately. We will return one of the executed copies to you for your files after obtaining Fimat UK's countersignature.

We are delighted that you continue to give us the opportunity to service you, and trust that these arrangements are satisfactory. If you have any questions, please contact me at (646) 557 8560. Our offer to extend to you this Agreement shall expire 60 days after the date of this amendment if we have not received by then your signed agreement to its terms.

Very truly yours,
**Fimat USA, LLC**

Amy Byrne
Senior Vice President
Head of Credit & Deputy Head of Risk Management

Acknowledged and Agreed:
**Fluxo-Cane Overseas Ltd.**

By: _____

Name: MANOEL FERNANDO GARCIA

Title: PRESIDENT

Date: AUGUST 28th, 2007

Consented to:
**Fimat International Banque S.A. (UK Branch)**

By: _____ p/a

Name: _____

Title: Christophe Bourges
Fimat International Banque SA (UK Branch)

Date: 9/18/7

**A SOCIETE GENERALE BUSINESS**

## LETTER OF INDIVIDUAL GUARANTEE

GUARANTEE, dated as of December 21th, 2006, (the "Guarantee"), made by Manoel F. Garcia (the "Guarantor"), in favor of FIMAT USA, LLC, a futures and commission merchant and broker-dealer organized under the laws of the State of Delaware, and in favor of Fimat International Banque SA (UK Branch), a company incorporated in France and acting through its branch registered in England (each and collectively, "FIMAT"), issued in connection with the Customer Agreements entered into by and between each of SA Fluxo Comercio e Assessoria International, a corporation organized and existing under the laws of Brazil, and Cane International Corporation Ltd, which was merged into Fluxo Overseas Ltd., on 21st December, 2006, resulting in Fluxo-Cane Overseas Ltd., a corporation existing under the laws of BVI (each and collectively, the "Customer") and FIMAT USA ("FIMAT's Customer Agreement(s)") and in connection with any demand loan margin financing facility agreement in place between the Customer and FIMAT UK ("Demand Loan(s)" and together with FIMAT's Customer Agreement(s), the "Agreement(s)").

Any capitalized term used but not defined herein shall have the same meaning ascribed to it in FIMAT's Customer Agreements and/or Demand Loans.

1. The Guarantor hereby unconditionally and irrevocably guarantees to FIMAT, as primary obligor and not merely as surety, the prompt payment in full when due (whether as stated maturity, by acceleration or otherwise) of all indebtedness, obligations and liabilities of Customer under the Agreements (collectively, the "Guaranteed Obligations").

2. The Guarantor hereby agrees that, if Customer fails to punctually comply with any of its obligations under the Agreements or if an Event of Default occurs, the Guarantor shall, upon first simple demand of FIMAT, pay to FIMAT the amount indicated by FIMAT against the statement of FIMAT that Customer failed to comply with an obligation under the Agreement(s) (at maturity, by acceleration or otherwise).

3. The Guarantor shall make all payments hereunder to FIMAT in United States dollars, in immediate available funds, by entering into the appropriate foreign exchange transactions and thereafter transferring such funds to a currency account indicated by FIMAT for such purpose.

4. Each payment hereunder shall be made without set-off or counterclaim and free and clear and without deductions for any taxes, charges, levies, compulsory loans or other withholdings or deductions and otherwise without limitation by reason of any law, regulation or decree in effect at any time which cause or permit to be invoked any alteration in the time, amount, currency, or manner of payment by the Guarantor of any and all payments hereunder, and without being affected by any compromise or arrangement made by Customer. If at any time any applicable law requires the Guarantor to make any such deduction or withholding from any such payment, the sum due from the Guarantor in respect of such payment shall be increased to the extent necessary to ensure that after the making of such deduction or withholding FIMAT will receive a net sum equal to the sum which it would have received had no such deduction been required to be made.

1

5. The Guarantor hereby waives promptness, diligence, presentment, demand of payment and protest, all notices (whether of non-payment, dishonor, protest or otherwise), with respect to the Guaranteed Obligations, filing of claims with a court in the event of the bankruptcy of Customer, any right to require a proceeding first against Customer, and all demands whatsoever with respect to the indebtedness related to the Guaranteed Obligations.

6. The Guarantor hereby covenants that the obligations herein contained shall continue to be in full force and effect until the indefeasible repayment in full of all amounts due by Customer under the Agreements and total satisfaction of all Customer's actual and contingent obligations thereunder.

7. The Guarantor shall be subrogated to all rights of FIMAT against Customer with respect to any amounts paid by the Guarantor pursuant to the provisions of this Guarantee, provided, however, that the Guarantor shall not be entitled to enforce or to receive any payment arising out of, or based upon, such right of subrogation until the Guaranteed Obligations shall have been paid in full.

8. This Guarantee constitutes a direct, unsecured, and unsubordinated obligation of the Guarantor and ranks equally in priority of payment with all other present and future unsecured and unsubordinated obligations of the Guarantor (save for obligations preferred by law).

9. As Guarantor, you represent and warrant that:

(a)    you have full power and capacity to give this Guarantee, to execute, and deliver this Guarantee and to undertake and to perform the obligations assumed by you herein;

(b)    the giving of this Guarantee, the execution and delivery of this Guarantee and the undertaking and performance by you of the obligations assumed by you herein will not conflict with, or result in a breach of or default under, any of the terms or provisions of the laws of Brazil or laws of any other jurisdiction applicable to you or any agreement or instrument to which you are a party or by which you are bound or in respect of indebtedness in relation to which you are a surety;

(c)    upon due execution and delivery by you, this Guarantee will constitute your legal, valid, binding, and enforceable obligation;

(d)    all authorizations, consents and approvals required by you for or in connection with the giving of this guarantee, the execution and delivery of this Guarantee and the performance by you of the obligations undertaken by you herein have been obtained and are in full force and effect.

10. The provisions of this Guarantee shall be governed by and interpreted in accordance with the laws of the State of New York. The Guarantor hereby expressly waives the benefits set forth in Articles 827, 835 and 838 of the Civil Code of Brazil and Article 595 of the Code of Civil Procedure of Brazil.

2

11. Any notices of communications to the Guarantor hereunder shall be effective upon receipt by the Guarantor and shall be sent as follows:

Rua Dr. Renato Paes de Barros, n. 778, 2º andar
CEP: 04530-001
São Paulo – SP, Brazil
Fax n. (55) (11) 3167-0174
Tel n. (55) (11) 2177-2000
Email: diretoria@safluxo.com.br

**IN WITNESS WHEREOF**, the Guarantor has caused this Guarantee to be duly executed this 21th day of December, 2006.

By: _____

Name: Manoel Fernando Garcia

[ By: JUDICIAL SEPARATED

Name of spouse: (Guarantor's spouse) Please note that under Brazilian Law the spousal consent is required for an individual to give guarantee, except in case of marriage under separate property system]

Witnessed by:

1. _____
   RG No.      Ana Paula Rodrigues Matsuda
                      RG 27.879.945-0
                      CPF: 328.128.968-23

2. _____
   RG No.      Carlos Eduardo Fujita
                    RG: 32.349.311-7
                    CPF: 297.725.118-94

3



Atlanta   Calgary   Chicago   Houston   London   New York   Singapore

**BY OVERNIGHT DELIVERY and ELCTRONIC TRANSMISSION**

February 21, 2008

Mr. Manoel Garcia                    Mr. Manoel Garcia
Fluxo-Cane Overseas Ltd.             Rua Dr. Renato Paes de Barros
Abbott Building, 2nd Floor           N. 778, 2° andar
Road Town-Tortola                    CEP: 04530-001
British Virgin Islands               Sao Paolo
                                     Brazil

Re:     **In the Matter of Newedge USA, LLC (f/k/a FIMAT USA, LLC) v. Fluxo-Cane
        Overseas Ltd. and Manoel Garcia**

Dear Mr. Garcia:

        An Arbitration has been commenced against you and Fluxo-Cane Overseas Ltd.
("Fluxo") by Newedge USA, LLC (f/k/a FIMAT USA, LLC) ("the Firm").  A copy of the Notice
of Arbitration ("Notice") is enclosed.  Pursuant to Arbitration Rule 20.03(a)(ii), you and Fluxo
have twenty (20) days from the date of your receipt of this letter to serve a written Answer on the
Firm's attorneys, Sidley Austin LLP, and the Exchange.  The Answer may contain any
counterclaims you or Fluxo may have against the Firm with respect to the claim referred to in the
Notice [please see Arbitration Rule 20.03(a)(ii)].  Any allegation not denied in the Answer will
be deemed admitted, and a failure to serve a written Answer may result in a default judgment
against you and/or Fluxo.

        The Firm's attorneys may be served by mailing to:

                William J. Nissen
                Scott R. Rauscher
                Sidley Austin LLP
                One South Dearborn Street
                Chicago, IL  60603.

You may serve the Exchange by mailing your Answer to my attention at ICE Futures U.S., Inc.,
One North End Avenue, 13th Floor, New York, NY 10282.

ICE Futures U.S., Inc., a designated contract market
under the Commodity Exchange Act, as amended.

ICE Futures U.S., Inc.
World Financial Center     phone   212 748 4000
One North End Ave          fax     212 742 6981
New York, NY 10282         online  www.theice.com

-2-

For your information, a copy of the Exchange's Arbitration Rules is enclosed.  If you have any questions, please contact me at 212-748-4084.

Sincerely,

Jill S. Fassler
Vice President
Associate General Counsel

Enc.

# ICE Futures U.S., Inc.

*All references to Board of Trade of the City of New York, Inc., New York Board of Trade or NYBOT shall be deemed to be ICE Futures U.S., Inc.*

## ARBITRATION RULES

### TABLE OF CONTENTS

| Rule | Subject |
|------|---------|
| 20.00 | Quorum and Disqualification |
| 20.01 | Definitions |
| 20.02 | Jurisdiction |
| 20.03 | Procedure |
| 20.04 | Withdrawal of Claims |
| 20.05 | Modification of Award |
| 20.06 | Compensation of Arbitrators |
| 20.07 | Punitive Damages |
| 20.08 | Failure to Comply with Award |

# ICE FUTURES U.S., INC.

***All references to Board of Trade of the City of New York, Inc., New York Board of Trade or NYBOT
shall be deemed to be ICE Futures U.S., Inc.***

# ARBITRATION RULES

### Rule 20.00. Quorum and Disqualification

(a) An individual shall be disqualified from taking any action as a member of the Arbitration Committee or as an arbitrator prescribed in the Arbitration Rules if such individual or an Affiliated Firm has an interest in the Claim or dispute. Any member of the Arbitration Committee may disqualify himself for any reason he deems appropriate. Each member of the Arbitration Committee or arbitrator appointed to hear and determine a Claim or grievance shall conduct himself in a manner consistent with the ABA/American Arbitration Association's "Code of Ethics for Arbitrators in Commercial Disputes" and shall disclose to the Chairman of the Arbitration Committee, who shall thereafter advise the parties to the arbitration, at any stage of the arbitration, any past or present, direct or indirect financial, business, professional, family or social relationship which is likely to affect an appearance or which might reasonably create an appearance of partiality or bias.

(b) If the Chairman of the Arbitration Committee is disqualified or is unavailable, the Vice Chairman of the Arbitration Committee shall act as Chairman. If both the Chairman and the Vice Chairman of the Arbitration Committee are disqualified or are unavailable, the Chairman of the Board of Governors shall appoint another member of the Arbitration Committee to act as Chairman.

(c) The lesser of a majority or three (3) members of the Arbitration Committee shall constitute a quorum for the transaction of business. Any action taken by a vote of the majority of the Arbitration Committee members present at a meeting at which a quorum is present shall be deemed to be a valid action of the Arbitration Committee.

### Rule 20.01. Definitions

Unless otherwise indicated, the following terms shall, for the purposes of these Arbitration Rules, have the following meanings:

(a) "Claims or grievance" shall mean any dispute which arises out of any Transaction on or subject to the Rules executed by or effected through a Member or any employee of such Member, which dispute does not require for adjudication the presence of essential witnesses or third (3rd) parties over whom the Exchange does not have jurisdiction or who are otherwise not available. The term "Claim or grievance" shall not include disputes arising from cash market transactions which are not a part of, or directly connected with, any Transaction.

(b) "Customer" shall mean any Person with a Claim or grievance against a Member or any employee of such Member; provided, however, that it shall not include Members.

(c) "Claimant" shall mean a Person who asserts a Claim pursuant to these Arbitration Rules.

(d) "Respondent" shall mean a Person against whom a Claim is asserted pursuant to these Arbitration Rules.

(e) "Contract market" shall mean an exchange designated by the Commodity Futures Trading Commission as a contract market under the Commodity Exchange Act.

(f) "Allowable Claim" shall mean a Claim for losses arising directly from (i) any order or Transaction for the purchase, sale, exercise or expiration of an Exchange Futures Contract or Exchange Option, (ii) any cash market transaction which is part of, or directly connected with, any Transaction, (iii) any documented loan made to a Member by his Clearing Member guarantor for the express purpose of

acquiring a Membership, (iv) any dispute concerning the purchase, sale, transfer or ownership of a Membership and (v) the performance of the Clearing Member guarantor's obligations pursuant to the terms of its Guaranty Agreement. An Allowable Claim shall not include legal or other incidental expenses incurred in connection with any such losses or with the events giving rise to any such losses.

**Amended by the Board March 8, 2007; effective March 12, 2007 [¶ (f)].**

### Rule 20.02. Jurisdiction

(a) Any Claim or grievance by a Customer against a Member, or any employee thereof, shall, if the Customer so elects, be settled by arbitration in accordance with these Arbitration Rules. If such a Claim or grievance is made, any counterclaim permissible under subparagraph (a)(ii) of Rule 20.03 of these Arbitration Rules shall, if asserted by such Member or employee thereof, likewise be settled by arbitration in accordance with these Arbitration Rules.

(b) Any Allowable Claim by a Member against another Member, whether originating before or during the period of time that the parties are Members, shall be settled by arbitration in accordance with these Arbitration Rules. If such an Allowable Claim is made, any Allowable Claim which may be asserted as a counter-claim under subparagraph (a)(ii) of Rule 20.03 shall likewise be settled by arbitration in accordance with these Arbitration Rules. Arbitration proceedings invoked pursuant to this paragraph shall be independent of, and shall not interfere with or delay the resolution of Customers' Claims and grievances submitted for arbitration pursuant to paragraph (a).

(c) All other disputes or controversies, regardless of their nature, between or among any two (2) or more parties, shall, if agreed to by all parties involved, be settled by arbitration in accordance with these Arbitration Rules. Arbitration proceedings invoked pursuant to this paragraph shall be independent of, and shall not interfere with or delay the resolution of Customers' Claims and grievances submitted for arbitration pursuant to paragraph (a).

(d) Notwithstanding the foregoing, any Panel or, in the absence of a Panel, any three (3) members of the Arbitration Committee appointed by the Chairman of the Arbitration Committee, in its sole and absolute discretion, may decline to take jurisdiction of, or, having taken jurisdiction may at any time decline to proceed further with, any Claim or grievance or any other dispute, controversy or counterclaim, other than such as may be asserted under paragraph (a) of this Rule.

### Rule 20.03. Procedure

**(a) Claims Asserted Pursuant to Rules 20.02(a) and (b).**

(i) A Person desiring to invoke the provisions of this paragraph (a) shall, within two (2) years from the time the Claim or grievance arose, file with the Exchange a Notice of Arbitration. The Notice of Arbitration shall set forth the name and address of the party or parties against whom the Claim or grievance is being asserted, the nature and substance of the Claim or grievance, the relief requested and the factual and legal bases alleged to underlie such relief. In the event of a Notice of Arbitration submitted by a Customer, such Notice of Arbitration shall indicate whether the Customer elects to have the Claim or grievance heard and determined by a Mixed Panel, as provided in subparagraph (a)(iii) of this Rule. Failure to so indicate will be deemed a waiver of such election.

The Notice of Arbitration shall be accompanied by the Claimant's non-refundable check payable to the Exchange in payment of the arbitration fee. The amount of the fee shall be determined by the amount of the relief requested in the Notice of Arbitration, as follows:

| Relief Requested | Amount of Fee |
|---|---|
| Up to $5,000 | 3% (minimum $100) |
| $5,001 to $10,000 | $150, plus 2% of excess over $5,000 |

| $10,001 to $15,000 | $250, plus 1% of excess over $10,000 |
| $15,001 to $100,000 | $300, plus 1% of excess over $15,000 |
| $100,001 and above | $1,150, plus 1/2% of excess over $100,000 |

(ii) Upon receipt, the Exchange shall promptly deliver a copy of the Notice of Arbitration to each Respondent and to the Chairman of the Arbitration Committee. Each Respondent shall, within twenty (20) days following the delivery of such Notice, file an Answering Statement with the Exchange, with a copy to the Claimant, setting forth its or his position with respect to the Claimant's Claim or grievance. Any allegation in the Notice of Arbitration not denied by a Respondent in its or his Answering Statement shall be deemed admitted.

The Answering Statement may set forth one (1) or more counterclaims against the Claimant provided that any such counterclaims (A) arise out of the Transaction or occurrence that is the subject of the Claimant's claim or grievance and (B) do not require for adjudication the presence of essential witnesses, parties or third (3rd) Persons over which the Exchange does not have jurisdiction. Other counterclaims are permissible only if the Claimant agrees to the submission thereof after such counterclaims have arisen.

If an Answering Statement sets forth one (1) or more counterclaims, the Claimant shall reply to such counterclaims within twenty (20) days following delivery of the Respondent's Answering Statement. The Reply shall be filed with the Exchange, with a copy to the Respondent involved.

(iii) The Chairman of the Arbitration Committee, promptly after receipt by the Exchange of the Answering Statement, shall appoint a Panel of disinterested Persons to hear and determine the Claim or grievance, selecting one (1) as the Chairman of the Panel. If the amount of relief requested is less than or equal to one hundred thousand dollars ($100,000), the Panel shall be composed of three (3) or more individuals. If the amount of relief requested is in excess of one hundred thousand ($100,000), the Panel shall be composed of five (5) or more individuals. In a case where a Customer has, in his Notice of Arbitration, elected a Mixed Panel, at least a majority of the Persons selected shall not be Members or associated with any Member of a contract market, or any employee thereof, or otherwise associated with a contract market. Promptly following such appointment, the Exchange shall forward copies of the Notice of Arbitration Answering Statement and Reply, if there be one, to the Panel members selected.

(iv) The Exchange shall notify the parties of the appointment of the members of the Panel. Any party objecting to all or any members of the Panel shall file such objection with the Chairman of the Arbitration Committee within ten (10) days of the giving of such notice by the Exchange. The Chairman of the Arbitration Committee shall then determine whether changes in the composition of the Panel are appropriate, and if so, shall make such changes. Any vacancy occurring on the Panel for any reason shall be filled by an individual appointed by the Chairman of the Arbitration Committee. The parties shall be notified of the filling of such vacancy and may file objections to the new appointee to the Panel in accordance with the procedure set forth above.

(v) Any party may, no later than ten (10) days prior to the first (1st) hearing session, notify the Chairman of the Panel of any pertinent documents or other information it seeks from another party. Upon receipt of such request, the Chairman shall notify the party from which the documents or information are sought. The parties shall thereafter cooperate in the voluntary exchange of such documents and information. Any objection to a request for the production of documents or other information shall be resolved by the Chairman of the Panel, or his designee.

(vi) The parties shall, within a time specified by the Chairman of the Panel, furnish each other and the Panel with a statement listing the witnesses expected to be called and the documents expected to be introduced into evidence, together with copies of such documents. Unless the Panel waives compliance with this requirement, no witness may testify and no documentary evidence may be introduced at the hearing unless listed in (and, in the case of documents, furnished with) such statement.

(vii) The Panel shall establish, on not less than ten (10) days' written notice to the parties, the date, time and place of the hearing. Each Panel shall determine the procedures to be followed in any hearing before it, including the use of preliminary hearings to resolve discovery disputes, simplify the issues, and expedite the hearings, except that the following shall apply in every case:

(A) Each of the parties shall be entitled to appear personally at the hearing

(B) Each of the parties, at his own expense, shall have the right to be represented by counsel in any aspect of the proceeding.

(C) Each of the parties shall be entitled to (1) prepare and present all relevant facts in support of the Claims and grievances, defenses or counterclaims, and to present rebuttal evidence to such Claims or grievances, defenses or counterclaims made by the other parties, (2) examine the other parties, (3) examine any witnesses appearing at the hearing, and (4) examine all relevant documents presented in connection with the Claim or grievance, or any defense or counterclaim applicable thereto.

(D) The formal rules of evidence shall not apply.

(E) No verbatim record shall be made of the proceedings, unless requested by a party who shall bear the cost of such record. If such a request is made, a stenographic transcript shall be taken, but not transcribed unless requested by a party who shall bear the cost of such transcription.

(F) Ex parte contacts by any of the parties with members of the Panel shall not be permitted.

(G) The Panel shall have the power, on the request of any party or on its own motion, to require any Person to testify and/or to produce documentary evidence in the proceedings as and to the extent provided for in Rule 21.03.

(viii) The Panel shall, within sixty (60) days of the termination of the hearing, render its award in writing and deliver a copy thereof either in person or by first-class mail to each of the parties. The Panel, in its award, may grant any remedy or relief which it deems just and equitable, including, without limitation, the awarding of interest and the arbitration fee; provided, however, that any costs incurred as a result of having a Mixed Panel shall be born by the Member unless the Panel determines that the Customer acted in bad faith in initiating or conducting the proceeding. Further, in any case wherein it is alleged that the Claim or grievance arose from a violation of the Rules in the execution of a Customer order on the Floor of the Exchange and the Panel determines that such violation occurred, the Panel may award the Customer the actual damages proximately caused by said violation. The award of the Panel shall be final and binding upon each of the parties to the arbitration, and judgment upon such award may be entered by any court having jurisdiction. Any Member who is a Respondent in an arbitration conducted pursuant to the Rules shall notify the Assistant Corporate Secretary of the Exchange of any judicial proceeding based on the award. In addition, any award, if not complied with within the time specified in the award, shall be enforceable by disciplinary proceedings pursuant to Rules.

(ix) Notwithstanding any other provision of this paragraph (a), including the right of a Customer to elect a Mixed Panel pursuant to Rule 20.03(a)(iii), if a Notice of Arbitration sets forth Claims or grievances aggregating less than five thousand dollars ($5,000), and the Answering Statement submitted by the Respondent either does not raise counterclaims or raises one (1) or more counterclaims aggregating less than five thousand dollars ($5,000), the Chairman of the Arbitration Committee may, on the request of any party or on his own motion, in his sole and absolute discretion, decide that there shall not be a hearing, in which case the following procedures shall apply:

(A) The Chairman of the Arbitration Committee shall notify both parties that neither the Claims or grievances nor the counterclaims, if any, aggregate to five thousand dollars ($5,000).

(B) The Claimant shall, within twenty (20) days of such notification, submit to the Exchange with a copy to each of the Respondents, a memorandum (together with such supporting documents,

affidavits and other materials as the Claimant deems pertinent) setting forth the bases upon which he believes he is entitled to the relief requested in the Notice of Arbitration.

(C) Each Respondent shall, within twenty (20) days of its or his receipt of the Claimant's memorandum and supporting documentation, submit to the Exchange, with a copy to the Claimant, a memorandum (together with such supporting documents, affidavits and other materials as the respondent deems pertinent) setting forth the bases upon which he believes that the relief requested by the Claimant should be denied and, if said Respondent has raised counterclaims in his Answering Statement, the bases upon which he believes he is entitled to the relief requested by such counterclaims.

(D) The Chairman of the Arbitration Committee may, on the request of any party or on his own motion, in his sole and absolute discretion determine whether to allow or require the submission of reply or additional papers, unless a Respondent has asserted one (1) or more counterclaims, in which case the Claimant shall be entitled to reply to such counterclaims within ten (10) days of delivery of the Respondent's memorandum setting forth the bases thereof.

(E) The Chairman of the Arbitration Committee or his designee, acting as sole arbitrator, shall, within thirty (30) days of his receipt of the final papers filed, render an award in writing and deliver a copy thereof either in person or by first-class mail to each of the parties. The sole arbitrator in his award may grant any remedy or relief which he deems just and equitable, including, without limitation, the awarding of interest and the arbitration fee; provided, however, that any costs incurred as a result of a Customer requesting a Mixed Panel shall be borne by the Member unless the sole arbitrator determines that the Customer acted in bad faith in initiating or conducting the proceeding. Further, in any case wherein it is alleged that the Claim or grievance arose from a violation of the Rules in the execution of a Customer order on the Floor of the Exchange and the sole arbitrator determines that such a violation occurred, the sole arbitrator may award the Customer the actual damages proximately caused by said violation. The decision of the sole arbitrator shall be final and binding upon each of the parties to the arbitration, and judgment upon such award may be entered by any court having jurisdiction. In addition, any award, if not complied with within the time specified in the award, shall be enforceable by disciplinary proceedings pursuant to the Rules.

(x) The failure of any party to an arbitration to comply with any of the requirements of this paragraph (a), or with any demand or request of either the Panel, the sole arbitrator or the Chairman of the Arbitration Committee shall be deemed a violation of the Rules and shall, in addition to any other action the Exchange may take for any such violation, subject such party to such action by the Panel, the sole arbitrator or the Chairman of the Arbitration Committee (including without limitation the entry of an award against such party) as it or he shall deem appropriate under the circumstances.

(xi) Notwithstanding the provisions of subparagraph (x) of this paragraph (a), either the Panel, the sole arbitrator or the Chairman of the Arbitration Committee, may for good cause shown extend any time limitation imposed by this paragraph (a) (except the two (2) year and the thirty (30) day limitation periods set forth in subparagraph (a)(i)) or may excuse any neglect to comply therewith or with any other requirement of this paragraph (a) or demand or request of the Panel, the sole arbitrator or the Chairman of the Arbitration Committee.

**(b) Other Claims Asserted Pursuant to Rule 20.02(c).**

(i) Any dispute or controversy between or among any two (2) or more parties may, if all of the parties to such dispute or controversy so agree, be settled by arbitration in accordance with this paragraph (b). Such dispute or controversy shall be heard and determined in accordance with the procedures set forth in paragraph (a) of this Rule, except for the following:

(A) In lieu of the procedure set forth in the first sentence of subparagraph (i) of paragraph (a), the provisions of this paragraph (b) shall be invoked by the submission by all of the parties concerned of

an agreement to submit the dispute or controversy to arbitration in accordance with this paragraph (b) and to be bound by the award of the arbitrators. Following such submission, the Exchange shall forward to the party requesting relief the information set forth in subparagraph (i) of paragraph (a) of this Rule, whereupon all of the other procedures set forth in said subparagraph (i) of paragraph (a) shall apply.

(B) None of the limitations on counterclaims set forth in subparagraph (ii) of paragraph (a) shall apply.

## Rule 20.04. Withdrawal of Claims

Any Notice of Arbitration may be withdrawn at any time before an Answering Statement is filed in accordance with these Rules.

If an Answering Statement has been filed, any withdrawal shall require consent of the party against which the Claim or grievance is asserted.

## Rule 20.05. Modification of Award

On written application to the Assistant Corporate Secretary of the Exchange by a party to an arbitration, within twenty (20) days after delivery of the award to the applicant, the Panel or sole arbitrator may modify the award if:

(1) there was a miscalculation of figures or a mistake in the description of any Person, thing, or property referred to in the award; or

(2) the Panel or sole arbitrator has awarded upon a matter not submitted to it and the award may be corrected without affecting the merits of the decision upon the issues submitted; or

(3) the award is imperfect in a matter of form, not affecting the merits of the controversy.

Written notice of the application shall be given to the other parties to the arbitration. Written objection to the modification must be served on the Exchange and the other parties to the arbitration within ten (10) days of receipt of the application. The Panel or sole arbitrator shall dispose of any application made under this Rule in writing, signed and acknowledged by the Panel or sole arbitrator, within thirty (30) days after either written objection to the modification has been served on it or the time for serving said objection has expired, whichever is earlier. The parties may in writing extend the time for such disposition either before or after its expiration.

## Rule 20.06. Compensation of Arbitrators

The parties to an arbitration shall pay the arbitrators appointed in each matter compensation in accordance with such fee schedule as the Board of Governors may from time to time determine. The arbitrators in each such matters shall determine the proportion in which such compensation shall be paid by each of the parties.

## Rule 20.07. Punitive Damages

In the case of a Claim or grievance arising from a violation of the Rules in the execution of a Customer order on the Floor of the Exchange wherein it is determined by the Panel or the sole arbitrator that the violation was willful and intentional, punitive damages may be awarded the Customer in an amount equal to no more than two (2) times the amount of actual damages proximately caused by the violation.

## Rule 20.08. Failure to Comply With Award

(a) Any Member in whose favor an award has been rendered pursuant to this Chapter shall promptly notify the Assistant Corporate Secretary of the Exchange, in writing, if the award is not complied with.

Any Member, who fails to comply with the terms of an award rendered against such Member, shall be subject to the procedures set forth in this Rule.  Specifically, upon receipt of a notice or information indicating that a Member has failed to comply with the terms of an award rendered against such Member, the Exchange shall notify such Member against whom or which the award was rendered of the Exchange's intention to suspend his or its privileges as a Member and afford the Member an opportunity to be heard by a panel of the Arbitration Committee appointed by the Chairman for the sole purpose of proving that the award has been satisfied, provided that the Secretary of the Exchange receives a written request from the Member for such a hearing within five (5) Business Days after receipt of such notice by the Member. Failure to so request such a hearing shall be deemed an acknowledgment by the Member that the award has not been complied with. Any such hearing shall be conducted in accordance with such procedures as the Panel shall determine. The Panel shall consist of no less than three (3) members of the Arbitration Committee. Following any such hearing, the Panel shall determine whether the Member has failed to timely satisfy the award and shall promptly advise the Exchange, and all parties in the proceeding, of its determination.

(b) If the Panel shall find, or if a Member shall acknowledge that he or it has failed to comply with any award rendered pursuant to this Chapter when and as provided by such award, the Member shall be automatically suspended and shall remain suspended until the award is complied with and the suspended Member is reinstated, as provided in Rule 21.35.

(c) If a Member suspended pursuant to paragraph (b) of this Rule fails to comply with the arbitration award upon which such suspension was based within thirty (30) days following the effective date of the suspension:

(i) the Member shall be expelled or, in the case of a Member Firm, member privileges terminated; and

(ii) his Membership and Required Shares, if any, or in the case of a Member Firm, the Memberships and Required Shares of the Conferring Members, sold and the proceeds paid and applied as provided in Rule 21.36.

# ICE Futures U.S., Inc.

*All references to Board of Trade of the City of New York, Inc., New York Board of Trade or NYBOT shall be deemed to be ICE Futures U.S., Inc.*

## DEFINITIONS

### TABLE OF CONTENTS

AA Transaction
Act
Affiliated Firm
Allowable Claim
Arbitrage Position
Associated Brokers
Board
Business Day
Call Option
Caller
Carrying Member
Cash Commodity
Certified Public Accountant
CFTC
Chairman
Claim
Claimant
Claim Notice
Class
Clearing Member
Clearing Organization
Clearing Organization Rules
Clerk
Closing Transaction
Cocoa
Coffee "C"®
Commodity
Commodity Contract
Conferring Agreement
Conferring Member
Conversion
Cotton No. 2$^{SM}$
Cross Margining Participant
Customer
Customer Account
eCOPS®
EFP
EFS
Emergency
Emergency Event
Equity

Ethanol
Exchange
Exchange Futures Contract
Exchange Holiday
Exchange Option
Exercise Notice
Expiration Day
FCOJ
Financial Contracts
Financial Emergency
Firm
Floor Broker
Futures Commission
  Merchant or FCM
Futures Contract
Futures Equivalent Contract
Governor
Grantor
Guaranteed Member
ICE
In-the-Money Option
Index Contracts
Last Trading Day
Lessee
Lessor
Licensed Store
Licensee
Lot
Margin
Member
Member-Elect
Member Firm
Member of the Trade
Membership
Net Liquid Assets
NFC
NYBOT
NYBOT Member
NYBOT Member firm
NYBOT Membership

NYBOT Permit Holder
NYBOT Trading Permit
Omnibus Account
Option
Option Buyer
Option Month
Option Seller
Out-of-the-Money Option
Permit Holder
Person
Physical Emergency
Position
Premium
President
Principal
Public Director
Pulp
Purchaser
Put Option
Required Shares
Respondent
Reverse Conversion
Rule or Rules
Secured Loan
Series
Settlement Premium
Settlement Price
Straddle
Striking Price
Sugar No. 11$^{SM}$
Sugar No. 14$^{SM}$
Trade or Transaction
Trade Committee
Trading Floor
Trading Member
Trading Membership
Trading Permit
Underlying Futures
 Contract

# ICE FUTURES U.S., INC.

**All references to Board of Trade of the City of New York, Inc., New York Board of Trade or NYBOT shall be deemed to be ICE Futures U.S., Inc.**

# DEFINITIONS

**EXCEPT WHERE THE CONTEXT REQUIRES OTHERWISE,
THE FOLLOWING TERMS SHALL HAVE THE FOLLOWING MEANING WHEN
USED IN THE BY-LAWS OR RULES. USE OF THE SINGULAR SHALL INCLUDE
THE PLURAL AND VICE VERSA, UNLESS THE CONTEXT REQUIRES OTHERWISE.**

**AA Transaction**

The term "AA Transaction" or "Against Actual" shall mean a Transaction in which there is an exchange of Futures Contracts for the Cash Commodity.

**Act**

The term "Act" shall mean the Commodity Exchange Act, as amended from time to time.

**Affiliated Firm**

The term "Affiliated Firm" shall mean with respect to a Firm, any Firm which controls, is controlled by or is under common control with such Firm. The term "control" shall mean the power to direct or cause the direction of the management or policies of a Firm, whether through ownership of securities, by contract or otherwise.

**Allowable Claim**

The term "Allowable Claim" shall mean a Claim for losses arising from (i) any order or Transaction for the purchase, sale, exercise or expiration of an Exchange Futures Contract or Exchange Option or (ii) any cash market transaction which is part of, or directly connected with, any Transaction, (iii) any documented loan made to a floor trader by his Clearing Member guarantor for the express purpose of acquiring a Membership, (iv) any dispute concerning the purchase, sale, transfer or ownership of a Membership and (v) the performance of the Clearing Member guarantor's obligations pursuant to the terms of its Guaranty Agreement. An Allowable Claim shall not include legal or other incidental expenses incurred in connection with any such losses or with the events giving rise to any such losses.

**Amended by the Board March 8, 2007; effective March 9, 2007.**

**Arbitrage Position**

The term "Arbitrage Position" shall mean (i) an Exchange Futures Contract in one delivery month for an account which is offset by a Futures Contract for the same Commodity in the same or a different delivery month for such account which is executed on or subject to the rules of the London International Financial Futures and Options Exchange, and (ii) an Exchange Option, a Futures Contract to sell or purchase the same Commodity as the Underlying Futures Contract for such Exchange option, which is executed on or subject to the rules of the London International Financial and Options Exchange.

**Associated Brokers**

The term "Associated Brokers" or "Broker Association" shall have the meaning set forth in Rule 6.41.

**Board**

The term "Board" shall mean the Board of Directors of the Exchange. Any reference to "Board of Governors" in the Rules shall also mean the Board of Directors of the Exchange.

**Business Day**

The term "Business Day" shall mean, with respect to an Exchange Futures Contract or an Exchange Option, any day on which a Commodity Contract with the same underlying commodity as such Exchange Futures Contract or Exchange Option is available for trading on the electronic trading platform for the full regular electronic trading session for such Commodity Contract.

**Amended by the Board February 7, 2007; effective March 5, 2007.**

**Amended by the Board October 10, 2007; effective January 7, 2008.**

**Call Option**

The term "Call Option" shall mean an Option whereby:

(i) the Purchaser has the right, but not the obligation, to enter into an Underlying Futures Contract to buy a Commodity for delivery in the Option Month, at the Strike Price specified; and

(ii) the Grantor has the obligation, upon exercise, to enter into an Underlying Futures Contract to sell a Commodity for delivery in such Option Month, at such Strike Price.

**Caller**

The term "Caller" shall mean an Exchange employee designated to conduct the opening or closing call.

**Carrying Member**

The term "Carrying Member" shall mean a Futures Commission Merchant that carries one or more Customer Accounts.

**Cash Commodity**

The term "Cash Commodity" shall mean a physical or actual commodity.

**Certified Public Accountant**

The term "Certified Public Accountants" shall mean:

(i) Firms or individuals who submit statements as Certified Public Accountants and firms which are registered members of the American Institute of Certified Public Accountants (AICPA) and who are acceptable to the Membership Committee.

(ii) Accountants or accountant firms registered under the laws of other countries where the requirements for registration are similar to the requirements for a CPA certificate in the United States and which accountants or accountant firms are acceptable to the Membership Committee.

**CFTC**

The term "CFTC" shall mean the Commodity Futures Trading Commission.

**Chairman**

The term "Chairman" shall mean Chairman of the Board, or one duly authorized to act with the authority of the Chairman of the Board.

**Claim**

The term "Claim" shall mean any right to payment whether or not any such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed or secured.

**Claimant**

The term "Claimant" shall mean a person who has either filed a Claim Notice or a Notice of Arbitration.

**Claim Notice**

The term "Claim Notice" shall mean a notice of claim against the proceeds of sale of a Trading Membership or Trading Permit as provided in the Rules.

**Class**

The term "Class" shall mean, with respect to any Option, a Put Option or a Call Option covering the same Underlying Futures Contract.

**Clearing Member**

The term "Clearing Member" shall mean any Person who is a member of a Clearing Organization.

**Clearing Organization**

The term "Clearing Organization" shall mean with respect to any Commodity Contract, the entity designated by the Board as being authorized to clear such Commodity Contract.

**Clearing Organization Rules**

The term "Clearing Organization Rules" shall mean the certificate of incorporation, by-laws, rules, regulations, resolutions, orders, directives and procedures of the Clearing Organization as adopted or amended from time to time.

**Clerk**

The term "Clerk" shall mean any individual employed by a Member and registered with the Exchange to work on the Trading Floor.

**Closing Transaction**

The term "Closing Transaction" shall mean any Transaction in which a Person (i) grants an Exchange Call Option or Exchange Put Option which is in the same Series as an Exchange Call Option or Exchange Put Option, respectively, which had been purchased by such Person; or (ii) purchases an Exchange Call Option or Exchange Put Option which is in the same Series as an Exchange Call Option or Exchange Put Option, respectively, which had been granted by such Person.

**Cocoa**

The term "Cocoa" shall mean cocoa deliverable under the Cocoa Contract of the Exchange.

**Coffee "C"®**

The term "Coffee 'C'" shall mean coffee deliverable under the Coffee "C" Contract of the Exchange.

**Commodity**

The term "Commodity" shall mean any and all goods, articles, services, rights and interests in which contracts for future delivery are presently or in the future dealt in, on or subject to the Rules.

**Commodity Contract**

The term "Commodity Contract" shall include Futures Contracts, Options on Commodities or on Futures Contracts, and any other interests or instruments traded on or subject to the Rules.

**Conferring Agreement**

The term "Conferring Agreement" shall mean the form of agreement specified in Rule 2.10.

**Conferring Member**

The term "Conferring Member" shall mean, with respect to a Member Firm, each Trading Member who satisfies the criteria specified in Rule 2.09.

**Conversion**

The term "Conversion" shall mean a Transaction composed of three (3) Commodity Contracts, including a long Futures Contract, a Long Put Option and a short Call Option. The delivery month must be the same for all three (3) Commodity Contracts and the Strike Price must be the same for the two (2) Option components.

**Cotton No. 2<sup>SM</sup>**

The term "Cotton No. 2" shall mean cotton deliverable under the Cotton No. 2 Contract of the Exchange.

**Cross Margining Participant**

The term "Cross Margining Participant" shall mean a Person that has been granted cross margining privileges pursuant to Rule 2.40.

**Adopted by the Board November 14, 2007; effective March 7, 2008.**

**Customer**

The term "Customer" shall mean a Person, including another Member, for whom a Member carries an account.

**Customer Account**

The term "Customer Account" shall mean an account carried for a Customer, including an Omnibus Account.

**eCOPS<sup>®</sup>**

The term "eCOPS" shall mean the electronic commodity operations system utilized by the Exchange.

**EFP**

The term "EFP" or "Exchange for Physical" shall mean a Transaction in which there is an exchange of Futures Contracts for the Cash Commodity.

**EFS**

The term "EFS" or "Exchange for Swap" shall mean a Transaction in which there is an exchange of Futures Contracts for a swap agreement for the Cash Commodity.

**Emergency**

The term "Emergency" shall have the meaning set forth in Rule 6.01(a).

**Emergency Event**

The term "Emergency Event' shall have the meaning set forth in Rule 21.00(a).

**Equity**

The term "Equity" shall include the following:

**Available Equity**

   (i) The term "Available Equity" shall mean the amount, if any, by which Total Equity or the Net Liquidating Value, as the case may be, of any account exceeds the amount of Original Margin required for any Options or Futures Contracts carried in such account.

**Open Trade Equity**

   (ii) The term "Open Trade Equity" as applied to any account, shall mean any net unrealized gain or loss on Futures Contracts carried in such account.

**Total Equity**

   (iii) The term "Total Equity" shall mean, with respect to any account, the Open Trade Equity, if any, in the account, the amount of money, if any, in the account, and the value of any securities or other property, if any, in the account, valued in accordance with the Rules.

**Net Liquidating Value**

   (iv) The term "Net Liquidating Value", as applied to any account, shall mean the Total Equity in such account plus the value of any long and short options in such account.

**Ethanol**

The term "Ethanol" shall mean ethanol deliverable under the Ethanol Contract of the Exchange.

**Exchange**

The term "Exchange" shall mean the Board of Trade of the City of New York, Inc.

**Exchange Futures Contract**

The term "Exchange Futures Contract" shall mean a Futures Contract traded on the Exchange or subject to the Rules.

**Exchange Holiday**

The term "Exchange Holiday" shall mean any day which the Board may designate as an Exchange holiday and on which the Exchange shall be closed.

**Exchange Option**

The term "Exchange Option" shall mean any Option traded on the Exchange or subject to the Rules.

**Exercise Notice**

The term "Exercise Notice" shall mean a notice, in the form prescribed by the Clearing Organization, issued to the Clearing Organization by a Clearing Member that is, or that carries accounts for other Persons who are, holding long Positions in Options that are to be exercised.

**Expiration Day**

The term "Expiration Day" shall mean the day on which Options in any Option Month expire.

**FCOJ**

   The term "FCOJ" shall mean frozen concentrated orange juice deliverable under the FCOJ Contracts of the Exchange.

**Financial Contracts**

The term "Financial Contracts" shall mean the U.S. Dollar Index®, the FINEX® EURO Index, the Euro Based Currency, the Pound Sterling Based Currency, the US Dollar Based Currency, the Australian and New Zealand Based Currency, the Japanese Based Currency, the Cash Settled Currency Futures and Options Contracts and any other instruments designated by the Board as Financial Contracts and traded at the Exchange.

**Financial Emergency**

The term "Financial Emergency" shall have the meaning set forth in Rule 21.00(b).

**Firm**

The term "Firm" shall mean a corporation, partnership, limited liability company, sole proprietorship or other entity.

**Floor Broker**

The term "Floor Broker" shall mean any Person who has been granted floor trading privileges pursuant to the Rules.

**Futures Commission Merchant or FCM**

The term "Futures Commission Merchant" or "FCM" shall have the same meaning as defined in the Act.

**Futures Contract**

The term "Futures Contract" shall mean any contract for the purchase or sale of a Commodity for future delivery that is traded on or subject to the rules of any exchange.

**Futures Equivalent Contract**

The term "Futures Equivalent Contract" shall mean an Option that has been converted to a Futures Contract equivalent in accordance with Rule 6.13(a).

**Governor**

The term "Governor" shall mean a member of the Board of Directors of the Exchange.

**Grantor**

The term "Grantor" shall mean, with respect to any Option, the Floor Broker granting an Option on the Floor of the Exchange (either as agent or principal), until the time such Option is accepted by the Clearing Organization. Thereafter, the term "Grantor" shall mean the Clearing Member that cleared such Option for the Customer who granted it.

**Guaranteed Member**

The term "Guaranteed Member" shall mean any Trading Member, Permit Holder or Lessee that is guaranteed by a Clearing Member pursuant to Rule 2.16.

**ICE**

The term "ICE" shall mean IntercontinentalExchange, Inc.

**In-the-Money Option**

The term "In-the-Money Option" shall mean an Option that has a Strike Price that is lower (in the case of a Call Option) or higher (in the case of a Put Option) than the price of the Underlying Futures Contract for such Option.

**Index Contracts**

The term "Index Contracts" shall mean the NYSE Composite Index®, the Russell Complex and the Reuters Jefferies CRB Futures Price Index and the Continuous Commodity Index Futures and Options Contracts and any other Commodity Contracts based on an index.

**Last Trading Day**

The term "Last Trading Day" shall mean, with respect to any futures or Option Month, the last day on which trading is permitted for such futures or Option Month in accordance with the Rules.

**Lessee**

The term "Lessee" shall mean an individual who leases a NYBOT Membership from the owner thereof pursuant to the Rules.

**Lessor**

The term "Lessor" shall mean an individual who leases a NYBOT Membership of which he is the owner to another individual who thereby becomes the Lessee of such NYBOT Membership.

**Licensed Store**

The term "Licensed Store" shall mean that portion of a licensed warehouse which has been approved by the appropriate Warehouse and License Committee as suitable for the storage of an Exchange Commodity. Whenever the word "store" is used in the Rules, "Licensed Store" is intended, except when the context clearly indicates a contrary intent.

**Licensee**

The term "Licensee" shall mean a Person licensed by the Exchange as a chemist, grader, master sampler, tank facility, warehouse or weighmaster.

**Lot**

The term "Lot" shall mean the par quantity of the Commodity deliverable under a particular Commodity Contract.

**Margin**

The term "Margin" shall include the following:

**Maintenance Level**

(i) The term "Maintenance Level" shall mean the minimum amount of Original Margin and Option Margins a Carrying Member is required to maintain in a Customer Account at all times, as provided in the Rules.

**Maintenance Margin**

(ii) The term "Maintenance Margin" shall mean the minimum amount of Original Margin and Option Margin a Carrying Member is required to maintain in a Customer Account at all times, as provided in the Rules.

**Option Margin**

(iii) The term "Option Margin" shall mean the amount of money, securities or other property required as security for the performance of Options carried in a Customer Account as provided in the Rules.

**Original Margin**

(iv) The term "Original Margin" shall mean the amount of money, securities or other property required as security for the performance of Futures Contracts carried in a Customer Account, as provided in the Rules.

**Member**

The term "Member" shall mean and include a Permit Holder, Lessee, Member Firm and Trading Member and Cross Margining Participant (to the extent that such Person engages in transactions in Commodity Contracts that are the subject of a Cross Margining Program implemented by the Clearing Organization).

**Amended by the Board November 14, 2007; effective March 7, 2008.**

**Member-Elect**

The term "Member-Elect" shall mean any individual applying to become a Trading Member, Permit Holder or Lessee whose application has been approved in accordance with the Rules but who has not yet acquired a Trading Membership, Trading Permit or secured a lease of a NYBOT Membership.

**Member Firm**

The term "Member Firm" shall mean any partnership, corporation, limited liability company, sole proprietorship or other entity to which Exchange privileges have been conferred by a Trading Member who is an Affiliated Person of such Firm in accordance with the Rules.

**Member of the Trade**

The term "Member of the Trade" shall mean any Person engaged regularly and actually as principal or broker (in his or its own name) in the business of producing, exporting, importing, roasting, financing, grinding, refining, buying, selling, manufacturing or wholesaling a Commodity which is the subject of a Commodity Contract or a product or by-product of any such Commodity, and any Person engaged in (in his or its own name) the activities of a Futures Commission Merchant set forth in the Act. The term "Member of the Trade" shall not include any director, officer, partner or employee of a Firm that is a Member of the Trade unless such individual is himself a Member of the Trade.

**Membership**

The term "Membership" shall mean any Trading Membership any Trading Permit and any lease of a NYBOT Membership.

**Net Liquid Assets**

The term "Net Liquid Assets" shall mean current assets less current liabilities.

**NFC**

The term "NFC" shall mean not-from-concentrate orange juice deliverable under the NFC Contracts of the Exchange.

**NYBOT®**

The term "NYBOT" shall mean the Board of Trade of the City of New York, Inc.

**NYBOT Member**

The term "NYBOT Member" shall mean an individual who has been granted one or more NYBOT Memberships pursuant to Section (1)(a)(i) of Annex A to the Bylaws.

**NYBOT Member Firm**

The term "NYBOT Member Firm shall mean any partnership, corporation, limited liability company, sole proprietorship or other entity to which Exchange privileges have been conferred by a Trading Member who is an Affiliated Person of such Firm in accordance with the Rules, provided that such Firm was a Member Firm on September 14, 2006.

**NYBOT Membership**

The term "NYBOT Membership" shall mean one of the Trading Memberships authorized to be issued pursuant to Section (1)(a)(i) of Annex A to the Bylaws.

**NYBOT Permit Holder**

The term "NYBOT Permit Holder" shall mean an inidivudal who has been granted one or more NYBOT Trading Permits pursuant to Section 1(b)(i) of Annex A of the Bylaws.

**NYBOT Trading Permit**

The term "NYBOT Trading Permit" shall mean the right to execute Trades in specific Commodity Contracts granted pursuant to Section 1(b)(i) of Annex A of the Bylaws, specifically including the Trading Permits described in Membership Rule 2.38.

**Omnibus Account**

The term "Omnibus Account" shall mean an account in which one (1) or more Customer Accounts are carried.

**Option**

The term "Option" shall mean a contract or Transaction whereby one (1) party grants to another the right, but not the obligation, to buy, sell or enter into a Futures Contract.

**Option Buyer**

The term "Option Buyer" shall mean a Customer purchasing any Exchange Option.

**Option Month**

The term "Option Month" shall mean, with respect to any Option, the delivery month of the Underlying Futures Contract.

**Option Seller**

The term "Option Seller" shall mean a Customer granting (or writing) any Exchange Option.

**Out-of-the-Money Option**

The term "Out-of-the-Money Option" shall mean an Option which has a Strike Price that is higher (in the case of a Call Option) or lower (in the case of a Put Option) than the price of the Underlying Futures Contract for such Option on any day.

**Permit Holder**

The term "Permit Holder" shall mean any holder of a Trading Permit.

**Person**

The term "Person" shall mean an individual or Firm.

**Physical Emergency**

The term "Physical Emergency" shall have the meaning set forth in Rule 6.02.

**Position**

The term "Position" with respect to any Person shall mean all the Commodity Contracts held by such Person.

**Premium**

The term "Premium" shall mean the amount agreed upon between the Purchaser and Grantor for the purchase or grant of an Exchange Option, which amount shall be the quoted Premium multiplied by the number of units of the Underlying Futures Contract for each Option.

**President**

The term "President" shall mean the President of the Exchange, or one duly authorized to act with the authority of the President.

**Principal**

The term "Principal" shall mean with respect to any Firm, any Person who is an executive officer, general partner, director or other person, who, in each case, exercises a controlling influence over the Exchange-related business of such Firm, and any Person who owns ten percent (10%) or more of the outstanding shares of stock of, or has contributed ten percent (10%) or more of the capital to, such Firm.

**Public Director**

The term "Public Director" shall mean any person who (i) qualifies as a "public" director within the meaning of the regulations proposed by the CFTC as of September 14, 2006 for determining qualification of public directors or, if the CFTC adopts any such regulations, within the meaning of such regulations in effect from time to time and (ii) the independence requirement of the New York Stock Exchange, Inc. for directors serving on the boards of listed companies, as amended from time to time.

**Pulp**

The term "Pulp" shall mean pulp deliverable under the Pulp Contract of the Exchange.

**Purchaser**

The term "Purchaser" shall mean, with respect to any Option, the Floor Broker purchasing such Option on the Trading Floor (either as agent or principal), until the time such Option is accepted by the Clearing Organization. Thereafter, the term "Purchaser" shall mean the Clearing Member which cleared such Option for the Customer purchasing it.

**Put Option**

The term "Put Option" shall mean an Option whereby:

(i) the Purchaser has the right, but not the obligation, to enter into an Underlying Futures Contract to sell a Commodity for delivery in the Option Month at the Strike Price specified; and

(ii) the Grantor has the obligation, upon exercise, to enter into an Underlying Futures Contract to buy a Commodity for delivery in such Option Month at such Strike Price.

**Required Shares**

The term "Required Shares" shall mean the shares of ICE common stock that each NYBOT Member is required to own to maintain a NYBOT Membership pursuant to Section 1(a)(i) of Annex A to the Bylaws.

**Respondent**

The term "Respondent" shall mean any Person who is charged with a Rule violation.

**Reverse Conversion**

The term "Reverse Conversion" shall mean a Transaction comprised of three (3) Commodity Contracts, including a short Futures Contract, a short Put Option and a long Call Option. The delivery month must be the same for all three (3) Commodity Contracts and the Strike Price must be the same for the two (2) Option components.

**Rule or Rules**

The term "Rule" or "Rules" shall mean the Charter, Certificate of Incorporation, By-Laws, rules, resolutions, interpretations, statements of policy, decisions, directives and orders of the Exchange.

**Secured Loan**

The term "Secured Loan" shall mean a loan, advance or any other form of receivable which is secured within the meaning of CFTC Regulation 1.17(c)(3) by readily marketable collateral that is: (i) money or securities that may be deposited as Original Margin or Option Margin pursuant to Rule 5.04; (ii) negotiable warehouse receipts issued by a warehouse or depository licensed or otherwise approved by any contract market; or (iii) any security that has a loan value for general accounts carried by securities brokers or dealers under Regulation T issued by the Board of Governors of the Federal Reserve System.

**Series**

The term "Series" shall mean all Options in the same Class having the same Option Month and Strike Price.

**Settlement Premium**

The term "Settlement Premium" shall mean the daily Settlement Premium of an Exchange Option determined in accordance with the Rules.

**Settlement Price**

The term "Settlement Price" shall mean the daily price of a Commodity Contract as determined by the Exchange on any day for the purpose of meeting Margin requirements on such day.

**Straddle**

The term "Straddle" shall mean, (i) with respect to the Rules governing Margin, the purchase (or sale) of an Exchange Futures Contract in one delivery month for an account which is offset by (A) the sale (or purchase) of another Exchange Futures Contract in the same form involving the same Commodity in a different delivery month for such account, or (B) the sale (or purchase) of another Exchange Futures Contract in a different form involving the same Commodity in the same or a different delivery month for such account, and (ii) with respect to any other Rules, shall have the meanings, if any, set forth in the Rules.

**Striking Price or Strike Price**

The terms "Striking Price" or "Strike Price" shall mean the price at which the Underlying Futures Contract may be purchased or sold pursuant to any Option.

**Sugar No. 11$^{SM}$**

The term "Sugar No. 11" shall mean sugar deliverable under the Sugar No. 11 Futures Contract of the Exchange.

**Sugar No. 14**[SM]

The term "Sugar No. 14" shall mean sugar deliverable under the Sugar No. 14 Futures Contract of the Exchange.

**Trade or Transaction**

The terms "Trade" and "Transaction" shall mean any purchase or sale of any Commodity Contract made in accordance with the Rules.

**Trade Committee**

The term "Trade Committee" shall mean a committee that is organized in accordance with Section 1(b) of Annex C to the Bylaws.

**Trading Floor**

The term "Trading Floor" or "Floor of the Exchange" shall mean the Trading Floor and surrounding booths and facilities which are governed by the Exchange wherever situated.

**Trading Member**

The term "Trading Member" means a holder of a Trading Membership.

**Trading Membership**

The term "Trading Membership" shall mean the right, as expressly provided for in Section 1(a) of Annex A to the Bylaws, to buy and sell all or any one or more of the categories of Commodity Contracts authorized for trading on the Exchange (as may be determined by the Board of Directors of the Corporation in the case of Trading Memberships authorized pursuant to Section 1(a)(ii) of Annex A to these Bylaws), together with an subject in all respects to such other rights and obligations as are expressly provided in the Bylaws and the Rules, and shall include a NYBOT Membership.

**Trading Permit**

The term "Trading Permit" shall mean any right (other than a Trading Membership), as expressly provided for in the Bylaws and Rules, to buy and sell one or more specified Commodity Contracts on the Exchange, together with and subject in all respects to such other rights and obligations as are expressly provided in the Bylaws and Rules.

**Underlying Futures Contract**

The term "Underlying Futures Contract" shall mean the Futures Contract which is the subject of an Option.

# ICE Futures U.S., Inc.

***All references to Board of Trade of the City of New York, Inc., New York Board of Trade or NYBOT
shall be deemed to be ICE Futures U.S., Inc.***

# ARBITRATION RULES

## TABLE OF CONTENTS

| Rule | Subject |
|------|---------|
| 20.00 | Quorum and Disqualification |
| 20.01 | Definitions |
| 20.02 | Jurisdiction |
| 20.03 | Procedure |
| 20.04 | Withdrawal of Claims |
| 20.05 | Modification of Award |
| 20.06 | Compensation of Arbitrators |
| 20.07 | Punitive Damages |
| 20.08 | Failure to Comply with Award |

# ICE FUTURES U.S., INC.

*All references to Board of Trade of the City of New York, Inc., New York Board of Trade or NYBOT shall be deemed to be ICE Futures U.S., Inc.*

# ARBITRATION RULES

**Rule 20.00. Quorum and Disqualification**

(a) An individual shall be disqualified from taking any action as a member of the Arbitration Committee or as an arbitrator prescribed in the Arbitration Rules if such individual or an Affiliated Firm has an interest in the Claim or dispute. Any member of the Arbitration Committee may disqualify himself for any reason he deems appropriate. Each member of the Arbitration Committee or arbitrator appointed to hear and determine a Claim or grievance shall conduct himself in a manner consistent with the ABA/American Arbitration Association's "Code of Ethics for Arbitrators in Commercial Disputes" and shall disclose to the Chairman of the Arbitration Committee, who shall thereafter advise the parties to the arbitration, at any stage of the arbitration, any past or present, direct or indirect financial, business, professional, family or social relationship which is likely to affect an appearance or which might reasonably create an appearance of partiality or bias.

(b) If the Chairman of the Arbitration Committee is disqualified or is unavailable, the Vice Chairman of the Arbitration Committee shall act as Chairman. If both the Chairman and the Vice Chairman of the Arbitration Committee are disqualified or are unavailable, the Chairman of the Board of Governors shall appoint another member of the Arbitration Committee to act as Chairman.

(c) The lesser of a majority or three (3) members of the Arbitration Committee shall constitute a quorum for the transaction of business. Any action taken by a vote of the majority of the Arbitration Committee members present at a meeting at which a quorum is present shall be deemed to be a valid action of the Arbitration Committee.

**Rule 20.01. Definitions**

Unless otherwise indicated, the following terms shall, for the purposes of these Arbitration Rules, have the following meanings:

(a) "Claims or grievance" shall mean any dispute which arises out of any Transaction on or subject to the Rules executed by or effected through a Member or any employee of such Member, which dispute does not require for adjudication the presence of essential witnesses or third (3rd) parties over whom the Exchange does not have jurisdiction or who are otherwise not available. The term "Claim or grievance" shall not include disputes arising from cash market transactions which are not a part of, or directly connected with, any Transaction.

(b) "Customer" shall mean any Person with a Claim or grievance against a Member or any employee of such Member; provided, however, that it shall not include Members.

(c) "Claimant" shall mean a Person who asserts a Claim pursuant to these Arbitration Rules.

(d) "Respondent" shall mean a Person against whom a Claim is asserted pursuant to these Arbitration Rules.

(e) "Contract market" shall mean an exchange designated by the Commodity Futures Trading Commission as a contract market under the Commodity Exchange Act.

(f) "Allowable Claim" shall mean a Claim for losses arising directly from (i) any order or Transaction for the purchase, sale, exercise or expiration of an Exchange Futures Contract or Exchange Option, (ii) any cash market transaction which is part of, or directly connected with, any Transaction, (iii) any documented loan made to a Member by his Clearing Member guarantor for the express purpose of

acquiring a Membership, (iv) any dispute concerning the purchase, sale, transfer or ownership of a Membership and (v) the performance of the Clearing Member guarantor's obligations pursuant to the terms of its Guaranty Agreement. An Allowable Claim shall not include legal or other incidental expenses incurred in connection with any such losses or with the events giving rise to any such losses.

**Amended by the Board March 8, 2007; effective March 12, 2007 [¶ (f)].**

### Rule 20.02. Jurisdiction

(a) Any Claim or grievance by a Customer against a Member, or any employee thereof, shall, if the Customer so elects, be settled by arbitration in accordance with these Arbitration Rules. If such a Claim or grievance is made, any counterclaim permissible under subparagraph (a)(ii) of Rule 20.03 of these Arbitration Rules shall, if asserted by such Member or employee thereof, likewise be settled by arbitration in accordance with these Arbitration Rules.

(b) Any Allowable Claim by a Member against another Member, whether originating before or during the period of time that the parties are Members, shall be settled by arbitration in accordance with these Arbitration Rules. If such an Allowable Claim is made, any Allowable Claim which may be asserted as a counter-claim under subparagraph (a)(ii) of Rule 20.03 shall likewise be settled by arbitration in accordance with these Arbitration Rules. Arbitration proceedings invoked pursuant to this paragraph shall be independent of, and shall not interfere with or delay the resolution of Customers' Claims and grievances submitted for arbitration pursuant to paragraph (a).

(c) All other disputes or controversies, regardless of their nature, between or among any two (2) or more parties, shall, if agreed to by all parties involved, be settled by arbitration in accordance with these Arbitration Rules. Arbitration proceedings invoked pursuant to this paragraph shall be independent of, and shall not interfere with or delay the resolution of Customers' Claims and grievances submitted for arbitration pursuant to paragraph (a).

(d) Notwithstanding the foregoing, any Panel or, in the absence of a Panel, any three (3) members of the Arbitration Committee appointed by the Chairman of the Arbitration Committee, in its sole and absolute discretion, may decline to take jurisdiction of, or, having taken jurisdiction may at any time decline to proceed further with, any Claim or grievance or any other dispute, controversy or counterclaim, other than such as may be asserted under paragraph (a) of this Rule.

### Rule 20.03. Procedure

**(a) Claims Asserted Pursuant to Rules 20.02(a) and (b).**

(i) A Person desiring to invoke the provisions of this paragraph (a) shall, within two (2) years from the time the Claim or grievance arose, file with the Exchange a Notice of Arbitration. The Notice of Arbitration shall set forth the name and address of the party or parties against whom the Claim or grievance is being asserted, the nature and substance of the Claim or grievance, the relief requested and the factual and legal bases alleged to underlie such relief. In the event of a Notice of Arbitration submitted by a Customer, such Notice of Arbitration shall indicate whether the Customer elects to have the Claim or grievance heard and determined by a Mixed Panel, as provided in subparagraph (a)(iii) of this Rule. Failure to so indicate will be deemed a waiver of such election.

The Notice of Arbitration shall be accompanied by the Claimant's non-refundable check payable to the Exchange in payment of the arbitration fee. The amount of the fee shall be determined by the amount of the relief requested in the Notice of Arbitration, as follows:

| Relief Requested | Amount of Fee |
| --- | --- |
| Up to $5,000 | 3% (minimum $100) |
| $5,001 to $10,000 | $150, plus 2% of excess over $5,000 |

| $10,001 to $15,000 | $250, plus 1% of excess over $10,000 |
| $15,001 to $100,000 | $300, plus 1% of excess over $15,000 |
| $100,001 and above | $1,150, plus 1/2% of excess over $100,000 |

(ii) Upon receipt, the Exchange shall promptly deliver a copy of the Notice of Arbitration to each Respondent and to the Chairman of the Arbitration Committee. Each Respondent shall, within twenty (20) days following the delivery of such Notice, file an Answering Statement with the Exchange, with a copy to the Claimant, setting forth its or his position with respect to the Claimant's Claim or grievance. Any allegation in the Notice of Arbitration not denied by a Respondent in its or his Answering Statement shall be deemed admitted.

The Answering Statement may set forth one (1) or more counterclaims against the Claimant provided that any such counterclaims (A) arise out of the Transaction or occurrence that is the subject of the Claimant's claim or grievance and (B) do not require for adjudication the presence of essential witnesses, parties or third (3rd) Persons over which the Exchange does not have jurisdiction. Other counterclaims are permissible only if the Claimant agrees to the submission thereof after such counterclaims have arisen.

If an Answering Statement sets forth one (1) or more counterclaims, the Claimant shall reply to such counterclaims within twenty (20) days following delivery of the Respondent's Answering Statement. The Reply shall be filed with the Exchange, with a copy to the Respondent involved.

(iii) The Chairman of the Arbitration Committee, promptly after receipt by the Exchange of the Answering Statement, shall appoint a Panel of disinterested Persons to hear and determine the Claim or grievance, selecting one (1) as the Chairman of the Panel. If the amount of relief requested is less than or equal to one hundred thousand dollars ($100,000), the Panel shall be composed of three (3) or more individuals. If the amount of relief requested is in excess of one hundred thousand ($100,000), the Panel shall be composed of five (5) or more individuals. In a case where a Customer has, in his Notice of Arbitration, elected a Mixed Panel, at least a majority of the Persons selected shall not be Members or associated with any Member of a contract market, or any employee thereof, or otherwise associated with a contract market. Promptly following such appointment, the Exchange shall forward copies of the Notice of Arbitration Answering Statement and Reply, if there be one, to the Panel members selected.

(iv) The Exchange shall notify the parties of the appointment of the members of the Panel. Any party objecting to all or any members of the Panel shall file such objection with the Chairman of the Arbitration Committee within ten (10) days of the giving of such notice by the Exchange. The Chairman of the Arbitration Committee shall then determine whether changes in the composition of the Panel are appropriate, and if so, shall make such changes. Any vacancy occurring on the Panel for any reason shall be filled by an individual appointed by the Chairman of the Arbitration Committee. The parties shall be notified of the filling of such vacancy and may file objections to the new appointee to the Panel in accordance with the procedure set forth above.

(v) Any party may, no later than ten (10) days prior to the first (1st) hearing session, notify the Chairman of the Panel of any pertinent documents or other information it seeks from another party. Upon receipt of such request, the Chairman shall notify the party from which the documents or information are sought. The parties shall thereafter cooperate in the voluntary exchange of such documents and information. Any objection to a request for the production of documents or other information shall be resolved by the Chairman of the Panel, or his designee.

(vi) The parties shall, within a time specified by the Chairman of the Panel, furnish each other and the Panel with a statement listing the witnesses expected to be called and the documents expected to be introduced into evidence, together with copies of such documents. Unless the Panel waives compliance with this requirement, no witness may testify and no documentary evidence may be introduced at the hearing unless listed in (and, in the case of documents, furnished with) such statement.

**20-4**

(vii) The Panel shall establish, on not less than ten (10) days' written notice to the parties, the date, time and place of the hearing. Each Panel shall determine the procedures to be followed in any hearing before it, including the use of preliminary hearings to resolve discovery disputes, simplify the issues, and expedite the hearings, except that the following shall apply in every case:

(A) Each of the parties shall be entitled to appear personally at the hearing

(B) Each of the parties, at his own expense, shall have the right to be represented by counsel in any aspect of the proceeding.

(C) Each of the parties shall be entitled to (1) prepare and present all relevant facts in support of the Claims and grievances, defenses or counterclaims, and to present rebuttal evidence to such Claims or grievances, defenses or counterclaims made by the other parties, (2) examine the other parties, (3) examine any witnesses appearing at the hearing, and (4) examine all relevant documents presented in connection with the Claim or grievance, or any defense or counterclaim applicable thereto.

(D) The formal rules of evidence shall not apply.

(E) No verbatim record shall be made of the proceedings, unless requested by a party who shall bear the cost of such record. If such a request is made, a stenographic transcript shall be taken, but not transcribed unless requested by a party who shall bear the cost of such transcription.

(F) Ex parte contacts by any of the parties with members of the Panel shall not be permitted.

(G) The Panel shall have the power, on the request of any party or on its own motion, to require any Person to testify and/or to produce documentary evidence in the proceedings as and to the extent provided for in Rule 21.03.

(viii) The Panel shall, within sixty (60) days of the termination of the hearing, render its award in writing and deliver a copy thereof either in person or by first-class mail to each of the parties. The Panel, in its award, may grant any remedy or relief which it deems just and equitable, including, without limitation, the awarding of interest and the arbitration fee; provided, however, that any costs incurred as a result of having a Mixed Panel shall be born by the Member unless the Panel determines that the Customer acted in bad faith in initiating or conducting the proceeding. Further, in any case wherein it is alleged that the Claim or grievance arose from a violation of the Rules in the execution of a Customer order on the Floor of the Exchange and the Panel determines that such violation occurred, the Panel may award the Customer the actual damages proximately caused by said violation. The award of the Panel shall be final and binding upon each of the parties to the arbitration, and judgment upon such award may be entered by any court having jurisdiction. Any Member who is a Respondent in an arbitration conducted pursuant to the Rules shall notify the Assistant Corporate Secretary of the Exchange of any judicial proceeding based on the award. In addition, any award, if not complied with within the time specified in the award, shall be enforceable by disciplinary proceedings pursuant to Rules.

(ix) Notwithstanding any other provision of this paragraph (a), including the right of a Customer to elect a Mixed Panel pursuant to Rule 20.03(a)(iii), if a Notice of Arbitration sets forth Claims or grievances aggregating less than five thousand dollars ($5,000), and the Answering Statement submitted by the Respondent either does not raise counterclaims or raises one (1) or more counterclaims aggregating less than five thousand dollars ($5,000), the Chairman of the Arbitration Committee may, on the request of any party or on his own motion, in his sole and absolute discretion, decide that there shall not be a hearing, in which case the following procedures shall apply:

(A) The Chairman of the Arbitration Committee shall notify both parties that neither the Claims or grievances nor the counterclaims, if any, aggregate to five thousand dollars ($5,000).

(B) The Claimant shall, within twenty (20) days of such notification, submit to the Exchange with a copy to each of the Respondents, a memorandum (together with such supporting documents,

affidavits and other materials as the Claimant deems pertinent) setting forth the bases upon which he believes he is entitled to the relief requested in the Notice of Arbitration.

(C) Each Respondent shall, within twenty (20) days of its or his receipt of the Claimant's memorandum and supporting documentation, submit to the Exchange, with a copy to the Claimant, a memorandum (together with such supporting documents, affidavits and other materials as the respondent deems pertinent) setting forth the bases upon which he believes that the relief requested by the Claimant should be denied and, if said Respondent has raised counterclaims in his Answering Statement, the bases upon which he believes he is entitled to the relief requested by such counterclaims.

(D) The Chairman of the Arbitration Committee may, on the request of any party or on his own motion, in his sole and absolute discretion determine whether to allow or require the submission of reply or additional papers, unless a Respondent has asserted one (1) or more counterclaims, in which case the Claimant shall be entitled to reply to such counterclaims within ten (10) days of delivery of the Respondent's memorandum setting forth the bases thereof.

(E) The Chairman of the Arbitration Committee or his designee, acting as sole arbitrator, shall, within thirty (30) days of his receipt of the final papers filed, render an award in writing and deliver a copy thereof either in person or by first-class mail to each of the parties. The sole arbitrator in his award may grant any remedy or relief which he deems just and equitable, including, without limitation, the awarding of interest and the arbitration fee; provided, however, that any costs incurred as a result of a Customer requesting a Mixed Panel shall be borne by the Member unless the sole arbitrator determines that the Customer acted in bad faith in initiating or conducting the proceeding. Further, in any case wherein it is alleged that the Claim or grievance arose from a violation of the Rules in the execution of a Customer order on the Floor of the Exchange and the sole arbitrator determines that such a violation occurred, the sole arbitrator may award the Customer the actual damages proximately caused by said violation. The decision of the sole arbitrator shall be final and binding upon each of the parties to the arbitration, and judgment upon such award may be entered by any court having jurisdiction. In addition, any award, if not complied with within the time specified in the award, shall be enforceable by disciplinary proceedings pursuant to the Rules.

(x) The failure of any party to an arbitration to comply with any of the requirements of this paragraph (a), or with any demand or request of either the Panel, the sole arbitrator or the Chairman of the Arbitration Committee shall be deemed a violation of the Rules and shall, in addition to any other action the Exchange may take for any such violation, subject such party to such action by the Panel, the sole arbitrator or the Chairman of the Arbitration Committee (including without limitation the entry of an award against such party) as it or he shall deem appropriate under the circumstances.

(xi) Notwithstanding the provisions of subparagraph (x) of this paragraph (a), either the Panel, the sole arbitrator or the Chairman of the Arbitration Committee, may for good cause shown extend any time limitation imposed by this paragraph (a) (except the two (2) year and the thirty (30) day limitation periods set forth in subparagraph (a)(i)) or may excuse any neglect to comply therewith or with any other requirement of this paragraph (a) or demand or request of the Panel, the sole arbitrator or the Chairman of the Arbitration Committee.

**(b) Other Claims Asserted Pursuant to Rule 20.02(c).**

(i) Any dispute or controversy between or among any two (2) or more parties may, if all of the parties to such dispute or controversy so agree, be settled by arbitration in accordance with this paragraph (b). Such dispute or controversy shall be heard and determined in accordance with the procedures set forth in paragraph (a) of this Rule, except for the following:

(A) In lieu of the procedure set forth in the first sentence of subparagraph (i) of paragraph (a), the provisions of this paragraph (b) shall be invoked by the submission by all of the parties concerned of

an agreement to submit the dispute or controversy to arbitration in accordance with this paragraph (b) and to be bound by the award of the arbitrators. Following such submission, the Exchange shall forward to the party requesting relief the information set forth in subparagraph (i) of paragraph (a) of this Rule, whereupon all of the other procedures set forth in said subparagraph (i) of paragraph (a) shall apply.

(B) None of the limitations on counterclaims set forth in subparagraph (ii) of paragraph (a) shall apply.

### Rule 20.04. Withdrawal of Claims

Any Notice of Arbitration may be withdrawn at any time before an Answering Statement is filed in accordance with these Rules.

If an Answering Statement has been filed, any withdrawal shall require consent of the party against which the Claim or grievance is asserted.

### Rule 20.05. Modification of Award

On written application to the Assistant Corporate Secretary of the Exchange by a party to an arbitration, within twenty (20) days after delivery of the award to the applicant, the Panel or sole arbitrator may modify the award if:

(1) there was a miscalculation of figures or a mistake in the description of any Person, thing, or property referred to in the award; or

(2) the Panel or sole arbitrator has awarded upon a matter not submitted to it and the award may be corrected without affecting the merits of the decision upon the issues submitted; or

(3) the award is imperfect in a matter of form, not affecting the merits of the controversy.

Written notice of the application shall be given to the other parties to the arbitration. Written objection to the modification must be served on the Exchange and the other parties to the arbitration within ten (10) days of receipt of the application. The Panel or sole arbitrator shall dispose of any application made under this Rule in writing, signed and acknowledged by the Panel or sole arbitrator, within thirty (30) days after either written objection to the modification has been served on it or the time for serving said objection has expired, whichever is earlier. The parties may in writing extend the time for such disposition either before or after its expiration.

### Rule 20.06. Compensation of Arbitrators

The parties to an arbitration shall pay the arbitrators appointed in each matter compensation in accordance with such fee schedule as the Board of Governors may from time to time determine. The arbitrators in each such matters shall determine the proportion in which such compensation shall be paid by each of the parties.

### Rule 20.07. Punitive Damages

In the case of a Claim or grievance arising from a violation of the Rules in the execution of a Customer order on the Floor of the Exchange wherein it is determined by the Panel or the sole arbitrator that the violation was willful and intentional, punitive damages may be awarded the Customer in an amount equal to no more than two (2) times the amount of actual damages proximately caused by the violation.

### Rule 20.08. Failure to Comply With Award

(a) Any Member in whose favor an award has been rendered pursuant to this Chapter shall promptly notify the Assistant Corporate Secretary of the Exchange, in writing, if the award is not complied with.

Any Member, who fails to comply with the terms of an award rendered against such Member, shall be subject to the procedures set forth in this Rule.  Specifically, upon receipt of a notice or information indicating that a Member has failed to comply with the terms of an award rendered against such Member, the Exchange shall notify such Member against whom or which the award was rendered of the Exchange's intention to suspend his or its privileges as a Member and afford the Member an opportunity to be heard by a panel of the Arbitration Committee appointed by the Chairman for the sole purpose of proving that the award has been satisfied, provided that the Secretary of the Exchange receives a written request from the Member for such a hearing within five (5) Business Days after receipt of such notice by the Member. Failure to so request such a hearing shall be deemed an acknowledgment by the Member that the award has not been complied with. Any such hearing shall be conducted in accordance with such procedures as the Panel shall determine. The Panel shall consist of no less than three (3) members of the Arbitration Committee. Following any such hearing, the Panel shall determine whether the Member has failed to timely satisfy the award and shall promptly advise the Exchange, and all parties in the proceeding, of its determination.

(b) If the Panel shall find, or if a Member shall acknowledge that he or it has failed to comply with any award rendered pursuant to this Chapter when and as provided by such award, the Member shall be automatically suspended and shall remain suspended until the award is complied with and the suspended Member is reinstated, as provided in Rule 21.35.

(c) If a Member suspended pursuant to paragraph (b) of this Rule fails to comply with the arbitration award upon which such suspension was based within thirty (30) days following the effective date of the suspension:

(i) the Member shall be expelled or, in the case of a Member Firm, member privileges terminated; and

(ii) his Membership and Required Shares, if any, or in the case of a Member Firm, the Memberships and Required Shares of the Conferring Members, sold and the proceeds paid and applied as provided in Rule 21.36.