UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------x

FLUXO-CANE OVERSEAS LTD. and MANOEL
FERNANDO GARCIA,

                       Plaintiffs,

        -against-

NEWEDGE USA, LLC (f/k/a FIMAT USA, LLC)

                 Defendant.

------------------------------------------x

No. 08 Civ. 2432 (BSJ)

## DECLARATION OF BENJAMIN R. NAGIN
## IN OPPOSITION TO PLAINTIFFS' MOTION
## FOR A TEMPORARY RESTRAINING ORDER

Pursuant to 28 U.S.C. § 1746, BENJAMIN R. NAGIN declares:

1.     I am an attorney admitted to practice before this Court and a member of the law firm of Sidley Austin LLP, counsel for Defendant Newedge USA, LLC (f/k/a FIMAT USA, LLC) ("Newedge"). I submit this declaration in opposition to Plaintiffs' Motion for a Temporary Restraining Order.

2.     Attached as Exhibit 1 is a copy of an Amended Verified Complaint in Fluxo-Cane Overseas Ltd., v. E.D. & F. Man Sugar Inc., No. 1:08-cv-356 (D. Md.), dated February 11, 2008.

3.     Attached as Exhibit 2 is a copy of the ICE Futures, U.S., Inc. Exchange and Clearing Fees, updated as of December 7, 2007.

4.     Attached as Exhibit 3 is a copy of the ICE Futures, U.S., Inc. Exchange Membership Rules.

5.     Attached as Exhibit 4 are copies of Manoel Fernando Garcia's (a) Application for Membership to the New York Board of Trade and attachments thereto, dated April 11, 2005, and

(b) Pledge Addendum, dated January 10, 2007, which were produced by the ICE Futures, U.S., Inc. to Newedge pursuant to a subpoena issued by Newedge on March 14, 2008.

6.      Attached as Exhibit 5 are copies of Fluxo-Cane Overseas Ltd.'s (a) Application to Receive Member Firm Privileges and the attachment thereto, dated March 13, 2007; (b) NYBOT Membership and Pledge Agreement, dated January 10, 2007; and (c) Application to Receive Member Firm Privileges and the attachment thereto, dated March 13, 2007, which were produced by the ICE Futures, U.S., Inc. to Newedge pursuant to a subpoena issued by Newedge on March 14, 2008.

7.      Attached as Exhibit 6 is a true and correct copy of the ICE Clear U.S., Inc. By-Laws.

8.      Attached as Exhibit 7 is a true and correct copy of the ICE Clear U.S., Inc. Clearing Member Agreement.

9.      Attached as Exhibit 8 is a true and correct copy of the List of ICE Futures U.S. Clearing Members.


I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. Executed on March 18, 2008 at New York, New York.


_____
Benjamin R. Nagin

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| Fluxo-Cane Overseas Ltd.,<br>2nd floor Abbott Building, Road Town,<br>Tortola, British Virgin Islands.<br><br>Plaintiff,<br><br>v.<br><br>E.D.& F. Man Sugar Inc.<br>2525 Ponce De Leon Blvd., Suite 1200,<br>Coral Gables, Miami, Florida 33134,<br><br>and<br><br>Cargo of 17,727 Metric Tons, More or<br>Less of Raw Sugar Laden On Board the<br>M/V TINA LITRICO and<br>related bills of lading, in rem<br><br>Defendants | Case No. 1:08-cv-356 |

## AMENDED VERIFIED COMPLAINT

Plaintiff Fluxo-Cane Overseas Ltd. (hereinafter "Fluxo-Cane"), through undersigned counsel, as and for its Verified Complaint against Defendants E.D. & F. Man Sugar Inc. ("Man Sugar"), and 17,727 metric tons, more or less, of raw sugar laden on board the M/V TINA LITRICO, and related bills of lading, in rem, alleges upon information and belief as follows:

### Jurisdiction and Venue

1.     This Court has jurisdiction of this action under 28 U.S.C. §§ 1332 and 1333.

2.     This claim is designated as an admiralty or maritime claim pursuant to Fed. R. Civ. P. 9(h) to the extent set forth below.

### The Parties

3.     At all times material hereto, the Plaintiff, Fluxo-Cane, was and still is a foreign corporation or other business entity duly organized and existing pursuant to the laws of a foreign country with principal office and place of business at 2nd floor Abbott Building, Road Town, Tortola, British Virgin Islands.

4.     The Plaintiff, Fluxo-Cane, operates a business selling sugar for shipment overseas, including for shipment to the United States.

5.     Upon information and belief, and at all times hereto, the Defendant, Man Sugar, was and still is a foreign corporation registered in Delaware, with its principle place of business at 2525 Ponce De Leon Boulevard, Suite 1200, Coral Gables, Miami, Florida 33134.

6.     Upon information and belief, the Defendant, Man Sugar is a buyer and broker of sugar cargoes carried by sea.

7.     Man Sugar is subject to personal jurisdiction within this District pursuant to Maryland Statute § 4-201 & 6-103(b)(1)-(3) due to its conduct of business within this District, to wit, the sale and delivery of sugar cargoes in this district and tortuous injury of Plaintiff in this District as set forth below.

**Background**

8.      The Parties had a long-standing business relationship for the purchase and delivery of sugar lasting many years, and upon information and belief in no prior instance had Defendant Man Sugar failed to promptly pay for shipments of sugar.

9.      During the period January 5-7, 2008, Defendant Man Sugar contacted Plaintiff Fluxo-Cane regarding the purchase of approximately 26,000 metric tons of sugar for shipment.

10.     On or about January 7, 2008, Defendant Man Sugar sent to Plaintiff Fluxo-Cane by electronic mail a "business confirmation" to buy 23,428.91 metric tons of sugar for shipment, with terms that payment shall be made in full, in cash, against presentation of the shipping documents to Defendant.

11.     Defendant Man Sugar entered into Purchase Contract No. P01688.000 dated January 7, 2008 and as amended by the Letter of Addendum dated January 11, 2008, with Plaintiff Fluxo-Cane (which by administrative error of Man Sugar appears in the contract under its prior name of Cane International Corp., Ltd.) for Defendant's purchase of 25,209.99 metric tons of sugar for delivery in Baltimore, Maryland (Attachment 1).

12.     Purchase Contract No. P01688.000 explicitly provided payment terms to be "cash against presentation of original shipping documents" for the subject cargo of sugar (Attachment 1).

13.     On or about January 17, 2008, the M/V TINA LITRICO completed the first loading of sugar cargo at Recife, Brazil towards satisfaction of Purchase Contract No.

3

P01688.000, and issued bills of lading numbers CSCV3048RE02 and CSCV3048RE01 (Attachment 2).

14.    Plaintiff Fluxo-Cane issued to Defendant Man Sugar Commercial Invoice No. 305/08 dated January 18, 2008 for 7,482.930 metric tons of sugar, in the amount of $2,538,265.23 (Attachment 3).

15.    On or about January 23, 2008, Defendant Man Sugar submitted to Plaintiff payment in respect of the first loading of 7,482.930 metric tons of sugar.

16.    On or about January 26, 2008, the M/V TINA LITRICO completed the second loading of sugar cargo at Maceio, Brazil towards satisfaction of Purchase Contract No. P01688.000, and issued bills of lading numbers CSCV3048MA03, CSCV3048MA04, and CSCV3048MA05 (Attachment 4).

17.    Plaintiff Fluxo-Cane issued to Defendant, Man Sugar, Commercial Invoice No. 319/08 dated January 28, 2008 for 17,727.060 metric tons of sugar, in the amount of $6,013,149.93 (Attachment 5).

18.    On or about January 30, 2008, Plaintiff Fluxo-Cane sent the shipping documents corresponding to invoice No. 319/08 (Attachment 6) to Defendant Man Sugar as required by Purchase Contract No. P01688.000.

19.    The shipping documents for the subject sugar cargo were delivered to Defendant Man Sugar on or about January 30, 2008  (Attachment 6).

20.    Plaintiff Fluxo-Cane corresponded by electronic mail with Defendant Man Sugar and repeatedly requested payment for the sugar during the period February 1-4, 2008 and at no time during these exchanges did Defendant Man Sugar dispute its obligation to make payment or signal any intention not to make such payment (Attachment 6).

21.    Only after the subject sugar cargo was loaded on board the M/V TINA LITRICO the shipping documents were received by Defendant Man Sugar did it then notify Plaintiff Fluxo-Cane for the first time by electronic mail dated February 4, 2008 that it would not make payment to Plaintiff of the sum of $6,013,149.93 as required by Commercial Invoice 319/08. Defendant stated its intention to refuse payment on the invoice due to an alleged debt of Plaintiff *not* to Man Sugar, but purportedly to an alleged affiliate of Man Sugar, which debt nonetheless is in dispute (Attachment 7).

22.    In its firm offer to buy the sugar, by electronic mail from Elizabeth Alters dated January 5, 2008, Man Sugar affirmatively misrepresented its intent to pay Plaintiff when Defendant's representative stated "Payment: 100 pct shall be paid cash against presentation of the original shipping documents . . ." (Attachment 8).

23.    Man Sugar's misrepresentation of its intent to pay the sum due prejudiced Plaintiff Fluxo-Cane's rights in the sugar cargo.

24.    On or about February 7, 2008, by an electronic mail, Plaintiff Fluxo-Cane again requested payment of the sums due under Commercial Invoice 319/08, notified defendant that its failure to make payment would constitute breach of Contract P01688.000 (Attachment 9), and demanded return of the bills of lading for the sugar.

25.    On or about February 7, 2008, through an electronic mail Plaintiff Fluxo-Cane demanded return of the sugar cargo, but Defendant Man Sugar refused (Attachment 9).

26.    Defendant Man Sugar has not paid Plaintiff the $6,013,149.93 corresponding to Commercial Invoice 319/08.

27.    Upon information and belief, the cargo corresponding to Commercial Invoice 319/08 has arrived or will shortly arrive in the Port of Baltimore on board the M/V TINA LITRICO.

## Count I (Conversion)

28.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 to 27 herein.

29.    Defendant Man Sugar took possession of the $6,013,149.93 lot of sugar and bills of lading therefor with no intention to pay for such cargo.

30.    Defendant Man Sugar misrepresented to Plaintiff Fluxo-Cane its intent to pay for the aforesaid sugar, and failed to pay for such sugar, as a result of which Plaintiff Fluxo-Cane has a superior right of possession of the sugar.

31.    Defendant Man Sugar wrongfully exercised unauthorized and distinct dominion and control over the subject sugar cargo and related bills of lading to the exclusion of Plaintiff Fluxo-Cane's rights with respect thereto.

32.    Plaintiff Fluxo-Cane has superior right to possession of the subject sugar cargo and related bills of lading.

33.    Plaintiff Fluxo-Cane has demanded the return of the sugar and related bills of lading, and Defendant Man Sugar has refused to return them.

## Count II (Breach of Contract)

34.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 to 33 herein.

35.    Defendant has materially breached the contract for the sale of sugar when it failed to pay the sums due and owing upon presentation of the shipping documents therefor, thereby causing damages and harm to Plaintiff.

36.    Upon information and belief, Defendant Man Sugar is a corporation which is not resident in this State and which has no resident agent in this State.

37.    This action involves property in this State to be attached, including but not limited to the subject approximately 17,727.060 metric tons of sugar cargo carried to Baltimore on board the M/V TINA LITRICO.

## Count III (Misappropriation of Bills of Lading and Sugar Cargo)

38.    Plaintiff re-alleges and incorporates by reference Paragraphs 1 to 37 herein.

39.    Defendant Man Sugar misappropriated the approximately 17,727.060 metric tons of sugar cargo and related bills of lading in question for its own use or gain.

40.    The approximately 17,727.060 metric tons of sugar cargo on board the TINA LITRICO is found within this District.

41.    Upon information and belief, the bills of lading relating to the approximately 17,727.060 metric tons of sugar on board the TINA LITRICO are found within this District.

**Prayer for Relief**

WHEREFORE, Plaintiff Fluxo-Cane prays as follows:

42.    That Defendant Man Sugar be summoned to appear and answer this Amended Verified Complaint;

43.    That Defendant, Man Sugar, not being found within this District, as set forth in the Affidavit of Bryant E. Gardner, all of its certain assets, accounts, freights, monies, credits, effects, payments for cargo, cargo, goods or services, and the like belonging to or claimed by Defendant within this district, up to the amount sued for herein, be attached pursuant to Rule B of the Supplemental Rules for Admiralty and Maritime Claims;

44.    That Defendant, Man Sugar, not being resident in this State of Maryland, as set forth in the Affidavit of Bryant E. Gardner, all of its certain assets, accounts, freights, monies, credits, effects, payments for cargo, cargo, goods or services, and the like belonging to or claimed by Defendant within this district, up to the amount sued for herein, be attached pursuant to Maryland Code § 3-303(b)(2);

45.    That the Plaintiff be declared rightful owner and possessor of the Defendant cargo of 17,727 metric tons, more or less, of raw sugar laden on board the M/V TINA LITRICO and related bills of lading here sued in rem pursuant to Rule D of the Supplemental Rules for Admiralty and Maritime Claims;

46.    That this Court order Defendant to return the cargo of sugar and related bills of lading to Plaintiff;

8

47.     That in the alternative this Court award judgment against Defendant for damages in the amount of $6,013,149.93 plus pre-judgment interest, costs, and fees; and

48.     That Plaintiff Fluxo-Cane be granted such other and further relief as the Court may determine to be just and proper under the circumstances.

Dated:  February 11, 2008

Respectfully submitted,

By:  /s/
        H. Allen Black, III (No. 024542)
        Bryant E. Gardner (*pro hac vice pending*)
        WINSTON & STRAWN LLP
        1700 K Street, N.W.
        Washington, DC  20006
        (202) 282-5821
        (202) 282-5100 (Facsimile)

        *Counsel for Fluxo-Cane Overseas, Ltd.*

## **VERIFICATION**

I am the Attorney-in-Fact of Plaintiff, Fluxo-Cane Overseas, Ltd. and was personally involved in the matters that are at issue in this dispute.

The facts alleged in the foregoing Amended Verified Complaint are true and correct to the best of my knowledge and information, based upon my personal knowledge and the records of Plaintiff.

The documents marked as Attachments 1 through 9 to the Amended Verified Complaint are true and correct copies of the records of Plaintiff, as represented in the foregoing Amended Verified Complaint.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 11th day of February, 2008.

_____
Jose Luiz Cipriani

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Amended Verified Complaint was served by first class mail, postage prepaid, on this 11th day of February, 2008, on E.D.& F. Man Sugar Inc., 2525 Ponce De Leon Boulevard, Suite 1200, Coral Gables, Miami, Florida 33134.


_____/s/_____
Bryant E. Gardner

# Attachment 1



ORIGINAL
RETAIN FOR RECORDS

E D & F MAN SUGAR INC.

CANE INTERNATIONAL CORP. LTD. -B.V.I.
ABBOTT BUILDING - 2ND FLOOR
ROAD TOWN
TORTOLA, BVI

Monday, January 07, 2008

### Purchase Contract No. P01688.000

We confirm having purchased from you on the Monday, January 07, 2008, as follows :

| | |
|---|---|
| **Quantity:** | 24,076.89 (twenty four thousand and seventy six point eight nine) Metric Tons minimum/maximum, |
| **Quality:** | US Quota raw sugar of fair average quality to be eligible for entry during quota year 2007/2008 with: Polarisation:  Minimum 98.5 degrees/maximum 99.4 degrees |
| **Origin:** | Brazil |
| **Packing:** | In Bulk |
| **Price:** | By Against Actuals (AA) against New York Sugar No. 14 MAR 08 Futures Contract less a discount of US Cents 4.60 (four  point six zero) per lb to give a final price basis Free on Board Stowed, Recife and or Maceio, BRAZIL, SOUTH AMERICA |
| **Payment:** | Cash against presentation of original shipping documents. |
| **Period:** | January 2008 Shipment |
| **Destination:** | BALTIMORE, MARYLAND, USA |
| **Weight, Quality, Quantity & Packing :** | Weight, quality, quantity and packing to be final at time of out-turn |
| | Polarisation shall be final at discharge port.  Polarisation premiums shall be calculated on results at discharge port with settlement of degree above 96.00 degrees polarisation as follows: |

For every full degree above 96.00 degrees to and including 97.00 degrees, add 0.50% (zero point five percent).

For every full degree above 97.00 degrees to and including 98.00 degrees, add an additional 2.25% (two point two five percent).

For every full degree above 98.00 degrees to and including 99.00 degrees, add an additional 1.20% (one point two percent).

Fractions of degree shall be calculated in the same proportions.

2525 Ponce De Leon Blvd,
Suite 1200, Coral Gables
Miami
FL 33134

Telephone: 786-279-7320
Facsimile: 786-279-7324



<u>E D & F Man Sugar Inc. Contract No. P01688.000 (continued)</u>

ORIGINAL₂
RETAIN FOR RECORDS

| | |
|---|---|
| **Documents:** | (1) A complete set of signed clean 'on board' Bills of Lading drawn "TO ORDER", "BLANK ENDORSED" |
| | (2) A complete set of non-negotiable 'on board' Bills of Lading |
| | (3) Certificate of Weight and Quality Plus 5 copies |
| | (4) Certificate of Origin Plus 5 copies |
| | (5) Certificate of Quota Eligitability Plus 5 copies |
| | (6) Seller's signed commercial invoice Plus 5 copies |
| **Discharge/ Loading:** | 4,000 MT calculated on grosss weight provided vessel can receive at this rate, per weather working day of 24 consecutive hours, SASHEX EIU. All other terms, conditions, and exceptions as per the unamended Sugar Charter Party 1999. Demurrage/Despatch rate as per relevant Charter Party. |
| **Force Majeure:** | The performance of this contract is subject to Force Majeure as defined by the Rules of Domino Terms as fully as if the same has been expressly inserted herein whether or not either or both of the parties are members of the association. |
| **Rules & Arbitration:** | This contract is subject to the rules of Domino Terms as fully as if the same had been expressly inserted herein, whether or not either or both the parties to it are members of the Association. |
| | All disputes arising out of or in connection with this contract shall be referred to the council of Domino Terms for settlement in accordance with the rules relating to arbitration. This contract shall be governed and construed in accordance with United States Law. |
| **Other :** | The provisions of the United Nations Convention on Contracts for the International Sale of Goods, of 1980, do not apply to this contract. |
| | The parties agree that neither this Contract nor the performance of this contract by the parties will violate the regulations of the United States Treasury Department (31 C.F.R. Subtitle B, Chapter V, as amended) including, but not limited to, the Foreign Assets Control Regulations and the Cuban Assets Control Regulations (31 C.F.R. Part 515). |

**The Seller :**                              **The Buyer:**

Signed for and on behalf of              Signed for and on behalf of
CANE INTERNATIONAL CORP. LTD. -B.V.I.        E D & F Man Sugar Inc

By its duly authorised representative        By its duly authorised representative

2525 Ponce De Leon Blvd.
Suite 1200, Coral Gables
Miami
FL 33134

Telephone: 786-279-7320
Facsimile: 786-279-7324



RETAIN FOR RECORDS
ORIGINAL

E D & F MAN SUGAR INC.

**ED&F MAN**

CANE INTERNATIONAL CORP. LTD. -B.V.I.
ABBOTT BUILDING - 2ND FLOOR
ROAD TOWN
TORTOLA, BVI

Friday, January 11, 2008

### Letter of Addendum - Purchase Contract No. P01688.000

By mutual consent between Buyer and Seller, this contract is amended as follows :-

- The quantity was increased by 735.93 MT.
- The new quantity is 25,209.99 MT = 496 lots against March N° 14

All above mentioned terms and conditions supersede all previous agreements.

All other terms and conditions remain unchanged.

**The Seller :**

Signed for and on behalf of
CANE INTERNATIONAL CORP. LTD. -B.V.I.

By its duly authorised representative

**The Buyer:**

Signed for and on behalf of
E D & F MAN SUGAR INC.

By its duly authorised representative

2525 Ponce De Leon Blvd,
Suite 1200, Coral Gables
Miami
FL 33134

Telephone: 786-279-7320
Facsimile: 786-279-7324

# Attachment 2

CODE NAME "CONGENBILL" EDITION 1994

| | Page 2 |
|---|---|

**Shipper**
USINA UNIÃO E INDUSTRIA S/A
ENGENHO BONFIM, 0 - ZONA RURAL
PRIMAVERA/PE - BRAZIL
ZIP CODE: 55.510-000
FDA: 14240231318

**BILL OF LADING**
TO BE USED WITH CHARTER-PARTIES

B/L No. CSCV3048RE02

Reference N°

**Consignee**

TO ORDER OF SHIPPER

**Notify address**

CSC SUGAR, LLC
36 GROVE STREET
NEW CANAAN, CONNECTICUT 06840

# COPY NOT
# NEGOTIABLE

| **Vessel** M/V TINA LITRICO | **Port of loading** RECIFE, BRAZIL |
|---|---|

**Port of discharge**
ONE OR TWO U.S. PORTS

**Shipper's description of goods**                                    **Gross Weight**

2,664.890 MT OF BRAZIL RAW CANE SUGAR IN BULK, OF FAIR AVERAGE QUALITY,
OF THE CURRENT CROP WITH A MINIMUM POLARIZATION OF 96 DEGREES AT TIME OF SHIPMENT

CLEAN ON BOARD

FREIGHT PAYABLE AS PER CHARTER PARTY

TOTAL NET/GROSS WEIGHT: 2,664.890 METRIC TONS

THIS BILL OF LADING INCORPORATES ALL TERMS, CONDITIONS, EXCEPTIONS AND ARBITRATION CLAUSE OF
CHARTER PARTY 10/26/2007

(of which ............ on deck at Shipper's risk; the Carrier not
being responsible for loss or damage howsoever arising)

| Freight payable as per CHARTER-PARTY.............................................................  FREIGHT ADVANCE. Received on account of freight: .................................................................................... Time used for loading ....................... days ............................ hours. | SHIPPED at the Port of Loading in apparent good order and condition on board the Vessel for carriage to the Port of Discharge or so near thereto as she may safely get the goods specified above. Weight, measure, quality, quantity, condition, contents and value unknown. IN WITNESS whereof the Master or Agent of the said Vessel has signed the number of Bills of Lading indicated below all of this tenor and date, any one of which being accomplished the others shall be void. |
|---|---|
| | FOR CONDITIONS OF CARRIAGE SEE OVERLEAF |

| Freight payable at | Place and date of issue RECIFE, JANUARY 17TH, 2008 |
|---|---|
| Number of original Bs/L. | Signature |

CÓPIA NÃO NEGOCIÁVEL
ASSINADA PARA FINS DE REGISTRO SOMENTE
SEM QUALQUER VALOR COMERCIAL
NON NEGOTIABLE COPY
SIGNED FOR RECORDS ONLY
WITHOUT COMMERCIAL VALUE

-3- ( THREE )

FOR AND ON BEHALF OF THE MASTER
CAPT. EDWARD MAX STOVALL III
Williams (Serviços Marítimos) Ltda.
As Agents only

WILLIAMS (SERVIÇOS MARITIMOS) LTDA.

CODE NAME "CONGENBILL" EDITION 1994

| Shipper | BILL OF LADING | Page 2 |
| S/A FLUXO – COMERCIO E ASSESSORIA INTERNACIONAL | | B/L No. CSCV3048RE01 |

Shipper
**S/A FLUXO – COMERCIO E ASSESSORIA INTERNACIONAL**
RUA DR. RENATO PAES DE BARROS, 778
ITAIM – SÃO PAULO/SP – BRAZIL
ZIP CODE: 04.530-001
**FDA: 16794236486**

**BILL OF LADING**
TO BE USED WITH CHARTER-PARTIES

Page 2
B/L No. CSCV3048RE01

Reference Nº

Consignee

TO ORDER OF SHIPPER

Notify address

CSC SUGAR, LLC
36 GROVE STREET
NEW CANAAN, CONNECTICUT 06840

# COPY NOT
# NEGOTIABLE

| Vessel | Port of loading |
| M/V TINA LITRICO | RECIFE, BRAZIL |

Port of discharge
ONE OR TWO U.S. PORTS

| Shipper's description of goods | Gross Weight |

4,818.040 MT OF BRAZIL RAW CANE SUGAR IN BULK, OF FAIR AVERAGE QUALITY,
OF THE CURRENT CROP WITH A MINIMUM POLARIZATION OF 96 DEGREES AT TIME OF SHIPMENT

CLEAN ON BOARD

FREIGHT PAYABLE AS PER CHARTER PARTY

TOTAL NET/GROSS WEIGHT: 4,818.040 METRIC TONS

THIS BILL OF LADING INCORPORATES ALL TERMS, CONDITIONS, EXCEPTIONS AND ARBITRATION CLAUSE OF
CHARTER PARTY 10/26/2007

(of which          on deck at Shipper's risk; the Carrier not
being responsible for loss or damage howsoever arising)

Freight payable as per
CHARTER-PARTY...............

FREIGHT ADVANCE.
Received on account of freight:

..............................................................
Time used for loading ...................... days ............................ hours.

SHIPPED at the Port of Loading in apparent good order and
condition on board the Vessel for carriage to the Port of Discharge
or so near thereto as she may safely get the goods specified
above.
Weight, measure, quality, quantity, condition, contents and value
unknown.
IN WITNESS whereof the Master or Agent of the said Vessel has
signed the number of Bills of Lading indicated below all of this
tenor and date, any one of which being accomplished the others
shall be void.

FOR CONDITIONS OF CARRIAGE SEE OVERLEAF

| Freight payable at | Place and date of issue
RECIFE, JANUARY 17TH, 2008 |
| Number of original Bs/L. | Signature |
| -3- ( THREE ) | FOR AND ON BEHALF OF THE MASTER
CAPT. EDWARD MAX STOVALL III
Williams (Serviços Maritimos) Ltda.
As Agents only

WILLIAMS (SERVIÇOS MARITIMOS) LTD. |

CÓPIA NÃO NEGOCIÁVEL
ASSINADA PARA FINS DE REGISTRO SOMENTE
SEM QUALQUER VALOR COMERCIAL
NON NEGOTIABLE COPY
SIGNED FOR RECORDS ONLY
WITHOUT COMMERCIAL VALUE

# Attachment 3

# *FLUXO-CANE OVERSEAS LTD.*

### *2nd floor Abbott Building,*
### *Road Town, Tortola - British Virgin Islands*

January 18th, 2008

Consignee: **ED&F MAN SUGAR LTD.**
Address: 2525 Ponce de Leon Blvd. Suite 1200
Coral Gables, FL 33134

## COMMERCIAL INVOICE # 305/08

**SHIPPING DETAILS**

**VESSEL NAME: M/V TINA LITRICO**
**PORT OF LOADING: RECIFE, BRAZIL**
**PORT OF DISCHARGE: ONE OR TWO U.S. PORTS**
**BILL OF LADING DATE: JANUARY 17th, 2008**
**OUR CONTRACT REFERENCE: 2209/08-A**

**GOODS DESCRIPTION**

| QUANTITY | UNIT | COMMODITY | UNIT PRICE | TOTAL |
|----------|------|-----------|------------|-------|
| 7,492.930 | MT | BRAZIL CANE RAW SUGAR IN BULK OF THE CURRENT CROP WITH A MINIMUM POLARIZATION OF 96 DEGREES AT TIME OF SHIPMENT. | 346.13 | 2,590,066.56 |
| | | LESS 2% TO BE SETTLED AFTER QUALITY AND QUANTITY RESULTS ARE KNOWN | | (51,801.33) |
| **TOTAL USD** | | | | **2,538,265.23** |

I, JOSE LUIZ CIPRIANI, HEREBY DECLARE THAT THE PRODUCT DESCRIBED IN THIS INVOICE IS WHOLLY GROWN AND PRODUCED OR MANUFACTURED IN BRAZIL.
FDA REGISTRATION NUMBERS:
S/A FLUXO – COMERCIO E ASSESSORIA INTERNACIONAL: 16794236486
USINA UNIAO E INDUSTRIA S/A: 14240231318

**PAYMENT INSTRUCTIONS**

**Please effect payment on value date to:**

**Banque Cantonale Vaudoise**
BCV Swift Code: BCVLCH2LXXX
Intermediary Bank (for BCV) Swift Code (=Citibank New York): CITIUS33XXX
IBAN number: CH86 0076 7001 E699 6272 6
Account # E 6096 27 26
Beneficiary: Fluxo-Cane Overseas Limited

FLUXO - CANE OVERSEAS LTD.

# Attachment 4

CODE NAME "CONGENBILL" EDITION 1994

Page 2

**Shipper**
COPERTRADING COMERCIO EXPORTACAO E IMPORTACAO S/A
RUA SA E ALBUQUERQUE, 235 JARAGUA, MACEIO-AL 57028-180
BRAZIL
FDA: 10915673514

**BILL OF LADING**
TO BE USED WITH CHARTER-PARTIES

B/L CSCV3048MA03

Reference Nº

**Consignee**

TO ORDER OF SHIPPER

**Notify address**

CSC SUGAR, LLC
36 GROVE STREET
NEW CANAAN, CONNECTICUT 06840

## COPY NOT NEGOTIABLE

| Vessel | Port of loading |
|---|---|
| M/V TINA LITRICO | MACEIO, BRAZIL |

**Port of discharge**
ONE OR TWO U.S. PORTS

**Shipper's description of goods**                                          **Gross Weight**

12,184.500 MT OF BRAZIL RAW CANE SUGAR IN BULK, OF FAIR AVERAGE QUALITY,
OF THE CURRENT CROP WITH A MINIMUM POLARIZATION OF 96 DEGREES AT TIME OF SHIPMENT

CLEAN ON BOARD

FREIGHT PAYABLE AS PER CHARTER PARTY

TOTAL NET/GROSS WEIGHT: 12,184.500 METRIC TONS

THIS BILL OF LADING INCORPORATES ALL TERMS, CONDITIONS, EXCEPTIONS AND ARBITRATION CLAUSE OF
CHARTER PARTY 10/26/2007

(Of which          on deck at Shipper's risk; the Carrier not
being responsible for loss or damage howsoever arising)

Freight payable as per
CHARTER-PARTY dated ........................................

FREIGHT ADVANCE.
Received on account of freight:

............................................................................
Time used for loading ...................... days ................................ hours.

SHIPPED at the Port of Loading in apparent good order
and condition on board the Vessel for carriage to the Port
of Discharge or so near thereto as she may safely get the
goods specified above.
Weight, measure, quality, quantity, condition, contents
and value unknown.
IN WITNESS whereof the Master or Agent of the said
Vessel has signed the number of Bills of Lading indicated
below all of this tenor and date, any one of which being
accomplished the others shall be void.

FOR CONDITIONS OF CARRIAGE SEE OVERLEAF

| Freight payable at | Place and date of issue |
|---|---|
|  | MACEIO, JANUARY 26TH, 2008. |
| **Number of original Bs/L** | **Signature** |
| 3/3 (THREE) | WILLIAMS (SERVIÇOS MARITIMOS) LTDA
AS AGENTS
FOR AND ON BEHALF OF THE MASTER
MR. STOVALL III, EDWARD MAX |

COPIA NÃO NEGOCIÁVEL.
ASSINADA PARA FINS DE REGISTRO SOMENTE
SEM QUALQUER VALOR COMERCIAL
NON NEGOTIABLE COPY
SIGNED FOR RECORDS ONLY
WITHOUT COMMERCIAL VALUE

CODE NAME "CONGENBILL" EDITION 1994

| Shipper | | Page 2 |
| --- | --- | --- |

**Shipper**

S/A FLUXO – COMERCIO E ASSESSORIA INTERNACIONAL
RUA DR. RENATO PAES DE BARROS, 778 – 2° ANDAR
04530-001 SÃO PAULO – SP BRAZIL
FDA: 16794236486

**BILL OF LADING**
TO BE USED WITH CHARTER-PARTIES

B/L CSCV3048MA04

Reference N°

**Consignee**

TO ORDER OF SHIPPER

**Notify address**

CSC SUGAR, LLC
36 GROVE STREET
NEW CANAAN, CONNECTICUT 06840

**COPY NOT NEGOTIABLE**

| Vessel | Port of loading |
| --- | --- |
| M/V TINA LITRICO | MACEIO, BRAZIL |

**Port of discharge**
ONE OR TWO U.S. PORTS

| Shipper's description of goods | Gross Weight |
| --- | --- |

1,781.080 MT OF BRAZIL RAW CANE SUGAR IN BULK, OF FAIR AVERAGE QUALITY,
OF THE CURRENT CROP WITH A MINIMUM POLARIZATION OF 96 DEGREES AT TIME OF SHIPMENT

CLEAN ON BOARD

FREIGHT PAYABLE AS PER CHARTER PARTY

TOTAL NET/GROSS WEIGHT: 1,781.080 METRIC TONS

THIS BILL OF LADING INCORPORATES ALL TERMS, CONDITIONS, EXCEPTIONS AND ARBITRATION CLAUSE OF
CHARTER PARTY 10/26/2007

(Of which    on deck at Shipper's risk; the Carrier not
being responsible for loss or damage howsoever arising)

Freight payable as per
CHARTER-PARTY dated ......................................

FREIGHT ADVANCE.
Received on account of freight:

...............................................................................
Time used for loading ...................... days ................................. hours.

SHIPPED at the Port of Loading in apparent good order
and condition on board the Vessel for carriage to the Port
of Discharge or so near thereto as she may safely get the
goods specified above.
Weight, measure, quality, quantity, condition, contents
and value unknown.
IN WITNESS whereof the Master or Agent of the said
Vessel has signed the number of Bills of Lading indicated
below all of this tenor and date, any one of which being
accomplished the others shall be void.

FOR CONDITIONS OF CARRIAGE SEE OVERLEAF

| Freight payable at | Place and date of issue |
| --- | --- |
| | MACEIO, JANUARY 26TH, 2008. |
| **Number of original Bs/L** | **Signature** |
| 3/3 (THREE) | WILLIAMS (SERVICOS MARITIMOS) LTDA |
| | AS AGENTS |
| | FOR AND ON BEHALF OF THE MASTER |
| | MR. STOVALL III, EDWARD MAX |

CÓPIA NÃO NEGOCIÁVEL
ASSINADA PARA FINS DE REGISTRO SOMENTE
SEM QUALQUER VALOR COMERCIAL
NON NEGOTIABLE COPY
SIGNED FOR RECORDS ONLY
WITHOUT COMMERCIAL VALUE

CODE NAME "CONGENBILL" EDITION 1994

| Shipper | BILL OF LADING | B/L CSCV3048MA05 |
|---|---|---|
| USINA TRAPICHE S/A | TO BE USED WITH CHARTER-PARTIES | |
| ENGENHO ROSARIO - SIRINHAEM – PERNAMBUCO – BRAZIL | | Reference Nº |
| 55580-000 | | |
| FDA: 16320909260 | | |

**Page 2**

Consignee

TO ORDER OF SHIPPER

Notify address

CSC SUGAR, LLC
36 GROVE STREET
NEW CANAAN, CONNECTICUT 06840

**COPY NOT NEGOTIABLE**

| Vessel | Port of loading |
|---|---|
| M/V TINA LITRICO | MACEIO, BRAZIL |

Port of discharge
ONE OR TWO U.S. PORTS

| Shipper's description of goods | Gross Weight |
|---|---|

3,761.480 MT OF BRAZIL RAW CANE SUGAR IN BULK, OF FAIR AVERAGE QUALITY,
OF THE CURRENT CROP WITH A MINIMUM POLARIZATION OF 96 DEGREES AT TIME OF SHIPMENT

CLEAN ON BOARD

FREIGHT PAYABLE AS PER CHARTER PARTY

TOTAL NET/GROSS WEIGHT: 3,761.480 METRIC TONS

THIS BILL OF LADING INCORPORATES ALL TERMS, CONDITIONS, EXCEPTIONS AND ARBITRATION CLAUSE OF
CHARTER PARTY 10/26/2007

(Of which    on deck at Shipper's risk; the Carrier not
being responsible for loss or damage howsoever arising)

Freight payable as per
CHARTER-PARTY dated ...........................................

FREIGHT ADVANCE.
Received on account of freight:

...............................................................................
Time used for loading ...................... days ...................................... hours.

SHIPPED at the Port of Loading in apparent good order
and condition on board the Vessel for carriage to the Port
of Discharge or so near thereto as she may safely get the
goods specified above.
Weight, measure, quality, quantity, condition, contents
and value unknown.
IN WITNESS whereof the Master or Agent of the said
Vessel has signed the number of Bills of Lading indicated
below all of this tenor and date, any one of which being
accomplished the others shall be void.

FOR CONDITIONS OF CARRIAGE SEE OVERLEAF

| Freight payable at | Place and date of issue |
|---|---|
| | MACEIO, JANUARY 26TH, 2008. |
| Number of original Bs/L | Signature |
| 3/3 (THREE) | WILLIAMS (SERVIÇOS MARITIMOS) LTDA |
| | AS AGENTS |
| | FOR AND ON BEHALF OF THE MASTER |
| | MR. STOVALL III, EDWARD MAX |

CÓPIA NÃO NEGOCIÁVEL
ASSINADA PARA FINS DE REGISTRO SOMENTE
SEM QUALQUER VALOR COMERCIAL
NON NEGOTIABLE COPY
SIGNED FOR RECORDS ONLY
WITHOUT COMMERCIAL VALUE

# Attachment 5

# FLUXO-CANE OVERSEAS LTD.

### 2nd floor Abbott Building,
### Road Town, Tortola - British Virgin Islands

January 28th, 2008

Consignee: **ED&F MAN SUGAR INC.**
Address: 2525 Ponce de Leon Blvd. Suite 1200
Coral Gables, FL 33134

## COMMERCIAL INVOICE # 319/08

**SHIPPING DETAILS**

**VESSEL NAME: M/V TINA LITRICO**
**PORT OF LOADING: MACEIO, BRAZIL**
**PORT OF DISCHARGE: ONE OR TWO U.S. PORTS**
**BILL OF LADING DATE: JANUARY 26th, 2008**
**OUR CONTRACT REFERENCE: 2209/08-B**

**GOODS DESCRIPTION**

| QUANTITY | UNIT | COMMODITY | UNIT PRICE | TOTAL |
|---|---|---|---|---|
| 17,727.060 | MT | BRAZIL CANE RAW SUGAR IN BULK OF THE CURRENT CROP WITH A MINIMUM POLARIZATION OF 96 DEGREES AT TIME OF SHIPMENT. | 346.13 | 6,135,867.28 |
| | | LESS 2% TO BE SETTLED AFTER QUALITY AND QUANTITY RESULTS ARE KNOWN | | (122,717.35) |
| **TOTAL USD** | | | | 6,013,149.93 |

I, JOSE LUIZ CIPRIANI, HEREBY DECLARE THAT THE PRODUCT DESCRIBED IN THIS INVOICE IS WHOLLY GROWN AND PRODUCED OR MANUFACTURED IN BRAZIL.
FDA REGISTRATION NUMBERS:
S/A FLUXO - COMERCIO E ASSESSORIA INTERNACIONAL: 16794236486
USINA TRAPICHE S/A: 16320909260
COPERTRADING COM EXP IMP LTDA: 10915673514

**PAYMENT INSTRUCTIONS**

Please effect payment on value date to:

**Banque Cantonale Vaudoise**
BCV Swift Code: BCVLCH2LXXX
Intermediary Bank (for BCV) Swift Code (=Citibank New York): CITIUS33XXX
IBAN number: CH86 0076 7001 E509 6272 5
Account # E 6096 27 25
Beneficiary: Fluxo-Cane Overseas Limited

FLUXO CANE OVERSEAS LTD.

# Attachment 6

**De:** Alper, Elizabeth (MIA-SUGAR) [mailto:Elizabeth.Alper@mansugar.com]
**Enviada em:** segunda-feira, 4 de fevereiro de 2008 10:48
**Para:** Marcos Bruno Daniel
**Assunto:** RE: M/V TINA LITRICO - MACEIO PORT

Dear Marcos Bruno,

Again I apologize for the delay in payment. Believe me when I say, I did everything to push London to make payment on Friday. But finally it was out of my control. I am following up on the payment right now and will advise.

**Elizabeth Alper**
**ED & F Man Sugar, Inc.**
**2525 Ponce de Leon Blvd.**
**Suite 1200**
**Coral Gables, FL 33134**
**elizabeth.alper@mansugar.com**
**IM: mansugar_ealper@yahoo.com**
**Tel: (786) 279-7350**
**Fax: (786) 279-7324**
**Cell: (305) 322-3996**

---

**From:** Marcos Bruno Daniel [mailto:marcos.bruno@safluxo.com.br]
**Sent:** Monday, February 04, 2008 7:43 AM
**To:** Alper, Elizabeth (MIA-SUGAR)
**Cc:** Nelson, Randall (MIA-SUGAR); S/A Fluxo - Operacoes; José Luiz Cipriani; Francesli Pereira; RODRIGUES, Bernardo (LDN Sugar); BONAVERO, Olivier (LDN Sugar); WHATMORE, Darren (LDN Sugar); Rodrigo de L.Franca
**Subject:** RES: M/V TINA LITRICO - MACEIO PORT

Dear Elizabeth,

Until now, we did not receive the payment of the vessel MV Tina Litrico, please send to us the swift in order to trace it.

Best Regards

2/8/2008

Marcos Bruno Daniel
Commercial Director
S/A Fluxo Com. Ass. Internacional
Phone: 55-11-2177.20.10
FAx: 55-11-3167.01.74
www.safluxo.com.br

---

**De:** Marcos Bruno Daniel
**Enviada em:** sexta-feira, 1 de fevereiro de 2008 17:37
**Para:** 'Alper, Elizabeth (MIA-SUGAR)'
**Cc:** 'Nelson, Randall (MIA-SUGAR)'; S/A Fluxo - Operacoes; José Luiz Cipriani; Francesli Pereira; 'RODRIGUES, Bernardo (LDN Sugar)'; 'BONAVERO, Olivier (LDN Sugar)'; WHATMORE, Darren (LDN Sugar); Rodrigo de L.Franca
**Assunto:** RES: M/V TINA LITRICO - MACEIO PORT

Dear Mrs. Alper,

We are very disappointed of non payment of our invoice for the following reason:

1 – All documentation was previously and fully approved by ED&F Man;

2- Before sending the original documentation you and Nelson Randall received copy by e-mail on January 30th ;

3-Original documentation was received at your office yesterday at 13:10, by A.Rodrigues;

4-Today we have sent e-mails and I personally sent one and called you also for this payment.

Dear Elizabeth, to call us at 4:00 PM informing that the invoice was made against ED&F Man Sugar Ltd and must be changed to Inc and give this excuse for not paying us today is very frustrating; moreover, let me remind you that you had paid the portion from Recife on the same vessel with the invoice showing ED&F Man sugar Ltd.

Please provide the payment with valid date today and send the copy of the swift to us immediately

Marcos Bruno Daniel
Commercial Director
S/A Fluxo Com. Ass. Internacional
Phone: 55-11-2177.20.10
FAx: 55-11-3167.01.74
www.safluxo.com.br

---

**De:** Rodrigo de L.Franca
**Enviada em:** sexta-feira, 1 de fevereiro de 2008 15:40
**Para:** 'Alper, Elizabeth (MIA-SUGAR)'; Marcos Bruno Daniel
**Cc:** Nelson, Randall (MIA-SUGAR); S/A Fluxo - Operacoes; José Luiz Cipriani; Francesli Pereira
**Assunto:** RES: M/V TINA LITRICO - MACEIO PORT

Elizabeth,

Please find attached revised invoice.
Please confirm payment value date today.

Best Regards,

Rodrigo

---

**De:** Alper, Elizabeth (MIA-SUGAR) [mailto:Elizabeth.Alper@mansugar.com]
**Enviada em:** sexta-feira, 1 de fevereiro de 2008 10:41
**Para:** Marcos Bruno Daniel; Rodrigo de L.Franca
**Cc:** Nelson, Randall (MIA-SUGAR); S/A Fluxo - Operacoes; José Luiz Cipriani; Francesli Pereira
**Assunto:** RE: M/V TINA LITRICO - MACEIO PORT
Dear Marcos Bruno,

I have submitted payment to London. I am doing everything I can to get this paid today, but I have to wait for their approval as all of our Treasury functions are handled by our London office. I will advise as soon as I get confirmation.

Best regards,

**Elizabeth Alper**
**ED & F Man Sugar, Inc.**
**2525 Ponce de Leon Blvd.**
**Suite 1200**
**Coral Gables, FL 33134**
**elizabeth.alper@mansugar.com**
**IM: mansugar_ealper@yahoo.com**
**Tel: (786) 279-7350**
**Fax: (786) 279-7324**
**Cell: (305) 322-3996**

**From:** Marcos Bruno Daniel [mailto:marcos.bruno@safluxo.com.br]
**Sent:** Friday, February 01, 2008 7:05 AM
**To:** Rodrigo de L.Franca; Alper, Elizabeth (MIA-SUGAR)
**Cc:** Nelson, Randall (MIA-SUGAR); S/A Fluxo - Operacoes; José Luiz Cipriani; Francesli Pereira
**Subject:** RES: M/V TINA LITRICO - MACEIO PORT

Dear Elizabeth,

We need your assistance again in order to confirm the payment today.

Best Regards

Marcos Bruno Daniel
Commercial Director
S/A Fluxo Com. Ass. Internacional
Phone: 55-11-2177.20.10
FAx: 55-11-3167.01.74

www.safluxo.com.br

**De:** Rodrigo de L.Franca
**Enviada em:** sexta-feira, 1 de fevereiro de 2008 09:26
**Para:** 'Alper, Elizabeth (MIA-SUGAR)'
**Cc:** 'Nelson, Randall (MIA-SUGAR)'; S/A Fluxo - Operacoes; Marcos Bruno Daniel; José Luiz Cipriani; Francesli Pereira
**Assunto:** ENC: M/V TINA LITRICO - MACEIO PORT

Dear Elizabeth, Good day!

Please confirm urgently as Randall seem to be out of the office today.

Best Regards,

Rodrigo

---

**De:** Rodrigo de L.Franca
**Enviada em:** sexta-feira, 1 de fevereiro de 2008 09:24
**Para:** Rodrigo de L.Franca; 'Nelson, Randall (MIA-SUGAR)'
**Cc:** S/A Fluxo - Operacoes; 'Alper, Elizabeth (MIA-SUGAR)'
**Assunto:** RES: M/V TINA LITRICO - MACEIO PORT
Dear Randall,

Please confirm receipt of documents as well as payment value date.
Fgos, as per world courier webstie documents were delivered yesterday (31/01)

Best Regards,

Rodrigo

---

**De:** Rodrigo de L.Franca
**Enviada em:** quarta-feira, 30 de janeiro de 2008 18:57
**Para:** 'Nelson, Randall (MIA-SUGAR)'
**Cc:** S/A Fluxo - Operacoes; 'Alper, Elizabeth (MIA-SUGAR)'
**Assunto:** M/V TINA LITRICO - MACEIO PORT
Dear Randall,

Please find attached copies of the originals which will be sent today by World Courier under 0572087. Such documents shall be delivered to you on Friday (01/02).

Best Regards,

Rodrigo Franca
S/A Fluxo - Comércio e Assessoria Internacional
For and On Behalf of Fluxo-Cane Overseas Ltd.

2/8/2008

Phone: (55 11) 2177 2035
Fax: (55 11) 3167 0174

This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information. Any review, dissemination, copying, printing or other
use of this e-mail by persons or entities other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender by email immediately or by phone at
(786) 279-7320 and delete the material from any computer.
This e-mail has been scanned for viruses but it is your full responsibility for virus checking.

Please note that we have recently moved. Our new address is 2525 Ponce De Leon Blvd. Suite 1200, Coral Gables, FL 33134. Main: (786) 279-7320; Fax: (786) 279-7324

This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information. Any review, dissemination, copying, printing or other
use of this e-mail by persons or entities other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender by email immediately or by phone at
(786) 279-7320 and delete the material from any computer.
This e-mail has been scanned for viruses but it is your full responsibility for virus checking.

Please note that we have recently moved. Our new address is 2525 Ponce De Leon Blvd. Suite 1200, Coral Gables, FL 33134. Main: (786) 279-7320; Fax: (786) 279-7324

2/8/2008

# Attachment 7

---

**De:** Machado, Carlos (MIA-SUGAR) [mailto:Carlos.Machado@mansugar.com]
**Enviada em:** segunda-feira, 4 de fevereiro de 2008 19:57
**Para:** Marcos Bruno Daniel
**Cc:** McGregor, Alberto (MIA-SUGAR); MARMION, Myles (LDN Corporate)
**Assunto:** Payment Offset

To Fluxo-Cane Overseas Limited (Fluxo Cane)

Dear Sirs

We refer to purchase contract no PO1688.000. Pursuant to our obligation to make payment to you in the sum of US$6,013,149.93 (our Contractual Indebtedness) kindly note as follows: As of 4th February you are indebted to ED&F Man Commodity Advisers Limited in the sum of US$41,961,982.07 (the MCA Debt) in respect of unpaid margin. On 4 February 2008 MCA equitably assigned to ED&F Man Sugar Inc (MSI) part of this debt in the amount of US$6,013,149.14 (Partial Assigned Debt). We hereby give you notice that we hereby set-off our Contractual Indebtedness against the Partial Assigned Debt which discharges our obligation to make any further payment for the shipping documents presented pursuant to purchase contract PO1688.000.

Sincerely,


Carlos E. Machado
Controller
ED&F Man Sugar Inc.
2525 Ponce de Leon Blvd. Ste 1200
Coral Gables, FL 33134

---

This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information. Any review, dissemination, copying, printing or other
use of this e-mail by persons or entities other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender by email immediately or by phone at
(786) 279-7320 and delete the material from any computer.
This e-mail has been scanned for viruses but it is your full responsibility for virus checking.

---

Please note that we have recently moved. Our new address is 2525 Ponce De Leon Blvd. Suite 1200, Coral Gables, FL 33134. Main:
(786) 279-7320; Fax: (786) 279-7324

---

2/8/2008

# Attachment 8

**De:** Alper, Elizabeth (MIA-SUGAR) [mailto:Elizabeth.Alper@mansugar.com]
**Enviada em:** segunda-feira, 7 de janeiro de 2008 16:55
**Para:** Marcos Bruno Daniel
**Cc:** José Luiz Cipriani; TradeSupport; Nelson, Randall (MIA-SUGAR)
**Assunto:** RE: RES: Business Proposal

Dear Marcos Bruno,

Please find belowbusiness confirmation to buy 23,428.91 MTS of USQ Sugar for prompt shipment.

**BUYER:** ED&F MAN SUGAR INC.

**SELLER:** FLUXO-CANE OVERSEAS LTD

**QUANTITY:** 23,428.91 Metric Tons of 2007/2008 US Quota

**QUALITY:** Raw cane Sugar of a fair average quality of the current crop eligible for entry in the U.S. under Brazil's 2007/2008 US Quota entitlement with min Polarization 98.5 degrees and Maximum 99.4 at time of shipment.

**PRICE:** AA's of 510 lots against March 2008 ICE Futures U.S N° 14 contract less a discount 4,62 cent/ lb ( four, point sixty five) cents per pound, FOB Stowed Recife and or Maceio - Brasil;

**SHIPMENT:** January 2007 at Seller's option', with 7 days pre-notice;

**LOAD:** At an average rate of 4,000 MT calculated on gross weight provided vessel can receive at this rate, per weather working day of 24 consecutive hours, SASHEX EIU. All other terms, conditions and exceptions as per the Sugar Charter Party 1999. Demurrage/Despatch rate as per relevant Charter Party.

2/8/2008

**POLARIZATION PREMIUM:** Weights and tests final at destination. Premiums and penalties to be calculated basis the CIF value.

Polarization shall be final at discharge port. Polarization premiums shall be calculated on results at discharge port with settlement of degree above 96.00 degrees polarization as follows:

For every full degree above 96.00 degrees to and including 97.00 degrees, add 0.50% (zero point five percent).

For every full degree above 97.00 degrees to and including 98.00 degrees, add an additional 2.25% (two point two five percent).

For every full degree above 98.00 degrees to and including 99.00 degrees, add an additional 1.20% (one point two percent).

Fractions of degree shall be calculated in the same proportions

**SUPERVISION:** To be shared 50/50% between Buyer and Seller

**PAYMENT:** 100 pct shall be paid cash against presentation of the original shipping documents in Miami in the offices of E.D.& F Man Sugar Inc

Nomination to follow.

Best regards,

**Elizabeth Alper**
**ED & F Man Sugar, Inc.**
**2525 Ponce de Leon Blvd.**
**Suite 1200**
**Coral Gables, FL 33134**
**Tel: (786) 279-7350**
**Fax: (786) 279-7324**
**Cell: (305) 322-3996**

---

**From:** Marcos Bruno Daniel [mailto:marcos.bruno@safluxo.com.br]
**Sent:** Monday, January 07, 2008 10:47 AM
**To:** Alper, Elizabeth (MIA-SUGAR)
**Cc:** José Luiz Cipriani
**Subject:** RES: RES: Business Proposal

Dear Elizabeth,

We can close our 23.428,910 metric tons, and I am pushing the possible seller for the CQE's and let you know.

Best Regards

Marcos Bruno Daniel
Commercial Director

2/8/2008

S/A Fluxo Com. Ass. Internacional
Phone: 55-11-2177.20.10
FAx: 55-11-3167.01.74

www.safluxo.com.br

---

**De:** Alper, Elizabeth (MIA-SUGAR) [mailto:Elizabeth.Alper@mansugar.com]
**Enviada em:** segunda-feira, 7 de janeiro de 2008 11:33
**Para:** Marcos Bruno Daniel
**Cc:** José Luiz Cipriani
**Assunto:** Re: RES: Business Proposal

Thanks MARCOS Bruno!

Can we know today regarding balance? Can we close today on the 23.428,910 metric tons?

Please advise so that I can instruct owner of vessel.

Thanks

----- Original Message -----
From: Marcos Bruno Daniel <marcos.bruno@safluxo.com.br>
To: Alper, Elizabeth (MIA-SUGAR)
Cc: José Luiz Cipriani <jlcipriani@safluxo.com.br>
Sent: Mon Jan 07 08:21:06 2008
Subject: RES: Business Proposal

Dear Elizabeth,

We have at this moment, 23.428,910 metric tons, 15.945,980 mt in Maceio and 7.482,930 mt in Recife.

There is a cota of 3.523,77 metric tons to be negotiated and I am waiting there intention to sell.

Also there is a balance of 640 metric tons from Agrovale.

Interiorana – Guilherme Maranhão they have around 2.000 metric tons and he is checking if they can sell or not due to the sales of the sugar to US already done.

Best Regards

Marcos Bruno Daniel

Commercial Director

2/8/2008

S/A Fluxo Com. Ass. Internacional

Phone: 55-11-2177.20.10

FAx: 55-11-3167.01.74

www.safluxo.com.br

---

De: Alper, Elizabeth (MIA-SUGAR) [mailto:Elizabeth.Alper@mansugar.com]
Enviada em: sábado, 5 de janeiro de 2008 15:34
Para: dani656@terra.com.br
Cc: Marcos Bruno Daniel; José Luiz Cipriani
Assunto: Re: Business Proposal


Marcos Bruno,

Spoke with owner, he is willing to give us a tolerance for 2000 MTS but wants 73 $/mt which is 467 discount. I am willing to share this with you. Can we close business at 465?


----- Original Message -----
From: Zélia - Office <dani656@terra.com.br>
To: Alper, Elizabeth (MIA-SUGAR)
Cc: Marcos Bruno Daniel <marcos.bruno@safluxo.com.br>; jlcipriani@safluxo.com.br <jlcipriani@safluxo.com.br>
Sent: Sat Jan 05 10:02:49 2008
Subject: Re: Business Proposal

Dear Elizabeth,

Thanks for your e-mail, at this moment I don't have condition to give you the exactly quantity to be shipped.
Please remember must load two ports, Recife and Maceio.
We can propose to you firm H-08 US 14 less 4,55 cents/ lb (four, point, fifth five) and you know we are loosing money at this business, around USD7,00 per ton.

In case you can agree with the discount and the conditions, four side you can consider closed.

Best Regards

Marcos Bruno Daniel

    ----- Original Message -----
    From: Alper, Elizabeth (MIA-SUGAR) <mailto:Elizabeth.Alper@mansugar.com>
    To: dani656@terra.com.br
    Sent: Saturday, January 05, 2008 12:16 PM
    Subject: Business Proposal


    Dear Marcos Bruno,


    Please find below firm offer to buy 25,928.73 MTS of USQ Sugar for prompt shipment.

2/8/2008

BUYER: ED&F MAN SUGAR INC.

SELLER: FLUXO-CANE OVERSEAS LTD

QUANTITY: 25,928.73 Metric Tons of 2007/2008 US Quota

QUALITY: Raw cane Sugar of a fair average quality of the current crop eligible for entry in the U.S. under Brazil's 2007/2008 US Quota entitlement with min Polarization 98.5 degrees and Maximum 99.4 at time of shipment.

PRICE: AA's of 510 lots against March 2008 ICE Futures U.S N° 14 contract less a discount 4,65 cent/ lb ( four, point sixty five) cents per pound, FOB Stowed Recife and or Maceio - Brasil;

SHIPMENT: January 2007 at Seller's option', with 7 days pre-notice;

LOAD: At an average rate of 4,000 MT calculated on gross weight provided vessel can receive at this rate, per weather working day of 24 consecutive hours, SASHEX EIU. All other terms, conditions and exceptions as per the Sugar Charter Party 1999. Demurrage/Despatch rate as per relevant Charter Party.

POLARIZATION PREMIUM: Weights and tests final at destination. Premiums and penalties to be calculated basis the CIF value.

Polarization shall be final at discharge port. Polarization premiums shall be calculated on results at discharge port with settlement of degree above 96.00 degrees polarization as follows:

For every full degree above 96.00 degrees to and including 97.00 degrees, add 0.50% (zero point five percent).

For every full degree above 97.00 degrees to and including 98.00 degrees, add an additional 2.25% (two point two five percent).

For every full degree above 98.00 degrees to and including 99.00 degrees, add an additional 1.20% (one point two percent).

Fractions of degree shall be calculated in the same proportions

SUPERVISION: To be shared 50/50% between Buyer and Seller

2/8/2008

PAYMENT: 100 pct shall be paid cash against presentation of the original shipping documents in Miami in the offices of E.D.& F Man Sugar Inc.


PORT AGENT: Williams



Elizabeth Alper

ED & F Man Sugar, Inc.

2525 Ponce de Leon Blvd.

Suite 1200

Coral Gables, FL 33134

Tel: (786) 279-7350

Fax: (786) 279-7324

Cell: (305) 322-3996

This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information. Any review, dissemination, copying, printing or other
use of this e-mail by persons or entities other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender by email immediately or by phone at
(786) 279-7320 and delete the material from any computer.
This e-mail has been scanned for viruses but it is your full responsibility for virus checking.

Please note that we have recently moved. Our new address is 2525 Ponce De Leon Blvd. Suite 1200, Coral Gables, FL 33134. Main: (786) 279-7320; Fax: (786) 279-7324

This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information. Any review, dissemination, copying, printing or other
use of this e-mail by persons or entities other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender by email immediately or by phone at
(786) 279-7320 and delete the material from any computer.
This e-mail has been scanned for viruses but it is your full responsibility for virus checking.

2/8/2008

Please note that we have recently moved. Our new address is 2525 Ponce De Leon Blvd. Suite 1200, Coral Gables, FL 33134. Main: (786) 279-7320; Fax: (786) 279-7324

This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information. Any review, dissemination, copying, printing or other
use of this e-mail by persons or entities other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender by email immediately or by phone at
(786) 279-7320 and delete the material from any computer.
This e-mail has been scanned for viruses but it is your full responsibility for virus checking.

Please note that we have recently moved. Our new address is 2525 Ponce De Leon Blvd. Suite 1200, Coral Gables, FL 33134. Main: (786) 279-7320; Fax: (786) 279-7324

This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information. Any review, dissemination, copying, printing or other
use of this e-mail by persons or entities other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender by email immediately or by phone at
(786) 279-7320 and delete the material from any computer.
This e-mail has been scanned for viruses but it is your full responsibility for virus checking.

Please note that we have recently moved. Our new address is 2525 Ponce De Leon Blvd. Suite 1200, Coral Gables, FL 33134. Main: (786) 279-7320; Fax: (786) 279-7324

2/8/2008

# Attachment 9

**De:** Machado, Carlos (MIA-SUGAR) [mailto:Carlos.Machado@mansugar.com]
**Enviada em:** quinta-feira, 7 de fevereiro de 2008 16:42
**Para:** Marcos Bruno Daniel
**Cc:** Alper, Elizabeth (MIA-SUGAR); ASKEW, Richard (LDN Corporate); RODRIGUES, Bernardo (LDN Sugar); McGregor, Alberto (MIA-SUGAR)
**Assunto:** PAYMENT MV TINA LITRICO

Dear Marcos:

Thank you for your email today. We are certainly not aware that the debt owed by ED&F Man Commodity Advicers Limited (MCA) is disputed. Our position quite simply is that we have exersised ligimate the right to set-off following the assignment to us of part of your company's indebtness to MCA. We understand that these steps might not have been necessary had your company responded to invitations to discuss the outstanding position with MCA. In the light of the above, we believe that we have fulfilled our obligation to you under the contract and no further payment is due. We note that with regard to other contracts, you will continue to perform in accordance with their terms. We shall do likewise.

Sincerely,

Carlos E. Machado

Controller

ED&F Man Sugar Inc.

---

**From:** Marcos Bruno Daniel [mailto:marcos.bruno@safluxo.com.br]
**Sent:** Thu 2/7/2008 7:49 AM
**To:** McGregor, Alberto (MIA-SUGAR); Machado, Carlos (MIA-SUGAR)
**Cc:** Alper, Elizabeth (MIA-SUGAR); ASKEW, Richard (LDN Corporate); RODRIGUES, Bernardo (LDN Sugar)
**Subject:** PAYMENT MV TINA LITRICO

**To ED&F Man Sugar Inc.**

**CONTRACT P01688.000 DATED 7 JANUARY 2008**

**M.V. "TINA LITRICO"**

We refer to the above contract and to our email of yesterday, in which we made it clear that: (i) we do not recognise the validity and/or effectiveness of the purported assignment to you of sums alleged to be due to ED&F Man Commodity Advisers Limited, London, in equity or otherwise; and (ii) the alleged debt owed to ED&F Man Commodity Advisers Limited is disputed, as you and they are well aware.

Your failure to effect payment of the full price for the goods shipped on the above vessel is a clear breach of the above contract and, unless you immediately either, (i) confirm that full payment will be made or (ii) return the shipping documents to us, we shall take all necessary action against you.

All our rights remain fully reserved.

Best Regards


Marcos Bruno Daniel

Commercial Director

S/A Fluxo Com. Ass. Internacional

Phone: 55-11-2177.20.10

FAx: 55-11-3167.01.74

www.safluxo.com.br

This e-mail is intended solely for the person or entity to which it is addressed and may contain confidential and/or privileged information.
Any review, dissemination, copying, printing or other
use of this e-mail by persons or entities other than the addressee is prohibited. If you have received this e-mail in error, please contact the sender by email immediately or by phone at
**(786) 279-7320** and delete the material from any computer.
This e-mail has been scanned for viruses but it is your full responsibility for virus checking.

Please note that we have recently moved. Our new address is 2525 Ponce De Leon Blvd. Suite 1200, Coral Gables, FL 33134. Main: (786) 279-7320; Fax: (786) 279-7324

07/02/2008 19:09



## ICE FUTURES U.S. EXCHANGE AND CLEARING FEES (Effective as of January 1, 2008)

| | Member | Permit Holders | Lessees | Member Firms | Other | Screen-Trade Surcharge | Block Trade & EFP Surcharge |
|---|---|---|---|---|---|---|---|
| | A1 (All) & A2 (Open-Outcry Only) | B | C | D | A2 (Electronic-Only), E, F | All | All |
| Cocoa, Coffee, Sugar, Pulp | $0.40 | $0.50 | $0.60 | $0.65 | $1.50 | $0.25 | $0.75 |
| Cotton, FCOJ | $0.40 | $0.50 | $0.60 | $0.95 | $1.50 | $0.25 | $0.75 |
| Currencies | $0.50 | $0.63 | $0.65 | $0.75 | $0.94 | NA | NA |
| Dollar Index, CRB-CI, NYSE | $0.50 | $0.63 | $0.65 | $0.95 | $1.35 | NA | NA |
| Russell Index (Full Size) | $0.50 | $0.63 | $0.65 | $0.63 | $1.35 | NA | NA |
| Russell Minis /Coffee Minis | $0.24 | $0.30 | $0.30 | $0.30 | $0.94 | NA | NA |

## OTHER FEES

| | Transfers | Mechanical Adjustments | Notices | Exercise & Assignment | Currency Delivery Fee | Currency Transfer Charge (per Transfer) |
|---|---|---|---|---|---|---|
| Minis | $0.05 | $0.05 | $0.05 | $0.05 | NA | NA |
| All other applicable products | $0.10 | $0.10 | $0.10 | $0.10 | $0.12 | $7.50 |

## ACCOUNT TYPES

A1 - account of an individual Member who was an Equity Member as of January 12, 2007.

A2 - account of an individual Member who was not an Equity Member as of January 12, 2007.

B - account of a Permit Holder who held the permit immediately prior to the Merger on January 12, 2007, for contracts covered by the Permit.

C - account of a Lessee of a NYBOT Membership if
(i) the Lessor is a person who was an Equity Member on January 12, 2007 and
(ii) the NYBOT Membership being leased was acquired by the Lessor prior to August 21, 2007.

D - account of a Clearing or other Member Firm which held such status as of September 14, 2006.

E - account of:   (i) a Lessee not covered by C; or

(ii) a Permit Holder not covered by B; or

(iii) a Member Firm not covered by D.

F - account of any other trader

**Updated 12/7/2007**

# ICE Futures U.S., Inc.

***All references to Board of Trade of the City of New York, Inc., New York Board of Trade or NYBOT shall be deemed to be ICE Futures U.S., Inc.***

## MEMBERSHIP RULES

### TABLE OF CONTENTS

**Rule**                    **Subject**

#### REQUIREMENTS

2.01    Qualifications
2.02    Reserved

#### APPLICATION PROCEDURES

2.03    Application
2.04    Notice of Application
2.05    Reserved
2.06    Review of Application
2.07    Election to Membership by the Board; Reinstatement; Rejection
2.08    Conditions for Denial

#### MEMBER FIRMS

2.09    Eligibility for Member Firm Privileges
2.10    Application for Member Firms
2.11    Member Firm Annual Fees
2.12    Cancellation of Member Firm Privileges
2.13    Termination of Member Firm Privileges

#### CLEARING MEMBERS AND GUARANTORS

2.14    Application and Qualification of Clearing Members
2.15    Reserved
2.16    Qualification for Guarantors, Procedure and Guarantee Termination
2.17    Member Claims Not Recoverable Against Guarantor

#### FLOOR TRADING PRIVILEGES

2.18    Qualifications and Requirements for Floor Trading Privileges
2.19    Application
2.20    Notice of Application
2.21    Granting of Floor Trading Privileges
2.22    Termination of Floor Trading Privileges

#### NYBOT MEMBERSHIP LEASING AND TRANSFERS

2.23    NYBOT Membership Leasing

#### NYBOT MEMBERSHIP SALES AND TRANSFERS

2.24    Security Interest and Disposition of Proceeds from Sale of a Membership
2.25    General Transfer Procedure; Beneficial Interest

2.26        Sole Membership Transfer Procedure

**DUTIES OF MEMBERS**

2.27        Duties of Member-Elect
2.28        Duties of All Members
2.29        Member Violations
2.30        Reserved
2.31        Duties of Guaranteed Member
2.32        Duties of all Members to Clearing Member Guarantors
2.33        Duty to Supervise
2.34        Member Firm Reporting Requirements
2.35        Service of Papers
2.36        Reserved
2.37        Expenses of Lawsuits Brought Against the Exchange by Members
2.38        NYBOT Trading Permits
2.39        Market Specialists
2.40        Cross Margining Privileges
2.41        Exchange Broker Fee Payment Policy

**RESOLUTIONS**

No. 1       Statement of Policy Concerning Conduct

# ICE FUTURES U.S., INC.

*All references to Board of Trade of the City of New York, Inc., New York Board of Trade or NYBOT shall be deemed to be ICE Futures U.S., Inc.*

# MEMBERSHIP RULES

## REQUIREMENTS

**Rule 2.01. Qualifications**

To be eligible to become and remain a NYBOT Member, NYBOT Permit Holder or Lessee, a person must be a natural person at least twenty-one (21) years of age, of good character, reputation and business integrity with adequate financial resources and credit to assume the responsibilities and privileges of Membership.

**Rule 2.02. Reserved**

## APPLICATION PROCEDURES

**Rule 2.03. Application**

(a) An individual applying to be a NYBOT Member, NYBOT Permit Holder or Lessee must file with the Exchange an application for Membership in the form supplied by the Exchange, a non-refundable application fee in the amount specified by the Board, a confidential statement or report from two (2) different business references acceptable to the Membership Committee and such other documents as the Exchange may deem necessary or appropriate, including in the case of a NYBOT Membership, evidence that the individual owns or will acquire the Required Shares, or that the Required Shares will be owned by a Member Firm with which the Person has entered into an A-B-C Agreement approved by the Exchange.

(b) Unless the Exchange decides otherwise, an individual who had been a Member in good standing and who, following the transfer of his sole Membership, files an application for readmission to Membership, in the form prescribed by the Exchange, a non-refundable application fee in the amount specified by the Board and such other documents as the Exchange deems necessary or appropriate, shall be readmitted to Membership if such application, fee and other documents are filed within forty-five (45) calendar days following the date of transfer of the applicant's sole Membership.

(c) Incomplete applications shall be kept on file for two (2) months; thereafter, the application shall be deemed withdrawn and an applicant must submit a new application for Membership.

**Amended by the Board September 11, 2007; effective September 13, 2007 [¶ (b)].**

**Rule 2.04. Notice of Application**

The name of each applicant shall be posted on the Member Page of the Exchange's website or otherwise sent to all NYBOT Members at least ten (10) days prior to approval by the Exchange.

**Amended by the Board September 11, 2007; effective September 13, 2007.**

**Rule 2.05. Reserved**

**Rule 2.06. Review of Application**

(a) The Exchange may direct the applicant to supplement, or the Exchange may investigate, any information supplied by the applicant, or which the Exchange believes is appropriate.

(b) The Exchange shall review the application and may ask for and review any additional information it deems relevant; provided however, that review of all the requirements for and the granting of floor trading privileges shall be the exclusive responsibility of the Floor Trading Privileges Committee.

**Amended by the Board September 11, 2007; effective September 13, 2007 [¶¶ (a) and (b)].**

### Rule 2.07. Election to Membership; Reinstatement; Rejection

(a) The Exchange shall, when it deems the application to be complete, either approve the application or refer the application to the Membership Committee for action with a recommendation either to approve or disapprove the same, provided that the Exchange shall refer the application to the Membership Committee whenever (i) an application contains, or the Exchange learns of, information of the type specified in the Rules as constituting a condition for denial, (ii) an application is filed by a suspended Member seeking reinstatement or (iii) an application is filed by an expelled Member.

(b) The Membership Committee shall consider each application referred to it by the Exchange and shall vote for or against election of the applicant to Membership. An applicant receiving affirmative votes of a majority of those members of the Membership Committee present at a duly convened meeting shall be elected to Membership; provided, however, that a suspended Member's application for reinstatement shall be treated in accordance with the Rules of the Exchange concerning the reinstatement of suspended Members, and an expelled Member's application for readmission:

(i) shall only be considered if notice thereof shall have been included in written notice of the meeting, which shall have been given at least three (3) days in advance thereof; and

(ii) shall require the affirmative votes of three-fourths of the members of the Membership Committee present to effect a readmission.

(c) In the event that the Exchange recommends to the Membership Committee denial of an application or the Membership Committee intends to deny such an applicant, the applicant shall be given notice thereof and an opportunity to be heard by the Membership Committee, or a subcommittee of the Membership Committee designated for this purpose by the Chairman of the Membership Committee, to present evidence as to why the application should not be denied, provided that the Secretary of the Exchange receives a written request from the applicant for such a hearing within ten (10) days after the receipt of such notice by the applicant. If a hearing is held before a subcommittee designated by the Chairman of the Membership Committee pursuant to this paragraph (c), such subcommittee shall report its findings and conclusions to the Membership Committee. The Membership Committee decision shall be the final action of the Exchange.

(d) Any application rejected by the Membership Committee shall not be reconsidered for one (1) year.

**Amended by the Board September 11, 2007; effective September 13, 2007 [¶¶ (a), through (d)].**

### Rule 2.08. Conditions for Denial

The Exchange may deny Membership or reinstatement to any applicant seeking approval as a NYBOT Member, NYBOT Permit Holder or Lessee who:

(a) does not meet any of the qualifications for Membership, or does not follow the procedures for application, set forth in these Rules;

(b) has been denied registration or whose registration has been revoked or is currently suspended by the CFTC or by the Securities and Exchange Commission;

(c) has been convicted of any felony or misdemeanor;

(d) has been enjoined by order, judgment or decree of any court of competent jurisdiction or of the CFTC or the Securities and Exchange Commission or of any state securities authority or agency from engaging in or continuing any conduct or practice in connection with the purchase or sale of any Commodity, security, option or similar instrument;

(e) is or has been subject to an order of the CFTC denying trading privileges on any contract market to the applicant, or suspending or expelling the applicant from membership on any contract market;

(f) has ever been or is suspended or expelled from any commodity or securities exchange, related clearing organization, the National Futures Association, the National Association of Securities Dealers, Inc., or any other self-regulatory organization or other business or professional association for violation of any rule of such organization;

(g) has accumulated a disciplinary or arbitration record at any exchange, association or similar tribunal which record is judged by the Exchange or the Membership Committee to be such that membership for the applicant would not be in the best interests of the Exchange;

(h) is subject to any material unsatisfied liens or judgments;

(i) has made any false statement in or in connection with any application filed with the Exchange;

(j) has been individually, or as a Principal of a Firm that has been, subject to any liquidation, arrangement, reorganization, receivership, assignment for the benefit of creditors or other bankruptcy or insolvency proceeding, under state or federal law, within the past ten (10) years;

(k) has engaged in an established pattern of failure to pay just debts; or

(l) fails to meet such other qualifications as the Board may from time to time determine are in the best interests of the Exchange.

**Amended by the Board September 11, 2007; effective September 13, 2007 [¶ (g)].**

## MEMBER FIRMS

### Rule 2.09. Eligibility for Member Firm Privileges

(a) Any Firm shall be eligible to receive Member Firm privileges provided that at least one (1) of its general partners, directors, officers, members, executive employees or managers (a "Conferring Member") (i) is a full-time employee of such Firm or an Affiliated Firm thereof and is not employed by any other Person; (ii) is a Trading Member in good standing and (iii) has and exercises authority over the affairs of the Firm directly related to the Firm's activities on the Exchange, satisfactory to the Membership Committee.

(b) A Member who is a special or limited partner in a Firm may not confer any of the privileges of the Exchange on such Firm.

(c) A Member cannot confer Membership privileges upon more than one (1) Firm at any one (1) time.

### Rule 2.10. Application for Member Firm Privileges

(a) To obtain Member Firm privileges, a Firm shall file with the Exchange an application for Member Firm privileges in a form approved by the Board, accompanied by a non-refundable

application fee in the amount specified by the Board, and such other documents as the Exchange may deem necessary or appropriate, which documents shall include, but shall not be limited to:

(1) an agreement whereby the Firm shall agree to abide by and be subject to the Rules;

(2) an agreement in a form prescribed by the Exchange, signed by the Conferring Member, making the proceeds from the sale of his Trading Membership and the corresponding Required Shares, if applicable, available for settlement of Exchange, Clearing Organization and Members' Claims against such Firm and against any Affiliated Firms of such Firm that are entitled to Member Firm rates on contract fees in accordance with Standing Resolution No. R-6, but which are not themselves Member Firms, and against such Member as prescribed in such agreement; provided, however, that any Member Firm, which has more than two (2) Persons who are Lessees and are either partners, shareholders or employees soliciting or accepting orders from or executing Transactions for other Persons, must file with the Exchange duly executed Conferring Agreements with respect to two (2) Trading Memberships;

(3) in the case of a partnership, a copy of the partnership agreement together with any amendments thereto, certified by a general partner;

(4) in the case of a corporation, a copy of the certificate of incorporation, including all amendments thereto, the by-laws, and a resolution of the board of directors thereof authorizing the application for Member Firm privileges, duly certified by the secretary of the corporation;

(5) in the case of a limited liability company ("LLC"), a copy of the articles of organization and operating agreement, and all amendments thereto, duly certified by an authorized member or manager thereof; and

(6) in the case of a sole proprietorship, a copy of a certificate of doing business as a sole proprietor (d/b/a) which has been filed with the Clerk of New York County, City of New York, at least five days prior to conferring membership privileges upon such sole proprietorship.

(b) The Exchange shall, when it deems the application to be complete, either approve the application or refer the application to the Membership Committee for action with a recommendation either to approve or disapprove the same.

**Amended by the Board September 11, 2007; effective September 13, 2007 [¶ (b)].**

### Rule 2.11. Member Firm Annual Fees

Each Member Firm shall pay to the Exchange an annual fee in the amount specified by the Board, which shall be due and payable on the first day of January of each year.

### Rule 2.12. Cancellation of Member Firm Privileges

(a) Member Firm privileges may be canceled by the Conferring Member or the Firm at any time provided that:

(1) A Notice of Intention to Cancel such privileges, signed by the Firm or by the Conferring Member, shall be given to the Exchange at least ten (10) calendar days prior to the intended termination date of such privileges; and

(2) The Firm and the Conferring Member shall have filed with the Exchange a written statement that all Claims arising out of Commodity Contracts executed on the Exchange have been settled.

(b) Cancellation of privileges shall be effective on such date as specified by the canceling party in subparagraph (a)(1), provided, however, that the Exchange shall hold the Conferring Member responsible for all Claims against the Firm until the requirements specified in paragraph (a) of this Rule have been satisfied.

### Rule 2.13. Termination of Member Firm Privileges

In the event the Conferring Member ceases to comply with the eligibility requirements specified in the Rules, the Member Firm shall continue to enjoy Member Firm privileges for ninety (90) days following the occurrence of such event. Thereafter, Member Firm privileges shall be terminated unless, within such ninety (90) day period another Trading Member confers privileges to the Firm.

## CLEARING MEMBERS AND GUARANTORS

### Rule 2.14. Application and Qualification of Clearing Members

(a) Any Firm desiring to become a Clearing Member shall submit an application in the form prescribed by the Exchange. The Exchange shall, when it deems the application to be complete, either approve the application or refer the application to the Membership Committee for action with a recommendation either to approve or disapprove the application.

(b) In order to be eligible to be a Clearing Member of Commodity Contracts, a Firm must have Member Firm privileges and file with the Exchange a duly executed Conferring Agreement applicable to one (1) NYBOT Membership making the proceeds from the sale of the NYBOT Membership and the Required Shares available for the settlement of Exchange, Clearing Organization and Members' Claims against such Clearing Member in the order and according to the procedures prescribed in Rule 2.24.

(c) In the event that a Clearing Member ceases to comply with the applicable eligibility requirements specified in paragraph (b) of this Rule, its status as a Clearing Member shall be automatically suspended unless, within 90 days following occurrence of such event, the Clearing Member satisfies the Exchange that it has brought itself into compliance with such requirements.

Amended by the Board August 10, 2007; effective August 15, 2007 [(b)(i)].

Amended by the Board September 11, 2007; effective September 13, 2007 [¶ (a)].

Amended by the Board November 14, 2007; effective December 17, 2007 [¶¶ (b) and (c)].

### Rule 2.15. Reserved

### Rule 2.16. Qualification for Guarantors, Procedure and Guarantee Termination

(a) A Clearing Member in good standing may become a guarantor of any Trading Member, Permit Holder or Lessee upon approval by the Exchange. To be so approved, a Clearing Member must file with the Exchange an application in a form supplied by the Exchange, accompanied by a non-refundable application fee in the amount specified by the Board, and such other documents as the Exchange may deem necessary or appropriate, including but not limited to a copy of its financial statements as of the Clearing Member's most recent fiscal year end, certified by an independent public accountant and an agreement, in the form provided by the Exchange, whereby the guarantor agrees:

(i) to accept for clearance any Transaction effected by the Guaranteed Member on or subject to the Rules, when and as provided in the Rules or the Clearing Organization Rules;

(ii) to duly and timely pay:

(A) any Claim by any present or future Member against the Guaranteed Member arising from any order or Transaction for the purchase, sale, exercise or expiration of a Commodity Contract executed, or to be executed, on the Exchange or subject to the Rules, or arising from cash market transactions which are part of, or directly connected with, any Transaction executed on the Exchange or subject to the Rules; and

(B) any Claim by the Exchange or the Clearing Organization against the Guaranteed Member (other than for assessments, dues or fines imposed pursuant to the Exchange's Disciplinary Rules), arising under the Rules or Clearing Organization Rules; and

(iii) to timely comply with the provisions of the Rules applicable to guarantors and to furnish such information as the Exchange may from time to time request.

(b) The Exchange shall (when it deems the application to be complete) either approve the application or refer the application to the Membership Committee for action with a recommendation either to approve or disapprove the same. The Exchange and the Membership Committee may consider any factors which they deem in the best interests of the Exchange, including the number of Persons guaranteed by the applicant on other exchanges and any other factors set forth in the Rules which may be conditions for denial of an application for Membership.

(c) A guarantor may terminate its guarantee of a Guaranteed Member by serving upon the Exchange and the Guaranteed Member written notice of such termination. Such notice shall indicate the effective time and date of termination provided, however, that in no event may a guarantee be terminated prior to the Exchange's receipt of such notice and communication of such termination to the Members in accordance with this Rule. Except as provided in paragraph (d) hereof, a guarantee shall remain in full force and effect until the effective time and date indicated in such notice. At the effective time and date of termination, the affected Guaranteed Member's floor trading privileges shall be suspended immediately and shall be reinstated upon approval of a new guarantor.

(d) Without limiting any other provisions of the Rules, if at any time the Member Firm privileges of a guarantor on the Exchange are suspended, terminated or canceled, or if a guarantor shall cease to be or shall be suspended as a Clearing Member of the Exchange, or if a guarantor shall be restricted by either the Exchange or the Clearing Organization to trading for liquidation only, all guarantees submitted to the Exchange by such guarantor shall automatically terminate.

(e) When a Guaranteed Member requests to change guarantors, the President or his designee (when he deems the application to be complete) may approve a new guarantor of such Guaranteed Member. If for any reason the President or his designee does not approve the new guarantor, the Membership Committee shall review the request and either approve or disapprove the application for the new guarantor. The Exchange shall notify the existing guarantor, if any, of requests to change guarantor by its Guaranteed Member at least five (5) Business Days prior to the effective date of such request.

(f) The Exchange shall promptly give notice to the Members of any termination of guarantee.

**Amended by the Board September 11, 2007; effective September 13, 2007 [¶¶ (b) and (e)].**

### Rule 2.17. Member Claims Not Recoverable Against Guarantor

A Clearing Member guarantor shall not be obligated to pay any Claim based on any failure by the Guaranteed Member to perform, pay and discharge any of his obligations or liabilities, unless the Claimant had given the Clearing Member guarantor or the Exchange written notice of such Claim within four (4) Business Days after such Claim arose. The Exchange shall notify the Clearing Member guarantor promptly upon receipt of any such notice of Claim. For purposes of this Rule, a Claim shall be deemed to arise on the first date that the Claimant has the right to receive

payment (without regard to any extensions of time granted by the Claimant) from the Guaranteed Member, whether or not any demand for such payment is made.

## FLOOR TRADING PRIVILEGES

### Rule 2.18. Qualifications and Requirements for Floor Trading Privileges

(a) To be eligible to receive and hold floor trading privileges a Person must:

(i) Be an individual NYBOT Member, NYBOT Permit Holder or Lessee in good standing, and guaranteed by a Clearing Member in accordance with Rule 2.16; and

(ii) Comply with the application and approval procedures for the granting of floor trading privileges; and

(iii) Be sponsored by two (2) NYBOT Members who have been granted floor trading privileges and have been NYBOT Members for at least six (6) months preceding the date of the applicant's application for floor trading privileges; and

(iv) Attend an ethics course as required by CFTC or National Futures Association regulations; and

(v) Attend a sexual harassment awareness course sponsored by or acceptable to the Exchange as may be determined by the President, in his sole discretion, within three (3) months of admission to Membership; and

(vi) Prior to being granted floor trading privileges, successfully complete the Exchange's Floor Trading course; provided, however, that the Floor Trading Privileges Committee may, in its sole discretion, waive any part, or all, of such training course for a particular Member.

(b) The floor trading privileges of any Member who fails to attend the sexual harassment awareness course as prescribed in subparagraph (a)(v) of this Rule shall be automatically suspended until compliance with such requirement has been satisfied; provided, however, that the President in his sole discretion may extend the period of time to satisfy such requirement.

### Rule 2.19. Application

(a) A Person applying for floor trading privileges must file with the Exchange an application for floor trading privileges in the form supplied by the Exchange, accompanied by an unconditional guarantee by a Clearing Member and a sponsor statement from two (2) NYBOT Members who have been granted floor trading privileges and have been NYBOT Members for at least six (6) months preceding the date of the applicant's application for floor trading privileges.

(b) Incomplete applications shall be kept on file for two (2) months; thereafter, such applications shall be deemed withdrawn and an applicant must submit a new application.

### Rule 2.20. Notice of Application

The name of each applicant for floor trading privileges shall be posted on the Member Page of the Exchange's website or otherwise sent to all Members at least five (5) days prior to the Floor Trading Privileges Committee meeting at which such application is to be acted upon.

### Rule 2.21. Granting of Floor Trading Privileges

(a) The Floor Trading Privileges Committee will review the information contained in the application to determine, in its discretion, whether the applicant has adequate experience to warrant floor privileges. In so doing, the Committee will consider the following factors:

(i) The extent and nature of prior experience on the Trading Floor as either a Floor Broker or a Clerk.

(ii) The extent and nature of prior experience at other commodities or securities exchanges as a floor broker or a clerk.

(iii) The extent and nature of business experience in dealing in the physical commodities traded on the Exchange.

(iv) Compliance with such additional requirements, if any, as the Board may prescribe for trading Exchange Options.

(b) If in any case the Floor Trading Privileges Committee concludes that, in order for an applicant to be eligible for floor privileges, such applicant should spend some period of time as an observer on the Floor of the Exchange, the Floor Trading Privileges Committee may specify such period and so advise the applicant.

(c) In order for an applicant to gain access to the Trading Floor, the applicant must have one (1) of his sponsors sign the applicant onto and off the Trading Floor and sign an agreement with the Exchange in which such sponsor agrees to supervise the applicant and be fully responsible for any and all actions of the applicant while the applicant is on the Trading Floor.

(d) If in any case the Floor Trading Privileges Committee concludes that, in order for an applicant to be eligible for floor trading privileges, such applicant should spend some period of time receiving individual instruction, the applicant's sponsors shall be responsible for providing such instruction and reporting back to the Committee.

(e) The Floor Trading Privileges Committee will decide whether or not to grant the application, based upon the information contained in the application and such other matters as the Committee may consider relevant. The Committee decision shall be the final action of the Exchange.

(f) In the event the Committee grants the application, the six (6) month period following the effective date of said grant shall be deemed a probationary period. During said probationary period, the Executive Floor Committee may, extend said probationary period, or revoke or suspend such applicant's floor trading privileges.

(g) None of the provisions of this Rule 2.21 shall apply to temporary floor traders' identification badges issued solely to authorize the effectuation of an "AA" or "EFP" Transaction.

(h) A Member who has been granted floor trading privileges and is changing his type of Membership shall not be required to re-apply for floor trading privileges, but, if the Member's floor trading privileges are restricted or extended by virtue of the change in type of Membership, the Exchange will announce to the Trading Floor the change in floor trading privileges.

(i) A Member, who had been granted floor trading privileges prior to transferring his sole Membership and is readmitted to Membership pursuant to Rule 2.03, shall have such floor trading privileges reinstated on the effective date of the Member's readmission.

**Amended by the Board September 11, 2007; effective September 13, 2007 [¶¶ (f) through (i)].**

### Rule 2.22. Termination of Floor Trading Privileges

(a) An individual Member who has been granted floor trading privileges may voluntarily terminate such privileges. Such termination shall be effective upon receipt by the Exchange of a written notice of termination and floor trader's identification badge.

(b) The floor trading privileges of a suspended Member shall terminate at the time of his suspension.

## NYBOT MEMBERHIP LEASING AND TRANSFERS

### Rule 2.23. NYBOT Membership Leasing

(a) A NYBOT Membership may be leased to an individual, who has been granted floor trading privileges pursuant to Rule 2.21, in accordance with this Rule. A leased NYBOT Membership may be utilized for the limited purpose of trading on the Trading Floor in the Commodity Contracts the NYBOT Membership being leased would permit the Lessor to trade and in such other Commodity Contracts as may be specified by the Board from time to time. The Rules governing qualification for and maintenance of the NYBOT Membership shall apply in the case of any such Lessee.

(b) An application for approval of a lease must be accompanied by a nonrefundable application fee in the amount specified by the Board.

(c) The following provisions shall apply:

(i) All Rules shall continue to apply to the Lessor of the NYBOT Membership.

(ii) A Lessor shall be ineligible for floor trading privileges, or to confer Member Firm privileges, based upon the leased NYBOT Membership.

(iii) Leases must be in the standard form provided by the Exchange.

(iv) NYBOT Membership dues shall be paid by the Lessor, and a Lessee shall not be required to pay dues.

(v) A lease shall not become effective until it has been approved by the Exchange. Upon the Merger, as such term is defined in the Bylaws, all approved leases of extinguished equity memberships shall be deemed to apply to the NYBOT Memberships issued with respect to such equity memberships, and the Lessor and Lessees thereunder shall continue to be bound by such leases until the leases terminate or are terminated pursuant to the terms thereof.

(vi) The Lessor shall not be permitted to sell or transfer the leased NYBOT Membership unless otherwise specifically provided in the lease.

(vii) The Lessee shall not be entitled to exercise the rights or receive the benefits described in clauses (1) and (2) below on the basis of the leased NYBOT Membership:

(1) confer Member Firm privileges based upon the leased NYBOT Membership; or

(2) solicit, or accept an order from or execute a Transaction for any other Person unless the Lessee is a partner, shareholder or employee of a Member Firm.

(viii) Lessors and Lessees may serve on Exchange committees to the extent allowed by the Rules.

(d) Termination of Lease

(i) If a lease provides that it may be terminated prior to expiration, a party to the lease shall provide written notice of termination to the Exchange and the other party at least thirty (30) days in advance of the intended effective date of termination unless the lease agreement provides for a shorter notice period, provided, however, that in no event may a lease be terminated on less than fifteen (15) calendar days' notice to the Exchange and the other party.

(ii) A Lessee's floor trading privileges shall automatically be suspended ten (10) calendar days prior to the effective date of termination of a lease. If a Lessee enters into a new lease for a NYBOT Membership that has been approved by the Exchange, or a NYBOT Membership is transferred to the Lessee within forty-five (45) calendar days following receipt of notice of

termination by the Exchange, the Lessee's floor trading privileges shall be reinstated on the effective date of the new lease or of the transfer of such NYBOT Membership to the Lessee. A Lessee who has had floor trading privileges suspended hereunder shall incur a change of status fee which must be paid to the Exchange prior to the reinstatement of such privileges.

(iii) A lease shall automatically terminate upon the suspension or expulsion of the Lessor, the revocation of the leased NYBOT Membership as a result of the disposition of the Required Shares relating to the NYBOT Membership, or the suspension, expulsion or death of the Lessee. The Lessor shall give the Lessee and the Exchange at least fifteen (15) calendars prior written notice of any disposition of the Required Shares relating to any leased NYBOT Membership.

(e) Renewal of Lease

An agreement to renew an existing lease shall be submitted to the Exchange at least fifteen (15) calendar days prior to the expiration date of the existing lease. Failure of the parties to submit such renewal agreement shall cause the automatic suspension of the Lessee's floor trading privileges ten (10) calendar days prior to such lease expiration date unless a new lease agreement for a NYBOT Membership with another Lessor has been approved by the Exchange, or a NYBOT Membership has been transferred to such Lessee, prior to commencement of the ten (10) day period preceding the expiration of the lease. If the Lessee's floor trading privileges are suspended pursuant to the previous sentence, and if the Lessee receives Exchange approval of the renewal of an existing lease or of the lease of a NYBOT Membership to him or has a NYBOT Membership transferred to him during the ten-day period prior to expiration of an existing lease, the Lessee's floor trading privileges shall automatically be reinstated.

**Amended by the Board August 10, 2007; effective August 15, 2007.**

**Amended by the Board August 24, 2007, effective September 10, 2007.**

## NYBOT MEMBERSHIP SALES AND TRANSFERS

### Rule 2.24  Security Interest in Disposition of Proceeds from Sale of a Membership

(a) In becoming a NYBOT Member, each NYBOT Member grants to the Exchange for the benefit of the Exchange, the Clearing Organization, the Clearing Members and all other Members, a security interest in the Required Shares that he owns to satisfy the NYBOT Membership requirements of Section 1(a)(i) of Annex A to the Bylaws and the proceeds thereof, for the purpose of securing such Member's obligations under the Rules, including, without limitation this Rule 2.24. In the case of a NYBOT Member who is a party to an approved A-B-C Agreement with a Member Firm, the Member Firm may grant the required security interest in the Required Shares on behalf of the NYBOT Member. Each NYBOT Member (and Member Firm, if applicable) shall execute such documentation as may be required by the Exchange to evidence such security interest.

(b) The distribution by the Exchange of the proceeds from the sale of a NYBOT Membership and the corresponding Required Shares or of funds deposited with the Exchange pursuant to Rule 2.26(b) shall be made as follows:

(i) First, in satisfaction pro rata of any amounts which have been determined to be payable out of such proceeds or funds to the Clearing Member guarantor of the Member whose NYBOT Membership has been sold for Claims arising directly from (A) any payment by such guarantor pursuant to the Clearing Member guarantee, (B) the clearance by such guarantor of any Transaction executed by such Member on the Exchange or subject to the Rules, or (C) a

documented loan made to the Member by the Clearing Member guarantor for the express purpose of acquiring the NYBOT Membership.

(ii) Second, in satisfaction pro rata of any amounts which have been determined to be payable out of such proceeds or funds to other Members pursuant to paragraph (b) of this Rule with respect to Allowable Claims against the Member whose NYBOT Membership has been sold; provided however, that no partner shall share in the proceeds from the sale of a NYBOT Membership and corresponding Required Shares of one of his partners or in funds deposited by such partner with the Exchange pursuant to Rule 2.26(b), and no member of a limited liability company shall share in the proceeds of the sale of a NYBOT Membership and corresponding Required Shares of one of the members of such limited liability company or in funds deposited by such member with the Exchange pursuant to Rule 2.26(b), until all Allowable Claims filed by other Members and amounts owing to the Exchange and the Clearing Organization as provided in subparagraph (iii) have been satisfied in full;

(iii) Third, in satisfaction pro rata of any amounts that may be due to the Clearing Organization and the Exchange for dues, assessments, fees or fines; and

(iv) Fourth, to the person whose NYBOT Membership was sold, or to his legal representatives or assigns, upon the execution and delivery to the Exchange of a release or releases in form and substance satisfactory to the Exchange.

(c) Any Claimant holding an Allowable Claim against a Member whose NYBOT Membership is sold shall be entitled to participate in the proceeds of sale of such Membership and corresponding Required Shares or in the distribution of funds deposited with the Exchange by the transferor of such Membership pursuant to Rule 2.26(b) provided that:

(i) The Claimant shall have filed a Notice of Claim with the Exchange within ten (10) days after the Exchange shall have posted notice of the Exchange's receipt of the Notice of Intention to Transfer such Membership on the Exchange's website, or shall have timely filed with the Exchange the Claim Notice required by Rule 21.34 (if applicable); and

(ii) The Arbitration Committee shall have determined that such Claim is valid, in whole or in part, pursuant to this Rule.

(d) In the event any Claim is disputed, the Arbitration Committee shall proceed as though the disputing party had demanded arbitration; provided, however, that the disputing party shall pay the fee prescribed in the Arbitration Rules. The Arbitration Rules of the Exchange shall apply to such proceedings, except to the extent the Arbitration Committee may decide otherwise.

**Rule 2.25. General Transfer Procedure; Beneficial Interest**

(a) A NYBOT Member may transfer his NYBOT Membership only to another NYBOT Member or to a Member-Elect who will own the Required Shares (or otherwise satisfy the Required Shares requirement) as set forth in Section 1(a)(i) of Annex A to the Bylaws as of the effective time of the transfer, whether such Required Shares are to be purchased from the transferring Member or from another party. Such transfer shall become effective upon execution by the Exchange of a proper notation of the assignment of his NYBOT Membership on the records of the Exchange.

(b) The Exchange shall be entitled to treat the person in whose name any NYBOT Membership is registered on the books of the Exchange as the sole owner thereof, for all purposes, and shall not be bound to recognize any Claim to, or interest in, such Membership, except as provided in the Rules, on the part of any other Person, whether or not the Exchange shall have notice thereof.

(c) Notwithstanding the above, a NYBOT Membership may be considered an asset of a Member Firm by the Member Firm provided (i) such Member Firm enters into an A-B-C

Agreement with an individual NYBOT Member who is an officer, general partner or employee of such Member Firm or an Affiliated Firm and (ii) such A-B-C Agreement has been approved by the Exchange prior to becoming effective.

(d) A NYBOT Membership subject to the provisions of an A-B-C Agreement in accordance with this Rule may not be transferred unless and until the Member Firm that is party to such agreement submits written notice to the Exchange acknowledging notification of such transfer.

**Rule 2.26. Sole Membership Transfer Procedure**

(a) If a NYBOT Member wishes to transfer a NYBOT Membership and such Membership is the only NYBOT Membership owned by such Member, such Membership shall not be transferred unless and until:

(i) a "Notice of Intention to Transfer" signed by the NYBOT Member or his legal representative shall be given to the Exchange at least fifteen (15) days prior to the intended effective date of the proposed transfer. Such notice shall include the date on which the NYBOT Membership rights and privileges of the transferor shall cease and the date on which the transfer is to become effective. A NYBOT Membership subject to the provisions of an A-B-C Agreement may not be transferred unless and until the Member Firm that is party to such agreement submits written notice to the Exchange acknowledging notification of such transfer. The Exchange shall notify the Members of the receipt of such Notification of Intention to Transfer no less than ten (10) days prior to the intended effective date of such transfer by posting such notice on the Member Page of the Exchange's website;

(ii) Any investigation commenced by the Compliance Department with respect to such Member has been concluded and any resulting disciplinary actions have been completed;

(iii) All Claims of the Clearing Member guarantor of such Member, if any, arising directly from (A) any payment by such guarantor pursuant to the guarantee, or (B) the clearance by such Clearing Member guarantor of any Transaction executed by such Member on the Exchange or subject to the Rules, which in either case are filed with the Exchange within ten (10) days after the Exchange has posted notice of the receipt of the Notice of Intention to Transfer on the Member Page of the Exchange's website, have been paid or resolved in accordance with the Rules;

(iv) All Allowable Claims of Members against such Member filed with the Exchange within ten (10) days after the Exchange has posted notice of the receipt of the Notice of Intention to Transfer on the Member Page of the Exchange's website, have been paid or resolved in accordance with the Rules; and

(v) All dues and assessments levied by the Clearing Organization or the Exchange with respect to the NYBOT Membership sought to be transferred have been paid and all fines and fees imposed or charges assessed by the Clearing Organization or the Exchange against the NYBOT Member whose NYBOT Membership is to be transferred have been paid in accordance with the Rules.

(b) Notwithstanding the fifteen-day requirement in subparagraph (a)(i) of this Rule, subject to the approval of the President, a Notice of Intention to Transfer a Membership may be given to the Exchange less than fifteen (15) days prior to the intended effective date of the transfer and the conditions set forth in subparagraphs (a)(ii)-(v) need not be complied with, if the transferor deposits with the Exchange an Official Teller's check or similar instrument issued by a bank or such other financial institution as is acceptable to the Exchange payable to the order of the Exchange in an amount equal to the price of the last sale of a Membership of the same type as the Membership sought to be transferred or the last bid for such a Membership, whichever is higher, plus (ii) the

market value of the Required Shares corresponding to the Membership to be transferred. Upon receipt by the Exchange of such deposit the Membership may be transferred. The Exchange shall retain such deposit in its custody either for fifteen (15) days, or until such time as the provisions of paragraph (a) have been satisfied, whichever is longer. Such deposit shall be paid and applied in accordance with the provisions of Rule 2.24.

# DUTIES OF MEMBERS

### Rule 2.27. Duties of Member-Elect

(a) A Member-Elect shall within thirty (30) days after his election or such longer period of time as the President shall determine:

(i) sign an agreement in the form supplied by the Exchange to abide by the Rules and all amendments that may be made thereto; and

(ii) pay the Exchange such initiation fee as the Board may determine from time to time; and

(iii) secure a transfer or lease of a NYBOT Membership or Trading Permit to himself from another NYBOT Member or NYBOT Permit Holder; and

(iv) in the case of a NYBOT Membership, acquire the Required Shares as set forth in Section 1(a)(i) of Annex A to the Bylaws.

(b) Failure by a Member-Elect to secure to himself the Required Shares and a NYBOT Membership, a NYBOT Trading Permit or a lease of a NYBOT Membership, as applicable, within the period of time specified in or under paragraph (a) shall void the Member's election.

(c) Upon compliance with the provisions of paragraph (a) of this Rule within the period of time specified therefor, the Member-Elect shall automatically and without any further act become a Member in the category in which he was elected.

### Rule 2.28. Duties of All Members

(a) Each Member shall immediately notify the Exchange in writing at such time as he becomes aware of the occurrence of any of the following events:

(i) Election to or acquisition of membership in any other commodity or security exchange, or the acquisition of trading privileges thereon, or election to membership in any other self-regulatory organization;

(ii) Any material adverse change in financial condition;

(iii) Any material change in the Member's relationship with a guarantor;

(iv) Any refusal of admission to, withdrawal of any application for membership in, any suspension, expulsion, bar, fine, censure, denial of membership, registration or license, withdrawal of any application for registration, cease and desist order, temporary or permanent injunction, denial of trading privileges, or any other sanction or discipline through an adverse determination, voluntary settlement or otherwise, by a commodity or securities exchange, related clearing organization, the National Futures Association, the National Association of Securities Dealers, Inc., or any other self-regulatory organization or other business or professional association;

(v) Any refusal of admission to, withdrawal of any application for membership in, any suspension, expulsion, bar, fine, censure, denial of membership, registration or license, withdrawal of any application for registration, cease and desist order, temporary or permanent

injunction, denial of trading privileges or any other sanction or discipline through an adverse determination, voluntary settlement or otherwise by:

(1) the Securities and Exchange Commission, the CFTC or the securities commission or equivalent authority of any state, territory, the District of Columbia or foreign country or;

(2) any federal court, state court, or regulatory agency not mentioned above, quasi-governmental body;

(vi) Any conviction, finding of guilt, confession of guilt, plea of guilty or nolo contendere to a felony or misdemeanor charging misrepresentation, fraud, deceit, theft, embezzlement, gambling, conversion, abuse of a fiduciary relationship or other such act;

(vii) The issuance of a bar by any agency of the United States from contracting with the United States;

(viii) The issuance of a formal order of investigation (or its equivalent) or the commencement, by the issuance or service of a written complaint (or its equivalent), of any judicial, administrative or self-regulatory proceeding, as the case may be, against such Member by the CFTC, the Securities and Exchange Commission, the securities commission or equivalent authority of any state, territory, the District of Columbia or foreign country, or any commodity or securities exchange or related clearing organization, the National Futures Association, the National Association of Securities Dealers, or any self-regulatory organization or other business or professional association;

(ix) Any change in the office where papers may be served upon the Member or any change in the Exchange liaison designated pursuant to subparagraph (b) hereof;

(x) If an individual Member is employed by another Member who is the guarantor of such individual Member or upon whom such individual Member confers Membership privileges, any material change in the status of such individual Member's employment, including without limitation any termination, voluntary or otherwise, of his employment by such other Member; or

(xi) The existence of any interest of any other Person in his Membership.

(b) Each Member shall file with the Exchange (i) a written notice designating an office where papers may be served upon such Member; and (ii) if a partnership, corporation, limited liability company or other entity, a written notice designating an officer, employee, partner or member as the Exchange liaison, whom the Exchange may contact in order to obtain additional information or documentation in connection with any matter whatsoever provided in the Rules.

(c) Each Member shall promptly notify the Exchange's Membership Department in writing of any change in address of the Member. The most recent address of a Member as is on file in the records of the Membership Department shall be deemed to be said Member's current address for all purposes, including service of notices or other documents.

**Amended by the Board September 11, 2007; effective September 13, 2007 [¶ (b)].**

## Rule 2.29. Member Violations

It shall be a violation of the Rules for any Member to:

(a) Submit for clearance to a Clearing Member Transactions which were executed after an announcement was made on the Floor of the Exchange that such Clearing Member was in default, (as that term is defined in Clearing Organization Rules).

(b) Disseminate any false, misleading or knowingly inaccurate information, including reports concerning crop or market information or conditions that affect or tend to affect the price of any Commodity traded on the Exchange;

(c) Manipulate, or attempt to manipulate, the price of any Commodity traded on the Exchange;

(d) Furnish false information, or fail to furnish information when requested, to the Board or to any committee, subcommittee, officer or employee of the Exchange in the course of its, their, or his duties;

(e) Violate, or fail to conform to, the Rules or the procedures of the Exchange or the Clearing Organization, or to engage in conduct or practices inconsistent with just and equitable principles of trade or conduct detrimental to the best interests of the Exchange;

(f) Trade or accept Margins after insolvency;

(g) Corner, or attempt to corner, any Commodity traded on the Exchange;

(h) Violate, or fail to comply with, the terms of any agreement with the Exchange or any order or decision of or any suspension imposed by the Exchange, the Board or any committee or subcommittee of the Exchange, including, without limitation, any Hearing or Appeals Panel;

(i) Receive and execute an order if such Member is an associated broker who has not registered with the Exchange in accordance with the Rules;

(j) Commit fraudulent action on the Exchange;

(k) Execute a wash sale, accommodation Trade, fictitious sale or prearranged Trade;

(l) Accept a Commodity Contract account for (i) a Clerk of a Member registered with the Exchange, (ii) an employee of the Exchange, the Clearing Organization, or another Member, without the written consent of the employer in each case, or (iii) a non-member market participant who has been denied access to the Exchange's markets;

(m) Unless otherwise provided, gain access to the minutes of meetings of the Board or any committee except under such regulations as the Board may prescribe; provided, however, that notwithstanding any other provision in the Rules, all books, records, minutes and journals of proceedings of the Exchange, the Board and the committees of the Exchange, shall be subject to inspection by any authorized representatives of the CFTC or the United States Department of Justice;

(n) Fail continuously to meet the criteria for eligibility for Membership;

(o) (i) Make fictitious or trifling bids or offers, (ii) offer to buy or sell any Contract at variations less than the minimum price fluctuation permitted for such contract under the Rules, or (iii) knowingly make any bid or offer for the purpose of making a market price which does not reflect the true state of the market;

(p) clear Commodity Contracts on the Exchange or subject to the Rules for a Member or non-member Futures Commission Merchant, foreign broker or other such entity which does not disclose the identity of the ultimate Customer for whom the contracts are cleared, unless the Clearing Member has the authority and ability to provide the Exchange, promptly upon request by the Exchange, with:

(i) the name, address and telephone number of any ultimate Customer(s);

(ii) the name, address and telephone number of any intermediary Person through whom that ultimate Customer placed orders for the execution of such contracts; and

(iii) such other information concerning the account as the Exchange may request; including, but not limited to, the positions held by each ultimate Customer in the account; or

(q) register or conduct business as a Clerk on the Floor of the Exchange at any time during which the Member's registration under the Act as a Floor Broker is suspended by the CFTC.

### Rule 2.30. Reserved

### Rule 2.31. Duties of Guaranteed Member

Each Guaranteed Member shall notify his guarantor in writing of every commodity account which he maintains and the name of the Futures Commission Merchant maintaining that account, whether such account is maintained with a Member or non-member.

### Rule 2.32. Duties of all Members to Clearing Member Guarantors

(a) No Member that is an FCM shall open or accept Trades for an account for any Guaranteed Member without first obtaining the written authorization from the guarantor authorizing such Firm to open and accept Trades for such Guaranteed Member. Any Trades accepted for a Guaranteed Member without such authorization as specified hereunder shall release such Guaranteed Member's guarantor from any responsibility or liability for such accepted Trades.

(b) To facilitate compliance with this Rule, the Exchange shall publish from time to time a list of all Guaranteed Members.

### Rule 2.33. Duty to Supervise

(a) Every Member shall diligently supervise the Exchange-related activities of such Member's employees and shall be responsible for the acts and omissions of such employees.

(b) Every Member Firm shall diligently supervise the Exchange-related activities of its employees and of any Lessee who is a Principal of such Member Firm and shall be responsible for the acts and omissions of such employees and Lessees.

### Rule 2.34. Member Firm Reporting Requirements

(a) A Member Firm which is registered as a Futures Commission Merchant or which is a Clearing Member must submit to the Exchange, within ninety (90) days of the close of its fiscal year, or, in the case of an FCM that is also registered as a broker dealer, within sixty (60) days of the close of its fiscal year, a copy of its financial statement certified by an independent Certified Public Accountant.

(b) A Member Firm which is registered as a Futures Commission Merchant shall submit to the Exchange, as of the close of business each month, a statement of the computation of its net capital. Such statement shall be filed with the Exchange no later than seventeen (17) Business Days of the statement date.

(c) A Member Firm which is registered as a Futures Commission Merchant and for which the Exchange is the designated self-regulatory organization shall submit to the Exchange a copy of its Form 1-FR-FCM (as defined in Commission Regulation 1.10) for each fiscal quarter of each fiscal year including the final fiscal quarter of each fiscal year; provided, however, that a Member Firm which is registered with the Securities and Exchange Commission as a securities broker or dealer may elect to file a copy of its unaudited Financial and Operational Combined Uniform Single Report under the Securities and Exchange Act of 1934, Part II or Part IIA instead of the Form 1-FR-FCM. Each Form 1-FR-FCM for the fiscal quarter must be filed with the Exchange no later than seventeen (17) Business Days after the date for which the report is made. Filing the Form

1-FR-FCM with the Exchange does not relieve the Member Firm from filing the Form 1-FR-FCM with the Commission in accordance with Regulation 1.10.

### Rule 2.35. Service of Papers

(a) The service of papers upon a Member, or any written notification to the Exchange from a Member in accordance with the Rules may be made as follows:

(i) By personal delivery to the Member or an officer of the Member or, in the case of a notification to the Exchange, by personal delivery to the Secretary or such other officer of the Exchange as may be specified in the Rules;

(ii) By first class mail, postage prepaid, or express courier, delivery charges prepaid, in each case to the office or address on file with the Exchange or, in the case of a notification to the Exchange, to the principal office of the Exchange addressed to the Secretary or such other officer of the Exchange as may be specified in the Rules; or

(iii) By facsimile message ("FAX") to a FAX number on file with the Exchange or, in the case of notification to the Exchange, to the FAX number from time to time published by the Exchange for the purpose.

(b) Service of papers and written notification in accordance with paragraph (a) of this Rule shall be complete upon delivery, in the case of personal service, or express courier, two (2) days after depositing in the U.S. mail or, in the case of a FAX, upon receipt of confirmation of successful transmission from the transmission device.

**Amended by the Board September 11, 2007; effective September 13, 2007 [¶ (a)(ii) and (b)].**

### Rule 2.36. Reserved

### Rule 2.37. Expenses of Lawsuits Brought Against the Exchange by Members

Any Member who institutes a lawsuit or other similar proceeding against the Exchange, or any of its officers, Board of Governors or committee members, agents or employees in any court or otherwise and who fails to prevail in such lawsuit or proceeding shall pay to the Exchange and any such officer, member, agent or employee any and all reasonable expenses and disbursements, including attorney's fees and any statutory costs, incurred thereby in the defense of such lawsuit or proceeding.

### Rule 2.38. NYBOT Trading Permits

(1) Authorization

(a) The Board of Directors may issue the following NYBOT Trading Permits:

(i) FINEX® Trading Permits, which authorize the Permit Holder to trade Financial Contracts and Index Contracts;

(ii) Option Trading Permits, which authorize the Permit Holder to trade all Exchange Options; and

(iii) FINEX-Europe Trading Permits, which authorize the Permit Holder to trade only those Commodity Contracts that are listed by the Exchange for trading in Dublin, Ireland.

(2) Trading Limitations

(a) A Trading Permit issued hereunder authorizes the Permit Holder to:

(i) enter into proprietary trades in those Commodity Contracts which are authorized by the particular type of Permit held; and

(ii) execute from the Floor of the Exchange, for the account of other Persons, those Commodity Contracts which are authorized by the particular type of Permit held.

(b) A Permit Holder shall not execute or attempt to execute, or participate in any manner in any activity on the Floor of the Exchange involving Commodity Contracts other than those Commodity Contracts that are authorized by the Trading Permit held by him.

(c) A Permit Holder shall not represent by word or conduct that he is a Trading Member.

(3) Committee Membership

A Permit Holder may be elected or appointed to any Exchange committee as permitted by the Rules.

(4) Qualification for Trading Permit and Application Procedure

(a) Every applicant for a Trading Permit hereunder shall satisfy the qualifications specified in Rule 2.01.

(b) An applicant for a Trading Permit shall follow the application procedures specified in Membership Rules 2.03 through 2.08.

(5) Number of Authorized NYBOT Trading Permits

(a) The number of FINEX Trading Permits authorized hereunder is four hundred eighty-three (483).

(b) The number of Option Trading Permits authorized hereunder is one hundred thirty-nine (139).

(c) The number of FINEX-Europe permits authorized hereunder is one hundred twenty-five (125).

(6) Transfer of Trading Permit

Trading Permits may be transferred in accordance with the Rules regarding the transfer of Memberships (without reference to the Required Shares provisions).

**Amended by the Board January 24, 2007; effective February 2, 2007 [¶ (7)].**

**Amended by the Board July 24, 2007; effective August 2, 2007 [¶ (2)(a)(i) and (ii)].**

### Rule 2.39. Market Specialists

From time to time, the Exchange may adopt one or more Market Specialist Programs pursuant to which Market Specialists may be appointed and authorized to maintain two-sided markets for Commodity Contracts designated by the Board. To the extent that the terms of any such Market Specialist program may be in conflict with any Rules, such terms shall supersede such Rules; provided, however, that nothing in this Rule shall alter or waive a Member's responsibility to comply with provisions of the Act or the rules and regulations of the CFTC.

### Rule 2.40. Cross Margining Privileges

The Exchange may, upon application submitted in accordance with such procedures as it adopts from time to time, grant cross margining privileges to any Person that is a member or member firm of another designated contract market. The holder of such privileges shall be entitled to participate in any Cross Margining Program authorized under Clearing Organization Rule 502B, but only to the extent that the holder actively trades for his or its own account Exchange Futures Contracts or Options that are eligible for cross margining treatment under the terms of the Cross Margining Program. Cross margining privileges granted pursuant to this Rule shall not be transferable.

Adopted by the Board November 14, 2007; effective March 7, 2008.

## Rule 2.41. Exchange Broker Fee Payment Policy

(a) Whenever a Floor Broker or Member Firm provides written notice to a Clearing Member of the rate such Floor Broker or Member Firm charges for Trade execution services for a particular Customer, such Clearing Member shall thereafter pay such rate for any Trades which the Floor Broker or Member Firm gives up to, and which are accepted by, the Clearing Member for such Customer. In connection with all Transactions executed on the Exchange, any Member who provides Trade execution services and any Clearing Member for which such services are performed must utilize ATOM® ("Automatic Transfer of Money" System) to effect payment of brokerage fees. Payment for Trade execution services rendered by an employee, partner or shareholder of a Member Firm who is a Lessee must be effected through the bank account in the name of such Member Firm registered in the ATOM System. To comply with this Rule, a Member must file with the Membership Department an application in a form supplied by the Exchange.

(b) No Clearing Member may implement a rate change in ATOM® with respect to a Customer described in paragraph (a), above, unless a minimum thirty-day (30) written notice of rate change ("Notice Period") has been given to each and every Member affected by such change. No such rate change may become effective prior to the first of the month following the month in which expiration of the Notice Period occurs, unless agreed to in writing by the Floor Broker or Member Firm. Within fifteen (15) days following receipt of a notice of rate change, a Floor Broker or Member Firm may notify the Clearing Member in writing that such rate change is rejected. In the event that a Floor Broker or Member Firm provides such notice of rejection to a Clearing Member, the Clearing Member shall continue to pay the last rate specified in writing by the Floor Broker or Member Firm to the Clearing Member for any orders thereafter executed by the Floor Broker or Member Firm for each Customer in dispute.

(c) A Floor Broker or Member Firm may not change the rate charged to a particular Customer unless a minimum thirty-day (30) written notice of rate change has been given to the Clearing Member affected by such change. No such rate change may become effective prior to the first of the month following the month in which expiration of the Notice Period occurs, unless agreed to in writing by the Clearing Member.

(d) No rate change in ATOM implemented by a Clearing Member may be imposed retroactively.

## RESOLUTIONS

## No. 1 - Statement of Policy Concerning Conduct

The Board of Governors has been apprised of a growing incidence of Members acting in a discourteous manner towards Exchange officials—both staff and Members alike. In some extreme cases Members have engaged in verbal abuse and overtly threatening behavior towards Exchange officials.

By the order of the Board of Governors, the Members are hereby advised that such conduct is unacceptable and will be addressed by appropriate action, including possible disciplinary action under the Rules. Any Member who is dissatisfied with the way an employee or committee official is performing his or her function should bring the matter to the attention of the employee's supervisor or the relevant committee chairman.

**NEW YORK BOARD OF TRADE®**    M01

## APPLICATION FOR MEMBERSHIP

The undersigned hereby applies for membership on the Board of Trade of the City of New York, Inc. ("NYBOT").

1. Last Name Garcia _____ First Name Manoel _____ M.I. Fernando

   Date of Birth 11/21/1944 Citizenship Brazilian Social Security # _____

   Driver License ID # 02070322692 _____ State São Paulo _____

2. Home Address Rua Professor Artur Ramos, 339 - apto. 241 _____

   City São Paulo _____ State SP _____ Zip Code 01454-010 ____

   Country Brazil _____

3. Firm Name Cane International Corporation Ltd. _____

   Business Address Beaufort House - P.O.Box 438 _____

   City Road Town _____ State Tortola ____ Zip Code _____

   Country British Virgin Islands _____ E-Mail address: _____

4. Telephone Numbers:

   Home ( ) 11-3813-5686 Business ( ) 11-2177-2000 Mobile (Cell) 9981-8944 ____

5. Contact Information:
   (a) designate an office within the County of New York as a place where papers may be served upon you:

   Fimat Futures USA, Inc. _____

   (b) designate an address to receive notifications:

   630 Fifth Avenue, Suite 500 - New York, NY 10111 _____

6. If you are registered with the CFTC/NFA, indicate registration number and category: 40-735-01 ____

7. State the purpose of applying for membership (check all that apply):

   Non-Floor Trading Member [ ✓ ]    Floor Broker* [  ]    Local /Trader* [  ]

   Confer Member Privileges to my firm** [ ✓ ]
   If Conferring Privileges, state firm name: Cane International Corporation Ltd. ____

   \*   If you are applying for floor trading privileges, a completed Form F01 must accompany this application.
   \*\*  If you intend to confer member firm privileges, a completed Form C 01 and C02 must accompany this application.

8. List all bank accounts (i.e. PASSBOOK, CD, NOW, CHECKING, etc.) and all firms with which you have carried securities or commodities accounts during the past five (5) years. (If additional space is required, attach a separate sheet.)

| Firm/Bank Name | Full Address | Account No./Type | Dates opened/closed | |
|---|---|---|---|---|
| Banco do Brasil | Agency 3055-4 | 725000-2 | 05/2001 | still valid |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

9.    SCHEDULE OF FINANCIAL DATA

As of  Dec 31,2004

**CURRENT ASSETS:**

|  |  |  |
|---|---|---|
| 1. Cash in Banks (including certificates of deposit) (Note 1) | | US$ 162,383.73 |
| 2. US Government Obligations at Market (Note 2) | | 0 |
| 3. Municipal Obligations at Market (Note 2) | | 0 |
| 4. Securities at Market (Note 2) | | 0 |
| 5. Equity in Commodity Accounts (Note 3) | | 0 |
| 6. Trade Receivables, net of allowance for uncollectibles (Note 4) | Accounts Receivable | |
| | Notes and Loans Receivable | 0 |
| 7. Miscellaneous Current Assets (Note 5) | | US$ 536,253.42 |
| 8. Total Current Assets (Lines 1-7) | | US$ 698,655.16 |

**CURRENT LIABILITIES**

|  |  |  |
|---|---|---|
| 9. Deficit in Commodity Accounts (Note 3) | | 0 |
| 10. Trade Payables: (Note 4) | Accounts Payable | |
| | Notes and Loans Payable | 0 |
| 11. Other Current Payables (Note 6) | Credit Cards | |
| | Unsecured Loans | 0 |
| 12. State and/or Local Income Taxes | | 0 |
| 13. Federal Income Taxes Payable | | 0 |
| 14. Total Current Liabilities (Lines 9-13) | | 0 |
| 15. Net Worth (Line 8 less line 14) | | US$ 698,655.16 |

NOTES TO SCHEDULE OF FINANCIAL DATA*

Note 1:  Attach bank statements supporting cash balances indicated.
Note 2:  Attach account statements describing obligation, quantity and market value.
Note 3:  Attach commodity account statements.
Note 4:  Attach documentation for any trade receivable and/or payables listed. An uncollectible receivable is deemed to mean any receivable not collected within one month of it being accrued.
Note 5:  Miscellaneous current assets may include any other asset listed in categories 1-6 which is readily marketable.  Attach a detailed list showing description and market value of any asset you elect to include under this category.
Note 6:  List any other liabilities which are currently due and payable such as credit cards, school loans and unsecured loans.
**\*Supporting documentation is not required if financial data is certified by a CPA.**
10. List the names of employers within the last ten (10) years. Include current employer, previous employment and college attendance. Include post-secondary education if it occurred within the last ten (10) years.

| From Mo./Yr. | To Mo./Yr. | Business Name, Address And Telephone Number | Nature of Business | Position Held | Reason for Leaving |
|---|---|---|---|---|---|
| | | See Attachment I | | | |
| | | | | | |
| | | | | | |
| | | | | | |

11. List the educational institutions you have attended starting with the most recently attended and include graduate school, specialized training, college, and high school.

| Institution | Dates (From/To) | Address | Degree Earned |
|---|---|---|---|
| | | See Attachment I | |
| | | | |
| | | | |
| | | | |

12. List the U.S. commodity exchange(s) of which you are currently a member, and any exchange of which you were a member within the last ten (10) years. If you currently have floor trading privileges on a particular exchange, please specify the name of your guarantor and the badge number and alpha code for each such membership.

| Exchange | Dates (From/To) | Guarantor | Badge Number | Alpha Code |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

13. Give a brief explanation of the extent and nature of your experience in the futures and/or physical commodities industry.

See Attachment (III) _____

_____

14. What type **AND** how will you obtain your membership or permit? (Check One of Each):

TYPE | TO BE OBTAINED BY

[✓] Membership
[ ] Option Trading Permit
[ ] FINEX® Trading Permit
[ ] FINEX® European Trading Permit

[ ] Transfer from _____
[✓] Bid for a Membership/Permit in the Exchange's open market
[ ] Lease agreement with _____
**NOTE: Lessees who are not employed by or who are not a principal of a member firm may not execute customer orders.**

Whose funds will be used to purchase the membership or permit? _____

15. If you are an employee of a member firm which is having the membership/permit transferred to you, will the membership or permit be subject to an ABC agreement?    [ ] YES    [✓] NO
**If yes, a completed Form S 06 must accompany this application**

> *For questions 16-25 if the response is "yes" please provide an explanation and the details, including dates, of the matter to which the question pertains.*

16. Are you aware of any pending or outstanding lawsuits, or claims against, or investigations of, any persons which arise from your business dealings?    [ ] YES    [✓] NO

17. Has a surety company ever refused you a bond or has a surety company ever paid against your account?    [ ] YES    [✓] NO

18. Are you permanently or temporarily enjoined by order, judgement or decree of any court of competent jurisdiction, the Securities and Exchange Commission ("SEC") or the Commodity Futures Trading Commission ("Commission" or "CFTC") from engaging in or continuing any conduct or practice in connection with the purchase or sale of commodities or securities?    [ ] YES    [✓] NO

19. Are you or have you ever been subject to an order of the Commission denying trading privileges on any contract market, or suspending or expelling you from membership on any contract market?

      ☐ YES    ☑ NO

20. Are you or have you ever been suspended or expelled from any commodity or securities exchange, related clearing organization, registered futures association, the National Association of Securities Dealers, Inc., or any other self-regulatory organization or other business or professional association for violation of any rule of such organization?

      ☐ YES    ☑ NO

21. Have you ever been the subject of any of the following events: a refusal to admit, withdrawal or revocation of any registration or license, withdrawal of any application for membership, cease and desist order, temporary or permanent injunction, denial of trading privileges, or the imposition of any sanction or discipline through an adverse determination or voluntary settlement, any suspension, expulsion, bar, fine, censure, denial of registration or membership, or otherwise

    (i)    by a commodity or securities exchange, related clearing organization, registered futures association, the National Association of Securities Dealers, Inc., or any self-regulatory organization or other business or professional association?

      ☐ YES    ☑ NO

    (ii)    by the SEC, the CFTC or the securities commission or equivalent authority of any state, territory, the District of Columbia or foreign country?

      ☐ YES    ☑ NO

    (iii)    any federal court, state court, quasi-governmental body or regulatory agency not mentioned above?

      ☐ YES    ☑ NO

22. Have you ever been convicted or found guilty of any felony or misdemeanor?

      ☐ YES    ☑ NO

23. Have you ever been barred by any agency of the United States from contracting with the United States?

      ☐ YES    ☑ NO

24. Are you aware of the issuance of a formal order of investigation (or its equivalent) or the commencement, by the issuance or service of a written complaint (or its equivalent), of any judicial, administrative or self-regulatory proceeding, as the case may be, against you by the CFTC, the SEC, the securities commission or equivalent authority of any state, territory, the District of Columbia or foreign country, or any commodity or securities exchange or related clearing organization, or any registered futures or securities association, or any self-regulatory organization or other business or professional organization?

      ☐ YES    ☑ NO

25. Have you ever, either individually or as a principal, been subject to any liquidation, arrangement, reorganization, receivership, assignment for the benefit of creditors or other bankruptcy or insolvency proceeding, under state or federal law, within the past ten (10) years?

      ☐ YES    ☑ NO

**I understand that the Exchange may conduct, or cause to be conducted, an investigation of my financial status, character, general reputation and business history, and I hereby give the Exchange permission to request any such information.**

**I hereby agree that, if I am accepted as a member of the Exchange, I will observe and be bound by and will comply with all the provisions of the certificate of incorporation, by-laws, rules, resolutions, orders, decisions, awards, requirements and procedures of the Exchange as now in effect, hereafter adopted or amended.**

**I certify that the information contained in this application and any attachments hereto is true, complete and accurate. I agree to notify the Exchange of any changes which may hereafter occur with respect to any information requested in the application.**

                                      April 11th, 2005

_____      _____
     **Signature of Applicant**                         **Date**

     **The applicant is required to appear before the Membership Committee when notified to do so. Failure of the applicant to appear will be understood to be a withdrawal by the applicant of the application.**

# ATTACHMENT I

# MANOEL FERNANDO GARCIA – PROFESSIONAL EXPERIENCE

1) My first important job, at Matarazzo Group, where I started my professional carrier, was to run Amalia Farm, a state-of-the-art facility at that time. In sugar and alcohol, besides producing cardboard from the crushed cane, citric acid (the only one in South America at that time), also from sugar, raising high quality cattle (pure Charolez and Nelore) and irrigating intensively the sugar fields, something almost unusual at that time, modernizing the mill with French, German and Brazilian machinery, turning it into a model and reference for the sector (nowadays not anymore!), the Farm counted with its own huge hydroelectric power-station, a immense dam for irrigation and it was something really special in Brazil.

2) In the beginning of 70´s, I worked actively with alcohol, organizing a  pool of exporters to sell to Japan, aggregating 28 mills, which, during some years exported near 100 million liters/year to that market;

3) Still during the 70's, we also organized a molasses export pool (when the prices were good!) and we annually exported hundreds of millions of tons to various destinations; in both cases above I coordinated the pool;

4) In the 80´s, as an adviser to Alagoas' Cooperative, I helped them to organize their exports to Tate & Lyle, creating the special crystal sugar, in spite of IAA being monopolizer of Brazilian exports (the IAA agreed with the operation);

5) In the 70´s, I created the project and implemented for Usina São José, in Pernambuco, the first big ethanol factory (back then!), introductory of Proálcool, obtaining financing from Banco do Brasil, in a line called "Proterra Industrial", which later on became Proálcool.

6) As Fluxo, we participated in dozens of Proálcool projects in São Paulo, Rio de Janeiro, Minas Gerais and also in the Northeast, either in the technical aspect or in the technical and financial aspects jointly;

7) In the 70´s and 80´s, we participated actively in the implementation of new facilities of Usinas Petribú – PE, Matari – PE, Laranjeiras – PE, Trapiche –Pe,

Pumaty - PE, Coruripe-AL, Caeté-AL, Serra Grande-AL, Junqueira-SP, Santa Lina –SP, São João-RJ, etc, etc;

8) During all its existing period, Fluxo has intermediated sale and purchase operations in the cement industry, pottery, glass and sugar and alcohol. In this last segment, we supported the operations of purchase, sale and implementation of Cachoeira and Marituba mills in Alagoas (for Caeté), Trapiche-PE (twice – one for Brennand's group and another for Andrade Bezerra Group), Água Limpa-SP (for Petribú), Delta-MG (for Caeté), Santana-PB (for Agroval), Serra e Barra –SP (for Cosan), etc, etc.
Auke, the support was from "making everything" to even assist in the decisions, indicating lawyers, administrators, technical experts, etc, etc, including the negotiation of issues concerning pre-existing commercial transaction.
Each case was a different one.

9) Still in the sugar area, the current embryo of Cosan's terminal was born here as it was planned to be an association of Cosan / Phibro / Fluxo.
I worked directly in the construction of the current Empat (Alagoas' terminal) in 1970.
The current Temap, at Suape, for liquids in bulk, also had our help and nowadays it is a success, belonging to Trapiche, Olho D' Água and Ipojuca;

10) Fluxo, in the 1970's and 1980's, rendered services to 120 mills, which received financing and/or corporate/accounting consulting (today this activity has almost stopped by lack of time and motivation).
We gave full support to the consolidation process of Cosan Group, in the shareholding, financial and logistical aspects, and up to 1996 we traded in the name of the group all their exports (included pricing).
The Center-South VHP sugar itself is "made in Fluxo", the polypropylene / polyethylene brown bags for white sugars, idem, and now we are giving support to Maceió and Recife to launch the VHP production as well;

11) With Phibro, we operated actively with alcohol and oil derivates, besides sugar, also selling to Petrobrás USA (in joint account in some cases), selling here in Brazil and also exporting from Brazil (even fine alcohol);

12) Today, we help in "n" cases Única, in commercial, legal, strategic and stock exchange aspects.

## EDUCATIONAL INSTITUTIONS

1- GINÁSIO "NOGUEIRA DA GAMA" – HIGH SCHOOL
   GUARATINGUETÁ – SÃO PAULO – BRAZIL – CONCLUDED IN 1955/1959

2- DEPARTAMENTO DA PRODUÇÃO ANIMAL DA SECRETARIA DA
   AGRICULTURA
   CURSO DE SUINOCULTURA – SERTÃOZINHO – BRAZIL – CONCLUDED
   IN 1961

3- UNIVERSIDADE DE SÃO PAULO - UNIVERSITY
   FACULDADE DE MEDICINA VETERINÁRIA
   INSTITUTO DE ZOOTECNIA E INDÚSTRIAS PECUÁRIAS " FERNANDO
   COSTA" – CURSO DE LATICÍNIOS
   SÃO PAULO / BRAZIL – CONCLUDED IN 1962

4- I CONGRESSO LATINO-AMERICANO DE MINERALURGIA
   CIDADE UNIVERSITÁRIA ARMANDO DE SALLES DE OLIVEIRA SÃO
   PAULO
   CONCLUDED IN 1970

## Quem é Quem no Setor

Manoel Fernando Garcia, empresário e administrador de empresas, é diretor-presidente e principal acionista da S/A Fluxo - Comércio e Assessoria Internacional, empresa constituída em 1975 que atua como trading company no comércio internacional de commodities e produtos agrícolas, notadamente com açúcar, álcool e o melaço. Iniciou sua carreira nas Indústrias Reunidas F. Matarazzo, onde atingiu o cargo de diretor geral da divisão de mineração e diversos. Foi também vice-superintendente do Grupo Votorantim, respondendo por diversas unidades de negócios no Norte-Nordeste e em São Paulo. Em ambos os grupos, teve atuação expressiva no setor sucroalcooleiro, merecendo destaque seu trabalho de organização de pools de produtores para a exportação de álcool e melaço a partir do fim dos anos 60.

Como vice-presidente da Fives Lille do Nordeste, desempenhou papel relevante na implantação del terminal açucareiro de Alagoas, além de ter participado da instalação de dezenas de unidades produtoras de açúcar e álcool em todo o país. Foi acionista e diretor da Socôco S/A Indústrias Alimentícias, bem como foi consultor e membro de conselhos de administração de importantes empresas nacionais.

Atualmente, integra o grupo brasileiro de estudos para a atualização das Sugar "11"e "5"Rules, bem como auxiliou na estruturação do contrato de álcool da NYBOT (New York Board of Trade).

## Who's who in the Sector

Manoel Fernando Garcia, businessman and company administrator, is director president and main shareholder of S/A Fluxo - Comércio e Assessoria Internacional (Trade and International Consultants), a company founded in 1975 that operates as a trading company in the international commodity and agricultural products market, mainly with sugar, ethanol and molasses. He began his career in the Indústrias Reunidas F. Matarazzo, where he reached the position of general director of the mining division. He was also vice superintendent of the Votorantim Group, responsible for several business units in the North/Northeast and in São Paulo. In both groups, he had an expressive role in the sugar and ethanol sector, with special highlight on his success in organizing pools of producers for exporting ethanol and molasses starting at the end of the 60's.

As vice president of the Fives Lille do Nordeste, he played an important part in establishing a sugar outlet in Alagoas, besides participating in the installation of dozens of sugar and ethanol productive plants throughout the whole country. He was a shareholder and director of Socôco S/A Food Industries, as well as consultant and member of administrative boards of important national companies.

At present, he is part of the Brazilian study group whose task is to update the Sugar "11" and "5" Rules, and also helped draw up ethanol contract of the NYBOT (New York Board of Trade).

# Fluxo sees a promising future

At the head of Trading Company S/A Fluxo, Manoel Fernando Garcia, one of the most active businessmen in the sugar and ethanol sector, analyzes optimistically the growth of sugar and ethanol exportations and the modernization of the sugar factories. In his professional background, the executive had an important role in the establishment of the sugar outlet in Alagoas and of dozens of productive sugar and ethanol plants in several regions in Brazil. In the public sphere, he presided over the CVM - Comissão de Valores Mobiliários (Securities and Exchange Commision of Brazil) and was a consultant for the Fundo Nacional de Desenvolvimento (National Fund for Development), Conselho de Recursos do Sistema Financeiro Nacional (Board of National Finance System Resources), among others. He also assisted the elaboration of the ethanol contract of the NYBOT (New York Board of Trade).

In the following interview, he makes an analysis of the market, both domestic and foreign, showing that his optimism can also be proved through figures and statistical data.

**Ethanol Guide - What kind of participation does S/A Fluxo have in the sugar and ethanol market?**

**Manoel Fernando Garcia -** Fluxo, for its own interests and also representing those of other,

has been the representative of 12 to 14% of Brazilian sugar exports. In this year's harvest, it will participate directly in the exportation of nearly 2 million tons of sugar, working with all types of the product (VHP, demerara or raw, refined and crystal). It is actually the largest sugar originating trading company (Brazilian owned) and the third largest in the general ranking of the tradings that operate here.

**How do you analyze the present situation of this market? And what about the future of this segment in the domestic and foreign levels?**

The sugar sector went through extremely difficult times, consolidating itself and increasing quantities, improving quality, logistics and port facilities. The progress up to now has been amazing and now that it has gained solidity, it will certainly grow over the next years, increasing sugar and ethanol exportations, ready to take better advantage of the domestic market, and now apparently starting a new cycle of growth, which will bring an increase of domestic sugar consumption and, even more rapidly, of ethanol, benefiting from new models of cars and from the high price of petroleum. The recent Brazilian victories over subsidies given by first world countries to sugar, although still waiting to be implemented, open new perspectives for the sector in Brazil, which has, undeniably up to now, the lowest production cost in the world. New sugar and ethanol factories spring up every day, sometimes in traditional sugar cane regions, others in new regions, generating a notable increase of jobs, due to being an activity that has

a high labor demand.

**Is corn ethanol a competitor at the same level as Brazilian sugar cane ethanol?**

Ethanol extracted from corn is barely surviving, although at the present it is experiencing an authentic boom, due to the protection the North American government bestows on it, especially by means of the prohibitive importation tax. But the North American demand for ethanol is enormous and Brazil has every means necessary to expand its participation in that market.

**To which countries and in what volumes is Brazil exporting these products?**

In this year's harvest, Brazil expects to export over 16,500,000 tons of sugar and between 1,600,000,000 and 1,800,000,000 liters of ethanol and alcohol for various applications. These Brazilian products have been entering almost all the importing countries. This year (2004), according to Secex (Secretariat of Foreign Commerce), Brazil has already exported more than 1 billion liters of ethanol, taking quick advantage of the "price time" between the domestic ethanol market and the gasoline market in the United States. The United States, directly and indirectly (by means of reprocessing in the Carribean region), are the main receivers, but Brazil is also exporting to Japan, to North and South Korea, to Singapore, India, Sweden, Finland, Switzerland, Holland, Portugal, Turkey, Nigeria, Ghana, Togo, Angola, Serra Leoa, Camaroon, Argentina, Chile, Paraguay, Uruguay, Bolivia, Venezuela, among other countries.



*Ethanol Guide*

# Fluxo vê futuro promissor

À frente da Trading Company S/A Fluxo, Manoel Fernando Garcia, um dos mais atuantes empresários do setor sucroalcooleiro, analisa com otimismo o crescimento das exportações de açúcar e álcool e da modernização das usinas. Em sua trajetória profissional, o executivo teve papel relevante na implantação do terminal açucareiro de Alagoas e de dezenas de unidades produtoras de açúcar e álcool em diversas regiões do Brasil. Na área pública, presidiu a CVM - Comissão de Valores Mobiliários e foi conselheiro do Fundo Nacional de Desenvolvimento, Conselho de Recursos do Sistema Financeiro Nacional, entre outros. Auxiliou ainda a estruturação do contrato de álcool da NYBOT (New York Board of Trade).



Na entrevista a seguir, ele faz uma análise do mercado, interno e externo, demonstrando que seu otimismo também pode ser comprovado com números e dados estatísticos.

**Ethanol Guide - Como é a participação da S/A Fluxo no mercado sucroalcooleiro?**

**Manoel Fernando Garcia -** A Fluxo, em conta própria e por representação, vem representando de 12% a 14% das exportações brasileiras de açúcar. Nesta safra deverá ter participação direta na exportação de aproximadamente 2 milhões de toneladas de açúcar, trabalhando com todos os tipos de produto (VHP, demerara, refinado e cristais). É, de fato, a maior trading originadora (de capital brasileiro) de açúcar e a terceira no cômputo geral das tradings que operam aqui;

**Como o Sr. analisa a situação atual desse mercado? E quanto ao futuro desse segmento nos âmbitos interno e externo?**

O setor açucareiro ultrapassou anos extremamente difíceis, consolidando-se e ampliando quantidades, melhorando qualidade, logística e instalações portuárias. Foi notável a progressão e agora, mais sólido, fatalmente irá crescer ao longo dos próximos anos, aumentando exportações de açúcar e de álcool, a par de se aproveitar do mercado interno, ora aparentemente iniciando um novo ciclo de crescimento, o qual deverá trazer aumento do consumo interno do açúcar e, mais aceleradamente ainda, do álcool, beneficiário dos novos modelos de carros e do alto preço do petróleo. As últimas vitórias brasileiras contra os subsídios concedidos ao açúcar pelo primeiro mundo, embora ainda carentes de implementação, abrem novas perspectivas para o setor no Brasil, indiscutivelmente, até o momento, com o menor custo mundial de produção.

Novas unidades surgem a cada dia, quer em regiões tradicionais de cana, quer em novas regiões, gerando aumento significativo de empregos, por ser uma atividade de alta demanda de mão-de-obra.

**O etanol de milho é um concorrente a altura do álcool brasileiro?**

O etanol, a partir do milho apenas sobrevive, e ora está vivendo um autêntico "boom", em função da proteção que o governo norte americano lhe confere, notadamente através do proibitivo imposto de importação. Mas a demanda norte americana por álcool é enorme e o Brasil possui todas as condições para ampliar sua participação nos EUA.

**Para quais países e em em volumes o Brasil está exportando?**

Nesta safra, o Brasil deverá exportar acima de 16.500.000 de toneladas de açúcar e entre 1.600.000.000 a 1.800.000.000 de litros de álcool para diferentes usos. Esses produtos brasileiros vêm entrando em quase todos países importadores. Neste ano (2004), segundo a Secex (Secretaria do Comércio Exterior), já se exportou mais de 1 bilhão de litros de álcool, inclusive aproveitando-se rapidamente do "momento de preço" entre o mercado interno de álcool e o da gasolina nos Estados Unidos. Os Estados Unidos, direta e indiretamente (via reprocessamento na região do Caribe) são os principais recebedores, mas O Brasil está exportando também para o Japão e para as duas Coréias, para Cingapura, Índia, Suécia, Finlândia, Suiça, Holanda, Portugal, Turquia, Nigéria, Gana, Togo, Angola, Serra Leoa, Camarões, Argentina, Chile, Paraguai, Uruguai, Bolívia, Venezuela, dentre outros países.

## ATTACHMENT II

## SCHEDULE OF FINANCIAL DATA - DEC. 31ST, 2004

| ITEM | DESCRIPTION | REAIS R$ | EXCHANGE RATE | US$ |
|---|---|---|---|---|
| | **CURRENT ASSETS:** | | | |
| 1 | Cash in Banks + applications | 430.901,47 | 2,6536 | 162.383,73 |
| 2 | US Government Obligations in Market | 0,00 | 0,0000 | 0,00 |
| 3 | Municipal Obligations at Market | 0,00 | 0,0000 | 0,00 |
| 4 | Securities at Market | 0,00 | 0,0000 | 0,00 |
| 5 | Equity in Commodity Accounts | 0,00 | 0,0000 | 0,00 |
| 6 | Trade Receivables | 0,00 | 0,0000 | 0,00 |
| 7 | Miscellaneous Current Assets: | | | |
| | a- Real States | 309.815,89 | 2,6536 | 116.753,05 |
| | b- Art Collection | 865.338,96 | 2,6536 | 326.100,00 |
| | b- Equities from Brazilian Companies | 93.900,00 | 2,6536 | 35.385,89 |
| | c- Miscellaneous | 153.995,00 | 2,6536 | 58.032,48 |
| | | | | |
| 8 | **Total Current Assets** | **1.853.951,32** | | **698.655,16** |
| | | | | |
| | **CURRENT LIABILITIES:** | | | |
| 9 | Deficit in Commodity Accounts | 0,00 | 0,00 | 0,00 |
| 10 | Trade Payables | 0,00 | 0,00 | 0,00 |
| 11 | Other Current Payables | 0,00 | 0,00 | 0,00 |
| 12 | State/Local Income Taxes | 0,00 | 0,00 | 0,00 |
| 13 | Federal Income Taxes | 0,00 | 0,00 | 0,00 |
| | | | | |
| 14 | **Total Current Liabilities** | **0,00** | | **0,00** |
| | | | | |
| 15 | **Net Worth** | **1.853.951,32** | | **698.655,16** |

## ATTACHMENT III

### MARKET EXPERIENCE

Cane has been operating in futures and physical commodities since its foundation, in 1993, in an expressive and increasingly volume. Its experience, added to its attorney-in-fact's, covers more than 30 years in sugar production activities, alcohol, sugar-cane syrup/molasses and its derivatives, with a wide performance in the futures of these products, besides other commodities like soybean, cocoa, oil derivatives and shares. Its attorney-in-fact operated also as director and president of "Comissão de Valores Mobiliários", being very familiar with market rules and its mechanisms of protection, as well as its implied responsibilities.

In the current 2004/2005 crop, Cane has traded approximately 2.500.000 mt of VHP, crystal and refined sugar, being one of the three main purchasers of these products in Brazil. It operates also in the preferential North-American market (CQE's) – NY # 14.

# PLEDGE ADDENDUM

1.  I hereby grant to The Board of Trade of the City of New York, Inc., a Delaware corporation ("New NYBOT"), for the benefit of New NYBOT, its subsidiary New York Clearing Corporation, a New York corporation ("NYCC"), all Clearing Members and all other Members of the Exchange, a security interest in __3162__ shares of the common stock of IntercontinentalExchange, Inc. (the "Shares") and all "proceeds" (as defined in Section 9-102(a)(64) of the Uniform Commercial Code as in effect in the State of New York (the "UCC")) (collectively, the "Collateral"), as collateral security for the timely performance of (a) my obligations under the By-laws and Rules of New NYBOT, and under the by-laws and rules of the Board of Trade of the City of New York, Inc., a New York corporation, which has been merged into New NYBOT ("Old NYBOT"), (b) the obligations of any Firm with respect to which I have executed a Conferring Agreement under such by-laws and rules, under such Conferring Agreement, under any A-B-C Agreement between me and any such Firm, and under the bylaws and rules of NYCC, and (c) my obligations and covenants hereunder (together, the "Obligations").

2.  In connection with the forgoing grant of security interest, and in order that such security interest may be perfected by "control" pursuant to Sections 9-314(a), 9-106(a) and 8-106(d)(2) of the UCC, I hereby agree to be bound by the Uncertificated Securities Master Control Agreement, dated as of December 14, 2006, between New NYBOT and IntercontinentalExchange, Inc.

3.  I hereby represent and covenant that I have duly executed and delivered to New NYBOT the Member Agreement and this Pledge Addendum and that such agreement and this Pledge Addendum constitute legal, valid and binding obligations, enforceable against me in accordance with their terms.

4.  I will not grant, or suffer to exist, any interest in the Collateral adverse to the security interest of New NYBOT therein, including without limitation any "adverse claim" (as defined in Section 8-102(a)(1) of the UCC) thereto.

5.  Upon my failure to timely perform any of the Obligations, New NYBOT shall have, in addition to any rights that it or NYCC may have under the by-laws and rules of New NYBOT, Old NYBOT and NYCC, the rights of a secured party under the UCC and other applicable law and, in furtherance of the foregoing, New NYBOT may realize upon and dispose of the Collateral in such manner as it deems advisable for the benefit of New NYBOT, NYCC, all Clearing Members and all other Members of the Exchange.

6.  Any capitalized terms used but not defined herein shall have the meanings ascribed thereto in the By-laws and Rules of New NYBOT.

**IN WITNESS WHEREOF,** I have executed this Pledge Addendum on this __10__ day of __January__, 2007.

_____
[Name of NYBOT Member]

MANOEL F GARCIA

**NEW YORK BOARD OF TRADE®**                                         C01

### APPLICATION TO RECEIVE MEMBER FIRM PRIVILEGES

The undersigned hereby applies for member firm privileges on the Board of Trade of the City of New York, Inc. (hereinafter referred to as the "Exchange".)

1. Name of Firm  **Fluxo-Cane Overseas Ltd.** _____

2. Tax ID #: _____

3. Address of principal place of business: **2nd Floor, Abbot Building, Road Town,**

   **Tortola, British Virgin Islands** _____

4. Please supply the following information regarding the member(s) requesting to confer privileges upon the firm:

| Name | Title | Authority exercised over the affairs of the firm with respect to the Exchange | Membership Type and Number |
|------|-------|-------------------------------------------------------------------------------|----------------------------|
| **Manoel Fernando Garcia** | **President** |  | **Seat A151** |
|  |  |  |  |

5. Form of organization (corporation, partnership, LLC or other): **Corporation** _____

6. The Firm is __✓__ is not _____ [check one] registered with the Commodity Futures Trading Commission in the following capacity or capacities: **Sugar Trading Company** _____

7. Nature of the Firm's business: **Trading of Sugar and Alcohol** _____

8. Organizational Information

   A. **FOR PARTNERSHIPS**

   List the names and addresses of all general partners, including the partner requesting to confer membership privileges on the firm:

| Name | Address |
|------|---------|
|  |  |
|  |  |
|  |  |

(If more space is needed, attach additional pages(s) as necessary.)

B. **FOR CORPORATIONS**

(1) List the names and addresses of all stockholders, or if the firm is publicly traded, list of the names and addresses of all persons owning directly or indirectly 10% or more of the capital stock of the Corporation:

| Name | Address | Percentage of Stock |
|---|---|---|
| Manoel Fernando Garcia | Rua Dr. Renato Paes de Barros, n. 778, | 100% |
| | 1° andar, Sao Paulo - SP, Brazil | |
| | | |
| | | |

(2) List names, titles and addresses of all officers and directors of the corporation:

| Name | Title | Address |
|---|---|---|
| Please see additional | | |
| page attached to this | | |
| Application | | |
| | | |

C. **FOR LIMITED LIABILITY COMPANIES**

(1) List the names and addresses of all members of the LLC and their respective percentage of ownership:

| Members' Names | Address | Percentage Ownership |
|---|---|---|
| | | 100% |
| | | |
| | | |
| | | |

(2) List the names and titles of the officers and managers of the LLC:

| Names | Titles |
|---|---|
| | |
| | |
| | |

**IF THE ANSWER TO ANY PART OF QUESTIONS 8-15 IS "YES", PLEASE PROVIDE A COMPLETE EXPLANATION.**

8.  Is the applicant or has any officer, director, owner of 10% or more of the outstanding stock, member, manager, or general partner thereof currently, or in the past 10 years, subject to a suspension, expulsion, bar, fine, censure, denial of membership or registration, cease and desist order, temporary or permanent injunction, denial of trading privileges or other sanction or discipline through an adverse determination, voluntary settlement or otherwise by:

 (i)   the Securities and Exchange Commission, the Commodity Futures Trading Commission, or the securities commission or equivalent authority of any state, territory, the District of Columbia or foreign country?

 ____YES    ✔ NO

 (ii)  Any commodity or securities exchange related clearing organization, the National Futures Association or the National Association of Securities Dealers ("NASD")?

 ___YES    ✔ NO

 (iii) any federal or state court, regulatory agency (not mentioned above), quasi-governmental body or professional association based upon activities relating to commodities, securities, banking, insurance, real estate, finance, accounting or legal representation?

 ___YES    ✔ NO

9.  Has any officer, director, owner of 10% or more of the outstanding stock, member, manager, or general partner in the past 10 years been convicted, or been found guilty of, or pleaded guilty or nolo contendere to a felony?

 ___YES    ✔ NO

10. Has any officer, director, owner of 10% or more of the applicant in the past 10 years been convicted, or been found guilty of, or pleaded guilty or nolo contendere to a misdemeanor charging misrepresentation, fraud, deceit, theft, embezzlement, gambling, conversion, abuse of fiduciary relationship or other action involving the misuse of the funds or property of others?

 ___YES    ✔ NO

11. Has a complaint, counterclaim or cross complaint been filed against the applicant in the past 10 years in any civil proceeding or Commodity Futures Trading Commission reparation proceeding charging misrepresentation, fraud, deceit, theft, abuse of a fiduciary relationship or other action involving the misuse of funds or property of others which resulted in a judgment against the applicant with respect to such charge?

 ___YES    ✔ NO

12. Has the applicant EVER (not limited to the past 10 years) been barred by any agency of the United States from contracting with the United States?

 __YES    ✔ NO

13. Has the applicant ever been insolvent, made a compromise with creditors, been a debtor in any case under the U.S. Bankruptcy Code or any other law for the relief of insolvent debtors, or been in receivership of any federal or state court?

 ___YES    ✔ NO

14. Has the applicant ever withdrawn an application for membership from a commodities or securities Exchange, related clearing organization, registered futures association, the NASD or any self-regulatory organization or other business or professional association?         ___YES   ✓ NO

15. Has the applicant or any officer, director, owner of 10% or more of the outstanding stock, member, manager, or general partner thereof ever been the subject of a formal order of investigation (or its equivalent) or the commencement, by the issuance or service of a written complaint (or its equivalent), of any judicial, administrative or self-regulatory proceeding, as the case may be, against such member by the CFTC, the Securities and Exchange Commission, the securities commission or equivalent authority of any state, territory, the District of Columbia or foreign country, or any commodity or securities association, or any self-regulatory organization or other business or professional association?

         ___YES   ✓ NO

16. In consideration of being granted member firm privileges on the Exchange and for other good and valuable consideration, the applicant agrees that it will be bound by and will comply with all the provisions of the charter, certificate of incorporation, by-laws, rules, resolutions, interpretations, statements of policy, decisions, directives, orders, requirements and procedures of the Exchange as now in effect, hereafter adopted or hereafter amended. It is also understood and agreed that the privileges herein requested by the firm may be revoked at any time by the Board of Governors of the Exchange.

**(Corporate Seal)**

**Fluxo-Cane Overseas Ltd.**
<u>Name of Firm</u>

Dated: MARCH 13th, 2007

By: _____
<u>Signature of Officer</u>

**Manoel Fernando Garcia**
<u>Print Officer's Name and Title</u>

## CONFERRING MEMBER AGREEMENT

I/We, **Manoel Fernando Garcia**_____, hereby agree that my/our membership(s), on the basis of which privileges have been granted to **Fluxo-Cane Overseas Ltd.**_____(hereinafter called the "member firm"), "and the shares of common stock of IntercontinentalExchange, Inc. that I/we am/are required to own to maintain such membership(s) pursuant to the Rules of the Exchange," may be sold by the Exchange in accordance with the Rules as in effect from time to time, and the proceeds thereof, paid and applied by the Exchange (i) to satisfy any amounts which may be due and owing by such member firm to the Exchange and/or Clearing Organization, (ii) to satisfy any amounts which have been determined in accordance with the Rules to be owing to Exchange members by such member firm, and (iii) to satisfy such other amount, as may be provided in the Rules as in effect from time to time.

Dated MARCH 13th, 2007

_____
(Signature of conferring member)

Dated:_____

_____
(Signature of conferring member)

**Additional page attached to the Application to Receive Member Firm Privileges related to Fluxo-Cane Overseas Ltd.**

8.    Organization Information

    B.    **FOR CORPORATIONS**

        (2)    List names, titles and addresses of all officers and directors of the corporation:

| Name | Title | Address |
|------|-------|---------|
| Manoel Fernando Garcia | President | Rua Professor Artur Ramos, n. 339, 24º andar, Sao Paulo – SP, Brazil |
| Maria Pia de Siqueira Garcia | Financial Director | Rua Adolfo Tabacow, n. 1973, apto. 41-B, São Paulo – SP, Brazil |
| Marco Antônio de Siqueira Garcia | Administrative Director | Rua Adolfo Tabacow, n. 1973, apto. 41-B, São Paulo – SP, Brazil |
| Marcos Bruno Daniel | Commercial Director | Rua Pedro Pomponazzi, n. 230, apto. 141, São Paulo – SP, Brazil |

# NYBOT MEMBERSHIP AND PLEDGE AGREEMENT

**WHEREAS**, pursuant to the Merger Agreement, dated as of September 14, 2006, as amended on October 30, 2006, among the Board of Trade of The City of New York, Inc., a New York not-for-profit corporation ("Old NYBOT"), IntercontinentalExchange, Inc., a Delaware stock corporation ("ICE"), and a new Delaware stock corporation that was formed to act as a merger subsidiary of ICE ("New NYBOT"), Old NYBOT will be merged with and into New NYBOT, with New NYBOT continuing as the surviving company (such merger being referred to herein as the "Merger"); and

**WHEREAS**, upon the Merger, New NYBOT will operate the exchange previously operated by Old NYBOT (the "Exchange"); and

**WHEREAS**, as consideration in the Merger, equity members of Old NYBOT will receive (i) cash, shares of ICE common stock, or a combination of cash and shares of ICE common stock, and (ii) certain trading rights with respect to the Exchange that are defined in the by-laws (the "By-laws") and rules (the "Rules") of New NYBOT (a holder of such trading rights being referred to herein as a "NYBOT Member" and the new trading rights corresponding to each Old NYBOT equity membership being referred to herein as a "NYBOT Membership"); and

**WHEREAS**, to be eligible to exercise the trading rights associated with NYBOT Memberships under the By-Laws and Rules of New NYBOT, NYBOT Members will be required to hold at least 3,162 shares of ICE common stock for each such NYBOT Membership, and to pledge 3,162 shares of such stock to New NYBOT to secure the obligations of such NYBOT Members under the By-laws and Rules of New NYBOT;

**NOW, THEREFORE**, to satisfy the conditions in the By-laws and Rules of New NYBOT related to the exercise of the rights associated with the NYBOT Membership(s) that I will receive pursuant to the Merger, the undersigned represents, warrants and agrees as follows:

1.    I hereby agree to comply with and be bound by, all the provisions of the By-laws and Rules of New NYBOT applicable to NYBOT Members, together with all resolutions, orders, decisions, awards, procedures or other requirements of New NYBOT, as the same shall be in effect from time to time, and agree that New NYBOT will have the authority to enforce all of the foregoing against me. I agree that the by-laws and rules of Old NYBOT will continue to apply to me with respect to the period prior to the Merger, that the Exchange and New NYBOT, as the legal successor to Old NYBOT, will have the authority to continue to enforce such by-laws and rules against me, and that I must comply after the Merger with all orders, decisions and awards imposed by the Exchange and New NYBOT with respect to the period prior to the Merger. I agree that any rights that I may have previously held with respect to Old NYBOT to execute transactions no longer exist or have any applicability with respect to New NYBOT.

2.    I hereby acknowledge and agree that, as a NYBOT Member, from and after the Merger I will only have such rights and privileges as are set forth in the By-laws and Rules of New NYBOT (as the same may be amended from time to time in accordance with the express provisions of the By-laws and Rules), or as may be otherwise prescribed from time to time by the board of directors of New NYBOT, all of which rights will exist as a matter of contract only. Without limiting the foregoing, I acknowledge and agree that in my capacity as a NYBOT Member, (i) I will not be a stockholder of New NYBOT within the meaning of the Delaware General Corporation Law or the certificate of incorporation, By-Laws or Rules of New NYBOT, and that I will not have any of the rights and privileges of a stockholder of New NYBOT, (ii) neither New NYBOT nor any other person, including but not limited to any director or officer of New NYBOT, will have any fiduciary duty, obligation or responsibility of any nature to me (other than the contractual rights referenced above that are specifically set forth in the By-Laws or Rules of New NYBOT), and (iii) that I will not have any voting rights in New NYBOT or any right to receive any dividends or distributions of cash, securities or other property from New NYBOT, whether upon or pursuant to a dissolution, liquidation, merger, consolidation or otherwise.

3.    I hereby represent and agree that, effective upon the Merger, I will hold NYBOT Memberships No(s). _# 151_____, and that the required pledge of ICE common stock with respect to such NYBOT Memberships will be effected as follows:

*[Check and complete the following provision for each NYBOT Membership for which you will pledge shares that you own]*

☒    I will own at least 3,162 shares of ICE common stock (as the same shall be adjusted for share splits, dividends, and recombinations from time to time) for each of NYBOT Memberships No(s): ___151___. I hereby agree to the terms of the Pledge Addendum attached hereto to pledge at least such minimum number of shares to the Exchange, effective upon the Merger, as security for the performance of the obligations described in the Pledge Addendum.

*[Check and complete the following provision only if a Member Firm with which you have an A-B-C Agreement will be pledging the required 3,162 shares on your behalf. The Member Firm must also complete a Member Firm Pledge Agreement]*

☐    I am a party to an A-B-C Agreement that has been approved by the Exchange with _____, a Member Firm, with respect to NYBOT Membership(s) No(s). _____, and such Firm will own at least 3,162 shares of ICE common stock (as the same shall be adjusted for share splits, dividends, and recombinations from time to time) for each such NYBOT Membership and will pledge at least such minimum number of shares to the Exchange as security for the performance of my obligations under the By-laws and Rules of New NYBOT and the by-laws and rules of Old NYBOT, and for the performance of the obligations of such Firm pursuant to such by-laws and rules, pursuant to the A-B-C Agreement and pursuant to the Conferring Agreement between me and such Firm, if applicable.

**NOTE: ALL OF YOUR NYBOT MEMBERSHIPS MUST BE LISTED IN THE TWO PARAGRAPHS IMMEDIATELY ABOVE.**

4.    I hereby agree that following the Merger, I will continue to be bound by any Exchange approved A-B-C Agreement or Conferring Agreement to which I am a party at the time of the Merger, and that any such A-B-C Agreement or Conferring Agreement will apply to the NYBOT Membership that is issued with respect to the equity membership in Old NYBOT to which such A-B-C Agreement or Conferring Agreement had applied before the Merger.

5.    I hereby agree that, following the Merger, I will continue to be bound by any Exchange approved lease of an equity membership in Old NYBOT to which I am a party at the time of the Merger until the lease terminates or is terminated pursuant to the terms thereof, and that any such lease will apply to the NYBOT Membership that is issued with respect to the equity membership in Old NYBOT that was subject to the lease prior to the Merger.

6.    Any capitalized terms used but not defined in this Agreement shall have the meanings set forth in the By-laws and Rules of New NYBOT.

IN WITNESS WHEREOF, I have executed this NYBOT Membership and Pledge Agreement on this __10__ day of __January__, 2007.

[Name of NYBOT Member]

MANOEL F GARCIA

# FLUXO-CANE OVERSEAS LTD.

February 16th, 2007.

To
**The New York Board Of Trade**
One North End Avenue
New York, NY 10282-1101

Attention to:   **MS. HELENE J. RECCO**
**Member Services**
**Managing Director**

Ref.:        **Seat n. A 151**

Dear Sirs,

Regarding **Fluxo-Cane Overseas Ltd.**, a company established under the laws of the British Virgin Islands, with registered office headquartered in 2nd floor, Abbot Building, Road Town, Tortola, British Virgin Islands, the resultant company after the merger of Cane International Corp. Ltd. into Fluxo Overseas Ltd., please find attached the following documents:

- Fluxo-Cane Overseas's corporate documents; and

- Documents related to the merger (Articles and Plan of Merger and the Board of Directors Resolution of Fluxo Overseas).

As you already know, by reason of the merger, the NYBOT seat number **A151**, currently owned by Mr. Manoel Fernando Garcia, henceforth will be used to promote operations on behalf of Fluxo-Cane Overseas Ltd.

Please note that as soon as we get the documents related to the merger duly registered in accordance with the BVI laws; we will send them to you.

We kindly ask you to advice us if anything else is required in connection with this matter.

Please, do not hesitate to contact us if you need any further clarification.

Yours faithfully,

_____
**FLUXO-CANE OVERSEAS LTD.**
Manoel Fernando Garcia

**2nd Floor Abbott Building - Road Town – Tortola – British Virgin Islands
Mail Address: R. Dr. Renato Paes de Barros, 778, 2º and. – São Paulo -
Brasil**

# ICE Clear US, Inc.

# By-Laws

## TABLE OF CONTENTS

| Section | Subject |
|---|---|
| | **ARTICLE I** |
| | Definitions; Offices; Time References |
| 1.1. | Definitions |
| | **ARTICLE II** |
| | Shareholders |
| 2.1. | Share Certificates |
| 2.2. | Place of Meetings |
| 2.3. | Annual Meetings |
| 2.4. | Special Meetings |
| 2.5. | Notices |
| 2.6. | Quorum |
| 2.7. | Voting |
| 2.8. | Proxies |
| 2.9. | Written Consents |
| | **ARTICLE III** |
| | Directors |
| 3.1. | Duties and Powers |
| 3.2. | Number of Directors |
| 3.3. | Qualifications of Directors |
| 3.4. | Election, Appointment and Term of Office |
| 3.5. | Meetings |
| 3.6. | Quorum |
| 3.7. | Action by the Board |
| 3.8. | Notices |
| 3.9. | Vacancies |
| 3.10. | Removal |
| 3.11. | Resignation |
| 3.12. | Committees |
| 3.13. | Written Consent in Lieu of Meeting |
| 3.14. | Conference Calls |
| | **ARTICLE IV** |
| | Officers |
| 4.1. | Titles |
| 4.2. | Qualifications |
| 4.3. | Compensation |
| 4.4. | Appointment and Term of Office |
| 4.5. | Chairman |
| 4.6. | Vice Chairman |
| 4.7. | President |
| 4.8. | Vice President |
| 4.9. | Secretary |
| 4.10. | Treasurer |
| 4.11. | Resignation |

4.12.        Removal
4.13.        Vacancies

**ARTICLE V**
Clearing Members

5.1.        Status of Clearing Members
5.2.        Eligibility Requirements
5.3.        Procedure for Becoming a Clearing Member
5.4.        Guaranty Fund
5.5.        Monetary Defaults; Use of Guaranty Fund; Assessments
5.6.        Position Limits
5.7.        Original Margin

**ARTICLE VI**
Indemnification; Liability

6.1.        Indemnification by Corporation
6.2.        Indemnification by Resolution or Agreement
6.3.        Enforcement
6.4.        Indemnification By Clearing Members
6.5.        Exculpation and Reimbursement of Corporation
6.6.        General

**ARTICLE VII**
Emergency Powers

7.1.        Exchange-Determined Emergency
7.2.        Corporation-Determined Emergency
7.3.        Inconsistent Determinations
7.4.        Physical Emergency
7.5.        Definitions

**ARTICLE VIII**
Miscellaneous

8.1.        Fiscal Year
8.2.        Seal
8.3.        Obligations
8.4.        Amendment and Repeal

# BY-LAWS OF ICE Clear US, Inc. (A New York Corporation)

## ARTICLE I

### Definitions; Offices; Time References

### Section 1.1. *Definitions*

Unless the context otherwise clearly requires, the following terms as used in the By-Laws and Rules shall have the following meanings:

**Affiliated Person**

With respect to any Entity, any Person who Controls, is Controlled by or is under common Control with such Entity, and, without limiting the generality of the foregoing, any partner, trustee, officer, director or employee (whether or not having Control) of such Entity; with respect to any individual, any Person of which such individual is a partner, member, trustee, officer, director or employee or has Control, and any Person who Controls, is Controlled by or is under common Control with such Person.

**Assessment Amount**

The meaning set forth in Section 5.5(b).

**BCL**

The Business Corporation Law of the State of New York, as in effect from time to time.

**Board**

Board of Directors of the Corporation.

**Business Day**

A day on which the Corporation is open to accept Contracts for clearance.

**By-Laws**

The By-Laws of the Corporation, as in effect from time to time.

**Capital**

Adjusted Net Capital computed in accordance with Commission Regulation 1.17, except that unsecured receivables from any bank organized under the laws of the United States or of any state shall be included as current assets, so long as such receivables are outstanding no longer than 30 days from the date they are accrued. For purposes of Sections 5.4 and 5.5 of these By-Laws, the Capital of any Clearing Member shall be computed as of the date of either (a) the most recent financial reports provided by such Clearing Member to the Corporation in accordance with these By-Laws and the Rules, or (b) such Clearing Member's latest audited financial statements, whichever is as of the more recent date.

**Amended by the Board April 8, 2002 and July 15, 2002; effective on September 30, 2002 [delete (a) from citation to Section 5.4].**

**Amended by the Board April 11, 2005; effective April 22, 2005.**

**Certificate of Incorporation**

The Certificate of Incorporation of the Corporation, as in effect from time to time.

**Chairman**

The Chairman of the Board.

**Clearing Member**

A Person who or which pursuant to these By-Laws has the privilege to clear with the Corporation Contracts effected on or subject to the rules of an Exchange.

**Commission**

Commodity Futures Trading Commission and any successor agency.

**Commission Regulation**

Any rule or regulation adopted by the Commission, and any interpretation thereof or order thereunder issued by the Commission or the staff thereof.

**Contract**

A futures contract, option or other contract or instrument for which the Corporation acts as a clearing organization.

**Control**

The power to direct or cause the direction of the management or policies of a Person, whether through ownership of securities, by contract or otherwise.

**Corporation**

ICE Clear US, Inc., a corporation existing under the BCL, its successor and any permitted assign.

**Amended by the Board April 11, 2005; effective April 22, 2005.**

**Cross Margining Clearing Organization**

A clearing organization that has entered into a cross-margining agreement with the Corporation.

**Cross Margining Program**

Any program established under a cross margining agreement between the Corporation and one or more Cross Margining Clearing Organizations pursuant to which Clearing Members receive Cross Margining treatment.

**Defaulted Obligation**

The meaning set forth in Section 5.5(a).

**Defaulting Clearing Member**

The meaning set forth in Section 5.5.

**Deliverer**

The Clearing Member, whether acting for itself or for any other Person, that is the seller under any futures contract.

**Adopted by the Board April 11, 2005; effective April 22, 2005.**

**Effective Date**

The date upon which these By-Laws become effective.

**Emergency**

The meaning set forth in Section 7.5(a).

**Entity**

Any Person other than an individual.

**Exchange**

NYBOT® and any other board of trade, exchange or market for which the Corporation acts as a clearing organization, and their respective successors, by merger or otherwise.

**Amended by the Board April 11, 2005; effective April 22, 2005.**

**Exchange Director**

The meaning set forth in Section 3.4(a).

**Adopted by the Board April 11, 2005; effective April 22, 2005.**

**Guaranty Fund**

The guaranty fund established as provided in Section 5.4.

**Listing Exchange**

With respect to any Contract, the Exchange on or subject to the rules of which such Contract is traded.

**Merger**

The merger of Board of Trade of the City of New York, Inc., a New York not-for-profit corporation into NYBOT.

**Adopted by the Board December 11, 2006; effective January 12, 2007.**

**Monetary Default**

The meaning set forth in Section 5.5.

**NYBOT®**

Board of Trade of the City of New York, Inc., a corporation organized and existing under the Delaware General Corporation Law, its successor and any permitted assign.

**Amended by the board December 11, 2006; effective January 12, 2007.**

**Person**

An individual, sole proprietorship, partnership, limited liability company, association, firm, trust, corporation or other entity, as the context may require.

**Physical Emergency**

The meaning set forth in Section 7.5(b).

**Position Risk, Permitted Position Risk, Supermargin Position Risk, Permitted Supermargin Position Risk**

The meanings set forth in Section 5.6(a).

**Adopted by the Board April 11, 2005; effective April 22, 2005.**

**President**

The president of the Corporation.

**Receiver**

The Clearing Member, whether acting for itself or for any other Person, that is the buyer under any futures contract.

**Adopted by the Board April 11, 2005; effective April 22, 2005.**

**Rules**

The Rules of the Corporation adopted by the Board as authorized by these By-Laws, the interpretations, resolutions, orders and directives of the Board thereunder and the procedures adopted by the Corporation as in effect from time to time.

**Self-Regulatory Organization**

The Corporation and any self-regulatory organization as that term is defined in Commission Regulation 1.3(ee).

**Shareholder**

A holder of record of one or more shares in the Corporation.

**Vice Chairman**

Any Vice Chairman of the Board.

**Vice President**

Any Vice President of the Corporation.

**Amended by the Board April and May 1999; effective January 2000.**

**Withdrawal Date**

The meaning set forth in Section 5.5(g)(i), as affected by Rule 209(c).

**Adopted by the Board April 11, 2005; effective April 22, 2005.**

## Section 1.2. *Principal and Other Offices*

The principal office of the Corporation shall be located in the City, County and State of New York. The Corporation may have offices at such other places within or without the State of New York or within or without the United States as the Board from time to time may designate or the business of the Corporation may require.

## Section 1.3. *Date and Time References*

All references to dates, times or time periods in the By-Laws and Rules shall refer to, or be measured in accordance with, New York City time.

# ARTICLE II

## Shareholders

## Section 2.1. *Share Certificates*

Shares in the Corporation shall be represented by share certificates in such form as the Board may approve.

## Section 2.2. *Place of Meetings*

Special and annual meetings of any class of Shareholders shall be held at the principal office of the Corporation or at such other place within or without the State of New York as may be fixed by the Board and set forth in the notice of the meeting.

## Section 2.3. *Annual Meetings*

The annual meeting of each class of Shareholders shall be held for the transaction of such business as may properly come before it at 3:30 p.m. on the third Thursday of June in each year if not a legal holiday and, if a legal holiday, on the next following Business Day not a legal holiday.

## Section 2.4. *Special Meetings*

Special meetings of Shareholders may be called at any time by the Chairman, the President, or a majority of the members of the Board present at a meeting thereof (provided a quorum is present). Special meetings shall be called by the Secretary on receipt of a written demand

therefor, setting forth the matter or matters to be considered at such meeting, duly executed by the holders of not less than 10% of the votes of shares entitled to vote at the meeting being called.

## Section 2.5. *Notices*

Whenever under the provisions of this chapter Shareholders are required or permitted to take any action at a meeting, written notice shall be given stating the place, date and hour of the meeting and, unless it is the annual meeting, indicating that it is being issued by or at the direction of the person or persons calling the meeting. Notice of a special meeting shall also state the purpose or purposes for which the meeting is called. If, at any meeting, action is proposed to be taken which would, if taken, entitle Shareholders fulfilling the requirements of section 623 of the BCL to receive payment for their shares, the notice of such meeting shall include a statement of that purpose and to that effect and shall be accompanied by a copy of section 623 of the BCL or an outline of its material terms. A copy of the notice of any meeting shall be given, personally or by first class mail, not fewer than ten nor more than sixty days before the date of the meeting, provided, however, that a copy of such notice may be given by third class mail not fewer than twenty-four nor more than sixty days before the date of the meeting, to each Shareholder entitled to vote at such meeting. If mailed, such notice is given when deposited in the United States mail, with postage thereon prepaid, directed to the Shareholder at his address as it appears on the record of Shareholders, or, if he shall have filed with the secretary of the Corporation a written request that notices to him be mailed to some other address, then directed to him at such other address. An affidavit of the secretary or other person giving the notice or of a transfer agent of the Corporation that the notice required by this section has been given shall, in the absence of fraud, be prima facie evidence of the facts therein stated.

## Section 2.6. *Quorum*

(a) Except as may be otherwise provided in the Certificate of Incorporation or in these By-Laws or by law, the holders of one-third of the votes of shares entitled to vote thereat shall constitute a quorum at any meeting of Shareholders for the transaction of business.

(b) Shareholders present in person or by proxy at any meeting may adjourn the meeting despite the absence of a quorum. When a meeting is adjourned to another time or place, it shall not be necessary to give a notice of the adjourned meeting to any of the Shareholders who were present at the meeting in person or by proxy if the time and place to which the meeting is adjourned is announced at the meeting, but in any event notice shall be given to any Shareholder who was not so present not less than one Business Day prior to the date of the adjourned meeting. At the adjourned meeting any business may be transacted that might have been transacted on the original date of the meeting.

## Section 2.7. *Voting*

At every meeting of Shareholders, each Shareholder entitled to vote may vote in person or by proxy. Except as provided in the Certificate of Incorporation and these By-Laws, or as required by law, all corporate action to be taken by vote of the Shareholders or of any class of Shareholders shall be authorized by a majority of the votes cast at a meeting of Shareholders by the Shareholders entitled to vote thereon.

## Section 2.8. *Proxies*

Every Shareholder entitled to vote at a meeting of Shareholders or to express consent or dissent without a meeting may authorize any person or persons to act for the Shareholder by proxy. Every proxy must be signed by the Shareholder or the Shareholder's attorney-in-fact. No proxy shall be valid after the expiration of eleven months from the date thereof unless otherwise

provided in the proxy. Every proxy shall be revocable at the pleasure of the Shareholder executing the proxy except as otherwise provided by law.

### Section 2.9. *Written Consents*

Whenever Shareholders are required or permitted to take any action by vote, such action may be taken without a meeting on written consent, setting forth the action so taken, signed by the holders of all outstanding shares entitled to vote thereon.

# ARTICLE III

## Directors

### Section 3.1. *Duties and Powers*

The Board shall have control and management of the affairs and business of the Corporation and shall have all the powers and duties set forth in the BCL. Without limiting the generality of the foregoing, the Board shall have the power to:

(a) adopt, amend and repeal such Rules, not contrary to the provisions of the Certificate of Incorporation, these By-Laws or applicable law, with respect to the conduct of the business of the Corporation as will, in its judgment, best promote and safeguard the interests of the Corporation; and

(b) render interpretations of the By-Laws and the Rules, which shall be binding on all persons having dealings with the Corporation directly or through Clearing Members.

The fact that certain powers of the Board are specified in these By-Laws does not in any way limit the powers of the Board, whether or not specified in these By-Laws, except as may otherwise be expressly provided in the Certificate of Incorporation, the By-Laws or applicable law.

### Section 3.2. *Number of Directors*

The number of directors shall be 11.

### Section 3.3. *Qualifications of Directors*

(a) At the time of election to the Board, each director must be at least eighteen (18) years of age, must not be ineligible to serve pursuant to paragraph (c) of this Section 3.3 and (except for Exchange Directors) must be an Affiliated Person of a Clearing Member.

(b) For purposes of paragraph (c) of this Section 3.3, the following definitions shall apply:

(i) "Disciplinary Committee" means any committee of the Board or the Corporation empowered to bring disciplinary proceedings against a Clearing Member, to impose sanctions on a Clearing Member or to hear appeals thereof.

(ii) "Disciplinary Offense" means:

(A) any violation of the rules of a Self-Regulatory Organization except those rules relating to (1) decorum or attire, (2) financial requirements, or (3) reporting or recordkeeping, unless resulting in fines aggregating more than $5,000 in any calendar year;

(B) any rule violation described in subparagraph (b)(ii)(A) of this Section 3.3 which involves fraud, deceit or conversion or results in a suspension from membership in, or in expulsion from, a Self-Regulatory Organization;

(C) any violation of the Commodity Exchange Act or a Commission Regulation promulgated thereunder; or

(D) any failure to exercise supervisory responsibility with respect to acts described in subparagraphs (b)(ii)(A) through (C) of this Section 3.3, when such failure is itself a violation of either the rules of a Self-Regulatory Organization, the Commodity Exchange Act, or a Commission Regulation promulgated thereunder.

(iii) "Final Decision" means:

(A) a decision of a Self-Regulatory Organization which cannot be further appealed within the Self-Regulatory Organization, is not subject to the stay of the Commission or a court of competent jurisdiction, and has not been reversed by the Commission or any court of competent jurisdiction; or

(B) any decision by an administrative law judge, a court of competent jurisdiction or the Commission, which has not been stayed or reversed.

(iv) "Settlement Agreement" means any agreement whereby a person consents to the imposition of sanctions approved by the Board or a Disciplinary Committee or by another Self-Regulatory Organization, a court of competent jurisdiction or the Commission.

(c) No individual shall be eligible to serve on the Board or a Disciplinary Committee of the Corporation if such individual:

(i) was found within the prior three years by a Final Decision in any action or proceeding brought by the Commission, any other governmental agency or any Self-Regulatory Organization to have committed a Disciplinary Offense;

(ii) entered into a Settlement Agreement within the prior three years in which any of the findings or, in the absence of such findings, any of the acts charged (and not withdrawn) included a Disciplinary Offense;

(iii) currently is suspended from trading on any contract market, is suspended or expelled from membership in any Self-Regulatory Organization, is serving any sentence or probation or owes any portion of a fine imposed pursuant to either:

(A) a finding by a Final Decision in any action or proceeding brought by the Commission, any other governmental agency or any Self-Regulatory Organization that such person committed a Disciplinary Offense; or

(B) a Settlement Agreement in which any of the findings or, in the absence of such findings, any of the acts charged (and not withdrawn) included a Disciplinary Offense;

(iv) currently is subject to an agreement with the Commission or any Self-Regulatory Organization not to apply for registration with the Commission or membership in any Self-Regulatory Organization;

(v) currently is subject to, or has had imposed on such person, within the prior three years, a Commission registration revocation or suspension in any capacity for any reason, or has been convicted within the prior three years of any of the felonies listed in Section 8a(2)(D)(ii) through (iv) of the Commodity Exchange Act; or

(vi) currently is subject to a denial, suspension or disqualification from serving on the disciplinary committee, arbitration panel or governing board of any "self-regulatory organization" as that term is defined in Section 3(a)(26) of the Securities Exchange Act of 1934.

(d) Any individual who is a member of the Board or a Disciplinary Committee shall immediately notify the President of any Final Decision which subjects such person to disqualification pursuant to Section 3.3(c).

**Amended by the Board April 11, 2005; effective April 22, 2005 [¶ (a)].**

## Section 3.4. *Election, Appointment and Term of Office*

(a) The Board shall consist of eleven (11) directors, nine (9) of whom shall be elected by the Shareholders after receiving recommendations from the Clearing Members as provided in paragraph (b), and two (2) of whom ("the Exchange Directors") shall be elected without such recommendations. Directors elected or appointed prior to the 2005 annual meeting of Shareholders shall hold office for the terms to which they were elected or appointed and as otherwise provided in these By-Laws.

(b) At each annual meeting of Shareholders, the Shareholders shall elect directors to succeed those whose terms of office expire at such meeting. Not less than 90 days prior to each such annual meeting, the Board shall appoint a Nominating Committee consisting of five Affiliated Persons of Clearing Members, none of whom shall be members of the Board. Not less than 80 days prior to such annual meeting, the Nominating Committee shall nominate one or more candidates to be recommended by the Clearing Members to succeed each of the directors whose terms will expire at such annual meeting (other than the Exchange Directors) and shall report the names of such candidates to the President. At least one of such candidates shall be in the category of an Affiliated Person of a Clearing Member having Capital of $75,000,000 or less, and at least one of such candidates shall be in the category of an Affiliated Person of a Clearing Member having Capital of $1,000,000,000 or more. The President shall forthwith notify the Clearing Members of the names of the candidates so nominated. Any five Clearing Members may nominate any other candidates by filing a petition with the President not later than 70 days prior to such annual meeting. The list of all candidates nominated as hereinbefore provided shall be sent to the Clearing Members, and a meeting shall be held at which Clearing Members may vote for candidates to be recommended to succeed each of the directors whose terms are expiring at such annual meeting (other than the Exchange Directors). The results of such voting shall be reported to the Shareholders, but shall be advisory only. At the annual meeting, the Shareholders shall elect directors who may but need not include any or all of the individuals so recommended by the Clearing Members; provided that all but one of the directors so elected must be Affiliated Persons of Clearing Members, at least one of whom shall be in the category of an Affiliated Person of a Clearing Member having Capital of $75,000,000 or less, and at least one of whom shall be in the category of an Affiliated Person of a Clearing Member having Capital of $1,000,000,000 or more.

(c) The directors elected at each annual meeting shall hold office for a term of two years and until their respective successors have been elected and have taken office.

**Amended by the NYCC Board July 10, 2000; effective July 28, 2000.**

**Amended by the Board April 11, 2005; effective April 22, 2005 [¶¶ (a) and (b)].**

**Amended by the Board April 11, 2007; effective May 4, 2007 [¶ (b)].**

### Section 3.5. *Meetings*

(a) The annual meeting of the Board shall be held on such day and at such time as the Board may fix, for the purpose of appointing officers and transacting such other business as may properly come before the meeting.

(b) Regular meetings of the Board may be held at such time and place as may be fixed by the Board.

(c) Special meetings of the Board may be called at any time by the Chairman or the President and shall be called by the President whenever requested to do so by any two directors. Special meetings shall be held at such time and place within New York City as may be specified by the Chairman.

(d) A majority of the directors present, whether or not a quorum is present, may adjourn any meeting of directors to another time and place.

**Amended by the Board April 11, 2005; effective April 18, 2005 [¶ (a)].**

### Section 3.6. *Quorum*

A majority of the members of the Board shall constitute a quorum for the transaction of business or of any specified item of business, except that four members of the Board shall constitute a quorum for the taking of emergency action pursuant to ARTICLE VII of these By-Laws.

### Section 3.7. *Action by the Board*

Except as otherwise provided by law or these By-Laws, the vote of a majority of the directors present at the time of the vote, if a quorum is present at such time, shall be the act of the Board.

### Section 3.8. *Notices*

All meetings of the Board shall be held on notice to the directors. Special meetings of the Board shall be held upon not less than one hour's notice stating the purpose, place, date and hour of the meeting and specifying the person or persons at whose direction the meeting is called. At any special meeting of the Board, only the matters stated in the notice of the meeting may be acted upon at such meeting, unless an action on any other matter is consented to by all of the members of the Board. A notice pursuant to this Section 3.8 may be given orally or in writing, by personal delivery, by telephone, by telefacsimile or by electronic mail.

### Section 3.9. *Vacancies*

In case of any vacancy created by death, resignation, removal or disqualification of any director, such vacancy may be filled by election of a successor by the Shareholders. Such successor shall be elected by a plurality of the votes cast at a meeting of the Shareholders entitled to vote on such successor. If such director was in one of the categories specified in Section 3.4(b), the successor must be in the same category. A person elected or appointed to fill a vacancy as a director shall hold office for the balance of the term of the director whose position such successor is filling.

### Section 3.10. *Removal*

(a) Any director may be removed with or without cause at any time by the Shareholders.

(b) A director who becomes ineligible to serve on the Board pursuant to Section 3.3(c) shall be automatically removed upon the occurrence of such ineligibility without any act of the Shareholders or the Board.

## Section 3.11. *Resignation*

Any director may resign at any time. A resignation shall be written and shall take effect at the time specified therein. If no time is so specified, a resignation shall take effect at the time of its receipt by the Corporation. The acceptance of a resignation shall not be necessary to make it effective. No resignation shall discharge any accrued obligation or duty of a director.

## Section 3.12. *Committees*

(a) The Board may designate from among its members an executive committee and any other committees, each consisting of three or more directors. To the extent permitted by law and as provided in the resolution adopted by the Board, each such committee may have all the authority of the Board.

(b) Each committee member shall serve at the direction and at the pleasure of the Board.

(c) Notwithstanding paragraph (a) above, the Board shall appoint a Margin Committee with full authority to set and change levels of margins, which shall be comprised of at least two (2) members of the Board and at least seven (7) individuals who need not be members of the Board but must be persons who spend a considerable portion of their day on risk management activities for their employers and do not have significant client exposure. The Chairman of the Margin Committee shall be the President of the Corporation or another individual designated by the President. The Margin Committee shall conduct its business through subcommittees which shall be appointed by the Chairman of the Margin Committee. Each subcommittee shall consist of the Chairman of the Margin Committee and a minimum of two (2) members of the Margin Committee who have been appointed to such Committee based upon their risk management experience. A member of the staff of NYBOT shall be invited to attend each meeting of the Margin Committee and of each subcommittee thereof.

Amended by the Board December 8, 1998; effective January 29, 1999 [¶ (c)].

Amended by the Board effective August 16, 2001 [¶ (c)].

Amended by the Board June 6, 2005; effective June 20, 2005 [¶ (c)].

Amended by the Board September 12, 2005; effective September 26, 2005 [¶ (c)].

## Section 3.13. *Written Consent in Lieu of Meeting*

Any action required or permitted to be taken by the Board or any committee may be taken without a meeting if all the members of the Board or the committee consent in writing to the adoption of a resolution authorizing the action. Such consent may be given by telefacsimile showing the signature of the person or persons giving consent.

## Section 3.14. *Conference Calls*

Any one or more members of the Board or a committee may participate in a meeting of the Board or such committee by means of a conference telephone or similar communications equipment allowing all persons participating in the meeting to hear each other at the same time. Participation by such means shall constitute presence in person at a meeting.

# ARTICLE IV

## Officers

### Section 4.1. *Titles*

The officers of the Corporation shall be a Chairman, one or more Vice Chairmen, a President, one or more Vice-Presidents, a Secretary and a Treasurer. Each officer shall be appointed by the Board. The Board also may appoint such other officers as it may from time to time deem appropriate, who shall have such authority and perform such duties as may be prescribed by the Board.

### Section 4.2. *Qualifications*

The Chairman and each Vice Chairman must be a director of the Corporation. Each officer other than the Chairman and any Vice Chairman must be a full time employee of the Corporation. Any two or more offices may be held by the same person.

### Section 4.3. *Compensation*

The Board shall establish the compensation of all officers. The Board may establish the compensation of other employees and agents or may delegate such authority to one or more officers.

### Section 4.4. *Appointment and Term of Office*

Except as otherwise provided by law or by these By-Laws, each officer shall be appointed by the Board to hold office until the first meeting of the Board following the next annual meeting of Shareholders and until the successor of such officer is appointed and qualified.

### Section 4.5. *Chairman*

The Chairman shall preside at all meetings of Shareholders and of the Board and shall have such powers and shall perform such other duties as are set forth in these By-Laws or as may be specified by the Board. The Chairman also shall be a member *ex officio* of all committees of directors.

### Section 4.6. *Vice Chairman*

The Vice Chairman, in the absence or disability of the Chairman, shall have the powers and shall perform the duties of the Chairman. If there is more than one Vice Chairman, the Board shall specify the order in which they shall so act. The Vice Chairman also shall have such powers and shall perform such duties as are set forth in these By-Laws or as may be specified by the Board.

### Section 4.7. *President*

The President shall supervise the business and affairs of the Corporation, subject to the direction of the Board. The President shall not be a member of the Board or a Shareholder. The President shall perform all duties customarily incident to the office of president.

### Section 4.8. *Vice President*

Except as may otherwise be prescribed by the Board, the Vice President, in the absence or disability of the President, shall have the power and shall perform the duties of the President. If there is more than one Vice President, the Board shall specify the order in which they shall so act.

**B/L-13**

Each Vice President also shall have such powers and shall perform such duties as may be delegated to such Vice President by the President or prescribed by the Board.

### Section 4.9. *Secretary*

The Secretary shall keep the minutes of all meetings of the Board, Clearing Members and Shareholders. The Secretary shall give or cause to be given notice of all meetings of the Board and the Clearing Members and Shareholders and all other notices required by law or the By-Laws. In the event of the absence of the Secretary or the refusal by the Secretary to do so, any such notice may be given by any person so directed by the President or by the directors or by the Shareholder or Shareholders upon whose request the meeting is called. The Secretary shall have charge of the corporate books and records. The Secretary shall have custody of the seal of the Corporation and shall affix the seal to all instruments requiring such seal when authorized by the Board or President and shall attest the same. In general, the Secretary shall perform all duties customarily incident to the office of secretary.

**Amended by the Board April 11, 2005; effective April 22, 2005.**

### Section 4.10. *Treasurer*

The Treasurer shall have custody of all funds and securities of the Corporation. The Treasurer shall enter or cause to be entered in the books of the Corporation to be kept for the purpose, full and accurate accounts of all monies received and paid out on account of the Corporation and, when required by the Chairman or the President, shall render a statement of the accounts. The Treasurer shall keep or cause to be kept such other books as will show a true record of the expenses, losses, gains, assets and liabilities of the Corporation. The Treasurer at all reasonable times shall exhibit the books and accounts to any director of the Corporation upon application at the office of the Corporation during business hours. In general, the Treasurer shall perform all duties customarily incident to the office of treasurer.

### Section 4.11. *Resignation*

Any officer may resign at any time. A resignation shall be written and shall take effect at the time specified therein. If no time is so specified, a resignation shall take effect at the time of its receipt by the President or Secretary of the Corporation. The acceptance of a resignation shall not be necessary to make it effective. No resignation shall discharge any accrued obligation or duty of an officer.

### Section 4.12. *Removal*

Any officer appointed by the Board may be removed as an officer (but not as a director) by the Board at any time with or without cause.

### Section 4.13. *Vacancies*

If the office of any officer becomes vacant, the Board may appoint any qualified person to fill such vacancy. Any person so appointed shall hold office for the unexpired term of the predecessor of such person and until the successor of such person is elected or appointed and qualified.

# ARTICLE V

## Clearing Members

### Section 5.1. *Status of Clearing Members*

(a) Only Clearing Members shall be entitled to clear Contracts with the Corporation, except that, if the Board so determines, the Corporation may clear contracts, options or other instruments for members of any other clearing organization in connection with the linkage of an Exchange with another board of trade, exchange or market which is not an Exchange. Each Clearing Member shall have the privilege of clearing with the Corporation all Contracts traded on or subject to the rules of each Exchange of which it is a member or member firm, whether for customer or proprietary account, as specified in paragraph (b) of this Section 5.1.

(b) Each Clearing Member shall have the privileges, rights and obligations provided for in and pursuant to these By-Laws and the Rules. Such privileges, rights and obligations may be terminated or altered in any respect at any time as provided in these By-Laws or the Rules.

**Amended by the Board April 11, 2005; effective April 22, 2005 [¶¶ (a) and (b)].**

**Amended by the Board November 8, 2007; effective December 17, 2007 [¶ (b)].**

### Section 5.2. *Eligibility Requirements*

To become and remain a Clearing Member and to have the privilege of clearing Contracts effected on or subject to the rules of one or more Exchanges, a Person must:

(a) Be an Entity that is a member firm of such Exchange or Exchanges and satisfy the clearing member requirements of the Exchange or Exchanges;

(b) Have one person, satisfactory to the Corporation, who is (i) a director, general partner, trustee or officer (or person occupying a similar status or performing similar functions), (ii) responsible for the clearing operations of such Person and (iii) authorized to act on behalf of such Person in all transactions with or involving the Corporation, and effective October 1, 2004 for all Entities, have a second person who meets the requirements of this subsection 5.2(b)(i) and who is authorized to act on behalf of such Person in all transactions with or involving the Corporation in the event of death, incompetence or other inability of the first person to so act;

(c) Have Capital of at least $5,000,000;

(d) Have, in the judgment of the Board, such qualities of financial responsibility, operational capacity, experience, business integrity, reputation and competence as the Board, in its discretion, may consider necessary or appropriate to be a Clearing Member; and

(e) If an Entity which is subject to Control by any other Person or Persons, have on file with the Corporation a Guaranty in such form as the Corporation may prescribe from such other Person or from one or more of such other Persons (as the Corporation may specify) guaranteeing payment of all amounts owing by such Entity under or in connection with any proprietary account carried by the Corporation for such entity; provided, however, that the Board may, for good cause shown, waive or modify the requirements of this paragraph (e) with respect to any such Entity. Notwithstanding the foregoing, the Board shall not waive the Guaranty requirement for any Entity that has chosen one (1) or more of its Affiliates as the Approved Financial Institution to maintain its original margin accounts, to issue letters of credit to the Corporation or for any other purpose pursuant to the Rules of the Corporation.

**Amended by the Board February 7, 2000; effective March 14, 2000 [Par. (a) to extend time to 2001].**

**Amended by the NYCC Board; effective November 10, 2000.**

**Amended by the NYCC Board November 6, 2000; effective December 19, 2000.**

**Amended by the NYCC Board February 12, 2001; effective immediately.**

**Amended by the NYCC Board June 7, 2004; effective June 25, 2004 [¶¶(a) and (b)].**

**Amended by the NYCC Board July 12, 2004; effective August 18, 2004 [¶¶(a) and (b)].**

**Amended by the Board April 11, 2005; effective April 22, 2005 [¶¶ (a), (d) and (e)].**

**Amended by the Board February 6, 2006; effective March 13, 2006 [¶ (e)].**

**Amended by the Board December 11, 2006; effective January 12, 2007 [¶ (a)].**

**Amended by the Board November 8, 2007; effective December 17, 2007 [¶ (c)].**

## Section 5.3. *Procedure for Becoming a Clearing Member*

(a) Any Person desiring to become a Clearing Member must file an application with the Corporation in such form as the Corporation may prescribe, shall furnish such documents and information as the Corporation may request and shall pay such application fee as the Board may prescribe. The filing of any such application, documents and information, and the action by the Corporation with respect thereto, shall be as provided in the Rules.

(b) The Board shall have final authority to grant or deny an application to become a Clearing Member and shall deny the application of any Person which does not meet the eligibility requirements set forth in Section 5.2; provided, however, that if the Board proposes to deny any such application, it shall so notify the applicant in writing, setting forth the grounds upon which the Board proposes to deny such application, and the applicant, upon written request made within ten days after the date of receipt of such notification, shall be entitled to a hearing before the Board. Any such hearing shall be conducted pursuant to rules and procedures adopted by the Board which, in the judgment of the Board, are sufficient to give such applicant an opportunity fully and fairly to present to the Board the applicant's reasons why the application should be granted.

(c) If the Board grants an application to become a Clearing Member, the Corporation shall promptly give the applicant written notice thereof, specifying each Exchange whose Contracts the applicant is entitled to clear. Such applicant shall become a Clearing Member at such time as the Applicant has (i) deposited such amount in the Guaranty Fund as may be required pursuant to Section 5.4 of these By-Laws, and (ii) filed with the Corporation such agreements, undertakings and documents as the Corporation may require; provided, however, that if such applicant has not complied with the foregoing provisions within 30 days after the applicant was given written notice of approval of its application, the application shall be deemed to have been withdrawn.

(d) If, in accordance with paragraph (b) of this Section 5.3, the Board denies an application to become a Clearing Member, the Corporation shall give the applicant written notice of the Board's decision, setting forth the grounds therefor, and such decision shall be the final action of the Corporation.

**Amended by the Board April 11, 2005; effective April 22, 2005 [¶ (a)].**

## Section 5.4. *Guaranty Fund*

The Corporation shall establish and maintain a Guaranty Fund.

(a) For the purposes of this Section 5.4, the following terms shall have the following meanings:

(i) "Base Guaranty Fund Amount" shall mean the base amount (initially one hundred million dollars ($100,000,000)) established by the Board from time to time for the calculation of the Guaranty Fund deposit requirements of the Clearing Members.

(ii) "Net Margin" shall mean, as of any day, the quotient derived by dividing by three (3) the sum of a Clearing Member's net margin requirement as determined by the Corporation for the final trading day of each of the prior three calendar months (or for such other day in such months as the Board shall direct).

(iii) "Volume" shall mean, as of any day, the quotient derived by dividing by three (3) the total volume of futures contracts, options and other contracts or instruments involving all commodities on or subject to the rules of any Exchange which were cleared by the Corporation for the Clearing Member for the three calendar months prior to such day.

(iv) "Base Margin Amount" shall mean that portion of each Clearing Member's Guaranty Fund deposit requirement which is based upon Net Margin as determined pursuant to subsection (b)(i) of this Section 5.4.

(v) "Margin Surcharge" shall mean that portion of each Clearing Member's Guaranty Fund deposit requirement that is based upon the ratio of the Clearing Member's Net Margin to Capital as determined pursuant to subsection (b)(ii) of this Section 5.4.

(vi) "Base Volume Amount" shall mean that portion of each Clearing Member's Guaranty Fund deposit requirement which is based upon Volume as determined pursuant to subsection (b)(iii) of this Section 5.4.

(vii) "Volume Surcharge" shall mean that portion of each Clearing Member's Guaranty Fund deposit requirement that is based upon the ratio of the Clearing Member's Volume to Capital as determined pursuant to subsection (b)(iv) of this Section 5.4.

(b) Each Clearing Member shall deposit and maintain in the Guaranty Fund an amount calculated as follows:

(i) Base Margin Amount. The Clearing Member's Net Margin shall be divided by the total Net Margin of all Clearing Members. The resulting quotient shall be multiplied by 85% of the Base Guaranty Fund Amount. The Clearing Member's Base Margin Amount shall be equal to the lesser of the resulting product and three million five hundred thousand dollars ($3,500,000).

(ii) Margin Surcharge. The Clearing Member's Net Margin shall be divided by its Capital. If the resulting quotient is less than 0.5, then the Clearing Member's Margin Surcharge shall be zero (0). If the resulting quotient is equal to or greater than 0.5, then the Clearing Member's Margin Surcharge shall be calculated as follows:

(A) If the quotient is equal to or greater than 0.5, but less than 0.75, then the Clearing Member's Margin Surcharge shall be equal to 10% of the Clearing Member's Base Margin Amount.

(B) If the quotient is equal to or greater than 0.75, but less than 1.00, then the Clearing Member's Margin Surcharge shall be equal to 20% of the Clearing Member's Base Margin Amount.

(C) If the quotient is equal to or greater than 1.00, then the Clearing Member's Margin Surcharge shall be equal to 30% of the Clearing Member's Base Margin Amount.

(iii) Base Volume Amount. The Clearing Member's Volume shall be divided by the total Volume of all Clearing Members. The resulting quotient shall be multiplied by 15% of the Base Guaranty Fund Amount. The Clearing Member's Base Volume Amount shall be equal to the lesser of the resulting product and one million one hundred sixty-six thousand six hundred sixty-seven dollars ($1,166,667).

(iv) Volume Surcharge. The Clearing Member's Volume shall be multiplied by one thousand (1,000). The resulting product shall be divided by the Clearing Member's Capital. If the resulting quotient is less than five (5), then the Clearing Member's Volume Surcharge shall be zero (0). If the resulting quotient is equal to or greater than five (5), then the Clearing Member's Volume Surcharge shall be calculated as follows:

(A) If the quotient is equal to or greater than five (5), but less than twenty (20), then the Clearing Member's Volume Surcharge shall be equal to 25% of the Clearing Member's Base Volume Amount.

(B) If the quotient is equal to or greater than twenty (20), but less than forty (40), then the Clearing Member's Volume Surcharge shall be equal to 50% of the Clearing Member's Base Volume Amount.

(C) If the quotient is equal to or greater than forty (40), but less than sixty (60), then the Clearing Member's Volume Surcharge shall be equal to 100% of the Clearing Member's Base Volume Amount.

(D) If the quotient is equal to or greater than sixty (60), but less than eighty (80), then the Clearing Member's Volume Surcharge shall be equal to 150% of the Clearing Member's Base Volume Amount.

(E) If the quotient is equal to or greater than eighty (80), then the Clearing Member's Volume Surcharge shall be equal to 200% of the Clearing Member's Base Volume Amount.

(v) For each Clearing Member, the amount to be deposited and maintained in the Guaranty Fund shall be the sum of the Clearing Member's Base Margin Amount, Margin Surcharge, Base Volume Amount and Volume Surcharge computed pursuant to subsections (b)(i), (ii), (iii) and (iv) of this Section 5.4, provided that:

(A) the amount that any Clearing Member shall be required to deposit in the Guaranty Fund which is attributable to the aggregate of the Clearing Member's Base Margin Amount and Base Volume Amount (but excluding the Clearing Member's Margin Surcharge and Volume Surcharge) shall not exceed three million five hundred thousand dollars ($3,500,000) or such other amount as the Board may fix from time to time;

(B) each Clearing Member shall be required to deposit and maintain in the Guaranty Fund at least two million dollars ($2,000,000), or such other amount as the Board may fix from time to time;

(C) Reserved.

(D) each new Clearing Member shall be required to deposit the lesser of (1) 10% of its Capital and (2) three million five hundred thousand dollars ($3,500,000); provided, however, that in no event shall the amount of the deposit be less than the amount set forth in or determined by the Board pursuant to subsection (b)(v)(B) of this Section 5.4. Each

new Clearing Member must be a Clearing Member for one calendar month before its Guaranty Fund requirement is calculated as described in subsections (b)(i), (ii), (iii) and (iv) of this Section 5.4. In making such calculations for the period before the new Clearing Member has been a Clearing Member for three calendar months, the new Clearing Member's Net Margin and Volume will be determined based on the actual number of calendar months (one (1) or two (2)) that the new Clearing Member has been a Clearing Member at the time of the calculation.

The Board shall have the authority to cause the Base Margin Amount, Margin Surcharge, Base Volume Amount and Volume Surcharge of all Clearing Members to be recalculated at any time, and to require the Clearing Members to immediately deposit in the Guaranty Fund any amounts required to meet the recalculated Guaranty Fund deposit requirements, taking into account the minimum deposit requirements set forth in subsections (b)(v)(B) of this Section 5.4.

(c) Except as provided in paragraph (b)(v) of this Section 5.4, deposits in the Guaranty Fund may be made by any Clearing Member in the form of cash or securities which are (i) direct obligations of the United States Government, and which have such maximum time to maturity as the Corporation may prescribe, or (ii) interests in money market mutual funds which are permitted for customer funds for purposes of Rule 1.25(a)(viii) of the Commodity Futures Trading Commission (as amended from time to time) and approved by the Board for this purpose or pursuant to Rule 505(a)(i), provided, however, that through March 31, 2008, a Clearing Member that was a member of the Corporation on November 8, 2007 and does not have two million dollars ($2,000,000) on deposit in the Guaranty Fund on the effective date such minimum requirement becomes effective, may deposit shares of IntercontinentialExchange, Inc. stock, but only to the extent necessary to bring the Clearing Member's deposit to the minimum two million dollar ($2,000,000) amount; and provided further that each Clearing Member shall deposit a minimum of $50,000 in the form of cash. Any permitted securities shall be valued in accordance with such methodology as may be adopted by the Board. The Board may place limits on the portion of any Clearing Member's deposit that may be satisfied by the use of interests in money market mutual funds or any other category of permitted securities. Deposits of securities shall be made by such means and subject to such agreements and undertakings as may be prescribed by the Corporation. To the extent that any Clearing Member deposits any securities in the Guaranty Fund, such Clearing Member thereby represents and warrants that such securities are owned by it free and clear of any security interests, liens, encumbrances, charges or adverse claims of any kind.

(d) Guaranty Fund deposits shall be held in a bank approved for the purpose by the Corporation, in an account or accounts separate from all other cash and securities held by the Corporation. The Corporation shall have the sole right to withdraw cash or securities from, or to authorize the sale or other disposition of any securities held in, such account or accounts subject to the rights of any assignee, pledgee or holder of a security interest in the Guaranty Fund or any cash or securities therein.

(e) So long as any Person is a Clearing Member and thereafter for the period until the Corporation returns such person's Guaranty Fund deposits as provided in paragraph (i) of this Section 5.4, the Guaranty Fund deposits of such person may be applied by the Corporation:

(i) against any amounts that become due from such Person to the Corporation for any reason (including but not limited to original margin, variation margin, option premiums, dues, assessment, fines and reimbursement of any amounts paid by the Corporation to a Cross Margining Clearing Organization under any Cross Margining Program) at any time it was a Clearing Member and for the period until the Corporation returns such Person's Guaranty Fund deposits as provided in paragraph (i) of this Section 5.4;

(ii) against any amounts that are charged as provided in or pursuant to Section 5.5 of these By-Laws against the Guaranty Fund deposits of all Clearing Members at any time that such Person was a Clearing Member and for the period until the Corporation returns such Person's Guaranty Fund deposits as provided in paragraph (i) of this Section 5.4; and

(iii) to provide such funds, on such terms and conditions, as the Board in its discretion, acting by a vote of not less than three-fourths of all directors eligible to vote, may deem necessary or appropriate to facilitate the transfer of customer accounts from a Clearing Member experiencing financial difficulty to another Clearing Member, if the Board shall determine by such vote that to do so is in the best interests of the Corporation.

(f) The Corporation may at any time and from time to time assign, pledge, repledge or otherwise create a lien on or security interest in, the Guaranty Fund and/or the cash, securities and other property held in the Guaranty Fund to secure the repayment of funds borrowed by the Corporation (plus interest, fees and other amounts payable in connection therewith). Any such borrowing shall be on terms and conditions deemed necessary or advisable by the Corporation (including the collateralization thereof) in its sole discretion, and may be in amounts greater, and extend for periods of time longer, than the obligations, if any, of any Clearing Member to the Corporation for which such cash, securities or other property was pledged to or deposited with the Corporation. Any funds so borrowed shall be used and applied by the Corporation solely for the purposes for which cash, securities and other property held in the Guaranty Fund are authorized to be used pursuant to these By-Laws and the Rules; provided that the failure of the Corporation to use such funds in accordance with this subsection shall not impair any of the rights or remedies of any assignee, pledgee or holder of any such lien or security interest. Cash, securities and other property held in the Guaranty Fund, subject to the rights and powers of the Corporation with respect thereto as set forth in these By-Laws, the Rules and any agreements between any Clearing Member and the Corporation, and subject to the rights and powers of any person to which the Guaranty Fund or any cash, securities or other property held therein shall have been assigned, pledged, repledged or otherwise subjected to a lien or security interest, shall remain the property of the respective Clearing Members depositing such cash securities and other property.

(g) Subject to the rights of any assignee, pledgee or holder of a lien or security interest as provided in subsection (f) of this Section 5.4, if at any time the amount of any cash, plus the value of any securities, on deposit in the Guaranty Fund for any Clearing Member

(i) shall exceed the amount required to be on deposit for such Clearing Member by more than such amount as the Board may prescribe, the Corporation will return the excess to such Clearing Member upon its written request.

(ii) shall be less than the amount required to be on deposit for such Clearing Member, such Clearing Member shall restore the deficiency (including, without limitation, a deficiency caused by the application of such Clearing Member's deposits in the Guaranty Fund as described in Section 5.4(e) of these By-Laws) on demand; provided, however, that a Clearing Member that has withdrawn as a Clearing Member shall not be required to restore a deficiency occurring after the effective date of its withdrawal; and, further provided, that if and to the extent that any such deficiency is caused by the application of such Clearing Member's deposits in the Guaranty Fund to meet a Monetary Default pursuant to Section 5.5(b)(iii) of these By-Laws, any amounts deposited with the Corporation to restore such deficiency shall not be applied to further meet the same Monetary Default.

(h) Any interest earned on any securities deposited in the Guaranty Fund by a Clearing Member shall belong and be credited to such Clearing Member. The Corporation may invest any cash deposited in the Guaranty Fund in securities which are direct obligations of the United States Government and may engage in repurchase transactions with any cash or securities on deposit.

Any interest, capital gain or other income earned on any such securities shall belong and be credited to the Corporation.

(i) Subject to the rights of any assignee, pledgee or holder of a lien or security interest as provided in subsection (f) of this Section 5.4, whenever a Person ceases to be a Clearing Member, the Corporation shall return to such Person the amount of cash and securities on deposit in the Guaranty Fund for such Person; provided, however, that the Corporation shall not be required to so return such cash and securities after the effective date of the termination of such Clearing Membership until three (3) calendar months after the last date on which such Person either had any open positions carried by the Corporation or had any futures contracts, options or other contracts or instruments cleared by the Corporation (or such longer period as the Board may prescribe), unless the Corporation receives guaranties or other security satisfactory to it to assure the availability of any amounts to be applied as provided in subsection (e) of this Section 5.4.

(j) If the Guaranty Fund or any part thereof is lost as a result of the insolvency of any bank or other depository, embezzlement, defalcation or any reason other than use pursuant to Section 5.5 of these By-Laws, such loss may, in the discretion of the Board, be restored by application of the following sources of funds in the order listed (each such source to be fully utilized before the next following source is applied):

(i) such portion, if any, of the surplus of the Corporation as the Board determines to be available for such purpose; and

(ii) assessments levied by the Corporation upon the Clearing Members, which assessments shall be paid to the Corporation at such time and in such manner as the Board may specify. The amount of a Clearing Member's assessment shall be the amount derived by multiplying the loss by a fraction, the numerator of which shall be the sum of the amount of such Clearing Member's Base Margin Amount and Base Volume Amount (determined in each case without reference to the maximum Guaranty Fund deposit amounts imposed by subsections (b)(i), (b)(iii), and (b)(v)(A) of this Section 5.4) on the day preceding the loss and the denominator of which shall be the total amount of the Base Margin Amount and the Base Volume Amount of all Clearing Members (determined in each case without reference to the maximum Guaranty Fund deposit amounts imposed by subsections (b)(i), (b)(iii) and (b)(v)(A) of this Section 5.4) on such day.

(k) In the event that the Corporation accepts a transfer of cash or securities from a guaranty fund of any other clearing organization of which a Clearing Member is or was a member to satisfy in whole or in part the obligations of such Clearing Member to deposit and maintain funds in the Guaranty Fund, the Corporation shall (to the extent of the amount of the cash and the value of the securities so transferred) guaranty payment by such Clearing Member to such clearing organization of any amount, the payment of which would have been secured by such Clearing Member's deposit in the guaranty fund of such other clearing organization. If the Corporation is required to make any payment pursuant to such guaranty as to any Clearing Member, the Corporation may withdraw the amount thereof out of the Guaranty Fund, and such Clearing Member will restore the amount so withdrawn on demand.

(l) In the event that the Guaranty Fund or any part thereof shall have been applied as described in paragraph (e) of this Section 5.4 or shall have been lost as described in paragraph (j) of this Section 5.4, and the Corporation shall thereafter recover any amount so applied or lost from any Person liable therefor, the amount of such recovery (after deducting any expenses (including without limitation legal fees and expenses incurred in connection therewith) shall be credited to the Guaranty Fund deposits of each Clearing Member in that proportion which the amount required to be on deposit by such Clearing Member bears to the amount required to be on deposit

by all Clearing Members as of the date upon which such application took place or such loss was incurred.

(m) Any expense (including without limitation legal fees and expenses) incurred by the Corporation in connection with the deposit by a Clearing Member of assets into the Guaranty Fund, or the return thereof to such Clearing Member, may at the option of the Corporation be charged to such Clearing Member.

**Amended by the Board April and May 1999; effective January 2000.**

**Amended by the Board February 7, 2000; effective March 15, 2000.**

**Amended by the Board April 8, 2002 and July 15, 2002; effective on September 30, 2002 [¶¶ (a), (b), (c), (e), (i) and (j)].**

**Amended by the Board September 12, 2006; effective on October 6, 2006 [¶ (c)].**

**Amended by the Board November 8, 2007; effective December 17, 2007 [¶¶ (b)(v)(B), (C), (D) and (c)].**

**Amended by the Board December 17, 2007; effective December 20, 2007 [¶ (c)].**

## Section 5.5. *Monetary Defaults; Use of Guaranty Fund; Assessments*

If any Clearing Member fails to deposit with, or pay to, the Corporation in full any original margin, variation margin, option premium or other sum (not including any dues, assessments or fines) under or in connection with any Contract, or fails to satisfy any reimbursement obligation to the Corporation in full under or in connection with any Cross Margining Program, when and as required by or pursuant to the rules of the Listing Exchange, the Rules of the Corporation or pursuant to the terms of any Cross Margining Program, such failure shall constitute a "Monetary Default." If and at such times as the Corporation has in effect a procedure whereby deposits or payments of sums with or to the Corporation are effected by having the Corporation instruct the Clearing Members' banks to wire transfer funds from their accounts with such banks directly to the accounts of the Clearing Corporation, a Clearing Member shall be deemed to have failed to deposit or pay any sum when and as required if such Clearing Member's bank fails so to wire transfer funds when and as instructed by the Corporation. In the event that at any time a Monetary Default occurs on the part of any Clearing Member (the "Defaulting Clearing Member"), then:

(a) Such Defaulting Clearing Member's original margin on deposit with the Corporation (in both customer and proprietary accounts), its Guaranty Fund deposits and any of its other assets under the control of the Corporation shall be applied by the Corporation to pay the amount owing (the "Defaulted Obligation") as hereinafter set forth. If and to the extent a Monetary Default relates to a Contract carried in any customer account of a Defaulting Clearing Member, such margin, Guaranty Fund deposit and other assets (whether held for a proprietary account or the same or any other customer account) shall be applied to pay the Defaulted Obligation. If and to the extent a Monetary Default relates to a Contract carried in any proprietary account of a Defaulting Clearing Member, such Guaranty Fund deposit, and that portion of such margin and such other assets as are held for the same or any other proprietary account, shall be applied to pay the Defaulted Obligation. The Defaulting Clearing Member shall immediately restore any deficiencies in its margin and Guaranty Fund deposits resulting from any such application.

(b) If the margin, Guaranty Fund deposit and other assets of a Defaulting Clearing Member under the control of the Corporation are in the aggregate less than the Defaulted Obligation, and if the Defaulting Clearing Member fails to pay the Corporation the amount of the deficiency on demand, such Defaulting Clearing Member shall continue to be liable therefor, but the amount of the deficiency, until collected from the Defaulting Clearing Member, shall be met from the

following sources of funds in the order listed (each such source to be fully utilized before the next following source is applied):

(i) such portion, if any, of the surplus of the Corporation as the Board determines to be available for such purpose;

(ii) If the President, with the concurrence of the Chairman or the Vice Chairman, so determines, a loan on such terms and conditions as they may determine to be necessary or appropriate (including without limitation granting an assignment, pledge or other lien on or security interest in the Guaranty Fund or the cash, securities and other property held in the Guaranty Fund as provided in Section 5.4(f) of these By-Laws);

(iii) subject to Section 5.4(g)(ii) and the last paragraph of Section 5(b) of these By-Laws, the Guaranty Fund;

(iv) insurance proceeds, if any, received by the Corporation in connection with the Monetary Default giving rise to the Defaulted Obligation; and

(v) assessments levied by the Corporation upon all the Clearing Members (other than the Defaulting Clearing Member) as hereafter provided in this Section 5.5.

The total amount to be assessed at any one time pursuant to clause (v) of this paragraph (b) is hereinafter called the "Assessment Amount."

The amount that each Clearing Member must deposit in the Guaranty Fund to satisfy its obligation, pursuant to Section 5.4(g)(ii), to restore the Guaranty Fund deficiency in the event of the application of some part or all of the Guaranty Fund pursuant to Section 5.5(b)(iii) (the total Guaranty Fund amount so applied referred to herein as the "Aggregate Guaranty Fund Deficiency"), shall be determined by multiplying the Aggregate Guaranty Fund Deficiency by a fraction, the numerator of which shall be the sum of the amount of the Clearing Member's Base Margin Amount and Base Volume Amount (determined in each case without reference to the maximum Guaranty Fund deposit amounts imposed by subsections (b)(i), (b)(iii) and (b)(v)(A) of Section 5.4) for the period of three (3) calendar months prior to the Monetary Default, and the denominator of which shall be the total of the Base Margin Amounts and the Base Volume Amounts for such period for all Clearing Members (in each case determined without reference to the maximum Guaranty Fund deposit amounts imposed by subsections (b)(i), (b)(iii) and (b)(v)(A) of Section 5.4). The resulting product shall constitute the amount that each Clearing Member must restore to the Guaranty Fund pursuant to Section 5.4(g) as a result of the application of the Guaranty Fund pursuant to Section 5.5(b)(iii). Notwithstanding the foregoing, Clearing Members entitled to clear only Contracts in cotton at the time of the Merger ("Cotton Only Clearing Members") shall not be required to make any payments to restore the Guaranty Fund if and to the extent that the Guaranty Fund is applied pursuant to Section 5.5(b)(iii) as a result of a Monetary Default involving a type of Contract that was not cleared by the Corporation at the time of the Merger. If the Monetary Default involves both (i) Contracts of the type that were cleared by the Corporation at the time of the Merger, and (ii) Contracts of the type that were not cleared by the Corporation at the time of the Merger, then the Corporation will calculate the amounts to be paid to restore the Guaranty Fund separately for the different types of Contracts, as necessary, to comply with the previous sentence.

(c) The amount of any assessment levied on any Clearing Member pursuant to Section 5.5 shall be computed by multiplying the Assessment Amount by a fraction, the numerator of which shall be the sum of the Clearing Member's Base Margin Amount and Base Volume Amount determined (in each case determined without reference to the maximum Guaranty Fund deposit amounts imposed by subsections (b)(i), (b)(iii) and (b)(v)A) of Section 5.4) for the period of three

(3) calendar months preceding the Monetary Default, and the denominator of which shall be the total of the Base Margin Amounts and the Base Volume Amounts for such period for all Clearing Members being assessed (in each case determined without reference to the maximum Guaranty Fund deposit amounts imposed by subsections (b)(i), (b)(iii) and (b)(v)A) of Section 5.4). The resulting product shall constitute the amount of the assessment to be levied on such Clearing Member pursuant to this paragraph (c). Notwithstanding the foregoing, no assessments shall be made against Cotton Only Clearing Members if and to the extent that the assessments relate to a Monetary Default involving a type of Contract that was not cleared by the Corporation at the time of the Merger. If the Monetary Default involves both (i) Contracts of the type that were cleared by the Corporation at the time of the Merger, and (ii) Contracts of the type that were not cleared by the Corporation at the time of the Merger, then the Corporation will calculate the amounts to be paid to restore the Guaranty Fund separately for the different types of Contracts, as necessary, to comply with the previous sentence.

(d) If the amount assessed against any Clearing Member as determined pursuant to paragraph (c) of this Section 5.5 would exceed the maximum set forth in paragraph (e) of this Section 5.5, or if the amount assessed against any Clearing Member shall exceed the amount paid by such Clearing Member, the excess shall be assessed against the other Clearing Members (other than the Defaulting Clearing Member and any Clearing Member that shall have been assessed the maximum permitted by paragraph (e)) in accordance with such subparagraph (c), as if the excess were the Assessment Amount. Assessments pursuant to this paragraph (d) shall be repeated until the entire Assessment Amount shall have been assessed.

(e) If a Person shall withdraw as a Clearing Member, and if on the Withdrawal Date no assessment shall have been imposed upon such Clearing Member within the period of ten Business Days preceding the Withdrawal Date, or if on the Withdrawal Date an assessment shall have been so imposed during such period and such assessment shall have been paid in full (subject to the Assessment Cap), then the total amount that may be assessed against such Clearing Member pursuant to this Section 5.5 on and after the first day of such period shall not exceed an amount (the "Assessment Cap") which is the lesser of:

(i) 25% of such Clearing Member's Capital; or

(ii) $10 million.

Amounts deposited by Clearing Members in the Guaranty Fund, including without limitation amounts deposited to restore a deficiency as provided in Section 5.4(g)(ii) do not constitute assessments imposed or paid and are not subject to the Assessment Cap.(f) If in any case, because of the limitations contained in paragraph (e) of this Section 5.5, the maximum permitted assessments are less than the Assessment Amount, the Board shall determine what if any further action to take, provided that under no circumstances may the Board levy assessments on any Clearing Member that would exceed the limitations contained in paragraph (e) of this Section 5.5.

(g) Notwithstanding any other provision of these By-Laws, a Person which withdraws as a Clearing Member shall be subject only to assessments imposed to meet:

(i) Monetary Defaults occurring prior to the date on which such Clearing Member's withdrawal becomes effective or such Person otherwise ceases to be a Clearing Member (the "Withdrawal Date"), subject to the limitations contained in paragraph (e) of this Section 5.5;

(ii) assessments levied under Section 5.4(j) of these By-Laws prior to the effective date of such Clearing Member's withdrawal; and

(iii) the first Monetary Default occurring after the Withdrawal Date, subject to the limitations contained in paragraph (e) of this Section 5.5.

(h) All assessments shall be due and payable within such time as the Corporation may prescribe. If any Person shall not pay any assessment when due, such Person shall continue to be liable therefor, but the Corporation may assess the Clearing Members (other than such Person, the Defaulting Clearing Member and any Clearing Member that shall have been assessed the maximum amount permitted by paragraph (e)) for the unpaid amount in accordance with paragraphs (c) and (d) of this Section 5.5.

(i) If, after making any assessments to meet any Defaulted Obligation owing by a Defaulting Clearing Member as referred to in paragraph (b), or to meet any assessment not paid as referred to in paragraph (h), the Corporation collects the amount of such Defaulted Obligation or such unpaid assessment in whole or in part from the Person or Persons liable therefor, the Corporation shall refund the amount so collected (net of any expenses, including without limitation any legal fees incurred in connection therewith) pro rata to the Clearing Members that had been assessed to meet such Defaulted Obligation or nonpayment and had paid the amount so assessed.

**Amended by the Board April and May 1999; effective January 2000.**

**Amended by the Board April 8, 2002 and July 15, 2002; effective on September 30, 2002 [¶¶ (c) and (d)].**

**Amended by the Board February 12, 2007; effective February 14, 2007 [¶¶ (b) and (c)].**

## Section 5.6. *Position Risk*

(a) For the purpose of this By-Law, the following terms shall have the meanings set forth below, unless the context otherwise requires:

(i) "Position Risk" of any Clearing Member shall mean the amount of original margin required from such Clearing Member, exclusive of Option liquidating value, as calculated by the Corporation.

(ii) "Permitted Position Risk" of any Clearing Member shall mean the maximum Position Risk which the Clearing Member is permitted to have pursuant to paragraph (b) of this By-Law.

(iii) "Supermargin Position Risk" of any Clearing Member shall mean the amount by which a Clearing Member's Position Risk exceeds its Permitted Position Risk.

(iv) "Permitted Supermargin Position Risk" of any Clearing Member shall mean the maximum Supermargin Position Risk which the clearing member is permitted to have pursuant to paragraph (c) of this By-Law.

The Position Risk, Permitted Position Risk, Supermargin Position Risk and Permitted Supermargin Position Risk of a Clearing Member shall be determined separately for all of its customer accounts in the aggregate and for all of its proprietary accounts in the aggregate.

(b) Permitted Position Risk

Subject to the provisions of paragraph (c) below, no clearing member may carry contracts with the Corporation that result in Position Risk in excess of (i) 150% of its Capital, in the case of all the Clearing Member's Customer accounts in the aggregate, (ii) 75% of its Capital in the case of all the Clearing Member's proprietary accounts in the aggregate and (iii) 200% of its Capital, in the case of all accounts combined, provided, however, that for purposes of this By-Law, no Clearing Member shall be deemed to have Capital greater that $100 million.

(c) Supermargin Deposits

A Clearing Member with deposits with the Corporation as margin (in addition to all other deposits for margins, fees or other charges that may be required, but not including option

liquidation value) in an amount equal to the Supermargin Position Risk of its customer accounts or its proprietary accounts plus an amount equal to 50% of such Supermargin Position Risk, may carry Contracts that result in Position Risk in excess of such Clearing Member's Permitted Position Risk for such accounts, provided, however, that no Clearing Member may carry Contracts that result in Position Risk in excess of (i) 200% of its Capital, in the case of the Clearing Member's Customer Accounts, (ii) 100% of its Capital, in the case of the Clearing Member's proprietary accounts, and (iii) 250% of its Capital, in the case of all accounts combined. In the event that a Clearing Member exceeds its Permitted Position Risk with respect to all accounts combined as well as all its proprietary accounts and/or its Customer Accounts, the amount of additional margin required to be deposited pursuant to this paragraph (c) shall be the greater of (A) the amount of additional margin required for all accounts combined and (B) the sum of the amount of additional margin required with respect to the proprietary accounts and the amount of additional margin required with respect to the Customer accounts.

(d) Notwithstanding paragraph (c) hereof, the Board may establish for any Clearing Member a Permitted Position Risk and Permitted Supermargin Position Risk which is lower than those established pursuant to paragraphs (b) and (c) hereof, based on the Board's evaluation of the financial and operational capacity of the Clearing Member, and such other factors as the Board, in its discretion, deems appropriate, including but not limited to, (A) the Capital, business needs and financial condition of the Clearing Member; (B) the number of memberships on other clearing organizations held by the Clearing Member; (C) the average number of contracts cleared by the Clearing Member through each clearing organization each day and each month during the preceding twelve months and the extent to which such contracts were cleared for either customer accounts, proprietary accounts, or both; (D) the length of time the Clearing Member has been a Clearing Member; and (E) the number of guarantees given by such Clearing Member of the obligations of any member of any futures or options exchange in the United States.

Any Clearing Member may elect to have its Permitted Position Risk computed on the basis of an amount of Capital designated by it which is less than its actual Capital by giving written notice of such designation to the Corporation.

(e) Any Clearing Member which exceeds the Permitted Position Risk specified in paragraph (b) hereof by more than the amount permitted by paragraph (c) hereof shall transfer and/or liquidate such number of Contracts as may be necessary to eliminate the excess within such time as the Corporation may prescribe and shall report to the Corporation when such transfers and/or liquidations have been completed. If a Clearing Member fails so to transfer and/or liquidate Contracts within the time prescribed by the Corporation, the Corporation may liquidate such Contracts as the Corporation deems necessary on behalf of such Clearing Member in accordance with Rule 803. The Corporation in its discretion may require any Clearing Member whose Position Risk exceeds its Permitted Position Risk by more than the amount permitted by paragraph (c) hereof to deposit with the Corporation, in such form and by such time as it shall specify, such additional original margin as the Corporation determines is necessary with respect to the excess until such excess has been eliminated. Any instance of a Clearing Member exceeding Permitted Position Risk Limit by more than the amount permitted by paragraph (c) hereof is a violation of the Rules which subjects a Clearing Member to possible disciplinary action under the Rules.

(f) For purposes of this Section 5.6:

(i) The term "Contracts" shall include options.

(ii) A Clearing Member which collects margin with respect to an account that otherwise would be classified as a proprietary account of such Clearing Member, may treat such account as a Customer account.

(g) The Board or the President may at any time reduce the Permitted Position Risk of any Clearing Member if in the judgment of the Board or the President such reduction is necessary for the protection of the Corporation. After receiving notice of any such reduction, a Clearing Member shall transfer and/or liquidate such number of Contracts as may be necessary to reduce its Position Risk to the level of its Permitted Position Risk, within such time as the Board or the President may prescribe. Any such action by the President will be subject to revocation or modification by the Board, and the Board will review any such action taken by the President not later than its next regularly scheduled meeting.

(h) Notwithstanding the Capital limitations in Section 5.6(b) of these By-Laws, the Board or the President may at any time increase the Permitted Position Risk determined pursuant to such Section 5.6(b) of any Clearing Member with Capital greater than $100 million if in the judgment of the Board or the President such increase is justified by the financial condition of the Clearing Member as reported in its financial statements on file with the Corporation and such other considerations as they may deem appropriate. Any such action by the President will be subject to revocation or modification by the Board, and the Board will review any action taken by the President not later than its next regularly scheduled meeting.

(i) Where any two or more Clearing Members are Affiliated Persons, the Board may impose limits on the Position Risk that such Clearing Members may in the aggregate carry with the Corporation.

**Amended and Effective November 1, 2000.**

**Amended by the Board November 8, 2004; effective December 3, 2004 [¶¶ (h) and (i)].**

**Amended by the Board April 11, 2005; effective April 22, 2005 [¶¶ (a)(ii) and (d)].**

## Section 5.7. *Original Margin*

(a) Each Clearing Member shall deposit with the Corporation original margin in respect of all Contracts carried by the Corporation for such Clearing Member (customer and proprietary) in such amounts, in such forms, and by such times as the Corporation may require from time to time.

(b) Margin shall be collected by the Corporation in accordance with the methods and procedures specified in or pursuant to the Rules.

(c) The Corporation may establish Cross Margining Programs with one or more Cross Margining Clearing Organizations permitting Clearing Members to subject eligible positions to cross-margining treatment. Each such Cross Margin Program shall be conducted in accordance with a cross margin agreement between the Corporation and one or more Cross Margining Clearing Organizations.

**Amended by the Board April and May 1999; effective January 2000.**

# ARTICLE VI

## Indemnification; Liability

## Section 6.1. *Indemnification by Corporation*

(a) Except to the extent specifically prohibited by the BCL, the Corporation shall promptly indemnify each person who is or at any time was a director or officer of the Corporation, whether

or not then in office, who is made or is threatened to be made a party to any action or proceeding, threatened or pending, and whether civil, criminal or administrative and whether or not brought by or in the right of the Corporation, or who is the subject of an investigation by any governmental agency, Self-Regulatory Organization (other than the Corporation), securities exchange, securities clearing organization, registered securities association or other self-regulatory body, by reason of the fact that such person is or was a director or officer of the Corporation, or serves or served any other corporation, or Entity in any capacity at the request of the Corporation, against judgments, fines, amounts paid in settlement and expenses (including reasonable attorneys' fees), actually and necessarily incurred in connection with such action or proceeding, or any appeal therein, or any such investigation.

(b) The Corporation shall advance or promptly reimburse upon request of a person referred to in subsection (a) of this Section 6.1 all expenses, including reasonable attorneys' fees, actually and necessarily incurred by such person in connection with any action, proceeding or investigation of the kind referred to in said paragraph (a) in advance of the final disposition thereof, subject to receipt of a written undertaking by or on behalf of such person to repay such amounts if such person is ultimately found not to be entitled to indemnification under this Article or otherwise or, where indemnification is granted, to the extent the expenses so advanced or reimbursed exceed the amount to which such person is entitled, provided that such person shall cooperate in good faith with any request of the Corporation that common counsel be used by parties to any action, proceeding or investigation who are similarly situated unless to do so would be inappropriate because of actual or potential differing interests between such parties.

(c) A person for whom indemnification or the advancement or reimbursement of expenses is provided for under this Section 6.1 may elect to have the provisions of this ARTICLE VI interpreted on the basis of the applicable statute in effect (i) at the time of the occurrence of the event or events giving rise to the action, proceeding or investigation, to the extent permitted by statute, or (ii) at the time indemnification or advancement or reimbursement of expenses is provided or sought.

(d) The indemnification provided by this Section shall not be deemed exclusive of any other rights to which those seeking indemnification may be entitled as a matter of law.

(e) Indemnification under the provisions of this Section shall not be available to a director or officer in the event that a judgment or other final adjudication adverse to the director or officer establishes that his or her acts were committed in bad faith or were the result of active and deliberate dishonesty and were material to the matter so adjudicated, or that he or she personally gained in fact a financial profit or other advantage to which he or she was not legally entitled.

(f) Indemnification shall be accorded by the Corporation and related expenses shall be advanced to members of any committee authorized by the By-Laws or Rules of the Corporation or established by the Board, and to employees of the Corporation, to the same extent as is provided to directors and officers of the Corporation. The foregoing right of indemnification shall not affect any rights to indemnification to which the persons described in this subsection (f) may be entitled by contract or otherwise under law.

## Section 6.2. *Indemnification by Resolution or Agreement*

The Corporation, by a resolution of the Board or an agreement approved by the Board, may, to the fullest extent permitted by applicable statute, indemnify and advance or reimburse expenses to any person, including a person entitled to indemnification pursuant to Section 6.1, but nothing herein shall limit or affect the rights of any such person under that Section.

## Section 6.3. *Enforcement*

(a) The right to be indemnified or to the advancement or reimbursement of expenses pursuant to Section 6.1 or a resolution or agreement authorized pursuant to Section 6.2(i) is a contract right pursuant to which the person entitled thereto may bring suit as if the provisions hereof or of any such resolution were set forth in a separate written contract between the Corporation and such person, and (ii) shall continue to exist after any rescission or restrictive modification hereof or of any such resolution or agreement with respect to events occurring prior thereto.

(b) If a request to be indemnified or for the advancement or reimbursement of expenses pursuant to Section 6.1 or a resolution or agreement authorized by Section 6.2 is not paid in full by the Corporation within thirty days after a written claim has been received by an officer of the Corporation therefore and the claimant thereafter brings suit against the Corporation to recover the unpaid amount of the claim which is successful in whole or in part, the Corporation shall be obligated to pay the claimant the expenses, including reasonable attorneys' fees, of actually prosecuting such claim.

**Section 6.4. _Indemnification By Clearing Members_**

(a) If any action or proceeding is brought or threatened against the Corporation or any person entitled to be indemnified by the Corporation pursuant to Section 6.1 or Section 6.2 (such persons being collectively referred to as "Officials"), claiming, directly or indirectly, in whole or in part, that the Corporation or such Official has failed, neglected or omitted to prevent, detect or require any conduct by a Clearing Member or by an Affiliated Person of a Clearing Member, which conduct or lack thereof is alleged to constitute a violation of the Commodity Exchange Act, any other federal or state law, any Commission Regulation, any rule of any Self-Regulatory Organization, or any By-Law or Rule, such Clearing Member shall indemnify and hold harmless the Corporation and each such Official from and against all loss, liability, damage and expense (including but not limited to attorneys' fees, expenses of investigating such claim, judgments and amounts paid in settlement) incurred by or asserted against the Corporation or any such Official in or in connection with any such legal proceeding.

(b) If any action or proceeding is brought against the Corporation or an Official which could result in indemnification by a Clearing Member pursuant to subsection (a) of this Section 6.4:

(i) Such party shall promptly give such Clearing Member notice thereof in writing.

(ii) Neither the Corporation nor any such Official may settle a claim to the extent it seeks the recovery of money damages without the prior consent of such Clearing Member; provided that if such Clearing Member does not consent to any proposed settlement within ten (10) days following the date it receives written notice of the terms of such settlement, the Corporation or such Official may require such Clearing Member to post such security for the payment of its indemnification obligations to the Corporation or such Official as the Corporation or such Official deems necessary, but not in excess of the money damages claimed plus interest and anticipated expenses.

**Section 6.5. _Exculpation and Reimbursement of Corporation_**

(a) NEITHER THE CORPORATION, NYBOT NOR ANY EXCHANGE, NOR ANY DIRECTOR, COMMITTEE MEMBER, OFFICER, AGENT OR EMPLOYEE OF THE CORPORATION, NYBOT OR ANY EXCHANGE, SHALL BE LIABLE TO ANY CLEARING MEMBER FOR ANY DAMAGES ARISING OUT OF OR IN CONNECTION WITH ANY ERROR, ACT OR OMISSION ON THE PART OF THE CORPORATION, OR ON THE PART OF ANY PERSON IN THE CAPACITY OF MEMBER OR IN THE CAPACITY OF DIRECTOR, COMMITTEE MEMBER, OFFICER, AGENT OR EMPLOYEE OF A MEMBER OR OF THE CORPORATION, WHETHER OR NOT SUCH DAMAGES ARE DUE TO

NEGLIGENCE, UNLESS SUCH ERROR, ACT OR OMISSION WAS THE RESULT OF WILLFUL OR WANTON CONDUCT OR WAS IN BAD FAITH.

(b) EXCEPT IN INSTANCES WHERE THERE HAS BEEN A FINDING OF WILLFUL MISCONDUCT OR BAD FAITH, IN WHICH CASE THE PARTY FOUND TO HAVE ENGAGED IN SUCH CONDUCT CANNOT AVAIL ITSELF OF THE PROTECTIONS IN THIS PARAGRAPH (b), NEITHER THE CORPORATION, NYBOT NOR ANY EXCHANGE, NOR ANY DIRECTOR, COMMITTEE MEMBER, OFFICER, AGENT OR EMPLOYEE OF THE CORPORATION, NYBOT OR ANY EXCHANGE, SHALL BE LIABLE TO ANY PERSON, INCLUDING BUT NOT LIMITED TO A CUSTOMER, FOR ANY LOSSES, DAMAGES, COSTS OR EXPENSES (INCLUDING, BUT NOT LIMITED TO, LOSS OF PROFITS, LOSS OF USE, DIRECT, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES), ARISING FROM (i) ANY FAILURE OR MALFUNCTION OF ANY ELECTRONIC SYSTEM UTILIZED BY THE CORPORATION OR ANY OR THE CORPORATION'S SERVICES OR FACILITIES USED TO SUPPORT ANY SUCH SYSTEM, (ii) ANY FAULT IN DELIVERY, DELAY, OMISSION, SUSPENSION, INACCURACY OR TERMINATION, OR ANY OTHER CAUSE, IN CONNECTION WITH THE FURNISHING, PERFORMANCE, MAINTENANCE, USE OF OR INABILITY TO USE ALL OR ANY PART OF ANY ELECTRONIC SYSTEM UTILIZED BY THE CORPORATION OR ANY OF THE CORPORATION'S SERVICES OR FACILITIES USED TO SUPPORT ANY SUCH SYSTEM, OR (iii) THE USE OF THE CONTINUOUS LINKED SETTLEMENT SYSTEM ("CLS") IN THE DELIVERY OF CURRENCIES.

(c) THERE ARE NO EXPRESS OR IMPLIED WARRANTIES OR REPRESENTATIONS PROVIDED BY THE CORPORATION, NYBOT OR ANY EXCHANGE TO ANY PERSON RELATING TO ANY ELECTRONIC SYSTEM, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY AND WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE OR USE.

(d) ANY ACTIONS, SUITS OR PROCEEDINGS AGAINST THE CORPORATION, NYBOT, OR ANY EXCHANGE, OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS OR EMPLOYEES MUST BE BROUGHT WITHIN TWO (2) YEARS FROM THE TIME THAT A CAUSE OF ACTION, SUIT OR PROCEEDING HAS ACCRUED. ANY PARTY BRINGING ANY SUCH ACTION, SUIT OR PROCEEDING CONSENTS TO JURISDICTION IN THE U.S. DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND THE SUPREME COURT OF NEW YORK COUNTY, NEW YORK, AND WAIVES ANY OBJECTION TO VENUE THEREIN. THIS PROVISION SHALL IN NO WAY CREATE A CAUSE OF ACTION AND SHALL NOT AUTHORIZE AN ACTION THAT WOULD OTHERWISE BE PROHIBITED BY THIS PROVISION OR THE RULES OF THE CORPORATION, NYBOT OR ANY EXCHANGE.

(e) IN ANY ACTION, SUIT OR PROCEEDING AGAINST THE CORPORATION, NYBOT OR ANY EXCHANGE, OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES OR AGENTS, EACH PARTY WAIVES ANY RIGHT IT MIGHT HAVE TO A TRIAL BY JURY.

(f) Any Clearing Member which institutes an action or proceeding against the Corporation, or any of the officers, directors, committee members, agents or employees of the Corporation, and which fails to prevail in such action or proceeding, shall reimburse the Corporation and such officer, director, committee member, agent or employee, for any and all costs or expenses (including but not limited to attorneys' fees, expenses of investigation and amounts paid by way of indemnifying any officers, directors, employees or other persons by the Corporation) incurred in connection with the defense of such action or proceeding.

Amended by the Board April 11, 2005; effective April 22, 2005 [¶ (a)].

Amended by the Board July 10, 2006; effective July 17, 2006 [¶¶ (b)-(e)].

Amended by the Board December 11, 2006; effective January 12, 2007 [¶ (b)].

## Section 6.6. *General*

(a) The indemnification and advancement or reimbursement of expenses granted pursuant to the provisions of Sections 6.1 and 6.2 shall be in addition to and shall not be exclusive of any other rights to indemnification and advancement or reimbursement of expenses to which any person may otherwise be entitled by statute, the Certificate of Incorporation, insurance policy, contract or otherwise.

(b) For purposes of this ARTICLE VI, the terms: (i) "the Corporation" shall include any legal successor to the Corporation, including any corporation or other entity which acquires all or substantially all of the assets of the Corporation in one or more transactions; and (ii) "person" shall include the personal representative of an individual described in this ARTICLE VI who is deceased or under a disability.

# ARTICLE VII

## Emergency Powers

## Section 7.1. *Exchange-Determined Emergency*

If any Exchange determines that there is an Emergency, the Corporation shall take such action as may be ordered by, or as may be necessary or appropriate to implement emergency action ordered by, that Exchange with respect to (a) Contracts traded on or subject to the rules of that Exchange and cleared by the Corporation, and (b) Clearing Members of that Exchange.

## Section 7.2. *Corporation-Determined Emergency*

If the Board, by a three-fourths vote of the members of the Board present and voting at any meeting, determines that there is an Emergency, it may place into immediate effect a rule which may provide for, or may authorize the Corporation to undertake, actions necessary or appropriate to meet the Emergency.

## Section 7.3. *Inconsistent Determinations*

In the event of an inconsistency between a determination made by an Exchange as referred to in Section 7.1 and a determination made by the Corporation pursuant to Section 7.2, the determination so made by the Exchange shall govern.

## Section 7.4. *Physical Emergency*

If, in the judgment of the persons specified below, the physical functioning of the Corporation is, or is threatened to be, severely and adversely affected by a Physical Emergency, such persons are authorized to take such action as they deem necessary or appropriate to deal with such Physical Emergency. The persons authorized to take action pursuant to this Section 7.4 are any one of the following, in the order of their availability to take such action: (a) the Chairman; (b) any Vice Chairman; (c) the President; (d) any Vice President; and (e) any other officer of the Corporation.

## Section 7.5. *Definitions*

For purposes of this ARTICLE VII of the By-Laws, the following terms shall have the following meanings:

(a) The term "Emergency" means any occurrence or circumstance which an Exchange determines constitutes an emergency or physical emergency in accordance with the by-laws or rules of that Exchange, or which the Board, pursuant to Section 7.2, determines requires immediate action and threatens or may threaten such things as the orderly matching, clearing or liquidation of, or delivery or exercise pursuant to, any Contract, including such matters as:

(i) Any Physical Emergency.

(ii) The bankruptcy or insolvency of any Clearing Member, or the initiation of any proceedings for the liquidation of any Clearing Member, or the imposition of any injunction or other restraint by any government agency, court or arbitrator upon a Clearing Member which may affect the ability of that Clearing Member to perform its obligations under the By-Laws or the Rules.

(iii) Any circumstance in which it appears that a Clearing Member or any other person has failed to perform Contracts, is insolvent, or is in such financial or operational condition or is conducting business in such a manner that such person cannot be permitted to continue in business without jeopardizing the safety of customers' funds, of other Clearing Members, or of the Corporation.

(iv) Any circumstance or event which suddenly curtails the operations of one or more banks involved in the margining of Contracts; and

(v) Any other unusual, unforeseeable and adverse circumstance with respect to which it is impracticable for the Corporation to submit, in a timely fashion, a reviewable rule to the Commission for prior approval.

(b) The term "Physical Emergency" means any circumstance which may have a severe, adverse effect upon the physical functions of the Corporation including, but not limited to, fire or other casualty, bomb threats, substantial inclement weather, power failures, communication breakdowns, transportation breakdowns and computer malfunctions.

# ARTICLE VIII

## Miscellaneous

### Section 8.1. *Fiscal Year*

The fiscal year of the Corporation shall be fixed by resolution of the Board.

### Section 8.2. *Seal*

The seal of the Corporation shall be circular in form and have inscribed thereon the name of the Corporation, the year of its organization, and the words "Corporate Seal" and "New York". If and when so directed by the Board or the President, a duplicate of the seal may be kept and used by the Corporation. The seal may be used by causing it or a facsimile thereof to be affixed or impressed or reproduced in any other manner.

### Section 8.3. *Obligations*

All contracts, checks, notes and other evidences of indebtedness of the Corporation, and all other instruments and documents delivered on behalf of the Corporation, shall be signed by such officers of the Corporation or by such other person or persons as may be authorized by the Board.

**Section 8.4.** *Amendment and Repeal*

These By-Laws may be amended or repealed, and any other By-Laws may be adopted, amended or repealed, by a majority of the votes of the shares at the time entitled to vote in the election of any directors. These By-Laws may also be amended or repealed, and any other By-Laws may be adopted, amended or repealed, by the Board by a vote of not less than two-thirds of all the members of the Board, but any By-Law adopted by the Board may be amended or repealed by the shareholders entitled to vote thereon.

ICE Clear US, Inc.

Clearing Membership Application Instructions

Enclosed is an application form and related documents which must be completed by firms seeking to become Clearing Members of the ICE Clear US, Inc. for purposes of obtaining clearing privileges on ICE Futures U.S. The ICE Futures U.S. membership application must be completed in order to clear the contracts that are traded on the exchange. All Clearing Members must meet ICE Clear US, INC.'s operational criteria and requirements with respect to the contracts sought to be cleared.

In order to clear futures and options contracts traded on ICE Futures U.S., applicants for Clearing Membership must be approved by ICE Clear US, INC. and must also be approved by ICE Futures U.S. Applicants seeking clearing privileges must first be approved as a member or become recognized as a member firm of ICE Futures U.S.

The following is a list of documents that must be furnished by applicants for Clearing Membership. *An original plus one copy of all documents and agreements should be sent to the attention of:*

President
ICE Clear US, Inc.
One North End Avenue 13th Floor
New York, NY 10282
(212) 748-4123

A.    <u>Forms to be Completed:</u>

1.    ICE Clear US, INC. Application for Membership.

2.    ICE Clear US, INC. Clearing Member Agreement.

3.    ICE Clear US, INC. Margin Hook-Up Agreement.

ICE CLEAR US, INC.
CLEARING MEMBER AGREEMENT

In consideration of becoming a Clearing Member of ICE Clear US, Inc. (the Clearing Corporation") and of being permitted to clear with the Clearing Corporation contracts or other instruments that are traded on or subject to the rules of any exchange or market and that are cleared by the Clearing Corporation (each such exchange or market, an "Exchange"), and for other good and valuable consideration, the undersigned hereby agrees with the Clearing Corporation and each such Exchange as follows:

1.    The term "Rules" of the Clearing Corporation or of any Exchange shall include the Certificate of Incorporation, By-Laws and Rules of the Clearing Corporation and/or such Exchange, and all interpretations, resolutions, policies, procedures and orders promulgated by the Clearing Corporation or such Exchange, as the same may now or hereafter be in effect. The term "Collateral" shall mean the funds, property (including without limitation any substitutions for and proceeds of such property) and amounts subject to the pledges and security interests granted pursuant to Sections 6, 7 and 9 of this Agreement. Unless the context clearly requires otherwise, all capitalized terms used herein which are defined in the Rules of the Clearing Corporation or an Exchange and not otherwise defined herein, shall have the same meanings as set forth in such Rules.

2.    The undersigned will observe, comply with and be bound by the Rules of, and submit to the jurisdiction of, the Clearing Corporation and of each Exchange. Without limiting the generality of the foregoing, the undersigned specifically acknowledges and agrees as follows:

(a) The Rules of the Clearing Corporation and any Exchange may be changed at any time by the Board of Directors of the Clearing Corporation or such Exchange without the consent of, or any other action by, the undersigned or any other Clearing Members of the Clearing Corporation, except as may be otherwise expressly provided in such Rules.

(b) The undersigned will comply with the financial requirements applicable to Clearing Members of the Clearing Corporation as prescribed from time to time by the Clearing Corporation and/or by any Exchange.

(c) The undersigned will maintain on deposit in the Guaranty Fund of the Clearing Corporation such amount as may be prescribed from time to time by the Clearing Corporation. All or any portion of such amount may be withdrawn and applied by the Clearing Corporation at such time and for such purposes as provided for in or pursuant to the Rules of the Clearing Corporation, including without limitation, to cover losses attributable to acts or omissions of Clearing Members other than the undersigned.

(d) The undersigned will pay when and as due any assessments that may be made against the undersigned pursuant to the Rules of the Clearing Corporation, including, without limitation, to cover losses attributable to acts or omissions of Clearing Members other than the undersigned.

(e) The undersigned will timely comply with the Rules of the Clearing Corporation and of the Exchanges governing the deposit and payment of initial or original margin, variation margin, option premiums and the purchase price of any commodity and any other amounts coming due pursuant to or in accordance with such Rules, and the Clearing Corporation may sell or otherwise dispose of any money or other property deposited as initial or original margin by the undersigned without notice to or further consent of the undersigned as provided in or pursuant to such Rules. Without limiting the generality of the foregoing, if the Clearing Corporation, in its sole discretion, deems it advisable to borrow funds pending the consummation of the sale of any such property as aforesaid, the Clearing Corporation may pledge or otherwise grant a security interest in any such property to secure the repayment of such borrowing, and such borrowing, together with any interest, charges or expenses incurred in connection therewith, may at the election of the Clearing Corporation be paid out of the proceeds of sale of such property to the extent such proceeds are sufficient, with the undersigned remaining liable for the deficiency.

(f) The undersigned will timely comply with any limits that may be established from time to time by the Clearing Corporation and/or any Exchange on the

size of the positions the undersigned may carry with the Clearing Corporation.

(g) The undersigned will comply promptly with any request for information that may be made by authorized representatives of the Clearing Corporation pursuant to the Rules of the Clearing Corporation, and will permit authorized representatives of the Clearing Corporation, at any time upon demand, to inspect, take temporary possession of and make copies of the undersigned's books and records relating to transactions of the undersigned cleared or submitted for clearance by the Clearing Corporation.

(h) The undersigned may be fined, suspended, expelled or otherwise penalized by the Clearing Corporation in accordance with the Rules of the Clearing Corporation or any Exchange if the undersigned violates any provision of the Rules of the Clearing Corporation.

(i) The undersigned will be bound by, and will timely perform all obligations arising under or in connection with, all Contracts which (A) were heretofore submitted by or pursuant to the Rules of any Exchange or of the Clearing Corporation for clearance by the undersigned and have not been fully performed or closed out in accordance with the Rules of such Exchange and the Clearing Corporation, or (B) are hereafter submitted by or pursuant to the Rules of any Exchange or the Clearing Corporation for clearance by the undersigned until they are fully performed or closed out in accordance with the Rules of such Exchange and the Clearing Corporation.

3.    The undersigned hereby authorizes the Clearing Corporation to give instructions to _____ (the    "Bank")    to    debit the accounts of the undersigned set forth in Schedule A annexed hereto (collectively, the "Accounts") in such amounts as the Clearing Corporation may specify for the deposit with, or payment to, the Clearing Corporation of initial or original margin, variation margin, option premiums or the purchase price of any commodity, or any other amounts coming due pursuant to or in accordance with the Rules of the Clearing Corporation, and to transfer such amounts so debited to such account or accounts of the Clearing Corporation as the Clearing Corporation may specify, without inquiry or regard as to the purpose or use of such amounts or as to the authority of the person or persons acting on behalf of the Clearing Corporation in giving such instructions.

4.  The undersigned will have on deposit in the Accounts sufficient funds and property to deposit with or pay to the Clearing Corporation in full any initial or original margin, variation margin, option premiums or the purchase price of any commodity, and any other amounts coming due when and as required pursuant to or in accordance with the Rules of the Clearing Corporation.

5.  The undersigned will execute and deliver such instruments and documents, and take such further action, as the Bank may reasonably request in order to confirm or better effectuate the authority granted to the Clearing Corporation pursuant to Section 3.

6.  The undersigned hereby pledges and grants to the Clearing Corporation a security interest in all property deposited in the Guaranty Fund by the undersigned from time to time, all property deposited in the house or proprietary original margin account of the undersigned with the Clearing Corporation, and all substitutions for, and proceeds of, any such property, as security for the prompt and unconditional payment of each and every obligation and liability of the undersigned to the Clearing Corporation under the Rules of the Clearing Corporation.

7.  The undersigned hereby pledges, and grants to the Clearing Corporation a security interest in, and right of setoff as to, any amounts owing to the undersigned from the Guaranty Fund and the margin accounts of the undersigned with the Clearing Corporation from time to time, as security for the prompt and unconditional payment of each and every obligation and liability of the undersigned to the Clearing Corporation under the Rules of the Clearing Corporation.

8.  The Clearing Corporation may, at any time or from time to time, in its sole discretion and without notice to the undersigned, appropriate and apply any of the Collateral described in Section 6 or Section 7 toward the payment of any amounts owing by the undersigned to the Clearing Corporation and may take such other actions with respect thereto as may be authorized or permitted to a secured party under the New York Uniform Commercial Code, as in effect from time to time.

9.  The undersigned hereby pledges, and grants to the Clearing Corporation a security interest in, all funds and property on deposit in the customer account of the undersigned with the Clearing

Corporation from time to time, and all substitutions for and proceeds of such property, as security for the prompt and unconditional payment of each and every obligation and liability of the undersigned to the Clearing Corporation under the Rules of the Clearing Corporation with respect to and in connection with Contracts and positions cleared or carried by the Clearing Corporation for the customer account of the undersigned with the Clearing Corporation. The Clearing Corporation may at any time or from time to time in its sole discretion and without notice to the undersigned or any other Person appropriate and pay any of said funds and property, including said substitutions and proceeds, toward the payment of any such obligation or liability and may take such other actions with respect thereto as may be authorized or permitted to a secured party under the New York Commercial Code, as in effect from time to time.

10.     The undersigned represents, warrants and agrees that:

(a) Each security interest granted herein creates a valid and continuing first lien on, and security interest in, the Collateral in favor of the Clearing Corporation, subject to no prior liens, security interests or encumbrances of any kind whatsoever or rights of others, which lien and security interest is effective as against creditors of, or purchasers from, the undersigned, subject to any requirement for perfection thereof under any applicable law.

(b) The undersigned is, or will be (insofar as the security interest granted herein covers Collateral to be acquired after the date hereof), the owner of the Collateral described in Section 6 of this Agreement, and authorized to pledge and grant a security interest in the Collateral described in Section 9 of this Agreement, free from any and all pledges, liens, security interests, encumbrances, claims or rights of others, and the undersigned will promptly notify the Clearing Corporation of any pledge, lien, security interest, encumbrance, claim or right of others made against the Collateral and will defend the Collateral against any such pledge, lien, security interest, encumbrance, claim or right of others which is adverse to the lien and security interest granted to the Clearing Corporation hereunder.

(c) No financing statement, assignment, notice of assignment or other similar document covering all or any part of the Collateral is on file in any public office or has been delivered to any obligee or obligor of the undersigned or any other person,

except any financing statement, assignment, notice of assignment or other similar document filed or delivered by the undersigned in favor of the Clearing Corporation pursuant to this Agreement or the Rules of the Clearing Corporation.

(d) The undersigned authorizes the Clearing Corporation, at the undersigned's expense, to file one or more financing statements to perfect the security interests granted herein, without the Clearing Member's signature thereon, and the undersigned agrees to take such actions and to execute and deliver such documents as the Clearing Corporation may request in order to perfect and enforce its rights under this Agreement or the Rules of the Clearing Corporation.

(e) Neither the execution and delivery of this Agreement nor any act to be performed pursuant to this Agreement or the Rules of the Clearing Corporation or any Exchange, by or on behalf of the undersigned or the Clearing Corporation, will violate or conflict with any provision of the certificate of incorporation, by-laws, partnership agreement, limited liability company agreement or any other organizational document, as the case may be, of the undersigned, or of any agreement which is binding upon the undersigned, or of any law applicable to the undersigned.

(f) The undersigned has full power and all necessary authority to execute and deliver this Agreement and to perform any act that may be required pursuant to this Agreement or the Rules of the Clearing Corporation or of each Exchange.

(g) All information furnished to the Clearing Corporation in connection with its application for membership in the Clearing Corporation is true, complete and accurate.

(h) The undersigned is duly organized and validly existing under the laws of the jurisdiction of its organization and, if relevant under such laws, is in good standing.

11. The undersigned shall indemnify and hold harmless the Clearing Corporation and the Bank from and against any liability, cost or expense incurred by either of them in connection with any act or omission made in compliance with this Agreement.

12.  The authorization granted to the Clearing Corporation and the Bank pursuant to Section 3 of this Agreement shall remain in full force and effect unless and until expressly revoked or modified by written notice received and accepted by the Clearing Corporation and the Bank at least five business days prior to the day any proposed revocation or modification is to become effective. In the event such authorization should be revoked or terminated by operation of law without notification to the Clearing Corporation and the Bank, the obligation of the undersigned to indemnify and hold harmless the Clearing Corporation and the Bank pursuant to Section 11 of this Agreement shall nevertheless continue in full force and effect with respect to any act or omission made in compliance with this Agreement until such written notice has been so received.

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be executed on the_____day of                    _____.

FOR CORPORATIONS:

_____

Name of Corporation

(Corporate Seal)                By: _____

                                          President

ATTEST:

_____

Secretary

FOR PARTNERSHIPS:

_____

Name of Partnership

By:

General Partners

FOR LIMITED LIABILITY COMPANIES:

_____

Name of Limited Liability Company

By:

Marketing/Manager

Schedule A

[Account Name(s) and Number(s)]



RESOURCE CENTER  |  CONTACT  |  SEARCH    Select Topic          OR  Enter Key

**ICE** TRADE THE WORLD™

ABOUT ICE          MARKETS          SERVICES          TECHNOLOGY

LOGIN TO     Select one ...

USERNAME

PASSWORD

→ Change Passwo

**ICE CLEAR**

▸ ICE CLEAR EUROPE

▾ ICE CLEAR U.S.

  ▪ MEMBERSHIP

    MEMBER NOTICES

    MEMBER INFO

  RULEBOOK

  DELIVERY/EXPIRATION

  MARGIN/FEES

  PTMS

  CROSS MARGINING

▸ ICE CLEAR CANADA

# Clearing Members

ADM Investor Services, Inc.
Advantage Futures LLC
Alaron Trading Corporation
Banc of America Securities, Inc.
Bear Sterns Securities Corporation
BNP Paribas Commodity Futures, Inc.
Citigroup Global Markets, Inc.
Credit Suisse Securities (USA) LLC
Deutsche Bank Securities, Inc.
Dorman Trading, LLC
Dunavant Commodity Corporation
F.C. Stone, LLC
Fortis Clearing Americas LLC
Goldman Sachs & Company
Greenwich Capital Markets, Inc.
J.P. Morgan Futures, Inc.
Lehman Brothers, Incorporated
MF Global Inc.
MBF Clearing Corporation
Merrill Lynch, Pierce, Fenner & Smith, Inc.
Morgan Stanley & Company
Newedge Financial, Inc.
Newedge USA, LLC
Prudential Bache Commodities, LLC
Rand Financial Services, Inc.
RBC Capital Markets Corporation
R.J. O'Brien & Associates, LLC
Rosenthal Collins Group, LLC
Sterling Commodities Corporation
SMW Trading Company, Inc.
Term Commodities, Incorporated
Triland USA Inc.
UBS Securities, LLC
Wachovia Securities, LLC

GET STARTED

## Trade the World

LEARN MORE ABOUT TR/

LEARN MORE

▶ Member Application

▶ Assumption on Obligat

▶ eCops Application and
   Agreement

FIND PRODUCTS

Choose a contract type ...

Choose a commodity type .

Choose a product type ...

FAQs  |  SITE MAP  |  GLOSSARY  |  LEGAL  |  INVESTOR RELATIONS  |  RSS

© 2008 IntercontinentalExchange, Inc. All Rights Reserved.